## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

| | |
|---|---|
| **MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,** | |
| **Plaintiff,** | **CASE NO:** |
| | _____ |
| **v.** | **JURY TRIAL DEMANDED** |
| **BREEZE SMOKE LLC,** | |
| **Defendant.** | |

## COMPLAINT

Plaintiff Midwest Goods Inc., dba Midwest Distribution Illinois ("Midwest Goods"), by its attorneys, for its Complaint seeking declaratory relief, injunctive relief, damages, costs, attorneys' fees and any and all other available relief against Breeze Smoke LLC ("Defendant"), alleges as follows:

## PARTIES

1.    Midwest Goods is a corporation organized and existing under the laws of Illinois, with its principal place of business at 1001 Foster Avenue, Bensenville, Illinois 60106.  As is relevant to this Complaint, Midwest Goods distributes vaping products that prominently bear the brand "NORTH".

2.    On information and belief, Defendant Breeze Smoke is a limited liability company organized and existing under the laws of the State of Michigan, with its principal

1

place of business at 4654 Lilly Ct., West Bloomfield, Michigan 48323.[1]  As is relevant to this Complaint, Defendant distributes vaping products under its own brands, and it has trademark registrations that include "BREEZE" with other words, such as "BREEZE PRO" and "BREEZE SMOKE". On information and belief, Defendant's members (owners) are citizens of Michigan and/or other states but are **_not_** citizens of Illinois for purposes of 28 U.S.C. § 1332.

3.       On information and belief, Defendant sells goods to customers in Illinois, including, at least until recently, to Midwest Goods.

## **NATURE OF THE SUIT**

4.       This is a civil action arising, in part, out of Defendant's threatening and unjustified communications to Midwest Goods, and to Midwest Goods' customers, in violation of the federal and/or Illinois law.  Defendant has willfully and falsely accused Midwest Goods of selling "copycat" products and infringing Defendant's federal trademark and other rights, even though there is no basis for such an allegation and Defendant has conceded as such.

5.       Federal laws under which Midwest Goods seeks relief include the Lanham Act, 15 U.S.C. § 1051 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

6.       Illinois state laws under which Midwest Goods seeks relief include tortious interference, the Illinois Uniform Deceptive Trade Practices Act, and/or Illinois common law of disparagement.

---

[1]       Alternatively, based on communications from Breeze Smoke LLC as discussed herein, it may have a business address at 1471 E. Nine Mile Rd, Unit 200, Hazel Park, MI  48030.

## JURISDICTION AND VENUE

7.     This Court has federal subject-matter jurisdiction under 15 U.S.C. § 1121, 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 1331.

8.     This Court has federal diversity jurisdiction under 28 U.S.C. § 1332, as Midwest Goods and Defendant are citizens of different states, and Midwest Goods seeks relief in excess of $75,000 (not including fees and costs).

9.     This Court also has supplemental jurisdiction over Midwest Goods' common law and state law claims raised in this action pursuant to 28 U.S.C. § 1367 because they are so related to Midwest Goods' federal claims that they form part of the same case or controversy.

10.     The Court has personal jurisdiction over Defendant because Defendant does business in this District and/or has purposefully sent the Defendant's Demand Letter (hereinafter defined) to Midwest Goods in this District.  Midwest Goods' claims arise, in whole or in part, out of Defendant's purposeful contacts with this District.

11.     Venue also is proper in this District pursuant to applicable law.

## ACTS IN SUPPORT OF
## JURISDICTION/VENUE AND COUNTS

12.     Midwest Goods is, and has been for many years, a substantial and prominent distributor in the United Sates of various goods, including vapes and electronic cigarettes.

13.     Defendant sells various vapes, at least in the United States.

14.     Beginning in or around June 20, 2023, Defendant launched a concerted effort to falsely claim that Midwest Goods distributed products that infringe Defendant's patent and/or trademark rights in order to extract competitive information from Midwest Goods, disparage Midwest Goods' distributed products, and unfairly gain a competitive advantage in

the marketplace.

15.     For example, on or about June 21, 2023, Defendant electronically communicated a message to a Midwest Goods' representative (the "Patent Threat Message"), a true and correct copy of which is shown below:



16.     The Patent Threat Message purports to be sent from Defendant's representative, Mark Kareem. On information and belief, Mark Kareem is a person of influence and control for Defendant.

17.     The Patent Threat Message depicts a vape product sold and distributed by Midwest Goods, and it uses and/or is associated with the prominently-emphasized brand "NORTH", as shown in the image depicted in paragraph 15.

18. In the Patent Threat Message, Defendant alleged ownership of patent rights and requested remedial and cessation action by Midwest Goods.

19. On information and belief, notwithstanding the Patent Threat Message, Defendant owns no U.S. patent in connection with Defendant's product branded with BREEZE PRO or any other BREEZE-inclusive trademark.

20. On information and belief, Defendant offers its vape products for sale through its website, https://www.breezesmoke.com/.

21. Defendant's website, https://www.breezesmoke.com/, identifies no U.S. patent number associated with Defendant's product branded with BREEZE PRO or any other BREEZE-inclusive trademark.

22. On information and belief, Defendant identifies no U.S. patent number on either the product, or product packaging, of Defendant's product branded with BREEZE PRO or any other BREEZE-inclusive trademark.

23. On or about July 31, 2023, counsel for Defendant, Jeffrey K. Lamb (of Honigman), transmitted via FedEx, to the address of Midwest Goods, in the state of Illinois, a cease and desist letter, a true and correct copy of which is attached hereto as Exhibit A ("Defendant's Demand Letter").

24. Defendant's Demand Letter accuses Midwest Goods of, *inter alia*, "unlawful sale and offer for sale of obvious infringements of its [Defendant's] BREEZE PRO disposable e-cigarette products, trade dress and packaging."

25. Defendant's Demand Letter: (i) alleges numerous rights in various trademarks and "trade dress and packaging"; (ii) accuses Midwest Goods of promoting "infringing products"; (iii) threatens that Midwest Goods can "now avoid a similar lawsuit" as lawsuits

Defendant contends it has brought against others; and (iv) enumerates five (5) demands, among other things, including that Midwest "[c]ease and desist all use, sales and offer for sale of the [allegedly] Infringing Products."

26.     Notably, Defendant's Demand Letter makes no mention of Defendant's alleged patent rights, as asserted in Patent Threat Message.

27.     Defendant's Demand Letter provides "an example of [its] BREEZE PRO disposable e-cigarette", and a true and correct copy of the example as provided is shown below:



28.     Defendant's Demand Letter alleges that its "BREEZE PRO products are also marketed, offered and sold in a highly distinctive packaging that consumers associate exclusively with Breeze Smoke" and provides a single example, a true and correct image of which is shown below:



29.     Defendant's Demand Letter attaches its own "EXHUIBIT A" and "EXHUIBIT B," purporting to be documents from two prior lawsuits brought by Defendant in a federal court sitting in Michigan (the "Two Prior BREEZE Lawsuits").

30.     In the Two Prior BREEZE Lawsuits, Defendant alleged BREEZE trademark rights against allegedly infringing products of third parties, all of which allegedly infringing products included some variation of the word BREEZE.

31.     While Defendant uses the Two Prior BREEZE Lawsuits as a part of its threats against Midwest Goods, the attachments Defendant provides from federal Michigan courts have no judicial (or jury) finding relating to the trade dress or product packaging that Defendant alleges is violated by Midwest.   To the contrary, one such attachment is by *stipulation* of the parties, and the other provides a judicial opinion *inter alia* granting provisional injunctive relief that does not address any supposed trade dress or product packaging rights of Defendant.   Defendant's counsel is counsel of record in both of the Two Prior BREEZE Lawsuits, and Defendant must know, or have reason to know, that the threats it makes against Midwest Goods are not justified in the manner emphatically expressed in

Defendant's Demand Letter.

      32.     In Defendant's Demand Letter, there is no allegation by Defendant of any product promoted, sold, or distributed by Midwest Goods, that uses any form or variation of the word "BREEZE".[2]

      33.     Defendant is well aware, and has conceded to Midwest Goods, that Midwest Goods' "NORTH" branded products do not infringe on Defendant's trademark rights. On or about July 10, 2023, Defendant electronically communicated a message to a Midwest Good's representative ("Defendant's Trademark Concession Message"), a true and correct copy of which is shown below:



---

[2]     Midwest Goods has, in the past, purchased goods from Defendant that included a form of BREEZE and was thusly authorized to distribute said goods. At or around the time Midwest Goods received Defendant's Demand Letter, Defendant has been slow to ship product to Midwest Goods.

34.     Defendant's Trademark Concession Message purports to be provided from Mark Kareem.  As per paragraph 16, on information and belief, Mark Kareem is a person of influence and control for Defendant.

35.     As shown in paragraph 32, Midwest Goods responded to Defendant's Trademark Concession Message by indicating that the alleged product "doesn't say breeze or match shape or size or puff count" as compared to the BREEZE PRO vape sold by Defendant. Indeed, other differences also exist between the BREEZE PRO vape sold by Defendant and the vaping products that Midwest Goods distributes and that are labeled with a "NORTH" brand.  First, the "NORTH"-branded product uses an excessively large and impressionistic font, as compared to the "BREEZE PRO"-branded vape product sold by Defendant, as shown below:





36.     Other differences between the "BREEZE PRO"-branded vape product sold by Defendant and the vaping products that Midwest Goods distributes and that are labeled with a "NORTH" brand include, without limitation: (i) the respective product designs, including size, width, and that the vape labeled with a "NORTH" brand has a more elliptical cross section and entirely flat base; (ii) the vape labeled with a "NORTH" brand is rechargeable (and has a visible recharging port on its base), whereas, on information and belief, the "BREEZE PRO"-branded vape product sold by Defendant is not; and (iii) the vape labeled with a "NORTH" brand has a battery light and e-juice indicator, whereas, on information and belief, the "BREEZE PRO"-branded vape product sold by Defendant has neither of these features/appearances.

37.     As shown in paragraph 32, Defendant's Trademark Concession Message concedes there is "nothing wrong with it" [vaping products that Midwest Goods sells/distributes and that are labeled with a "NORTH" brand], and "I understand it's not the same."

38.     Indeed, rather than make a case that Midwest Goods' products actually do infringe on Defendant's rights in some way, Defendant's Trademark Concession Message

requests Midwest Goods to disclose Midwest Goods' proprietary information, namely, the source from which Midwest Goods purchases vaping products that Midwest Goods distributes and that are labeled with a "NORTH" brand.

39.     Defendant's Trademark Concession Message makes clear that Defendant has no good-faith belief that Midwest Goods is infringing on its rights in any way, but instead, Defendant is trying to leverage the threat of legal action in order to discover Midwest Goods' proprietary and competitive information.

40.     Despite the admissions in the Trademark Concession Message that there is "nothing wrong" with Midwest Goods' products and that they are "not the same" as Defendant's product, Defendant sent a letter to multiple Midwest Goods' customers on or about August 4, 2023, accusing Midwest Goods and others of selling "copycat vapes" and "holding themselves out to the public as being affiliated with and/or being the 'new Breeze'." ("Defendant's Disparaging Letter to Midwest Goods' Customers").  A true and correct copy of Defendant's Disparaging Letter to Midwest Goods' Customers is attached as Exhibit B.

41.     Defendant's Disparaging Letter to Midwest Goods' Customers identifies five different vapes, only one of which is associated with Midwest Goods – namely, vapes sold in connection with the "NORTH" brand.

42.     Defendant's Disparaging Letter to Midwest Goods' Customers indicates that Defendant is "currently pursuing legal action against all those named in this letter."  Contrary to that statement, to Midwest Goods' knowledge, Defendant has not filed any legal action against it

43.     Defendant's statements in Defendant's Disparaging Letter to Midwest Goods' Customers are false and misleading, and, on information and belief, they are part of a scheme

to disparage Midwest Goods' products and business in the marketplace and to provide Defendant with a competitive advantage.

44.     On information and belief, at least some of Midwest Goods' customers are influenced, to the detriment of Midwest Goods, by the allegations in Defendant's Disparaging Letter to Midwest Goods' Customers.

## ADDITIONAL ALLEGATIONS COMMON TO ALL COUNTS

45.     Midwest Goods incorporates fully herein all factual allegations from the preceding paragraphs.

46.     Defendant's Demand Letter to Midwest identifies five federal trademark registrations – namely, U.S. Trademark Registration Numbers 6,296,005; 6,296,004; 6,992,438; 6,976,533 [sic, 6,976,563][3]; and 6,770,534 (collectively, the "Alleged BREEZE trademarks").  True and correct copies of the Alleged BREEZE trademark registrations are included in Exhibit C.

47.     Each of the file histories of the Alleged BREEZE trademarks, in the United States Trademark Office records, includes a respective registration of goods, some of which have nothing at all to do with vaping devices.

48.     In each of the file histories of the Alleged BREEZE trademarks, there is a sworn attestation to the date when the respective trademark was first used.  Among the dates corresponding to the five Alleged BREEZE trademarks, the earliest date of first use anywhere is 02/04/2020, which is the file for registrations 6,296,005 and 6,296,004, neither of which

---

[3]     U.S. Trademark registration 6,976,533 is shown in the U.S. Trademark Office records (TESS database) as reciting the trademark EVOCARE, and the record owner is Evocare Corp. The letter is presumed to have identified U.S. Trademark registration 6,976,563, which is for BREEZE SMOKE, and the record owner is Defendant.

recites any goods related to vaping devices. The earliest recited date of first trademark usage in the Alleged BREEZE trademarks, in connection with vaping devices, is for registration 6,976,563, which is for the trademark BREEZE SMOKE, and for registration 6,770,534, which is for the trademark BREEZE PLUS, and both of said registrations recite the goods of "disposable electronic cigarettes." The sworn date of first use of the trademark that is in those two registrations 6,976,563 and 6,770,534 is 03/01/2020. Accordingly, on information and belief based on the sworn statements in the registrations of the Alleged BREEZE trademarks, Defendant (or its assignor) has used not simply the word BREEZE, but the word BREEZE SMOKE and BREEZE PLUS, in connection with "disposable electronic cigarettes," for less than three and one-half years.

49.     To the current date, Defendant does not identify, nor appear to own, a single United States federal trademark registration for the word "BREEZE" standing alone.

50.     Moreover, Defendant's claim that the alleged "similar design" of Midwest Goods' vape products infringes Defendant's rights ignores the multitude of similarly-shaped devices, dating back years, that were in the marketplace well before Defendant began distributing its products.

51.     In 1965, the United States Patent Office issued U.S. Patent 3,200,819, entitled "SMOKELESS NON-TOBACCO CIGARETTE." The U.S. Patent 3,200,819 states that its "invention relates to a smokeless non-tobacco cigarette and has for an object to provide a safe and harmless means for and method of smoking by replacing burning tobacco and paper with heated, moist, flavored air." A true and correct copy of U.S. Patent 3,200,819 is attached hereto as Exhibit D.

52.     A true and correct copy of the smokeless non-tobacco cigarette, illustrated in the U.S. Patent 3,200,819, is as follows:



53.     The U.S. Patent 3,200,819 identifies various parts in its apparatus shown in paragraph 52, to include: (i) a flavored cartridge 20; (ii) a mouthpiece 24; and (iii) an external tube 15.

54.     A true and correct copy of U.S. Patent D891,691, filed September 5, 2018, is attached here to as Exhibit E.

55.     A true and correct copy of the electronic cigarette, illustrated in the U.S. Patent D891,691, is as follows:



FIG. 17

56.     A true and correct copy of U.S. Patent D863,665, filed April 12, 2018, is attached here to as Exhibit F.

57.     A true and correct copy of the electronic cigarette, illustrated in the U.S. Patent D863,665, is as follows:



FIG.1

58.     A true and correct copy of U.S. Patent D865,276, filed April 2, 2018, is attached here to as Exhibit G.

59.    A  true  and  correct  copy  of  the  electronic  cigarette,  in  the  U.S.  Patent D865,276, is as follows:



60.    A true and correct copy of U.S. Patent D762,003, filed July 25, 2014, is attached here to as Exhibit H.

61.    A true and correct copy of the electronic cigarette, illustrated in the U.S. Patent D761,003, is as follows:



62.    A true and correct copy of U.S. Patent D759,303, filed February 19, 2015, is attached here to as Exhibit I.

63.    A true and correct copy of the electronic cigarette, illustrated in the U.S. Patent D759,303, is as follows:



64.     A true and correct copy of U.S. Patent D757,353, filed July 16, 2014, is attached here to as Exhibit J.

65.     A true and correct copy of the electronic cigarette, in the U.S. Patent D757,353, is as follows:



66.     A true and correct copy of U.S. Patent D756,031, filed August 18, 2014, is attached here to as Exhibit K.

67.    A true and correct copy of the electronic cigarette, illustrated in the U.S. Patent D756,031, is as follows:



FIG. 7

68.    On information and belief, a vaping product under the brand of SEA pads was publicly displayed prior to March of 2020, and a true and correct image representing said display is as follows:



69.    On information and belief, a vaping product under the brand of VAPORTECH

VAPO was publicly displayed prior to March of 2020, and a true and correct image representing said display is as follows:



70.     On information and belief, a vaping product under the brand of zalt was publicly displayed prior to March of 2020, and a true and correct image representing said display is as follows:



71.     On information and belief, a vaping product under the brand of Air Bar was publicly displayed prior to March of 2020, and a true and correct image representing said display is as follows:



72.     Contemporary websites offer vaping goods for sale into the United States, illustrative of the common themes among some vaping devices, shapes, containers, use of fonts, colors, and the like, all overwhelmingly demonstrate that Defendant either has no distinctiveness in any of such attributes – other than potentially in the words "BREEZE PRO" and "BREEZE SMOKE" – or that if Defendant's legal threats are to be given any weight, *then Defendant is likewise infringing the rights of numerous other brands*.   Representative examples are shown below:









   

 









26



73.     Defendant's Demand Letter also refers to the "look and feel of the design of the packaging for the" Midwest Goods product.  An even cursory review of the marketplace, going back years to the present, reveals myriad market usage of the very features Defendant now claims to have proprietary rights regarding, precluding any notion that the look and feel of Defendant's products could be regarded as distinctive.

74.     For example, Defendant references its container – which is a clear parallelepiped.  However, such clear packaging has been around for decades, including, for example, as shown below:



Top 10 Packages of the 90's | Dieline - Design, Branding & Packaging Inspiration    Visit

75.    The marketplace features contemporary vaping replete with clear packaging, with examples shown below, and numerous others in the earlier paragraph 72:

  

76. Indeed, the vaping marketplace includes vendors offering entire lines of clear vape packaging:



77. Moreover, a comparison of Defendant's packaging box to that of the packaging in which the "NORTH"-branded vape products are sold shows stark differences:

| Defendant's packaging | NORTH-branded vape packaging |
|---|---|
|  | |

## COUNT I

### Declaration that Defendant Does Not Own a Protectable Interest in Its Asserted Trade Dress and Product Packaging

78.     Midwest Goods repeats and re-alleges the allegations from the preceding paragraphs as if fully set forth herein.

79.     Notwithstanding that Defendant has no patent indication on its website, its product, nor its product packaging, Defendant has demanded that Midwest Goods take remedial action based on purported patent rights of Defendant.

80.     Notwithstanding that Defendant identifies no promotion or sale by Midwest Goods, of any unauthorized product with the word BREEZE, or any variation thereof, both Defendant directly, and through its counsel, have demanded that Midwest Goods take remedial action based on purported trademark rights of Defendant.

81.     Notwithstanding that the vaping architecture has been around since at least as early as 1965, that Patent Office records are replete with illustrated designs of various generally rectangular stick-shaped or cylindrical-shaped form-factor designs for electronic cigarettes, that the vaping industry (and others) has for years used utilitarian clear packaging permitting consumers to view goods therethrough, and representative colors for flavors (*e.g.*, yellow for lemon, red for strawberry, *etc*.), both Defendant directly, and through its counsel, have demanded that Midwest Goods take remedial action based on purported trade dress and product packaging rights of Defendant, with no evidence that such purported rights have secondary meaning and are not utilitarian.

82.     The elements asserted as comprising Defendant's trade dress for the packaging of its BREEZE electronic cigarette, apart from certain trademarks that include the word, but not solely the word, "BREEZE", do not constitute protectable rights and do not signify Defendant as the source of the goods.

83.     Defendant has threatened and communicated with Midwest Goods and with Midwest Goods' customers such threats and false claims.

84.     Defendant's assertions that the products distributed by Midwest Goods under the "NORTH" brand are violating Defendant's rights irreparably injure and adversely affect Midwest Goods, and, unless prevented by this Court, will continue to so affect Midwest Goods' business and investments made into its own business and attendant goodwill.

85.     Therefore, as a result of Defendant's threats, demands, and disparaging statements regarding Midwest Goods and its products, there is an actual, substantial controversy between the parties, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

86.    To resolve the legal and factual questions raised by Defendant concerning its rights in and to various forms of trade dress and product packaging alleged to subsist in its BREEEZE-inclusive electronic cigarettes, and to afford relief from the uncertainty and controversy which Defendant's assertions have precipitated, Midwest Goods is entitled to a declaratory judgment that Defendant does not have protectable intellectual property rights in patents, trade dress, and/or packaging of such products.

## COUNT II

### Declaration of Trade Dress/Product Packaging Non-Infringement

87.    Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

88.    In addition or in the alternative, to the extent Defendant is entitled to any protection in the trade dress and/or packaging of its BREEZE-inclusive electronic cigarettes, Midwest Goods is entitled to a declaratory judgment of its rights, namely that it is not in violation of Defendant's rights, including, without limitation, any rights Defendant may have in the BREEZE-inclusive trademarks, or trade dress/product packaging of electronic cigarettes with which the BREEZE-inclusive trademarks are used or associated, under 15 U.S.C. §§ 1114 or 1125, at common law, or under any applicable state trademark law.

## COUNT III

### Declaration of Trademark Non-Infringement

89.    Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

90.    To resolve the legal and factual questions raised by Defendant concerning its rights in and to BREEEZE-inclusive trademarks relating to electronic cigarettes, and to afford relief from the uncertainty and controversy which Defendant's assertions have precipitated,

Midwest Goods is entitled to a declaratory judgment that that there is no likelihood of confusion as between Defendant's BREEZE-inclusive trademarks and the branding of "NORTH" on products distributed and/or sold by Midwest Goods.

## COUNT IV

### Federal Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125 (a)

91.     Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

92.     Defendant made false and misleading descriptions and representations of fact that misrepresent the nature, characteristics, and qualities of its goods and rights, and of "NORTH"-branded goods distributed/sold by Midwest Goods.  Among other things, Defendant falsely stated or misrepresented: (i) Defendant has unspecified patent rights that are somehow infringed by "NORTH"-branded goods distributed by Midwest Goods; (ii) "NORTH"-branded goods distributed/sold by Midwest Goods are "copycats"; and (iii) Defendant has trade dress or product configuration rights in attributes of its products that are protectable.

93.     By making these and other false or misleading statements of fact in its communications to Midwest Goods and Midwest Goods' customers, Defendant caused and is likely to cause competitive and commercial injury to Midwest Goods in an amount to be determined at trial.

## COUNT V

### Tortious Interference with Business Expectancy

94.     Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

95.     Prior to Defendant sending out Defendant's Disparaging Letter to Midwest Goods' Customers, Midwest Goods had a reasonable expectancy of entering into valid business

relationships with many of the customers who received the Defendant's Disparaging Letter to Midwest Goods' Customers. Many of the recipients of Defendant's Disparaging Letter to Midwest Goods' Customers had purchased products from Midwest Goods in the past, and Midwest Goods anticipated they would continue to buy its goods in the future.

96.     Defendant had knowledge of these relationships and of Midwest Goods' expectancy of future business because Defendant's Disparaging Letter to Midwest Goods' Customers is purposefully directed to customers who might be inclined to purchase the alleged "copycat" products, including from Midwest Goods.

97.     Defendant has intentionally interfered with this expectancy and has, on information and belief, prevented the realization of this business expectancy, by making false and disparaging statements and warning customers not to purchase alleged "copycat" products, including "NORTH"-brand products distributed by Midwest Goods. This interference is not justified because, as detailed above, Defendant has no protectable interest in its asserted trade dress and packaging, and, even if it did, Defendant has essentially acknowledged that Midwest Goods is not infringing.

98.     Defendant's intentional interference has resulted in damages to Midwest Goods in an amount to be determined by the jury that is believed to exceed $75,000, exclusive of costs and fees.

## COUNT VI

### Violation of the Deceptive Trade Practices Act

99.     Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

100.     Defendant's actions have violated the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2) because, in the course of Defendant's business, Defendants have

(1) disparaged the goods, services, or business of Midwest Goods in Illinois and elsewhere by false or misleading representations of fact; *i.e.*, that Midwest Goods' products are "copycat" products and/or infringe the rights of Defendant; and (2) engaged in conduct which creates a likelihood of confusion or misunderstanding in Illinois and elsewhere; *i.e.*, with regard to whether Midwest Goods' products are "copycat" products and/or infringe the rights of Defendant. On information and belief, these false statements are part of a scheme by Defendant to disparage Midwest Goods' products and business in Illinois and other marketplaces and to provide Defendant with a competitive advantage.

101. Midwest Goods is likely to be damaged by Defendant's conduct because, on information and belief, at least some of Midwest Goods' Illinois and other customers are influenced, to the detriment of Midwest Goods, by the disparaging allegations in Defendant's Disparaging Letter to Midwest Goods' Customers.

102. On information and belief, Defendant will continue to spread false allegations of infringement and disparage Midwest Goods in Illinois and other marketplaces if Defendant is not restrained and/or enjoined from doing so as requested herein.

103. Midwest Goods has no adequate legal remedy for the injuries that have and will be incurred because, *inter alia*, the total amount of lost customers and revenues resulting from Defendant's wrongful conduct, and the damage to Midwest Goods' reputation and goodwill, will be difficult, if not impossible, to calculate.

104. Midwest Goods therefore seeks injunctive relief pursuant to 815 ILCS 510/3, enjoining Defendant from continuing to make false and disparaging statements about Midwest Goods or its products.

105. As evidenced by the Trademark Concession Message, as well as the obvious

lack of infringement, Defendant is willfully engaging in a deceptive trade practice. Midwest Goods is, therefore, entitled to recover its costs and attorneys' fees under 815 ILCS 510/3.

## COUNT VII

### Common Law Disparagement

106.     Midwest Goods repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

107.     Defendant's conduct described above also constitutes common law disparagement under Illinois law because Defendant has made false and demeaning statements regarding the quality of Midwest Goods' distributed products.

108.     Midwest Goods seeks damages in an amount to be determined by the jury that is believed to exceed $75,000, exclusive of costs and fees.

### PRAYER FOR RELIEF

WHEREFORE, Midwest Goods requests entry of judgment against Defendant as follows:

A.     A declaration that (1) Defendant has no protectable interest in its asserted trade dress and packaging and/or that (2) Midwest Goods' distributed products do not infringe any such protected rights that Defendant is found to possess;

B.     An award of damages in an amount to be determined by the jury;

C.     Injunctive relief and attorneys' fees;

D.     Costs of suit;

E.     Finding of the case to be exceptional under the Lanham Act, and an award of Midwest Goods' reasonable attorneys' fees;

F.     That any monetary award includes pre- and post-judgment interest at the highest rate allowed by law; and

G.     Such other and further relief as the Court and/or jury may deem just and proper.

## JURY DEMAND

Midwest Goods respectfully demands a trial by jury of any issues triable of right by a

jury.

Dated: August 11, 2023          Respectfully submitted,

                  */s/ Drew G.A. Peel*
                 Drew G.A. Peel (ARDC# 6209713)
                 **RACHLIS DUFF & PEEL, LLC**
                 542 South Dearborn Street, Suite 900
                 Chicago, IL 60605
                 Tel: (312) 275-0337
                 Fax: (312) 733-3952
                 dpeel@rdaplaw.net

                 Stephen L. Levine (*pro hac vice* forthcoming)
                 Texas Bar No. 12258100
                 Kelli M. Hinson (*pro hac vice* forthcoming)
                 Texas Bar No. 00793956
                 **CARRINGTON, COLEMAN, SLOMAN**
                  **& BLUMENTHAL, L.L.P.**
                 901 Main St., Suite 5500
                 Dallas, TX 75202
                 Tel: (214) 855-3000
                 slevine@ccsb.com
                 khinson@ccsb.com

.

                 *Attorneys for Midwest Goods Inc.*

# Exhibit A



HONIGMAN.

Jeffrey K. Lamb
(313) 465-7404
Fax: (313) 465-7405
jlamb@honigman.com

*Via FedEx*

July 31, 2023

Kamran Yasin
Midwest Goods, Inc.
DBA Midwest Distribution Illinois USA
1001 Foster Ave
Bensenville, Illinois 60106

Re:  *Infringing Breeze Pro Products, Trade Dress and Packaging*

Dear Mr. Yasin:

Honigman LLP represents Breeze Smoke LLC in trademark litigation matters. Breeze Smoke demands that you immediately cease your unlawful sale and offer for sale of obvious infringements of its BREEZE PRO disposable e-cigarette products, trade dress and packaging and that you likewise stop using BREEZE trademarks in your promotion of the infringing products.

Breeze Smoke has built an extremely successful brand under a family of BREEZE trademarks, which it has used extensively in connection with high-quality, well-known, and immensely popular tobacco and vaping products throughout the United States and worldwide. Breeze Smoke's most popular product is its BREEZE PRO disposable vape pen, which is the highest quality all-in-one vaping system ever introduced in the market. Breeze Smoke sells its products in various ways, including by licensees online and at a substantial number of brick-and-mortar locations, and promotes its products on its website at https://www.breezesmoke.com/. Through its predecessors in interest, Breeze Smoke has been using its BREEZE trademarks in the United States since at least as early as 2014 in connection with its products.

Breeze Smoke owns federal registrations of its BREEZE and BREEZE PRO marks. *See* U.S. Trademark Reg. No. 6,296,005; 6,296,004; and 6,992,438. Breeze Smoke also owns federal registrations for its BREEZE SMOKE and BREEZE PLUS marks, *see* U.S. Trademark Reg. Nos. 6,976,653 and 6,770,534. In addition, Breeze Smoke owns several U.S. Trademark Applications for its BREEZE and BREEZE PALM marks and several state registrations for its BREEZE-formative marks.

Breeze Smoke vigorously protects and enforces its rights against infringers and counterfeiters of its valuable BREEZE trademarks including filing lawsuits when necessary. For example, in May 2023, the District Court for the Western District of Michigan entered a preliminary injunction enjoining a wholesaler and multiple retailers from selling vape pens under the infringing mark BREEZY. In May 2021, the District Court for the Eastern District of Michigan entered a permanent injunction enjoining five defendants from, *inter alia*, the sale of unauthorized products bearing the BREEZE mark, or names or marks including or incorporating the mark BREEZE as well as Breeze Smoke's BREEZE packaging trade dress or trade dress confusingly similar thereto. *See* Exhibit A, sample injunctions against defendants.

You can now avoid a similar lawsuit by immediately ceasing your sales of products that infringe the BREEZE PRO disposable electronic cigarette trade dress and packaging (the "Infringing Products").

# HONIGMAN

July 31, 2023
Page 2

An example of the BREEZE PRO disposable e-cigarette is shown below.



Breeze Smoke's BREEZE PRO products are also marketed, offered and sold in a highly distinctive packaging that consumers associate exclusively with Breeze Smoke. An example is below:



Breeze Smoke was surprised to discover—through communications inquiring whether the Infringing Products emanate from Breeze Smoke—that you are offering for sale and selling disposable e-cigarettes that infringe the BREEZE PRO disposable e-cigarette trade dress and packaging. The packaging and the trade dress are so closely similar except that you use the trademark North instead of the BREEZE PRO mark. See photos provided to Breeze Smoke below.

# HONIGMAN

July 31, 2023
Page 3



    The designs of the Infringing Products are so similar that they have already caused confusion and will inevitably lead to more market confusion and significant economic damage to our client. Indeed, one can barely distinguish among the vape pen design of the BREEZE PRO disposable e-cigarette and the Infringing Product in shape, color, label design, font, font color and other markings and stylization. The packaging for the Infringing Products is also nearly indistinguishable from the BREEZE PRO packaging, which consumers are so used to seeing for such a long period of time. They have the same overall look and feel with the same shape and size container, a bold color wrapping around the bottom portion intended to match the flavoring, the brand in all capital letters and in white font with the flavor written directly

# HONIGMAN

July 31, 2023
Page 4

underneath and the warning at the bottom. Any consumer familiar with the BREEZE PRO brand, and there are many, would believe that the Infringing Product emanates from or is associated in some way with the BREEZE PRO disposable e-cigarette merely from the look and feel of the design of the packaging for the Infringing Product.

Furthermore, advertising of the Infringing Product falsely compares the Infringing Product with Breeze Smoke's highest quality vaping product. The advertisement below reads "BETTER QUALITY PRODUCT THAN BREEZE 2000!!" Thus, you have both designed the Infringing Product to associate the BREEZE PRO product in the minds of consumers and then used our client's BREEZE trademark unfairly in advertising and promoting your Infringing Products.



Your sale and offer for sale of the Infringing Products containing such closely similar trade dress and packaging to the genuine BREEZE PRO products along with false comparative advertising using the BREEZE trademark has already caused multiple instances of confusion and is likely to continue to cause confusion and deception in the marketplace. Such use constitutes intentional and willful trademark infringement, false designation of origin, false advertising, and unfair competition in violation of the U.S. Trademark Act, as amended, 15 U.S.C. § 1051 *et. seq*, and related state laws.

Accordingly, Breeze Smoke demands that you immediately:

(1) Cease and desist all use, sales and offer for sale of the Infringing Products, including all marketing and promotion thereof in any medium;

(2) Cease and desist all use of the BREEZE trademarks in your advertising of any disposable e-cigarette or other tobacco related product;

# HONIGMAN

July 31, 2023
Page 5

(3) Provide us with an accounting of your sales pertaining to the Infringing Products, including: a) total number of items purchased, and the purchase price; b) total number of Infringing Products sold; c) gross and net profit per item; d) total gross and net profits associated with the sale of Infringing Products. Please support your figures with your sales records;

(4) Turn over to us all Infringing Products inventory in your possession or control, and let us know whether you are awaiting any additional orders that are still in transit (and if so, the details of those orders/shipments);

(5) If you allege that you are not the manufacturer or source of the Infringing Products, provide us with information regarding the source of the Infringing Products you purchased, including but not limited to sales invoices, shipping documentation receipts, credit card receipts and payment information, e-mail or other communications with the seller, and any other information you may have to help Breeze Smoke to understand the source of the products.

If we do not receive written confirmation of the above and your full and complete response within seven (7) days of this letter, Breeze Smoke may pursue legal action against you without further notice. If you are not the source of the Infringing Products and you cooperate with Breeze Smoke in this matter and provide information that will allow Breeze Smoke to uncover the source of Infringing Products, Breeze Smoke will consider that information favorably to you. If you would like to discuss the specifics of such an arrangement, please contact me.

Nothing in this letter waives any rights, remedies, claims, causes of action, or defenses of Breeze Smoke, all of which are expressly reserved.

Very truly yours,

HONIGMAN LLP

Jeffrey K. Lamb

Encl.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

       Plaintiff,

vs.

FARID JARJESS, *et al.*,

       Defendants.

Case No. 2:20-cv-13413-AJT-EAS

Hon. Arthur J. Tarnow

Magistrate Judge Stafford

## STIPULATED PERMANENT INJUNCTION AGAINST CERTAIN DEFENDANTS

WHEREAS, Plaintiff Breeze Smoke LLC ("Plaintiff"), and Defendants EZ Smoke Shop 2, Inc., Ismail Kaid Al-Madrahi, EZ Smoke Shop Plus, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali, by and through their respective counsel, hereby stipulate and agree to the following permanent injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants EZ Smoke Shop 2, Inc., Ismail Kaid Al-Madrahi, EZ Smoke Shop Plus, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali, and any of their agents, successors, assigns, and/or others in active concert or participation with them, are enjoined from directly or indirectly using or selling any unauthorized products bearing the mark "BREEZE" or any other mark or name including or incorporating

39293958.1

the mark "BREEZE" and Breeze Smoke's BREEZE packaging trade dress shown

below, or any other packaging or trade dress that is confusingly similar thereto, in

connection with vaping products containing the "Breeze" name, or any other

related products or services, including but not limited to counterfeit BREEZE

products, the "Sea BREEZE Plus" product, or the "Night BREEZE" product:

  

SO ORDERED.

Dated: May 20, 2021

s/Arthur J. Tarnow
U.S. District Court Judge

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  May 20, 2021

By:  /s/ *Andrew M. Pauwels*
Jeffrey K. Lamb (P76738)
Andrew M. Pauwels (P79167)
Nicholas A. Burandt (P84113)
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com
apauwels@honigman.com
nburandt@honigman.com

Mary A. Hyde (P83066)
HONIGMAN LLP
155 North Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone:  (312) 701-9360
mhyde@honigman.com

*Attorneys for the Plaintiff*

Respectfully submitted,

By: /s/ *Kim Corbin* (w/ permission)
Kim Corbin
Kim Corbin PLLC
15206 Mack Ave.
Gross Pointe Park, MI 48230
(313) 610-2689
corbinlaw@comcast.net

*Attorney for Defendants EZ Smoke Shop 2, Inc.,*
*EZ Smoke Shop Plus, Inc., Ismail Kaid Al-*
*Madrahi, Bilal Mohamed Ali, Malek*
*Distribution, Inc., and Fuad Mugali*

39293958.1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

       Plaintiff,

                                 Case No. 1:22-cv-1182

v.

                                 Hon. Hala Y. Jarbou

YATIN ENTERPRISES INC., et al.,

       Defendants.

_____/

## OPINION

Plaintiff Breeze Smoke LLC manufactures and sells vaping products, including disposable electronic vaping devices ("e-cigarettes"). It owns several trademarks with the word "BREEZE" in them. Defendants Yatin Enterprises Inc., Mini Market, LLC, Drake Party Store, LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, and Wild Monkey Smoke Shop are a wholesaler and five party stores located in Western Michigan. Plaintiff claims that Defendants are infringing Plaintiff's trademark rights by selling disposable e-cigarettes with the name "BREEZY BAR" on the label. Before the Court are Plaintiff's motion for a preliminary injunction (ECF No. 6) and Defendants' motion for judgment on the pleadings (ECF No. 59). For the reasons herein, the Court will grant Plaintiff's motion for a preliminary injunction. The Court will grant Defendants' motion for judgment on the pleadings in part and deny it in part.

## I. BACKGROUND

Plaintiff sells its e-cigarettes online and in retail locations throughout Michigan and the United States under various BREEZE marks. (Haddad Decl. ¶ 15, ECF No. 6-2.) Plaintiff avers that it and its predecessor-in-interest have used "BREEZE trademarks" on vaping products since as early as 2014. (Id. ¶ 6.) Plaintiff owns federally registered trademarks for BREEZE PLUS and BREEZE SMOKE for use on disposable e-cigarettes. (Reg. No. 6,770,534, ECF No. 6-3,

PageID.216; Reg. No. 6,976,563.) The latter was approved on February 14, 2023. Plaintiff also owns a registration for BREEZE for use on apparel (Reg. No. 6,296,005, ECF No. 6-3, PageID.264), and a stylized version of the word breeze, **BREEZE**, also for use on apparel (Reg. No. 6,296,004, ECF No. 6-3, PageID.268). And it has applied for additional federal registrations for BREEZE-related word marks on disposable e-cigarettes and e-cigarette liquid, including BREEZE PALM and BREEZE PRO, asserting use as early as 2020. (Haddad Decl. ¶ 8.) It also owns two Michigan registrations for BREEZE, both of which assert use since 2020. (*Id.* ¶¶ 11-12.) The following are examples of Plaintiff's use of its BREEZE PRO, BREEZE PLUS, and BREEZE SMOKE marks on its disposable e-cigarette products:

  

(*Id.* ¶ 7.)

In October 2022, Plaintiff discovered that several retailers in Michigan, including Defendants, were selling disposable e-cigarettes under the name BREEZY BAR, such as the following:



(*Id.* ¶ 33.)  Plaintiff is not associated with these products.

Plaintiff claims that Defendants are infringing its rights under federal and state law. Count I of the complaint asserts that Defendants are infringing Plaintiff's federally registered trademarks, in violation of the Lanham Act, 15 U.S.C. § 1114.  Count II asserts that Defendants are engaged in unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a), by using Plaintiff's marks as a false designation of the origin of the infringing products.  Count III asserts that Defendants are using marks similar to Plaintiff's BREEZE marks in a manner that is likely to cause confusion, in violation of Michigan's Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 et seq.  Count IV asserts that Defendants' sale of the allegedly infringing products has misappropriated Plaintiff's goodwill and business reputation, constituting unfair competition under common law.  Count V asserts a claim for unjust enrichment based on Defendants' conduct.

Plaintiff now moves for a preliminary injunction to enforce its rights under the Lanham Act.

## II. PROCEDURAL HISTORY

Plaintiff initially brought this action in the Eastern District of Michigan.  On December 9, 2022, that court transferred the matter to this Court.  Plaintiff initially sought a temporary restraining order and preliminary injunction, but the Court denied the request for a temporary restraining order because Plaintiff did not fulfill the requirements for seeking one.  (*See* 12/13/2022

3

Order, ECF No. 25.) Accordingly, the Court gave Defendants an opportunity to respond before considering Plaintiff's motion for a preliminary injunction. They have now done so.

### III. PRELIMINARY INJUNCTION STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). The Court considers four factors when deciding whether to grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

### IV. PREIMINARY INJUNCTION ANALYSIS

#### A. Likelihood of Success

At issue under Plaintiff's Lanham Act claims is the alleged infringement of Plaintiff's rights flowing from its federally registered trademarks, as well as from its marks that have not been registered at the federal level. The Lanham Act creates a cause of action against "would-be infringers" of both registered and unregistered marks, as long as the unregistered marks are protectable. *Matal v. Lam*, 582 U.S. 218, 225 (2017); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754,

4

761 n.4 (6th Cir. 2005) ("'Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks . . . .'" (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992))). When determining whether Plaintiff has demonstrated a strong or substantial likelihood of success under its Lanham Act claims, the Court first examines whether its marks are protectable (if they are not registered) and then whether "'the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods . . . .'" *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 869 (6th Cir. 2022) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)). The "usual way" to prove customer confusion is through the "eight-factor, totality-of-the-circumstances test." *Id.* Those factors are:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Id.* (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

### 1. Protectable/Enforceable Marks

Here, Plaintiff currently possesses federal registrations for BREEZE PLUS and BREEZE SMOKE, and uses various unregistered marks on its vaping products that contain the word "breeze," including BREEZE PRO. These marks are all suggestive in nature.[1] They are not merely descriptive of Plaintiff's products. Suggestive marks are generally protectable so long as they are used by the putative owner, as is the case here. *Tumblebus*, 399 F.3d at 761.

---

[1] A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (internal quotation marks and citation omitted).

### (a) Unlawful Use Doctrine

Defendants argue that Plaintiff's marks (both registered and unregistered) are not protectable or enforceable here because they cannot lawfully be used in commerce on Plaintiff's vaping products. Plaintiff's e-cigarettes are subject to regulation by the FDA as a "new tobacco product." (*See* FDA Letter, ECF No. 37-1, PageID.199.) Specifically, the FDA requires that manufacturers of electronic nicotine delivery systems ("ENDS") obtain approval from the FDA before selling or marketing their products. The Court of Appeals has explained the history of the FDA's regulations as follows:

> In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (TCA) to regulate tobacco products and to empower the FDA to conduct the regulation. Pub. L. No. 111-31, 123 Stat. 1776 (2009). The statute recognized the FDA as the primary federal regulatory authority regarding the manufacture, marketing, and distribution of tobacco products. *Id.* § 3(1), 123 Stat. at 1781. The Act applies to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco," and also authorizes the Secretary of Health and Human Services (HHS) to subject through regulation any other tobacco product to the statute's requirements. 21 U.S.C. § 387a(b). The Secretary carries out this responsibility through the FDA. *See id.* § 393(d)(2).

> Manufacturers of new tobacco products that were not on the market as of February 15, 2007 or that were modified after that date must obtain premarket authorization prior to marketing their products. *Id.* § 387j(a). The TCA contains multiple pathways for tobacco manufacturers to seek authorization to market their products. *See* 21 U.S.C. §§ 387j(a)(2)(A)(i)–(ii), 387j(b)–(c), 387e(j)(1), 387e(j)(3). The relevant path here is the premarket tobacco application, in which a manufacturer may file a premarket application that contains information regarding the product's health risks, a statements of the product's ingredients, the product's manufacturing information, and samples of the product and its proposed labeling. 21 U.S.C. § 387j(b)-(c). A tobacco product that is marketed without the appropriate authorization can face civil and criminal enforcement action by the FDA. 21 U.S.C. §§ 331(a)-(c), 332, 334, 387b(6).

> In May 2016, the FDA promulgated the "Deeming Rule," which deemed cigars, pipe tobacco, and electronic nicotine delivery systems (e-cigarettes) to be tobacco products subject to the TCA. 81 Fed. Reg. 28,974, 28,982–84 (May 10, 2016). When the Deeming Rule took effect in August 2016, as many as 25,000 products already on the market became subject to, and would suddenly be in violation of, 21 U.S.C. § 387j(a). . . . The FDA announced that it would stagger compliance periods for deemed tobacco products that were already on the market on the effective date

of the Deeming Rule, during which time the FDA would not bring enforcement actions against the manufacturers of newly-regulated tobacco products for failure to obtain premarket authorization. 81 Fed. Reg. at 28,977-78. This was intended to allow time for manufacturers of newly deemed products to come into compliance. Originally, the FDA required premarket tobacco applications to be submitted by August 8, 2018. Id. at 29,010–11, 29,106. In May 2017, the FDA extended the compliance period by three months. 82 Fed. Reg. 22,338, 22,340 (May 15, 2017). Finally, the FDA issued new guidance in August 2017 that extended the compliance period to August 8, 2022 for most e-cigarettes.

*Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 498 (6th Cir. 2020) (footnote omitted).

Here, Plaintiff applied to the FDA for approval of its ENDS products, and the FDA denied its application. *See Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 504-06 (6th Cir. 2021) (discussing Plaintiff's application). Without such authorization, those products are considered "misbranded" under the Federal Food, Drug, and Cosmetic Act ("FDCA"), and Plaintiff is prohibited from introducing or delivering them into the marketplace. (*See* FDA Letter, PageID.198.)

Defendants rely on what some courts have called the "unlawful use doctrine." This "doctrine" first arose in administrative proceedings involving the registration or cancellation of a trademark. Although the Lanham Act requires only a "use[] in commerce" to establish trademark rights, 15 U.S.C. § 1051(a)(1), "[i]t has been the consistent position of [the Trademark Trial and Appeal Board ("TTAB")] and the policy of the Patent and Trademark Office that a 'use in commerce' means a '*lawful* use in commerce[.]'" *The Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850 (T.T.A.B. June 29, 1982) (emphasis added). Thus, according to the TTAB, "the shipment of goods in violation of federal statute, including the [FDCA], may not be recognized as the basis for establishing trademark rights." *Id.*

The TTAB "has added substantial gloss to the lawful use requirement since its introduction." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 3:20cv400 (DJN), 2022 WL 17477062, at *6 (E.D. Va. Dec. 6, 2022). For example, a use is unlawful only if "the issue of compliance has previously been determined . . . by a court of government agency having

competent jurisdiction over the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q. 2d 2045, 2047 (T.T.A.B. 1988). In addition, "there must be some nexus between the use of the mark and the alleged violation before the unlawfulness of a shipment can be said to result in the invalidity of a registration." *Gen. Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270 (T.T.A.B. 1992). Further, because "many [legal] requirements are purely technical in nature" and are "relatively harmless" and correctable, the TTAB evaluates the "materiality" of the violation before cancelling a registration. *Id.*

Some federal courts, including the Courts of Appeal for the Ninth and Tenth Circuits, have extended the TTAB's unlawful use doctrine to infringement suits such as this one, allowing an alleged infringer to raise the issue as an affirmative defense to infringement. *See, e.g., CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000). In contrast, the Courts of Appeal for the Fifth and Eleventh Circuits have declined to adopt the doctrine without expressly rejecting it. *See Perry v. H.J. Heinz Co. Brands, LLC*, 994 F.3d 466 (5th Cir. 2021); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016). The Court of Appeals for the Sixth Circuit has not addressed the issue and, so far as the Court is aware, no district court in this Circuit has expressly adopted or rejected the use of the doctrine in infringement cases.

Arguments in favor of applying the doctrine to infringement cases are, first, that extending trademark rights to unlawful uses "would . . . put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." *CreAgri*, 474 F.3d at 630. Second, "as a policy matter,

to give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations would be to reward the hasty at the expense of the diligent." *Id.*

Arguments against applying the doctrine to infringement cases are, first, that it would be inconsistent with the statutory and regulatory scheme for adjudicating trademark rights. The doctrine "has its home . . . in TTAB proceedings to challenge registrations and/or to cancel previously issued registrations[.]" *VPR Brands, LP v. Shenzhen Weiboli Tech. Co.*, No. 22-81576-CIV-CANNON, 2023 WL 2317165, at *6 (S.D. Fla. Feb. 23, 2023). Those proceedings are "the primary vehicle for cancellation of registered marks." *Id.* The Lanham Act does not permit a plaintiff to sue in federal court to cancel a trademark. *Beasley v. Howard*, 14 F.4th 226, 235-36 (3d Cir. 2021); 5 McCarthy on Trademarks & Unfair Competition § 30:110 (5th ed.). Litigants in an infringement case should not be able to avoid the TTAB process by raising a defense that is arguably equivalent to the cancellation of trademark rights. And "trademark holders should not be required to repeatedly litigate the question of use to enforce their rights," when that question is better addressed in administrative proceedings. *Jergenson v. Inhale Int'l Ltd.*, No. 22 CV 2040, 2023 WL 167413, at *4 (N.D. Ill. Jan. 12, 2023). Second, there is no private right of action under the FDCA. The FDA is responsible for enforcing that statute, and that agency should be the one to determine in the first instance whether the trademark holder has complied with the statute. Third, and relatedly, applying the rule to infringement suits makes the Court "a potential collateral enforcer of hundreds of labeling and licensing laws" that are beyond the scope of trademark law. 3 McCarthy on Trademarks & Unfair Competition § 19:123 (5th ed.). This makes trademark litigation "more complicated and more expensive for trademark owners." *Id.* Fourth, the rule "lacks a statutory basis" and purportedly "serves no useful purpose related to trademark law." *Id.*

The first argument against adopting the unlawful use doctrine is not persuasive because defendants in trademark infringement suits routinely raise arguments that attack the validity or enforceability of the trademark at issue. After all, a trademark registration creates only a "rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). Defendants can rebut this presumption in a trademark infringement suit without resorting to cancellation proceedings. *See id.*

The second and third arguments against adopting the unlawful use doctrine are not as pertinent here as they are in other cases. For instance, in *CreAgri* and *Perry*, the trademark holders failed to comply with relatively minor, technical issues regarding the labeling of their products. In *CreAgri*, the product label did not identify the accurate amount of nutrients in the product. *CreAgri*, 474 F.2d at 631. In *Perry*, the product label omitted information about the ingredients the product contained. *Perry*, 994 F.3d at 475. The inaccurate product labeling in those two cases meant that the plaintiffs' products were being sold in an improper manner under the FDCA. However, those labeling issues were immaterial because they were easily correctable and they had no connection to the plaintiffs' trademark rights. In contrast, the FDA's regulations here have prohibited Plaintiff from selling or marketing any of its ENDS products before obtaining FDA approval. There is nothing Plaintiff could have done, or can do at the moment, to change that. Altering its product labels would not make the sale of those products legal. Consequently, federal law bars Plaintiff from selling or marketing its ENDS products. And because a trademark must be used in commerce in order to obtain and maintain trademark rights, the FDA's decision potentially

impairs Plaintiff's ability to sustain its rights.[2] Accordingly, unlike the labeling errors in *CreAgri* and *Perry*, the legal restrictions faced by Plaintiff are significant and material to its trademark rights.

Also, unlike the products in *CreAgri* and *Perry*, Plaintiff's ENDS products have already been examined by the federal agency responsible for enforcing the FDCA. The FDA has expressly determined that Plaintiff cannot market or sell those products. Thus, this Court is not faced with the possibility of usurping the role of the agency responsible for assessing Plaintiff's compliance with the FDCA. And for similar reasons, applying the unlawful use doctrine here would not make this litigation significantly more expensive because the unlawfulness of Plaintiff's products has been established.

On the other hand, the fourth argument against adopting the unlawful use doctrine gives the Court pause. The Lanham Act does not expressly require a "legal" use in commerce. In other words, it does not require that the trademark user comply with all applicable federal laws when using its trademark in commerce. Also, the doctrine has no obvious connection to trademark law or to the purposes of the Lanham Act, which protect the trademark holder's reputation and the goodwill associated with its products. However "anomalous" it may be to give federal trademark protection to uses that violate other federal statutes, Congress did not expressly require compliance with other federal laws as a condition for obtaining or enforcing trademark rights. The Court declines to add a requirement that is not found in the statute itself.

In addition, adopting the doctrine here would have an odd result because Defendants' products are also governed by the FDA's regulations, yet there is no evidence that the

---

[2] There is evidence that Plaintiff's sales have been impacted. Plaintiff's Managing Member, Steven Haddad, represented in a sworn declaration filed with the Court of Appeals that, since the FDA's denial of Plaintiff's application, Plaintiff's distributors "have not made any additional orders of Breeze Smoke products[.]" (11/2021 Haddad Decl. ¶ 26, ECF No. 37-1.)

11

manufacturers of those products even attempted to obtain authorization from the FDA before marketing them or introducing them into commerce. Thus, enforcing Plaintiff's trademark rights would not "reward the hasty at the expense of the diligent." *Cf. CreAgri*, 474 F.3d at 630. Instead, that is what the unlawful use doctrine would do. It would effectively penalize Plaintiff's efforts to obtain a decision from the FDA while allowing Defendants' products to escape scrutiny. For all these reasons, the Court declines to adopt the unlawful use doctrine.

Furthermore, even if the Court were to adopt the unlawful use doctrine, it is doubtful that the rule would impact the outcome here because Plaintiff has provided evidence that some of its products do not fall under the FDA's rule for ENDS products. Some of Plaintiff's disposable e-cigarettes contain no nicotine. (*See* Haddad Decl. ¶ 6, ECF No. 44-1; List of Non-Nicotine BREEZE products, ECF No. 44-6.) For example, in the picture in Section I above, the label for Plaintiff's "mint" flavored disposable e-cigarette states that the product contains "0mg of nicotine." This product uses the same BREEZE-related trademark in the same manner as Plaintiff's other e-cigarettes. Defendants do not explain how a product that contains no nicotine could be a "new *tobacco* product" or an "electronic *nicotine* delivery system" under the FDA's regulations.

When explaining the Deeming Rule, the FDA stated that "a tobacco product includes components and parts (the objects intended or reasonably expected to be used with or for the human consumption of a tobacco product that are not accessories) (e.g., e-liquids, tanks, cartridges, pods, wicks, atomizers)[.]" Deeming Rule, 81 Fed. Reg. 28,973, 29,028 (May 10, 2016). As to nicotine-free products, the FDA stated that "an e-liquid without nicotine is a component (and subject to FDA's tobacco control authorities), if it is *intended or reasonably expected to be used with or for the human consumption of a tobacco product* (e.g., with liquid nicotine) and does not

12

constitute a tobacco product accessory[.]" *Id.* at 29,017 (emphasis added). Here, Plaintiff asserts that its products are "closed" systems, meaning that the consumer cannot add other liquids or cartridges to them. Thus, Plaintiff's nicotine-free e-cigarettes are not intended or reasonably expected to be used with or for the consumption of a tobacco product.

Defendants respond that Plaintiff's nicotine-free products are subject to the FDA's regulations because those products contain "non-tobacco nicotine (NTN) – that is, nicotine not made or derived from tobacco, such as synthetic nicotine." (Defs.' Surreply Br. 3 n.1, ECF No. 53.)[3] But non-tobacco nicotine is still nicotine. If Plaintiff's nicotine-free products contain no nicotine, then logically they contain no synthetic nicotine. Thus, Defendants' argument is not persuasive.

To be clear, the Court is not making an express finding that Plaintiff's nicotine-free e-cigarettes are not governed by the FDA's Deeming Rule. Instead, the Court is evaluating the strength of the parties' arguments and evidence when deciding whether Plaintiff is likely to succeed on the merits of its claim. At this stage, the Court is not persuaded that the marketing or sale of Plaintiff's nicotine-free e-cigarettes is unlawful. And because those products are substantially similar in type and appearance to Plaintiff's ENDS products, the Court is not persuaded that the unlawful use doctrine (if the Court were to adopt it) would preclude Plaintiff from enforcing its trademark rights associated with its nicotine-free products against Defendants' ENDS products.

---

[3] Contrary to Defendants' brief (Defs.' Surreply Br. 3), Plaintiff *does not* argue that its nicotine-free e-cigarettes contain non-tobacco nicotine.

### (b) Trademark Assignments

Next, Defendants question the validity of Plaintiff's marks due to two purportedly improper trademark assignments.

Assignment from Trucenta Holdings. Public records show that Trucenta Holdings, LLC assigned its interest and goodwill in nine standalone BREEZE marks to Plaintiff on February 4, 2002, including two marks that were registered by the U.S. Trademark Office and seven marks that were the subject of applications for a federal registration. (Trademark Assignment, ECF No. 37-8, PageID.413.) According to Defendants, of the trademark applications, six were intent-to-use applications. An application to register a trademark may not be assigned before the applicant files a verified statement of use of the mark in commerce. 15 U.S.C. § 1060(a)(1). There is an exception to this rule where the assignment is "to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing." *Id.* Defendants argue that this exception does not apply because Plaintiff is not a successor to Trucenta's business. Trucenta purportedly filed an annual statement after the assignment date and "still exists in the cannabis space according to numerous reports[.]" (Defs.' Resp. Br. 11-12, ECF No. 37.) An improper assignment renders the assignment, application, and any resulting trademark registration void. *See The Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d 1098 (T.T.A.B. 1996).

Defendants provide no facts or evidence to support their assertion that the assignment occurred before the filing of statements of use. But even if Defendants are correct that the assignment and related applications are invalid, that invalidity would impact only the six BREEZE marks that were the subject of those applications. It would not impact Plaintiff's ability to enforce its rights, including its common law rights, to the BREEZE PLUS mark or the BREEZE SMOKE mark that was recently approved for registration.

Assignment from KMT Services.  In passing, Defendants refer to an argument made by Trucenta in another case about a nunc pro tunc assignment of rights signed by Haddad, which purported to transfer certain trademark rights from KMT Services to Plaintiff.  That argument, which is not part of Defendants' brief, is not properly before the Court.  Moreover, the argument relies on evidence cited by Trucenta in Trucenta's brief.  (*See* Trucenta Br., ECF No. 38-1.)  The Court cannot evaluate that argument without the underlying evidence.

### (c) TTAB Proceedings

Defendants also note that Plaintiff's federal trademark registrations are the subject of cancellation proceedings initiated by Promontory Holdings, LLC, which has applied for federal trademark registrations for "BREEZ," for use in connection with cannabis-themed merchandise, cannabis sprays, and e-cigarettes containing cannabis. (*See* ECF No. 37-7.)  Promontory Holdings contends that the BREEZE PLUS registration is invalid because Plaintiff cannot lawfully sell its ENDS products without FDA approval.  (*Id.*, PageID.322.)  Promontory Holdings also contends that Plaintiff's registered BREEZE marks are confusingly similar to the BREEZ mark, which allegedly predates Plaintiff's marks.  (*Id.*, PageID.317.)  Based on these arguments, Defendants argue that "there is a substantial likelihood that Plaintiff's marks will be invalidated[.]"  (Defs.' Resp. Br. 11.)  However, the Court cannot evaluate that likelihood by looking solely at assertions made by a party seeking to cancel some of Plaintiff's marks.  Further, although BREEZ is similar to Plaintiff's BREEZE marks, Promontory Holdings will also have to demonstrate that it has priority over Plaintiff's registered marks, which is not clear at this stage.  In short, the possibility that Promontory Holdings may succeed in the cancellation proceedings at some point in the future does not prevent Plaintiff from enforcing its existing rights against Defendants in this case.

In summary, Defendants' arguments regarding the invalidity or unenforceability of Plaintiff's marks are not persuasive.

## 2. Strength of the Marks

Turning to the *Frisch* factors for evaluating a likelihood of confusion, the first factor is the strength of Plaintiff's marks. As indicated above, Plaintiff's marks are suggestive because they contain the word "breeze." Suggestive marks are strong enough to be protectable, but they are not as strong as fanciful or arbitrary marks. *See Daddy's*, 109 F.3d at 281.

Another factor when evaluating the strength of the mark is the extent to which it has obtained recognition in the marketplace. *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Here, Haddad avers that Plaintiff has "generated millions of dollars in revenue from the sale of its BREEZE-branded disposable vaping pens" and that Plaintiff and its distributors have spent "millions of dollars on advertising and marketing its BREEZE-branded vaping goods and services." (Haddad Decl. ¶ 17.) But "evidence of advertising budgets . . . has an attenuated link to actual market recognition[.]" *Homeowners Grp.*, 931 F.2d at 1108. Haddad also avers that "the BREEZE Marks enjoy widespread recognition" (Haddad Decl. ¶ 23), but that assertion is conclusory and unsupported.

Defendants note that the market is somewhat crowded with similar marks. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion." *Homeowners Grp.*, 931 F.2d at 1108. "'[E]xtensive third-party uses of a trademark [may] substantially weaken the strength of a mark.'" *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 420 (6th Cir. 2012) (quoting *Homeowners Grp.*, 931 F.2d at 1108). Defendants have produced a list of trademark registrations and trademark applications from category 34 (which is for tobacco and articles used for smoking) that use a form of "breeze" in the mark, twenty-three of which are not associated with Plaintiff. (*See* ECF No. 38-2.) For example, one is an application for C-BREEZE, published on November 29, 2022. Another is an application for BREEZ, published on December 23, 2022. Also, there

16

are two registrations for BREZ and seven registrations for word marks that end in BREEZE, such as POLAR BREEZE, BLUE BREEZE, MORNING BREEZE, PISTACHIO BREEZE, CITRUS BREEZE, CACTUS BREEZE, and VAPORILLO'S SMOKIN' BREEZE. (*Id.*) And an online "vape" store has a trademark registration for a stylized version of the word "Breazy."[4] (*Id.*)

The C-BREEZE and BREEZ marks are most similar to Plaintiff's marks, but those trademark applications are relatively recent and it is not clear whether and to what extent those marks are currently in use in the marketplace. An applicant can file for registration on an "intent-to-use" basis before the mark is actually in use. Also, Plaintiff has opposed those applications.

The BREZ mark and the stylized Breazy mark are less similar to Plaintiff's marks and convey a different impression. The other marks (e.g., POLAR BREEZE) appear to be the names of particular flavors that would be accompanied by a house mark identifying the product source.[5] Such uses reduce the likelihood of confusion with Plaintiff's mark. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 634 (6th Cir. 2002). Nevertheless, these trademark registrations suggest that the term "breeze" (and variations thereof) is somewhat common in the marketplace for Plaintiff's products, which weakens the strength of Plaintiff's marks.

In summary, the evidence regarding the strength of Plaintiff's marks cuts in different directions.

### 3. Relatedness of Goods

Plaintiff's goods are the same type of goods as the allegedly infringing products that Defendants are selling, i.e., flavored disposable electronic vaping devices. The products are

---

[4] The owner of that mark abandoned a registration for BREAZY as a word mark.

[5] *See, e.g.*, https://mipod.com/products/desert-breeze-fume-infinity ("Desert Breeze" flavor with FUME house mark); https://www.plusdispo.com/products/plus-diamond-blue-breeze-pack-of-10 ("Blue Breeze" flavor with PLUS DIAMOND house mark); https://www.gopuff.com/p/naked-polar-breeze-3mg-e-liquid-60ml/p7658 ("Polar Breeze" flavor with NAKED house mark).

closely related. Even Plaintiff's nicotine-free disposable e-cigarettes are closely related to Defendant's products. This factor weighs in Plaintiff's favor.

### 4. Similarity of Marks

The similarity of the marks "is a factor of considerable weight[.]" *Daddy's*, 109 F.3d at 283. When assessing similarity, the Court considers the "'pronunciation, appearance, and verbal translation of conflicting marks.'" *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 266 (6th Cir. 2021) (quoting *Daddy's*, 109 F.3d at 283). The Court must "'view marks in their entirety and focus on their overall impressions, not individual features.'" *Id.* (quoting *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004)).

The mark on the allegedly infringing product is remarkably similar in overall impression to Plaintiff's marks, including Plaintiff's unregistered BREEZE mark for e-cigarettes, as well as its federally registered BREEZE PLUS mark and the recently registered BREEZE SMOKE word mark. The product sold by Defendants is called "Breezy *Bar*" instead of "Breeze *Smoke*" or "Breeze *Plus,*" but the "Breeze" and "Breezy" aspects are the most dominant parts of those marks. Those words are more suggestive whereas the other words in the marks are more descriptive. In addition, "Breeze" is clearly the most prominent part of Plaintiff's mark on Plaintiff's packaging, just as the "Breezy" aspect is clearly the most prominent identifier on Defendants' allegedly infringing products. On both, the term is in all capital letters at the top of the packaging. The slight difference between "Breeze" and "Breezy" does not significantly undercut the similarity. Neither does the difference between "Smoke" or "Plus" and "Bar" at the end of the respective marks. Although the Court looks at the marks in their entirety, the Court can assign "more weight to the dominant features of the marks." *AWGI*, 998 F.3d at 266. Assigning such weight does not, as Defendants suggest, violate the "anti-dissection rule," which requires courts to consider marks

18

as a whole. *See id.* In summary, considering the marks as a whole, the similarity of the marks weighs in Plaintiff's favor.

### 5. Evidence of Actual Confusion

Plaintiff has provided some limited evidence of confusion from a few consumers and potential purchasers. One individual took a picture of the allegedly infringing product and sent it to Plaintiff, asking, "Guys seriously is this you? It looks like a fake but please tell me[.]" (ECF No. 6-13, PageID.468.) Another asked, "This fake breeze? Or original[?]" (*Id.*, PageID.470.) Similarly, another asked, "Are these by breeze or is it a different brand?" (ECF No. 6-15, PageID.478.) A distributor asked, "Too many people asking for breezy bar . . . . Is it yours? Or u guys coming with it new?" (ECF No. 6-14, PageID.472.) These comments suggest some brief confusion about the source of Defendants' products.

Also, a couple of customers complained to Plaintiff about the quality of the allegedly infringing product, thinking that Plaintiff was the source. One complained that "he bought one [Plaintiff's] breezy 6k box vapes jolly rancher flavor and it tastes like mint and it's burnt." (ECF No. 6-16, PageID.480.) Another complained to Plaintiff that his Breezy Bar "started blowing its juice out and got really hot" after only three days of use. (*Id.*, PageID.481.) These comments are even more indicative of confusion than the statements in the previous paragraph. The comments also suggest potential harm to Plaintiff's reputation from what could be an inferior product, the quality of which Plaintiff cannot control.

Bela Sareen, the President of Yatin Enterprises, avers that "Yatin Enterprises is not aware of any instances of confusion between the Breezy Bars and the Breeze Pros sold by the Plaintiff." (Sareen Decl. ¶ 19, ECF No. 37-2.) However, that assertion mentions only one of Plaintiff's trademarks and one type of product. It avoids mention of Plaintiff's standalone BREEZE and

19

BREEZE SMOKE marks, and the particular uses of those marks, that are most similar to the mark on the allegedly infringing product.

In short, the few instances of confusion tilt this factor slightly in favor of Plaintiff.

### 6. Marketing Channels

Defendants concede that the same marketing channels are used. (Defs.' Resp. Br. 22, ECF No. 37.) Indeed, Defendants have sold Plaintiff's products as well as the allegedly infringing ones. This factor weighs in Plaintiff's favor.

### 7. Degree of Purchaser Care

"The degree of customer care—i.e., how carefully a consumer selects a particular good or service—may also affect the possibility of consumer confusion." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 796-97 (6th Cir. 2015). Plaintiff's disposable e-cigarettes sell for $11 to $20 each. (Hadded Decl. ¶ 20.) Common sense suggests that consumers will not pay a high degree of care when purchasing a relatively inexpensive, disposable product like an e-cigarette, which makes confusion more likely. *See Gray v. Meijer*, 295 F.3d 641, 649 (6th Cir. 2002) ("[T]he average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products[.]"); *cf. Grubbs*, 807 F.3d at 797 ("[C]onfusion is less likely in cases involving expensive or unusual services or unusually skilled buyers[.]").

Defendants argue that evidence that one of Plaintiff's distributors asked, "too many people asking for breezy bar . . . is it yours?" suggests that customers are discerning and understand that Breezy Bar is a different product. But as Plaintiff notes, that question suggests confusion as to the *source* of the Breezy Bar product, which is what trademark rights are meant to guard against. This factor weighs in Plaintiff's favor.

### 8. Defendants' Intent in Selecting Mark

"The intent factor concerns the defendant's 'intent to benefit' from the other mark's recognition." *AWGI*, 998 F.3d at 268 (quoting *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 435 (6th Cir. 2017)). "'If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.'" *Daddy's*, 109 F.3d at 286 (quoting *Homeowners Grp.*, 931 F.2d at 1111).

Here, Plaintiff argues that Defendants were aware of its trademarks when they sold the allegedly infringing products because Defendants also sell Plaintiff's products. "[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* And "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Id.*

Defendants respond that they did not select the contested mark because they did not manufacture those products and have no affiliation with the manufacturer. They simply purchased those products from the marketplace.

Neither party cites a case in which a court examined whether the intent of a *distributor*, who did not select the mark that was applied to the product and instead purchased the product from the marketplace, is relevant to the likelihood-of-confusion analysis. At any rate, this factor plays no significant role here because intent is difficult to determine; knowledge of the senior mark can permit an inference of an intent to benefit from that senior mark, but it does not necessarily demonstrate that intent. Furthermore, the other factors discussed above are sufficient on their own to demonstrate a likelihood of confusion.

In summary, on balance, the likelihood-of-confusion factors weigh in Plaintiff's favor. In other words, Plaintiff has shown a substantial likelihood of success on its claims under the Lanham Act.

### B. Irreparable Injury

Next, the Court considers whether Plaintiff has shown the possibility of irreparable injury in the absence of an injunction. Because Plaintiff has shown a likelihood of success on the merits of its Lanham Act claims, it is entitled to a presumption of irreparable harm. 15 U.S.C. § 1116(a); *see Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 555 (6th Cir. 2013) ("In trademark infringement cases, a likelihood of confusion or possible risk to the requesting party's reputation satisfies the irreparable injury requirement.").

Defendants argue that Plaintiff would suffer no harm because its goods are not marketable under the FDA's order. But as discussed above, that is not necessarily the case for all of Plaintiff's products. Moreover, the Court declines to adopt the unlawful use doctrine, so the Court's focus is on whether Plaintiff can enforce its trademark rights. Even if Plaintiff cannot legally sell most of its products for the time being, those trademark rights have not disappeared. Neither has the goodwill associated with those marks. Plaintiff can enforce those rights against Defendants, who are potentially profiting off the goodwill developed by Plaintiff by selling a product with a mark that is similar to Plaintiff's marks.

Defendants contend that the equities weigh against enforcing Plaintiff's rights because Plaintiff's ENDS products are not legal. But that argument does not help Defendants, who are in the same position. Defendants do not claim that the Breezy Bar products have been approved, let alone evaluated, by the FDA.

### C. Substantial Harm to Others

The next factor is the harm to others from the injunction. As far as harm to Defendants is concerned, an injunction will prevent Defendants from selling the Breezy Bar product. However, that product is one of many products sold by Defendants. It is also one of several different brands

of disposable ENDS products sold by Defendants, in a market with multiple options. Thus, there is less likelihood that an injunction will cause significant harm to Defendants' businesses.

Defendants argue that an injunction against them "will not solve Plaintiff's alleged problem" because Defendants are local Michigan stores and the allegedly infringing product is sold nationwide. (Defs.' Resp. Br. 23.) An injunction may not stop the sale of Breezy Bar products entirely, but that is not the showing required of Plaintiff at this stage. It is sufficient for Plaintiff to show that stopping *Defendants'* sale of those products will prevent irreparable harm arising from those sales. It has made that showing.

### D. Public Interest

The public interest is served by enforcing Plaintiff's existing trademark rights and preventing the sale of products that are likely to create confusion in the marketplace.

### E. Balance of Factors

On balance, the factors weigh in favor of a preliminary injunction.

### F. Security Requirement

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "While this language appears to be mandatory, 'the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.'" *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). The parties have not briefed this issue, so any decision on the matter would be arbitrary. The Court will not enter an injunction until after the parties submit briefing on the requirement to post security.

In summary, the Court will grant Plaintiff's request for a preliminary injunction but will not enter the injunction until the parties provide further direction on the security requirement in Rule 65(c).

## V. JUDGMENT ON THE PLEADINGS

### A. Standard

Defendants seek judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim." *HDC*, 675 F.3d at 611. Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to

24

in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### B. Analysis

#### 1. Lanham Act (Counts I, II)

Defendants argue that Plaintiff fails to state a claim under the Lanham Act because Plaintiff's products are unlawful under the FDCA. As discussed above, however, the Court declines to adopt the unlawful use doctrine. Moreover, Plaintiff sells some nicotine-free vaping products under the BREEZE SMOKE mark. (*See* Compl. ¶ 18 (showing "mint" product with "0mg of nicotine").) Defendants have not adequately explained why such products would be governed by the FDA's regulations. Thus, their argument for dismissal is not persuasive.

#### 2. MCPA (Count III)

Defendants further argue that Plaintiff does not state a MCPA claim because its products are regulated by the FDA. The MCPA does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). Under that exemption, "the relevant inquiry 'is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 519 (Mich. 2007) (quoting *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999)). Accordingly, because the FDA regulates the marketing of ENDS products, Defendants argue that the MCPA does not apply to those products. *See Duronio v. Merck & Co.*, No. 267003, 2006 WL 1628516, at *7 (Mich. Ct. App. June 13, 2006) ("Because the general marketing and advertising activities underlying plaintiff's MCPA claim are authorized and regulated under laws administered by the FDA, the exemption in MCL 445.904(1)(a) applies to plaintiff's MCPA claim.").

25

Plaintiff responds that its nicotine-free products are not governed by the FDA's regulations. However, the marketing and sale of *Defendants'* ENDS products is the target of Plaintiff's MCPA claim. Those activities are regulated by the FDA. Plaintiff does not allege that Defendants sell nicotine-free products. Indeed, all the examples of Defendants' products that are pictured in the complaint state that they contain nicotine. (*See* Ex. C. to Compl., ECF No. 1-4.) Accordingly, the exemption applies and Plaintiff fails to state a claim under the MCPA.

## VI. CONCLUSION

For the reasons stated herein, the Court will grant Plaintiff's motion for a preliminary injunction, but the Court will not issue the injunction until after the parties provide further briefing regarding the security requirement. The Court will grant Defendants' motion for judgment on the pleadings, in part, as to Count III of the complaint.

The Court will enter an order consistent with this Opinion.


Dated: April 25, 2023                          /s/ Hala Y. Jarbou
                                               HALA Y. JARBOU
                                               CHIEF UNITED STATES DISTRICT JUDGE

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

     Plaintiff,

v.                                Case No. 1:22-cv-1182

YATIN ENTERPRISES INC., et al.,           Hon. Hala Y. Jarbou

     Defendants.

_____/

## PRELIMINARY INJUNCTION ORDER

In accordance with the Court's April 25, 2023, opinion and its order entered this date:

**IT IS ORDERED** that Defendants Yatin Enterprises Inc., Mini Market LLC, Drake Party Store LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, Wild Monkey Smoke Shop, and any of their agents, successors, assigns, and/or others in active concert or participation with them are **ENJOINED** from directly or indirectly using the name or mark "BREEZY," or any other name or mark including or incorporating that term, in connection with the marketing or sale of tobacco or vaping products, or any other related products or services.

**IT IS FURTHER ORDERED** that Plaintiff is not required to furnish a bond in connection with this preliminary injunction.

Dated: May 16, 2023

                               /s/ Hala Y. Jarbou
                               HALA Y. JARBOU
                               CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit B



1471 E. Nine Mile Rd., Unit 200
Hazel Park, MI 48030
www.breezesmoke.com

August 4, 2023

RE: COPYCAT VAPES

Dear Customers:

It has recently come to our attention that there are several copycat vapes on the market holding themselves out to the public as being affiliated with and/or being the "new Breeze". Some of these items look closely enough to our Breeze-branded products that they cause confusion in the marketplace.

The purpose of this communication is to inform you that none of the below imitation items are associated with our company. The vapes we are referring to are, but not limited to:

- North
- Freeze
- B-Freeze
- Breze Stiik
- VIP Freeze Pro

We are currently pursuing legal action against all those named in this letter. Feel free to reach out to info@breezesmoke.com with any questions or concerns or if you have any additional information on the aforementioned vapes.

All the products that we distribute are placed on our website. Please refer to www.breezesmoke.com if there is ever a question of authenticity.

Best,

The Breeze Team







Exhibit C

# United States of America

## United States Patent and Trademark Office



**Reg. No. 6,296,004**

**Registered Mar. 16, 2021**

**Int. Cl.: 25**

**Trademark**

**Principal Register**

Trucenta Holdings LLC  (MICHIGAN LIMITED LIABILITY COMPANY)
1675 E. Maple
Troy, MICHIGAN 48083

CLASS 25: Beanies; hats; hooded sweatshirts; long-sleeved shirts; shirts; sweaters; tank tops; graphic T-shirts; short-sleeved or long-sleeved T-shirts; sweat shirts; T-shirts; tee shirts; woolly hats

FIRST USE 2-4-2020; IN COMMERCE 4-6-2020

The mark consists of the letters "BREEZE" in an upper-case, san-serif font, with the second letter "E" backwards and the three horizontal elements of the first letter "E" joined to the corresponding horizontal element of the second letter "E" in elongated, wavy lines.

SER. NO. 88-462,141, FILED 06-06-2019







Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# BREEZE SMOKE

**Reg. No. 6,976,563**

**Registered Feb. 14, 2023**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

BREEZE SMOKE LLC  (MICHIGAN LIMITED LIABILITY COMPANY)
4654 LILLY CT
WEST BLOOMFIELD, MICHIGAN 48323

CLASS 34: Disposable Electronic Cigarettes

FIRST USE 3-1-2020; IN COMMERCE 3-1-2020

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "SMOKE"

SER. NO. 90-012,117, FILED 06-20-2020



*Katherine Kelly Vidal*

Director of the United States
Patent and Trademark Office



**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# BREEZE PLUS

**Reg. No. 6,770,534**

**Registered Jun. 28, 2022**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

BREEZE SMOKE LLC (MICHIGAN LIMITED LIABILITY COMPANY)
4654 LILLY CT
WEST BLOOMFIELD, MICHIGAN 48323

CLASS 34: Disposable Electronic Cigarettes

FIRST USE 3-1-2020; IN COMMERCE 3-1-2020

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO
ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 90-246,820, FILED 10-10-2020



Katherine Kelly Vidal

Director of the United States
Patent and Trademark Office



**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# BREEZE PRO

**Reg. No. 6,992,438**

**Registered Feb. 28, 2023**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

Breeze Smoke LLC  (MICHIGAN LIMITED LIABILITY COMPANY)
1471 E Nine Mile Rd., Unit 200
Hazel Park, MICHIGAN 48030

CLASS 34: Disposable Electronic Cigarettes

FIRST USE 8-18-2021; IN COMMERCE 8-18-2021

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO
ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 90-555,765, FILED 03-02-2021



*Katherine Kelly Vidal*

Director of the United States
Patent and Trademark Office



**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO).  The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

# United States of America

## United States Patent and Trademark Office

# BREEZE

**Reg. No. 6,296,005**

**Registered Mar. 16, 2021**

**Int. Cl.: 25**

**Trademark**

**Principal Register**

Trucenta Holdings LLC  (MICHIGAN LIMITED LIABILITY COMPANY)
1675 E. Maple
Troy, MICHIGAN 48083

CLASS 25: Beanies; hats; hooded sweatshirts; long-sleeved shirts; shirts; sweaters; tank tops; graphic T-shirts; short-sleeved or long-sleeved T-shirts; sweat shirts; T-shirts; tee shirts; woolly hats

FIRST USE 2-4-2020; IN COMMERCE 4-6-2020

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 88-462,147, FILED 06-06-2019





Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office



## REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# Exhibit D

Aug. 17, 1965

H. A. GILBERT

3,200,819

SMOKELESS NON-TOBACCO CIGARETTE

Filed April 17, 1963



INVENTOR
Herbert A. Gilbert

BY Mawhinney & Mawhinney
ATTORNEYS

# United States Patent Office

**3,200,819**
Patented Aug. 17, 1965

1

2

**3,200,819**
**SMOKELESS NON-TOBACCO CIGARETTE**
Herbert A. Gilbert, 278 McKinley Road, Beaver Falls, Pa.
Filed Apr. 17, 1963, Ser. No. 273,624
10 Claims. (Cl. 128—208)

The present invention relates to a smokeless non-tobacco cigarette and has for an object to provide a safe and harmless means for and method of smoking by replacing burning tobacco and paper with heated, moist, flavored air; or by inhaling warm medication into the lungs in case of a respiratory ailment under direction of a physician.

Another object of the invention is to provide an article of manufacture resembling a cigarette by which air may be drawn through a porous substance of a cartridge which has been moistened with a chemically harmless flavoring preparation, combining moisture and taste following which the moist and flavored air passes through a section of the device heated by a suitable heating element so that warm, moist and flavored air is drawn into the mouth and if desired into the lungs of the user.

A further object of the invention is to provide a smokeless non-tobacco cigarette in which provision is made for circulating the fluid around the heating element in a turbulent manner to suitably raise the temperature of the inhalent mixture, with the purpose that the temperature of the flavored air may approximate that of cigarette smoke.

A further object is to insulate the heat source so that the "cigarette" may be held in the fingers without discomfort to the user's hand.

With the foregoing and other objects in view, the invention will be more fully described hereinafter, and will be more particularly pointed out in the claims appended hereto.

In the drawings, wherein like symbols refer to like or corresponding parts throughout the several views:

FIGURE 1 is a side elevational view of the completed article constructed in accordance with the invention in simulation of a cigarette.

FIGURE 2 is a longitudinal section taken through the same with all interior parts assembled.

FIGURE 3 is a cross-sectional view taken on the line 3—3 in FIGURE 2.

FIGURE 4 is a side elevational view of a form of flavor cartridge employed.

FIGURE 5 is a transverse sectional view taken on the line 5—5 in FIGURE 2.

FIGURE 6 is a similar view taken on the line 6—6 in FIGURE 2.

FIGURE 7 is a longitudinal sectional view of a form of outer tube.

FIGURE 8 is a similar view of a form of insulating liner.

FIGURE 9 is a longitudinal sectional view of a form of mouthpiece that may be employed.

FIGURE 10 is a side elevational view of a form of heating element or vacuum tube or bulb that may be employed.

Referring more particularly to the drawings, 15 designates an external tube made preferably in the size, color and form of a cigarette, such tube having an outer end portion 16 and an inner end portion 17.

Subdividing the interior space of the external tube is an internal shoulder 18 which is preferably closer to the outer end portion 16 than to the opposite inner end portion 17, thus dividing the tube into relatively short and substantially longer chambers.

The tube 15 is supplied at the inner end portion 17

with internal threads 19 or some other means of connection for a mouthpiece as later described.

In the outer end portion 16 is detachably fitted a flavor cartridge 20 of some suitable absorbent material, preferably having longitudinal spaced passages 21 therethrough of a small diameter. The cartridge 20 is abutted against the outer edge of the internal shoulder 18 and is of an external diameter to fit snugly into the outer end portion 16 so that it will be held therein by friction or other suitable means.

Within the more forward chamber of the outer tube 15 is received a tubular liner 22 preferably of insulating material and having an internal wall 23 of a form and character to tumble the air or create turbulence therein. This internal wall may be spiralled or rifled as indicated.

A mouthpiece 24 is affixed to the inner end portion 17 of the tube 15 in any appropriate manner, preferably detachably as by external threads 26 on the hollow shank 25 of the mouthpiece which mate with the internal threads 19 in the inner end portion of the outer tube 15.

As shown in FIGURE 2, the free outer end of the hollow shank 25, when fitted home in the outer tube, will encounter and push the insert 22 against the inner wall of the internal shoulder 18 thus holding the insert 22 immovably in place.

The hollow shank 25 will preferably have an outstanding shoulder 27 forwardly of the threads 26 to engage the inner end of the tube 15 in the completely assembled position of the mouthpiece 24 relatively to the outer tube 15.

As best seen in FIGURE 6 showing a cross-section through the hollow shank portion 25 of the mouthpiece, a spider formation is shown providing air draft spaces 28 between the hollow shank 25 and an inner ring 29 spaced inwardly from the hollow shank 25 and connected therewith by radial arms 39. The air draft spaces 28 communicate with the suction orifice 40 of the mouthpiece at the inner end and at the outer end with the space circumscribed by the inner wall 23 of the tubular insert 22.

Within the inner ring 29 is a threaded electric socket 30 and forwardly thereof a battery cavity 31 for detachably receiving a battery 32 having an inner contact 33 and an outer contact 34 with a contact strip 35 between the inner contact 33 and the socket 30.

The heating element is preferably a vacuum tube or bulb 36 having a screw plug 37 for detachable engagement with the socket 30. The screw plug 37 has an end contact 38 adapted to close against the outer battery contact 34. The bulb or tube 36, similar to a light bulb, is preferably elongated and of a diameter to fit within the insert 22 in such manner as to provide an elongated heating passage throughout the length of the bulb and around the complete circumference of the bulb 36.

In assembly, the flavor cartridge 20 can be introduced and removed without regard to the other units of the device.

Before the mouthpiece 24 is assembled to the external tube 15, the liner 22 is slid through the open inner end portion of the tube until the outer end of the liner 22 encounters the internal shoulder 18. The bulb 36 will be mounted to the socket 30 while the mouthpiece 24 is detached from the tube 15 whereupon the bulb 36 may be introduced into the insert 22 as the mouthpiece 24 is put into place and rotated to effect attachment of the mouthpiece to the outer tube 15. The final home position of the parts is indicated in FIGURE 2 in which the hollow shank 25 engages the inner end of the insert 22 while the outer end of the insert is abutted against the internal shoulder 18.

When the bulb 36 is assembled to the socket 30 its tip end 38 will engage the inner battery contact 33 and com-

3,200,819

**3**

plete the circuit through the filament of the bulb 36 by the contact strip 35. Thus the bulb 36 will be illuminated or energized before assembly to the external tube 15.

The battery 32 is removable so that when exhausted, a fresh dry battery may be substituted, access to the same being had by first unscrewing the mouthpiece 24 and withdrawing the bulb 36 from its socket 30.

The insert 22 is preferably of a ceramic material. By the act of inhalation through the mouthpiece 24, air from the ambient atmosphere is drawn in through the passages 21 of the cartridge 20 which has been impregnated with suitable flavoring material which is picked up by the inhaled air and such air then passes into the heating chamber and is caused to flow around the heating bulb 36, the heated and flavored air finally passing through the mouthpiece 24 into the mouth and also, if desired, into the lungs.

The tumbling of the air around the heat source provides for uniformity of heat transfer while the insert 22 also serves to insulate the basic tube 15 so that it does not become hot to the hand of the user.

The cartridge 20 may be composed of a porous, moisture-holding substance such as felt or plastic sponge although there are many other materials which will serve the purpose.

The impregnation will be by a harmless flavored chemical compound. As suggested, such compounds may be solutions ranging from slightly mentholated water to a solution which would simulate artificially the flavor of Scotch whisky. Many other solutions and flavors may be employed.

The outer tube may be of plastic, fiber glass or any other appropriate material.

The member 24 as shown in the drawings is shaped in the fashion of a mouthpiece but it is not necessary that it be so shaped. The tubular shape of the outer tube 15 may be continued to the right hand end of the mouthpiece if desired to further the illusion of a cigarette.

Some of the advantages of the invention are:

(a) There is no open flame or fire and fire hazard is therefore eliminated.

(b) Nothing is consumed so that there is no smoke, ashes or dirt.

(c) Since the air which enters the lungs of the user comes into contact with only inert materials, there is nothing of an injurious nature being placed into the respiratory system of the user.

(d) Heated medication for respiratory ailments may be induced into the lungs of a user of this invention should a physician feel the same desirable.

(e) Persons who wish to smoke but have been advised against such a practice by their doctor may use this invention to maintain the satisfaction of smoking without any of its disadvantages.

(f) By changing the liquid employed to moisten the cartridge 20, a variety of tastes may be imparted to the warm moist air which serves to duplicate the smoking sensation.

(g) The size and shape of the device according to this invention may approximate the size and shape of a cigarette; therefore its use will not call undue attention to the user. A white coloration of the basic tube 15 and mouthpiece will further add to this illusion.

It is to be understood that various details of the exemplary structures chosen to illustrate the invention are capable of being modified and in some cases omitted without departing from the broad principles of the invention as defined by the more broadly worded of the appended claims.

What is claimed is:

1. A smokeless non-tobacco cigarette comprising
(a) an external tube having inner and outer end portions,

**4**

(b) a flavor cartridge in the outer end portion,
(c) heating means in the tube,
(d) a tubular liner also in the tube at least partially surrounding and spaced from the heating means and having
(e) an internal wall shaped to produce turbulence in the air stream drawn through the space between the heating means and tubular liner,
(f) a mouthpiece on the inner end portion of the tube for drawing atmosphere air by inhaling through the outer end portion of the tube including the cartridge and through the space between the heating means and liner and into the mouth of the user, and said cartridge having air passages therethrough communicating at the outer end of the tube with the atmosphere and at the inner end of the tube with said space and ultimately with the mouthpiece for permitting air to be drawn past the flavor cartridge for inhalation by the user at the mouthpiece.

2. A smokeless non-tobacco cigarette as claimed in claim 1 in which the internal wall (e) of the tubular liner is rifled to produce the turbulent effect recited.

3. A smokeless non-tobacco cigarette as claimed in claim 1 in which the tubular liner (d) is of heat insulating material and in which the internal wall (e) is spirally grooved to tumble the air around the heating means.

4. A smokeless non-tobacco cigarette as claimed in claim 1 in which the flavor cartridge (b) comprises
(h) a porous substance moistened with
(i) a chemically harmless flavoring material.

5. A smokeless non-tobacco cigarette as claimed in claim 4 in which the porous substance (h) is traversed by
(j) air passages running lengthwise of the tube opening at the outer end to atmosphere and at the inner end to the space between the heating means and the liner.

6. A smokeless non-tobacco cigarette as claimed in claim 1 in which the tube has
(h) an inwardly projecting division shoulder constituting a stop against the rear edge of which the flavor cartridge is abutted and against the forward edge of which the rear end of the liner is abutted.

7. A smokeless non-tobacco cigarette as claimed in claim 1 in which the mouthpiece (f) includes
(h) a hollow shank detachably interlocked with the external tube and abutted against the inner end portion of the liner.

8. A smokeless non-tobacco cigarette comprising
(a) on external tube having inner and outer end portions,
(b) a flavor cartridge in the outer end portion,
(c) heating means in the tube,
(d) a tubular liner also in the tube at least partially surrounding and spaced from the heating means and having
(e) an internal wall shaped to produce turbulence in the air stream drawn through the space between the heating means and tubular liner,
(f) a mouthpiece on the inner end portion of the tube for drawing atmospheric air by inhaling through the outer end portion of the tube including the cartridge and through the space between the heating means and liner and into the mouth of the user,
(g) said cartridge having air passages therethrough communicating at the outer end of the tube with the atmosphere and at the inner end of the tube with said space and ultimately with the mouthpiece for permitting air to be drawn past the flavor cartridge for inhalation by the user at the mouthpiece,
(h) an electric socket in the mouthpiece, said heating means being an electric bulb having
(i) a plug entered into the socket, and
(j) a battery also in the mouthpiece having electric

3,200,819

5

connection to the socket and exposed in the socket to the plug for energizing the electric bulb.

9. A smokeless non-tobacco cigarette as claimed in claim 8 further comprising

(k) a battery receiving cavity in the mouthpiece inwardly of the socket,

(l) a battery removably mounted through the socket into the cavity and having

(m) inner and outer contacts, said plug having

(n) an inner end contact for closing against said outer contact, and

(o) a contact strip connecting the inner battery contact with the socket.

10. A smokeless non-tobacco cigarette as claimed in claim 1 in which said mouthpiece (f) comprises

(h) a spider internal construction having

(i) spaced internal and external concentric rings having

(j) air draft spaces therebetween,

(k) radiating angularly spaced arms connecting the rings,

(l) a threaded socket in the inner ring,

6

(m) a battery cavity in the inner ring inwardly of the socket,

(n) a battery in the cavity electrically connected to the socket, said heating means having a screw plug adapted to be entered into the socket and electrically connected to the battery.

## References Cited by the Examiner

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 726,037 | 4/03 | Ferre _____ | 128—200 |
| 962,617 | 6/10 | Bucceri _____ | 128—201 |
| 2,204,312 | 6/40 | Huxter _____ | 128—192 |
| 2,696,382 | 12/54 | Gelardin. | |
| 2,702,033 | 2/55 | Pardeman _____ | 128—201 |
| 2,721,551 | 10/55 | Lobl _____ | 128—208 |
| 2,860,638 | 11/58 | Bartolomeo _____ | 128—201 |

### FOREIGN PATENTS

| | | | |
|---|---|---|---|
| 566,647 | 4/58 | Belgium. | |
| 960,469 | 10/49 | France. | |

RICHARD A. GAUDET, *Primary Examiner.*

Exhibit E

US00D891691S

(12) **United States Design Patent** (10) Patent No.: **US D891,691 S**

Chen (45) Date of Patent: ** **Jul. 28, 2020**

(54) **ELECTRONIC CIGARETTE**

(71) Applicant: **Shenzhen Smoore Technology Limited**, Shenzhen, Guandong (CN)

(72) Inventor: **Zhiping Chen**, Guandong (CN)

(73) Assignee: **SHENZHEN SMOORE TECHNOLOGY LIMITED**, Shenzhen (CN)

(**) Term: **15 Years**

(21) Appl. No.: **29/662,313**

(22) Filed: **Sep. 5, 2018**

(51) **LOC (12) Cl.** ............................................. **27-02**

(52) **U.S. Cl.**
USPC ....................................................... **D27/162**

(58) **Field of Classification Search**
USPC ....... D27/162, 100, 101, 161, 163–165, 172, D27/183, 185–194; D13/107–109; D24/110, 110.5; 128/202.21, 203.12; 131/273, 270, 191, 329, 330, 360–365
CPC ......... A61M 15/06; A24F 47/00; A24F 47/02; A24F 47/04; A24F 47/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| D799,110 | S | * | 10/2017 | Qiu | ............................. | D27/101 |
| D818,636 | S | * | 5/2018 | Qiu | ............................. | D27/101 |
| D825,834 | S | * | 8/2018 | Chen | ............................ | D27/101 |
| D827,195 | S | * | 8/2018 | Chen | ............................ | D27/101 |
| D842,536 | S | * | 3/2019 | Bowen | .......................... | D27/167 |
| D844,235 | S | * | 3/2019 | Cividi | ........................... | D27/167 |
| D844,240 | S | * | 3/2019 | Kauss | .......................... | D27/194 |

(Continued)

*Primary Examiner* — Marissa J Cash

*Assistant Examiner* — Rebecca Tsehaye

(57) **CLAIM**

The ornamental design for an electronic cigarette, as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view of an atomizer shown as a component 1 removed from the assembly in FIGS. **17-24** for clarity of disclosure;
FIG. **2** is another perspective thereof;
FIG. **3** is a front elevational view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a left side elevational view thereof;
FIG. **6** is a right side elevational view thereof;
FIG. **7** is a top plan view thereof;
FIG. **8** is a bottom plan view thereof;
FIG. **9** is a perspective view of a power supply device shown as a component 2 removed from the assembly in FIGS. **17-24** for clarity of disclosure;
FIG. **10** is another perspective thereof;
FIG. **11** is a front elevational view thereof;
FIG. **12** is a rear elevational view thereof;
FIG. **13** is a left side elevational view thereof;
FIG. **14** is a right side elevational view thereof;
FIG. **15** is a top plan view thereof;
FIG. **16** is a bottom plan view thereof;
FIG. **17** is a perspective view of an electronic cigarette where component 1 and component 2 are shown in an assembled state of use;
FIG. **18** is another perspective thereof;
FIG. **19** is a front elevational view thereof;
FIG. **20** is a rear elevational view thereof;
FIG. **21** is a left side elevational view thereof;
FIG. **22** is a right side elevational view thereof;
FIG. **23** is a top plan view thereof; and,
FIG. **24** is a bottom plan view thereof.
Oblique lines on the surfaces of the electronic cigarette indicate that those surfaces are transparent.
The broken lines in the drawings depict portions of the electronic cigarette that form no part of the claimed design.

**1 Claim, 21 Drawing Sheets**



**US D891,691 S**

Page 2

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D855,251 S | * | 7/2019 | Qiu ............................... | D27/162 |
| D857,290 S | * | 8/2019 | Crowe ......................... | D27/162 |
| D865,279 S | * | 10/2019 | Pino ............................. | D27/172 |
| D870,373 S | * | 12/2019 | Greenbaum ................. | D27/169 |
| D870,374 S | * | 12/2019 | Greenbaum ................. | D27/169 |
| D871,669 S | * | 12/2019 | Lee .............................. | D27/194 |
| D872,934 S | * | 1/2020 | Powell ......................... | D27/163 |
| D875,303 S | * | 2/2020 | Pan .............................. | D27/162 |

* cited by examiner

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 96 of 162 PageID #:96



FIG. 1

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 97 of 162 PageID #:97



FIG. 2



FIG. 3



FIG. 4



FIG. 5

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 101 of 162 PageID #:101



FIG. 6

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 102 of 162 PageID #:102



FIG. 7



FIG. 8



FIG. 9

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 104 of 162 PageID #:104



FIG. 10



FIG. 11

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 106 of 162 PageID #:106



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 111 of 162 PageID #:111



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 116 of 162 PageID #:116



FIG. 23



FIG. 24

# Exhibit F



US00D863665S

(12) **United States Design Patent** (10) Patent No.: **US D863,665 S**

Huang et al. (45) Date of Patent: ** **Oct. 15, 2019**

(54) **ELECTRONIC CIGARETTE**

(71) Applicant: **Shenzhen Bluemark Technology Co., Ltd.**, Shenzhen, Guangdong (CN)

(72) Inventors: **Liangzhi Huang**, Guangdong (CN); **Furong Huang**, Guangdong (CN)

(73) Assignee: **Shenzhen Bluemark Technology Co., Ltd.**, Shenzhen (CN)

(**) Term: **15 Years**

(21) Appl. No.: **29/643,935**

(22) Filed: **Apr. 12, 2018**

(30) **Foreign Application Priority Data**

Jan. 17, 2018 (CN) .......................... 2018 3 0021172

(51) **LOC (12) Cl.** ............................................... **27-01**
(52) **U.S. Cl.**
USPC ...................................................... **D27/101**
(58) **Field of Classification Search**
USPC .............. D27/100, 101, 162–196; D23/366;
D24/110; D19/101, 106, 115, 165, 195;
D7/416; D3/212, 247; D21/394, 573,
D21/574, 682
CPC ........ A24F 47/00; A24F 47/002; A24F 15/12;
A24F 1/32; A24F 15/18
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D284,795 | S | * | 7/1986 | Webb | D27/194 |
| D535,054 | S | * | 1/2007 | Zilberman | D27/189 |
| D574,951 | S | * | 8/2008 | Reusch | D24/108 |
| D723,738 | S | * | 3/2015 | Liu | D27/189 |
| D725,310 | S | * | 3/2015 | Eksouzian | D27/101 |
| D725,823 | S | * | 3/2015 | Scatterday | A24F 15/12 |
| | | | | | D27/189 |
| D732,733 | S | * | 6/2015 | Spagnolo | D27/101 |

| | | | | | |
|---|---|---|---|---|---|
| D735,936 | S | * | 8/2015 | Liu | D27/189 |
| D752,284 | S | * | 3/2016 | Doster | D27/189 |
| D762,003 | S | * | 7/2016 | Lomeli | D27/163 |
| D767,821 | S | * | 9/2016 | Clark | D27/189 |
| D776,337 | S | * | 1/2017 | Levin | D27/101 |
| D776,338 | S | * | 1/2017 | Lomeli | D27/163 |
| D776,869 | S | * | 1/2017 | Heidl | D27/163 |
| D778,492 | S | * | 2/2017 | Liu | D27/101 |
| D779,719 | S | * | 2/2017 | Qiu | D27/101 |
| D788,697 | S | * | 6/2017 | Verleur | D13/103 |
| D790,680 | S | * | 6/2017 | Afridi | D23/366 |
| D792,643 | S | * | 7/2017 | Wong | D27/101 |
| D793,004 | S | * | 7/2017 | Liu | D27/189 |
| D799,110 | S | * | 10/2017 | Qiu | D27/101 |
| D799,113 | S | * | 10/2017 | Qiu | D27/101 |
| D799,744 | S | * | 10/2017 | Qiu | D27/101 |

(Continued)

*Primary Examiner* — Marissa J Cash

(57) **CLAIM**

The ornamental design for an electronic cigarette, as shown and described.

**DESCRIPTION**

FIG. **1** is a front elevational view of an electronic cigarette showing our new design;
FIG. **2** is a rear elevational view thereof;
FIG. **3** is a left side view thereof;
FIG. **4** is a right side view thereof;
FIG. **5** is a top plan view thereof;
FIG. **6** is a bottom plan view thereof;
FIG. **7** is a top, front and right side perspective view thereof; and,
FIG. **8** is a bottom, rear and right side perspective view thereof.
The broken lines in the drawings illustrate portions of the electronic cigarette which form no part of the claimed design.
The oblique lines depict transparency.

**1 Claim, 7 Drawing Sheets**



**US D863,665 S**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D808,071 | S | * | 1/2018 | Folkerts .................... D27/101 |
| D813,447 | S | * | 3/2018 | Watson ..................... D27/162 |
| D815,341 | S | * | 4/2018 | Qiu .......................... D27/101 |
| D818,636 | S | * | 5/2018 | Qiu .......................... D27/101 |
| D819,262 | S | * | 5/2018 | Lin .......................... D27/101 |
| D819,263 | S | * | 5/2018 | Zhu .......................... D27/101 |
| D819,881 | S | * | 6/2018 | Qiu .......................... D27/101 |
| D821,867 | S | * | 7/2018 | Oligschlaeger ............. D9/422 |
| D822,271 | S | * | 7/2018 | Eksouzian .................. D27/101 |
| D822,896 | S | * | 7/2018 | Durand ..................... D27/101 |
| D822,898 | S | * | 7/2018 | Ruiz ......................... D27/191 |
| D825,098 | S | * | 8/2018 | Fornarelli .................. D27/101 |
| D825,099 | S | * | 8/2018 | Wright ...................... D27/101 |
| D825,102 | S | * | 8/2018 | Bowen ...................... D27/167 |
| D825,834 | S | * | 8/2018 | Chen ......................... D27/101 |
| D827,195 | S | * | 8/2018 | Chen ......................... D27/101 |
| D829,371 | S | * | 9/2018 | Durand ..................... D27/101 |
| D829,372 | S | * | 9/2018 | Huang ...................... D27/101 |
| D829,373 | S | * | 9/2018 | Huang ...................... D27/101 |
| D829,980 | S | * | 10/2018 | Qiu .......................... D27/162 |
| D830,625 | S | * | 10/2018 | Stone ....................... D27/101 |
| D832,499 | S | * | 10/2018 | Qiu .......................... D27/162 |
| D832,500 | S | * | 10/2018 | Qiu .......................... D27/162 |
| D834,246 | S | * | 11/2018 | Qiu .......................... D27/162 |
| D834,702 | S | * | 11/2018 | Evans ....................... D24/110 |
| D834,744 | S | * | 11/2018 | Zhu .......................... D27/101 |

| | | | | |
|---|---|---|---|---|
| 10,136,679 | B1 | * | 11/2018 | Shotey ..................... G01K 13/00 |
| D835,337 | S | * | 12/2018 | Beer ......................... D27/162 |
| D836,190 | S | * | 12/2018 | Evans ....................... D24/110 |
| D836,831 | S | * | 12/2018 | Cividi ....................... D27/162 |
| D837,446 | S | * | 1/2019 | Durand ..................... D27/101 |
| D843,644 | S | * | 3/2019 | Qiu .......................... D27/101 |
| D844,229 | S | * | 3/2019 | Sherwood ................. D27/162 |
| D844,890 | S | * | 4/2019 | Schwartz ................... D27/101 |
| 2015/0034104 | A1 | * | 2/2015 | Zhou ................... A24F 47/008 |
| | | | | 131/329 |
| 2015/0128967 | A1 | * | 5/2015 | Robinson .............. A24F 47/008 |
| | | | | 131/328 |
| 2017/0258142 | A1 | * | 9/2017 | Hatton .................. A24F 47/008 |
| 2017/0347713 | A1 | * | 12/2017 | Robinson ................. B32B 7/12 |
| 2018/0042302 | A1 | * | 2/2018 | Robinson ............. A61M 15/06 |
| 2018/0043115 | A1 | * | 2/2018 | Gould ............... A61M 15/0021 |
| 2018/0098571 | A1 | * | 4/2018 | Watson ................. A24F 47/008 |
| 2018/0153221 | A1 | * | 6/2018 | Verleur ................. A24F 47/008 |
| 2018/0184716 | A1 | * | 7/2018 | Song .................... A24F 47/008 |
| 2018/0213847 | A1 | * | 8/2018 | Reevell ................ A24F 47/008 |
| 2018/0279682 | A1 | * | 10/2018 | Guo .................... A24F 47/008 |
| 2018/0310618 | A1 | * | 11/2018 | Watson ................. H05B 1/0227 |
| 2018/0368473 | A1 | * | 12/2018 | Fraijo .................... A24F 1/28 |
| 2019/0008208 | A1 | * | 1/2019 | Cirillo .................. A24F 47/008 |
| 2019/0029319 | A1 | * | 1/2019 | Moorman .............. A24F 47/008 |
| 2019/0029326 | A1 | * | 1/2019 | Qiu ..................... A24F 47/008 |
| 2019/0037926 | A1 | * | 2/2019 | Qiu ..................... A24F 47/008 |
| 2019/0116881 | A1 | * | 4/2019 | Sherwood ............. A24F 47/008 |

* cited by examiner



FIG.1



FIG.2



FIG.3



FIG.4



FIG.5



FIG.6



FIG.7



FIG.8

# Exhibit G

US00D865276S

(12) **United States Design Patent** (10) Patent No.: **US D865,276 S**
Pino et al. (45) Date of Patent: \*\* Oct. 29, 2019

(54) **ELECTRONIC CIGARETTE**

(71) Applicant: **SS Group Holding Limited**, Hong Kong (CN)

(72) Inventors: **Victor Shelton Sanna Pino**, Sao Paulo (BR); **Lipei Tan**, Guangming Shenzhen (CN)

(73) Assignee: **SS Group Holding Limited**, Hong Kong (CN)

(\*\*) Term: **15 Years**

(21) Appl. No.: **29/642,829**

(22) Filed: **Apr. 2, 2018**

(51) **LOC (12) Cl.** .................................... **27-02**

(52) **U.S. Cl.**
USPC .................................... **D27/162**

(58) **Field of Classification Search**
USPC ....... D27/163–170, 101, 102, 106, 108, 111, D27/112, 144, 183, 186–189; 206/259, 206/242, 249
CPC .......... A24F 15/00; A24F 15/02; A24F 15/04; A24F 15/12; A24F 15/14; A24F 47/00; A24F 47/002; A24F 19/0035; A24F 19/00; A24F 19/0014; A61M 15/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D779,719 | S | * | 2/2017 | Qiu | D27/101 |
| D792,643 | S | * | 7/2017 | Wong | D27/101 |
| D799,110 | S | * | 10/2017 | Qiu | D27/101 |
| D799,112 | S | * | 10/2017 | Qiu | D27/101 |
| D799,113 | S | * | 10/2017 | Qiu | D27/101 |
| D819,881 | S | * | 6/2018 | Qiu | D27/101 |
| D824,093 | S | * | 7/2018 | Kauss | D27/101 |
| D825,834 | S | * | 8/2018 | Chen | D27/101 |
| D829,371 | S | * | 9/2018 | Durand | D27/101 |
| D832,499 | S | * | 10/2018 | Qiu | D27/162 |
| D832,500 | S | * | 10/2018 | Qiu | D27/162 |
| D834,246 | S | * | 11/2018 | Qiu | D27/162 |
| D837,446 | S | * | 1/2019 | Durand | D27/101 |

* cited by examiner

*Primary Examiner* — Susan Bennett Hattan
*Assistant Examiner* — Rebecca Tsehaye
(74) *Attorney, Agent, or Firm* — Gurr Brande & Spendlove, PLLC; Robert A. Gurr

(57) **CLAIM**

The ornamental design for an electronic cigarette, as shown and described.

**DESCRIPTION**

FIG. **1** is a front perspective view of the electronic cigarette;
FIG. **2** is a front elevation view of the electronic cigarette;
FIG. **3** is a back-elevation view of the electronic cigarette;
FIG. **4** is a left side elevation view of the electronic cigarette;
FIG. **5** is a right side elevation view of the electronic cigarette;
FIG. **6** is a top plan view of the electronic cigarette;
FIG. **7** is a bottom plan view of the electronic cigarette; and,
FIG. **8** is a front elevation view of the electronic cigarette shown in a state of use with a cartridge for electronic cigarette liquid depicted in broken lines.
The broken lines shown in the drawings depict portions of the electronic cigarette that form no part of the claimed design. Additional broken lines in FIG. **8** showing a cartridge for electronic cigarette liquid depict environmental subject matter only and form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4             FIG. 5

**U.S. Patent**     Oct. 29, 2019     **Sheet 4 of 4**     **US D865,276 S**



FIG. 6



FIG. 7



FIG. 8

# Exhibit H

US00D762003S

(12) **United States Design Patent**
Lomeli

(10) Patent No.: **US D762,003 S**
(45) Date of Patent: ** **Jul. 19, 2016**

(54) **ELECTRONIC VAPORIZATION DEVICE**

(71) Applicant: **PAX Labs, Inc.**, San Francisco, CA (US)

(72) Inventor: **Kevin Lomeli**, San Francisco, CA (US)

(73) Assignee: **PAX Labs, Inc.**, San Francisco, CA (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/497,578**

(22) Filed: **Jul. 25, 2014**

(51) **LOC (10) Cl.** .............................................. **27-02**

(52) **U.S. Cl.**
USPC ....................................................... **D27/163**

(58) **Field of Classification Search**
USPC ........ D27/101, 148, 162–165, 167, 171–173,
D27/182–189, 192–194, 176–181, 191, 169,
D27/123, 105, 108, 190; D8/300, 349–352,
D8/354–356; D13/108, 120, 121, 103.104;
D25/126; D23/355, 356, 360, 370;
D24/110; D9/516, 521, 522, 529, 549,
D9/551, 559, 561, 564, 572–575, 651, 682,
D9/686–694, 724, 738, 747
CPC ....... A24F 15/00; A24F 15/005; A24F 15/02;
A24F 15/04; A24F 15/06; A24F 15/08;
A24F 15/10; A24F 15/12; A24F 15/14;
A24F 15/16; A24F 15/18; A24F 15/20;
A24F 47/00; A24F 47/002; A24F 47/004;
A24F 47/006; A24F 47/008
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D301,837 S | * | 6/1989 | Peterson | D9/529 |
| D302,659 S | * | 8/1989 | Peterson | D9/529 |
| D310,171 S | * | 8/1990 | Cusenza | D9/529 |
| D367,605 S | * | 3/1996 | Moore | D9/529 |
| D379,810 S | * | 6/1997 | Giordano, Jr. | D14/138 R |
| D540,687 S | * | 4/2007 | Egawa | D9/529 |
| D558,060 S | * | 12/2007 | Sir | D9/687 |
| D562,151 S | * | 2/2008 | Larocca | D9/529 |
| D569,727 S | * | 5/2008 | Moretti | D9/454 |
| D571,556 S | * | 6/2008 | Raile | D3/265 |
| D573,474 S | * | 7/2008 | Beam | D9/423 |
| D577,591 S | * | 9/2008 | Bouroullec | D9/529 |
| D599,670 S | * | 9/2009 | Qin | D9/529 |
| D616,753 S | * | 6/2010 | Beam | D9/420 |
| D670,272 S | * | 11/2012 | Suzuki | D14/217 |

(Continued)

OTHER PUBLICATIONS

Electronic Vaporization Device | Pax Vaporizer | Vape World,posted at www.vapeworld.com, posting date not given, @ 2014 vapeworld.com [online] [site visited Nov. 13, 2015]. Availabe from internet, http://www.vapeworld.com/pax-vaporizer-by-ploom?gclid=CPCi1PKojskCFU06gQodPr.*

(Continued)

*Primary Examiner* — Susan Bennett Hattan
*Assistant Examiner* — Jennifer Wright
(74) *Attorney, Agent, or Firm* — Shay Glenn LLP

(57) **CLAIM**
The ornamental design for an electronic vaporization device, as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view of an electronic vaporization device, showing my new design;
FIG. **2** is a top plan view thereof;
FIG. **3** is a front elevation view thereof;
FIG. **4** is a right side elevation view thereof;
FIG. **5** is a left side elevation view thereof;
FIG. **6** is a rear elevation view thereof; and,
FIG. **7** is a bottom plan view thereof.
The broken lines in the drawings depict parts of the electronic vaporization device that form no part of the claimed design.

**1 Claim, 2 Drawing Sheets**



**US D762,003 S**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D682,698 S | * | 5/2013 | Young .......................... D9/529 |
| D684,683 S | * | 6/2013 | Curti .......................... D24/110 |
| D721,972 S | * | 2/2015 | Brewer ........................ D9/529 |
| D725,310 S | * | 3/2015 | Eksouzian ................... D27/101 |
| D738,038 S | * | 9/2015 | Smith ......................... D27/170 |
| D739,973 S | * | 9/2015 | Chao .......................... D13/108 |
| 2013/0042865 A1 | * | 2/2013 | Monsees ............... A61M 15/06 |
| | | | 128/203.27 |
| 2015/0305409 A1 | * | 10/2015 | Verleur ................ A24F 47/008 |
| | | | 131/329 |

OTHER PUBLICATIONS

Electronic Vaporization Device | Pax Vaporizer | Fuck Combustion | posted at, www.fuckcombustion.com, posting date not given, @ 2010-2015 fuckcombustion.com [online] [site visited Nov. 16, 2015]. Available from internet, http://fuckcombustion.com/threads/pax-vaporizer-by-ploom.6223/.*

* cited by examiner



FIG. 1

FIG. 2

FIG. 4

FIG. 3

FIG. 5

FIG. 6

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 137 of 162 PageID #:137



*FIG. 7*

Exhibit I

US00D759303S

(12) **United States Design Patent** (10) Patent No.: **US D759,303 S**

Afridi (45) Date of Patent: ** **Jun. 14, 2016**

(54) **VAPORIZER**

(71) Applicant: **A.K.A. Worldwide, L.L.C.**, Salt Lake City, UT (US)

(72) Inventor: **Adnan Afridi**, Riverton, UT (US)

(73) Assignee: **A.K.A. Worldwide, L.L.C.**, Riverton, UT (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/518,036**

(22) Filed: **Feb. 19, 2015**

(51) **LOC (10) Cl.** ................................................. **27-02**

(52) **U.S. Cl.**
USPC .......................................... **D27/163**; D27/101

(58) **Field of Classification Search**
USPC ........ D27/101, 162, 163–169, 171; D24/110,
D24/113; D23/360; 131/329
CPC ..... A24F 47/00; A24F 47/002; A24F 47/004;
A24F 47/006; A24F 47/008; F23Q 2/28
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D653,803 | S | * | 2/2012 | Timmermans | D27/163 |
| D720,095 | S | * | 12/2014 | Alima | D27/101 |
| D720,496 | S | * | 12/2014 | Alima | D27/101 |
| D720,497 | S | * | 12/2014 | Alima | D27/101 |
| D720,881 | S | * | 1/2015 | Liu | D27/101 |
| D720,882 | S | * | 1/2015 | Albanese | D27/101 |
| D721,202 | S | * | 1/2015 | Liu | D27/101 |
| D724,263 | S | * | 3/2015 | Malhi | D27/101 |
| D725,310 | S | * | 3/2015 | Eksouzian | D27/101 |
| D727,562 | S | * | 4/2015 | Li | D27/101 |
| D731,112 | S | * | 6/2015 | Li | D27/101 |
| D751,249 | S | * | 3/2016 | Chen | D27/101 |
| 2013/0068239 | A1 | * | 3/2013 | Youn | A24F 47/008 131/273 |

* cited by examiner

*Primary Examiner* — Susan Bennett Hattan
*Assistant Examiner* — Janice Hallmark
(74) *Attorney, Agent, or Firm* — Maschoff Brennan

(57) **CLAIM**

The ornamental design for a vaporizer, substantially as shown and described.

**DESCRIPTION**

FIG. **1** is a front perspective view of a vaporizer, showing my new design;
FIG. **2** is a top perspective view thereof;
FIG. **3** is a bottom perspective view thereof;
FIG. **4** is second top perspective view thereof;
FIG. **5** is another bottom perspective view thereof;
FIG. **6** is third top perspective view thereof;
FIG. **7** is a front elevational view thereof;
FIG. **8** is a rear elevational view thereof;
FIG. **9** is a first side elevational view thereof;
FIG. **10** is a second side elevational view thereof;
FIG. **11** is a top plan view thereof; and,
FIG. **12** is a bottom plan view thereof.
The broken lines in the drawings depict parts of the vaporizer that form no part of the claimed design.

**1 Claim, 9 Drawing Sheets**



**U.S. Patent**     Jun. 14, 2016      Sheet 1 of 9         US D759,303 S



*FIG. 1*



*FIG. 2*

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 142 of 162 PageID #:142



**FIG. 3**



*FIG. 4*

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 144 of 162 PageID #:144



*FIG. 5*

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 145 of 162 PageID #:145



*FIG. 6*





*FIG. 7*                *FIG. 8*

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 147 of 162 PageID #:147





*FIG. 9*            *FIG. 10*



*FIG. 11*



*FIG. 12*

Exhibit J

US00D757353S

(12) **United States Design Patent** (10) Patent No.: **US D757,353 S**
Nunnelly et al. (45) Date of Patent: ** May 24, 2016

(54) **SMOKING DEVICE ASSEMBLY**

(71) Applicant: **Music City Marketing, Inc.**, Nashville, TN (US)

(72) Inventors: **William H. Nunnelly**, Nashville, TN (US); **Arron D. Sissom, Jr.**, Manchester, TN (US)

(73) Assignee: **Music City Marketing, Inc.**, Nashville, TN (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/496,691**

(22) Filed: **Jul. 16, 2014**

(51) **LOC (10) Cl.** ............................................... **27-01**
(52) **U.S. Cl.**
USPC ....................................................... **D27/101**
(58) **Field of Classification Search**
USPC ........ D27/101, 100, 163, 167, 169, 170, 172, D27/174, 175, 180, 183, 194; 131/347, 360, 131/361, 191, 199, 225, 229, 200; D24/113, 112
CPC .................................... A24F 1/28; A24F 13/00
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D590,991 S | * | 4/2009 | Hon | D27/101 |
| 7,997,280 B2 | * | 8/2011 | Rosenthal | A61M 11/041 128/202.21 |
| D662,257 S | * | 6/2012 | Alelov | D27/101 |
| D666,355 S | * | 8/2012 | Alelov | D27/101 |
| D720,882 S | * | 1/2015 | Albanese | D27/101 |
| D720,883 S | * | 1/2015 | Albanese | D27/101 |
| D732,733 S | * | 6/2015 | Spagnolo | D27/101 |
| D743,539 S | * | 11/2015 | Chung | D24/113 |
| 2012/0186592 A1 | * | 7/2012 | Schleider | A24F 1/28 131/191 |

* cited by examiner

*Primary Examiner* — Susan Bennett Hattan
*Assistant Examiner* — Rebecca Tsehaye
(74) *Attorney, Agent, or Firm* — Eric B. Fugett; Waller Lansden Dortch & Davis, LLP

(57) **CLAIM**
The ornamental design for a smoking device assembly, substantially as shown and described.

**DESCRIPTION**

FIG. **1** is a front perspective view of a smoking device assembly showing my new design.
FIG. **2** is an exploded front perspective view thereof;
FIG. **3** is a rear perspective view thereof;
FIG. **4** is an exploded rear perspective view thereof;
FIG. **5** is a top view thereof, the opposite side view being a mirror image thereof;
FIG. **6** a rear view thereof;
FIG. **7** a front view thereof;
FIG. **8** is a side view thereof, the opposite side view being a mirror image thereof;
FIG. **9** is a side view of a mouthpiece of the smoking device assembly of FIGS. **1-8**, the opposite side being a mirror image thereof;
FIG. **10** is a rear view of an end-piece of the smoking device assembly of FIGS. **1-8**;
FIG. **11** is a front view of the mouthpiece of FIG. **9**; and,
FIG. **12** is a side view of the end-piece of FIG. **10**, the opposite side being a mirror image thereof.
The broken lines in the drawing depict portions of the smoking device assembly that form no part of the claimed design.

**1 Claim, 6 Drawing Sheets**





FIG. 1



FIG. 2

Case: 1:23-cv-05406 Document #: 1 Filed: 08/11/23 Page 153 of 162 PageID #:153



FIG. 3



FIG. 4



**FIG. 5**



**FIG. 7**



**FIG. 6**



**FIG. 8**



FIG. 9



FIG. 10



FIG. 11



FIG. 12

# Exhibit K

US00D756031S

(12) **United States Design Patent**
Wu

(10) Patent No.: **US D756,031 S**
(45) Date of Patent: ** **May 10, 2016**

(54) **ELECTRONIC CIGARETTE**

(71) Applicant: **SHENZHEN JIESHIBO TECHNOLOGY CO., LTD.**, Guangdong (CN)

(72) Inventor: **Jianyong Wu**, Guangdong (CN)

(**) Term: **14 Years**

(21) Appl. No.: **29/499,731**

(22) Filed: **Aug. 18, 2014**

(51) **LOC (10) Cl.** .............................................. **27-01**

(52) **U.S. Cl.**
USPC ........................................................ **D27/101**

(58) **Field of Classification Search**
USPC .......... D27/100, 101, 162, 165, 194; D9/549, D9/564, 567; D28/4, 48, 68, 85, 88; D24/110; 131/173, 174, 194, 220, 221, 131/222, 226, 227, 270, 271, 273, 328, 329, 131/330, 347, 348, 360, 361
CPC .............. A24B 1/00; A24F 1/02; A24F 1/04; A24F 1/06; A24F 1/08; A24F 1/10; A24F 1/12; A24F 1/14; A24F 1/22; A24F 1/28; A24F 1/30; A24F 9/16; A24F 25/00; A24F 47/00; A24F 47/002; A24F 47/004; A24F 47/006; A24F 47/008; A24D 1/00; A24D 1/04; A24D 3/00
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,499,766 | B1 * | 8/2013 | Newton | A24F 47/008 131/273 |
| D695,449 | S * | 12/2013 | Tucker | D27/101 |
| D728,154 | S * | 4/2015 | Lavanchy | D27/100 |
| 2010/0200008 | A1 * | 8/2010 | Taieb | A24F 47/008 131/360 |
| 2014/0007863 | A1 * | 1/2014 | Chen | A24F 47/008 128/200.14 |
| 2014/0069425 | A1 * | 3/2014 | Zhang | A24F 47/008 128/202.21 |
| 2014/0283858 | A1 * | 9/2014 | Liu | A24F 47/008 131/329 |
| 2015/0083145 | A1 * | 3/2015 | Li | H01M 2/1055 131/329 |
| 2015/0164143 | A1 * | 6/2015 | Maas | A24F 47/008 131/329 |
| 2015/0173422 | A1 * | 6/2015 | Liu | A24F 47/008 131/329 |
| 2015/0208726 | A1 * | 7/2015 | Liu | H05B 1/0244 131/329 |
| 2015/0216232 | A1 * | 8/2015 | Bless | A24F 47/008 131/328 |
| 2015/0216236 | A1 * | 8/2015 | Bless | B23K 26/20 131/328 |

* cited by examiner

*Primary Examiner* — Rosemary K Tarcza
*Assistant Examiner* — Christy Nemeth
(74) *Attorney, Agent, or Firm* — Prakash Nama; Global IP Services, PLLC

(57) **CLAIM**

The ornamental design for an electronic cigarette, as shown and described.

**DESCRIPTION**

FIG. **1** is a front elevational view of an electronic cigarette showing my new design;
FIG. **2** is a rear elevational view thereof;
FIG. **3** is a left side view thereof;
FIG. **4** is a right side view thereof;
FIG. **5** is a top plan view thereof;
FIG. **6** is a bottom plan view thereof;
FIG. **7** is a front perspective view thereof; and,
FIG. **8** is a rear perspective view thereof.
The broken lines shown in FIG. **5** show portions of the electronic cigarette which form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



**U.S. Patent**      May 10, 2016      Sheet 1 of 4      US D756,031 S



FIG. 1          FIG. 2

FIG. 3         FIG. 4



FIG. 5

FIG. 6

FIG. 7



FIG. 8