# EXHIBIT 4



FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

*Legal Terms and Conditions*

Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of 100 USD or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is 500 USD, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).



Jeffrey K. Lamb
Office: 313.465.7404
jlamb@honigman.com

*Via FedEx*

September 13, 2023

Mr. Abdel Zehour
CEO
Wisemen Wholesale, Inc.
857 Industrial Dr.
Bensenville, IL 60106

Re:    *Infringing Breeze Pro Products and Trade Dress*

Dear Mr. Zehour:

Honigman LLP represents Breeze Smoke LLC in trademark litigation matters. Breeze Smoke demands that you immediately cease your unlawful sale and offer for sale of products that are obvious infringements of the trade dress in the BREEZE PRO disposable e-cigarette products.

Breeze Smoke has built an extremely successful brand under a family of BREEZE trademarks, which it has used extensively in connection with high-quality, well-known, and immensely popular tobacco and vaping products throughout the United States and worldwide. Breeze Smoke's most popular product is its BREEZE PRO disposable vape pen, which is the highest quality all-in-one vaping system ever introduced in the market. Breeze Smoke sells its products in various ways, including by licensees online and at a substantial number of brick-and-mortar locations, and promotes its products on its website at https://www.breezesmoke.com/. Through its predecessors in interest, Breeze Smoke has been using its BREEZE trademarks in the United States since at least as early as 2014 in connection with its products.

Breeze Smoke owns federal registrations of its BREEZE and BREEZE PRO marks. *See* U.S. Trademark Reg. No. 6,296,005; 6,296,004; and 6,992,438. Breeze Smoke also owns federal registrations for its BREEZE SMOKE and BREEZE PLUS marks, *see* U.S. Trademark Reg. Nos. 6,976,563 and 6,770,534. In addition, Breeze Smoke owns several U.S. Trademark Applications for its BREEZE and BREEZE PALM marks and several state registrations for its BREEZE-formative marks.

Breeze Smoke's BREEZE PRO products also bear a highly distinctive trade dress. An example showing the highly distinctive shape of the BREEZE PRO disposable e-cigarette is shown below.

# HONIGMAN ®

September 6, 2023
Page 2



Breeze Smoke's BREEZE PRO products are also marketed, offered and sold in a highly distinctive packaging that consumers associate exclusively with Breeze Smoke. An example is below:



Breeze Smoke vigorously protects and enforces its rights against infringers and counterfeiters of its valuable BREEZE trademarks and trade dress including filing lawsuits when necessary. *See* Exhibit A, sample injunctions against defendants.

You can now avoid a similar lawsuit by immediately ceasing your sales of products that infringe the BREEZE PRO disposable electronic cigarette trade dress (the "Infringing Products").

Breeze Smoke was surprised to discover that you are offering for sale and selling disposable e-cigarettes that infringe the BREEZE PRO disposable e-cigarette trade dress on your wisemenwholesale.com website. The trade dress of these products is virtually identical; the only difference is that these products bear the mark NORTH instead of the BREEZE PRO and BREEZE SMOKE marks that belong to our client. *See* Exhibit B.

The designs of the Infringing Products are so similar that they have already caused multiple instances of confusion in the marketplace and will inevitably lead to more market confusion and significant economic damage to our client. Indeed, one can barely distinguish among the vape pen design of the

# HONIGMAN ®

September 6, 2023
Page 3

BREEZE PRO disposable e-cigarette and the Infringing Product in shape, color, label design, font, font color and stylization. The packaging for the Infringing Products is also closely similar to the BREEZE PRO packaging, which consumers have become highly accustomed to seeing and selecting in connection with the BREEZE PRO disposable e-cigarette. They have the same overall look and feel with the same shape and size container, a bold color wrapping around the bottom portion intended to match the flavoring, the brand in all capital letters and in white font with the flavor written directly underneath and a tobacco warning at the bottom. Any consumer familiar with the BREEZE PRO brand—and there are many—would believe that the Infringing Product emanates from or is associated in some way with the BREEZE PRO disposable e-cigarette solely from the look and feel of the product design and design of the packaging for the Infringing Product.

Finally, we note that you advertise BREEZE PRO disposable e-cigarettes on your website right alongside the Infringing Products. This conduct demonstrates your knowledge of Breeze Smoke, the BREEZE marks belonging to Breeze Smoke, and the BREEZE PRO disposable e-cigarette product design and packaging trade dress as well as your willful infringement of Breeze Smoke's highly distinctive and instantly recognizable trade dress that Breeze Smoke has spent considerable time and resources protecting.



Your sale and offer for sale of the Infringing Products bearing such closely similar trade dress to the genuine BREEZE PRO disposable e-cigarettes has caused many instances of confusion in the marketplace and is highly likely to continue to cause confusion and deception in the marketplace. Such use constitutes intentional and willful trade dress infringement, false designation of origin, false advertising, and unfair competition in violation of the U.S. Trademark Act, as amended, 15 U.S.C. § 1051 *et. seq*, and related state laws.

49355548.1

**HONIGMAN** ®

September 6, 2023
Page 4

Accordingly, Breeze Smoke demands that you immediately:

(1) Cease and desist all use, sales and offer for sale of the Infringing Products, including all marketing and promotion thereof in any medium;

(2) Provide us with an accounting of your sales pertaining to the Infringing Products, including: a) total number of items purchased, and the purchase price; b) total number of Infringing Products sold; c) gross and net profit per item; d) total gross and net profits associated with the sale of Infringing Products. Please support your figures with your sales records;

(3) Turn over to us all Infringing Products inventory in your possession or control, and let us know whether you are awaiting any additional orders that are still in transit (and if so, the details of those orders/shipments);

(4) Provide us with information regarding the source of the Infringing Products you purchased, including but not limited to sales invoices, shipping documentation receipts, credit card receipts and payment information, e-mail or other communications with the seller, and any other information you may have to help Breeze Smoke to understand the source of the products.

If we do not receive written confirmation of the above and your full and complete response within seven (7) days of this letter, Breeze Smoke may pursue legal action against you without further notice. If you are not the source of the Infringing Products and you cooperate with Breeze Smoke in this matter and provide information that will allow Breeze Smoke to uncover the source of Infringing Products, Breeze Smoke will consider that information favorably to you. If you would like to discuss the specifics of such an arrangement, please contact me.

Nothing in this letter waives any rights, remedies, claims, causes of action, or defenses of Breeze Smoke, all of which are expressly reserved.

Very truly yours,

HONIGMAN LLP

Jeffrey K. Lamb

Encl.

Honigman LLP • 2290 First National Building • 660 Woodward Avenue • Detroit, Michigan 48226-3506

49355548.1

Exhibit A

49355548.1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

    Plaintiff,

vs.

FARID JARJESS, *et al.*,

    Defendants.

Case No. 2:20-cv-13413-AJT-EAS

Hon. Arthur J. Tarnow

Magistrate Judge Stafford

## STIPULATED PERMANENT INJUNCTION AGAINST CERTAIN DEFENDANTS

WHEREAS, Plaintiff Breeze Smoke LLC ("Plaintiff"), and Defendants EZ Smoke Shop 2, Inc., Ismail Kaid Al-Madrahi, EZ Smoke Shop Plus, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali, by and through their respective counsel, hereby stipulate and agree to the following permanent injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants EZ Smoke Shop 2, Inc., Ismail Kaid Al-Madrahi, EZ Smoke Shop Plus, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali, and any of their agents, successors, assigns, and/or others in active concert or participation with them, are enjoined from directly or indirectly using or selling any unauthorized products bearing the mark "BREEZE" or any other mark or name including or incorporating

39293958.1

the mark "BREEZE" and Breeze Smoke's BREEZE packaging trade dress shown below, or any other packaging or trade dress that is confusingly similar thereto, in connection with vaping products containing the "Breeze" name, or any other related products or services, including but not limited to counterfeit BREEZE products, the "Sea BREEZE Plus" product, or the "Night BREEZE" product:

  

SO ORDERED.

Dated: May 20, 2021

s/Arthur J. Tarnow
U.S. District Court Judge

39293958.1

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  May 20, 2021

By:  /s/ *Andrew M. Pauwels*
Jeffrey K. Lamb (P76738)
Andrew M. Pauwels (P79167)
Nicholas A. Burandt (P84113)
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com
apauwels@honigman.com
nburandt@honigman.com

Mary A. Hyde (P83066)
HONIGMAN LLP
155 North Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone:  (312) 701-9360
mhyde@honigman.com

*Attorneys for the Plaintiff*

Respectfully submitted,

By: /s/ *Kim Corbin* (w/ permission)
Kim Corbin
Kim Corbin PLLC
15206 Mack Ave.
Gross Pointe Park, MI 48230
(313) 610-2689
corbinlaw@comcast.net

*Attorney for Defendants EZ Smoke Shop 2, Inc., EZ Smoke Shop Plus, Inc., Ismail Kaid Al-Madrahi, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali*

39293958.1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

      Plaintiff,

                                   Case No. 1:22-cv-1182

v.

                                   Hon. Hala Y. Jarbou

YATIN ENTERPRISES INC., et al.,

      Defendants.

_____/

### OPINION

Plaintiff Breeze Smoke LLC manufactures and sells vaping products, including disposable electronic vaping devices ("e-cigarettes"). It owns several trademarks with the word "BREEZE" in them. Defendants Yatin Enterprises Inc., Mini Market, LLC, Drake Party Store, LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, and Wild Monkey Smoke Shop are a wholesaler and five party stores located in Western Michigan. Plaintiff claims that Defendants are infringing Plaintiff's trademark rights by selling disposable e-cigarettes with the name "BREEZY BAR" on the label. Before the Court are Plaintiff's motion for a preliminary injunction (ECF No. 6) and Defendants' motion for judgment on the pleadings (ECF No. 59). For the reasons herein, the Court will grant Plaintiff's motion for a preliminary injunction. The Court will grant Defendants' motion for judgment on the pleadings in part and deny it in part.

### I. BACKGROUND

Plaintiff sells its e-cigarettes online and in retail locations throughout Michigan and the United States under various BREEZE marks. (Haddad Decl. ¶ 15, ECF No. 6-2.) Plaintiff avers that it and its predecessor-in-interest have used "BREEZE trademarks" on vaping products since as early as 2014. (*Id.* ¶ 6.) Plaintiff owns federally registered trademarks for BREEZE PLUS and BREEZE SMOKE for use on disposable e-cigarettes. (Reg. No. 6,770,534, ECF No. 6-3,

PageID.216; Reg. No. 6,976,563.)  The latter was approved on February 14, 2023.  Plaintiff also owns a registration for BREEZE for use on apparel (Reg. No. 6,296,005, ECF No. 6-3, PageID.264), and a stylized version of the word breeze, **BREEZE**, also for use on apparel (Reg. No. 6,296,004, ECF No. 6-3, PageID.268).  And it has applied for additional federal registrations for BREEZE-related word marks on disposable e-cigarettes and e-cigarette liquid, including BREEZE PALM and BREEZE PRO, asserting use as early as 2020.  (Haddad Decl. ¶ 8.)  It also owns two Michigan registrations for BREEZE, both of which assert use since 2020.  (*Id.* ¶¶ 11-12.)  The following are examples of Plaintiff's use of its BREEZE PRO, BREEZE PLUS, and BREEZE SMOKE marks on its disposable e-cigarette products:



(*Id.* ¶ 7.)

In October 2022, Plaintiff discovered that several retailers in Michigan, including Defendants, were selling disposable e-cigarettes under the name BREEZY BAR, such as the following:



(*Id.* ¶ 33.)  Plaintiff is not associated with these products.

Plaintiff claims that Defendants are infringing its rights under federal and state law. Count I of the complaint asserts that Defendants are infringing Plaintiff's federally registered trademarks, in violation of the Lanham Act, 15 U.S.C. § 1114.  Count II asserts that Defendants are engaged in unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a), by using Plaintiff's marks as a false designation of the origin of the infringing products.  Count III asserts that Defendants are using marks similar to Plaintiff's BREEZE marks in a manner that is likely to cause confusion, in violation of Michigan's Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 et seq.  Count IV asserts that Defendants' sale of the allegedly infringing products has misappropriated Plaintiff's goodwill and business reputation, constituting unfair competition under common law.  Count V asserts a claim for unjust enrichment based on Defendants' conduct.

Plaintiff now moves for a preliminary injunction to enforce its rights under the Lanham Act.

## II. PROCEDURAL HISTORY

Plaintiff initially brought this action in the Eastern District of Michigan.  On December 9, 2022, that court transferred the matter to this Court.  Plaintiff initially sought a temporary restraining order and preliminary injunction, but the Court denied the request for a temporary restraining order because Plaintiff did not fulfill the requirements for seeking one.  (*See* 12/13/2022

Order, ECF No. 25.) Accordingly, the Court gave Defendants an opportunity to respond before considering Plaintiff's motion for a preliminary injunction. They have now done so.

## III. PRELIMINARY INJUNCTION STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). The Court considers four factors when deciding whether to grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

## IV. PREIMINARY INJUNCTION ANALYSIS

### A. Likelihood of Success

At issue under Plaintiff's Lanham Act claims is the alleged infringement of Plaintiff's rights flowing from its federally registered trademarks, as well as from its marks that have not been registered at the federal level. The Lanham Act creates a cause of action against "would-be infringers" of both registered and unregistered marks, as long as the unregistered marks are protectable. *Matal v. Lam*, 582 U.S. 218, 225 (2017); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754,

4

761 n.4 (6th Cir. 2005) ("'Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks . . . .'" (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992))). When determining whether Plaintiff has demonstrated a strong or substantial likelihood of success under its Lanham Act claims, the Court first examines whether its marks are protectable (if they are not registered) and then whether "'the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods . . . .'" *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 869 (6th Cir. 2022) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)). The "usual way" to prove customer confusion is through the "eight-factor, totality-of-the-circumstances test." *Id.* Those factors are:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Id.* (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

### 1. Protectable/Enforceable Marks

Here, Plaintiff currently possesses federal registrations for BREEZE PLUS and BREEZE SMOKE, and uses various unregistered marks on its vaping products that contain the word "breeze," including BREEZE PRO. These marks are all suggestive in nature.[1] They are not merely descriptive of Plaintiff's products. Suggestive marks are generally protectable so long as they are used by the putative owner, as is the case here. *Tumblebus*, 399 F.3d at 761.

---

[1] A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (internal quotation marks and citation omitted).

### (a) Unlawful Use Doctrine

Defendants argue that Plaintiff's marks (both registered and unregistered) are not protectable or enforceable here because they cannot lawfully be used in commerce on Plaintiff's vaping products. Plaintiff's e-cigarettes are subject to regulation by the FDA as a "new tobacco product." (*See* FDA Letter, ECF No. 37-1, PageID.199.) Specifically, the FDA requires that manufacturers of electronic nicotine delivery systems ("ENDS") obtain approval from the FDA before selling or marketing their products. The Court of Appeals has explained the history of the FDA's regulations as follows:

> In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (TCA) to regulate tobacco products and to empower the FDA to conduct the regulation. Pub. L. No. 111-31, 123 Stat. 1776 (2009). The statute recognized the FDA as the primary federal regulatory authority regarding the manufacture, marketing, and distribution of tobacco products. *Id.* § 3(1), 123 Stat. at 1781. The Act applies to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco," and also authorizes the Secretary of Health and Human Services (HHS) to subject through regulation any other tobacco product to the statute's requirements. 21 U.S.C. § 387a(b). The Secretary carries out this responsibility through the FDA. *See id.* § 393(d)(2).

> Manufacturers of new tobacco products that were not on the market as of February 15, 2007 or that were modified after that date must obtain premarket authorization prior to marketing their products. *Id.* § 387j(a). The TCA contains multiple pathways for tobacco manufacturers to seek authorization to market their products. *See* 21 U.S.C. §§ 387j(a)(2)(A)(i)–(ii), 387j(b)–(c), 387e(j)(1), 387e(j)(3). The relevant path here is the premarket tobacco application, in which a manufacturer may file a premarket application that contains information regarding the product's health risks, a statements of the product's ingredients, the product's manufacturing information, and samples of the product and its proposed labeling. 21 U.S.C. § 387j(b)-(c). A tobacco product that is marketed without the appropriate authorization can face civil and criminal enforcement action by the FDA. 21 U.S.C. §§ 331(a)-(c), 332, 334, 387b(6).

> In May 2016, the FDA promulgated the "Deeming Rule," which deemed cigars, pipe tobacco, and electronic nicotine delivery systems (e-cigarettes) to be tobacco products subject to the TCA. 81 Fed. Reg. 28,974, 28,982–84 (May 10, 2016). When the Deeming Rule took effect in August 2016, as many as 25,000 products already on the market became subject to, and would suddenly be in violation of, 21 U.S.C. § 387j(a). . . . The FDA announced that it would stagger compliance periods for deemed tobacco products that were already on the market on the effective date

6

of the Deeming Rule, during which time the FDA would not bring enforcement actions against the manufacturers of newly-regulated tobacco products for failure to obtain premarket authorization. 81 Fed. Reg. at 28,977-78. This was intended to allow time for manufacturers of newly deemed products to come into compliance. Originally, the FDA required premarket tobacco applications to be submitted by August 8, 2018. Id. at 29,010–11, 29,106. In May 2017, the FDA extended the compliance period by three months. 82 Fed. Reg. 22,338, 22,340 (May 15, 2017). Finally, the FDA issued new guidance in August 2017 that extended the compliance period to August 8, 2022 for most e-cigarettes.

*Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 498 (6th Cir. 2020) (footnote omitted).

Here, Plaintiff applied to the FDA for approval of its ENDS products, and the FDA denied its application. *See Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 504-06 (6th Cir. 2021) (discussing Plaintiff's application). Without such authorization, those products are considered "misbranded" under the Federal Food, Drug, and Cosmetic Act ("FDCA"), and Plaintiff is prohibited from introducing or delivering them into the marketplace. (*See* FDA Letter, PageID.198.)

Defendants rely on what some courts have called the "unlawful use doctrine." This "doctrine" first arose in administrative proceedings involving the registration or cancellation of a trademark. Although the Lanham Act requires only a "use[] in commerce" to establish trademark rights, 15 U.S.C. § 1051(a)(1), "[i]t has been the consistent position of [the Trademark Trial and Appeal Board ("TTAB")] and the policy of the Patent and Trademark Office that a 'use in commerce' means a '*lawful* use in commerce[.]'" *The Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850 (T.T.A.B. June 29, 1982) (emphasis added). Thus, according to the TTAB, "the shipment of goods in violation of federal statute, including the [FDCA], may not be recognized as the basis for establishing trademark rights." *Id.*

The TTAB "has added substantial gloss to the lawful use requirement since its introduction." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 3:20cv400 (DJN), 2022 WL 17477062, at *6 (E.D. Va. Dec. 6, 2022). For example, a use is unlawful only if "the issue of compliance has previously been determined . . . by a court of government agency having

7

competent jurisdiction over the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q. 2d 2045, 2047 (T.T.A.B. 1988). In addition, "there must be some nexus between the use of the mark and the alleged violation before the unlawfulness of a shipment can be said to result in the invalidity of a registration." *Gen. Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270 (T.T.A.B. 1992). Further, because "many [legal] requirements are purely technical in nature" and are "relatively harmless" and correctable, the TTAB evaluates the "materiality" of the violation before cancelling a registration. *Id.*

Some federal courts, including the Courts of Appeal for the Ninth and Tenth Circuits, have extended the TTAB's unlawful use doctrine to infringement suits such as this one, allowing an alleged infringer to raise the issue as an affirmative defense to infringement. *See, e.g.*, *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000). In contrast, the Courts of Appeal for the Fifth and Eleventh Circuits have declined to adopt the doctrine without expressly rejecting it. *See Perry v. H.J. Heinz Co. Brands, LLC*, 994 F.3d 466 (5th Cir. 2021); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016). The Court of Appeals for the Sixth Circuit has not addressed the issue and, so far as the Court is aware, no district court in this Circuit has expressly adopted or rejected the use of the doctrine in infringement cases.

Arguments in favor of applying the doctrine to infringement cases are, first, that extending trademark rights to unlawful uses "would . . . put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." *CreAgri*, 474 F.3d at 630. Second, "as a policy matter,

8

to give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations would be to reward the hasty at the expense of the diligent." *Id.*

Arguments against applying the doctrine to infringement cases are, first, that it would be inconsistent with the statutory and regulatory scheme for adjudicating trademark rights. The doctrine "has its home . . . in TTAB proceedings to challenge registrations and/or to cancel previously issued registrations[.]" *VPR Brands, LP v. Shenzhen Weiboli Tech. Co.*, No. 22-81576-CIV-CANNON, 2023 WL 2317165, at *6 (S.D. Fla. Feb. 23, 2023). Those proceedings are "the primary vehicle for cancellation of registered marks." *Id.* The Lanham Act does not permit a plaintiff to sue in federal court to cancel a trademark. *Beasley v. Howard*, 14 F.4th 226, 235-36 (3d Cir. 2021); 5 McCarthy on Trademarks & Unfair Competition § 30:110 (5th ed.). Litigants in an infringement case should not be able to avoid the TTAB process by raising a defense that is arguably equivalent to the cancellation of trademark rights. And "trademark holders should not be required to repeatedly litigate the question of use to enforce their rights," when that question is better addressed in administrative proceedings. *Jergenson v. Inhale Int'l Ltd.*, No. 22 CV 2040, 2023 WL 167413, at *4 (N.D. Ill. Jan. 12, 2023). Second, there is no private right of action under the FDCA. The FDA is responsible for enforcing that statute, and that agency should be the one to determine in the first instance whether the trademark holder has complied with the statute. Third, and relatedly, applying the rule to infringement suits makes the Court "a potential collateral enforcer of hundreds of labeling and licensing laws" that are beyond the scope of trademark law. 3 McCarthy on Trademarks & Unfair Competition § 19:123 (5th ed.). This makes trademark litigation "more complicated and more expensive for trademark owners." *Id.* Fourth, the rule "lacks a statutory basis" and purportedly "serves no useful purpose related to trademark law." *Id.*

The first argument against adopting the unlawful use doctrine is not persuasive because defendants in trademark infringement suits routinely raise arguments that attack the validity or enforceability of the trademark at issue. After all, a trademark registration creates only a "rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). Defendants can rebut this presumption in a trademark infringement suit without resorting to cancellation proceedings. *See id.*

The second and third arguments against adopting the unlawful use doctrine are not as pertinent here as they are in other cases. For instance, in *CreAgri* and *Perry*, the trademark holders failed to comply with relatively minor, technical issues regarding the labeling of their products. In *CreAgri*, the product label did not identify the accurate amount of nutrients in the product. *CreAgri*, 474 F.2d at 631. In *Perry*, the product label omitted information about the ingredients the product contained. *Perry*, 994 F.3d at 475. The inaccurate product labeling in those two cases meant that the plaintiffs' products were being sold in an improper manner under the FDCA. However, those labeling issues were immaterial because they were easily correctable and they had no connection to the plaintiffs' trademark rights. In contrast, the FDA's regulations here have prohibited Plaintiff from selling or marketing any of its ENDS products before obtaining FDA approval. There is nothing Plaintiff could have done, or can do at the moment, to change that. Altering its product labels would not make the sale of those products legal. Consequently, federal law bars Plaintiff from selling or marketing its ENDS products. And because a trademark must be used in commerce in order to obtain and maintain trademark rights, the FDA's decision potentially

impairs Plaintiff's ability to sustain its rights.[2]  Accordingly, unlike the labeling errors in *CreAgri* and *Perry*, the legal restrictions faced by Plaintiff are significant and material to its trademark rights.

Also, unlike the products in *CreAgri* and *Perry*, Plaintiff's ENDS products have already been examined by the federal agency responsible for enforcing the FDCA.  The FDA has expressly determined that Plaintiff cannot market or sell those products.  Thus, this Court is not faced with the possibility of usurping the role of the agency responsible for assessing Plaintiff's compliance with the FDCA.  And for similar reasons, applying the unlawful use doctrine here would not make this litigation significantly more expensive because the unlawfulness of Plaintiff's products has been established.

On the other hand, the fourth argument against adopting the unlawful use doctrine gives the Court pause.  The Lanham Act does not expressly require a "legal" use in commerce.  In other words, it does not require that the trademark user comply with all applicable federal laws when using its trademark in commerce.  Also, the doctrine has no obvious connection to trademark law or to the purposes of the Lanham Act, which protect the trademark holder's reputation and the goodwill associated with its products.  However "anomalous" it may be to give federal trademark protection to uses that violate other federal statutes, Congress did not expressly require compliance with other federal laws as a condition for obtaining or enforcing trademark rights.  The Court declines to add a requirement that is not found in the statute itself.

In addition, adopting the doctrine here would have an odd result because Defendants' products are also governed by the FDA's regulations, yet there is no evidence that the

---

[2] There is evidence that Plaintiff's sales have been impacted.  Plaintiff's Managing Member, Steven Haddad, represented in a sworn declaration filed with the Court of Appeals that, since the FDA's denial of Plaintiff's application, Plaintiff's distributors "have not made any additional orders of Breeze Smoke products[.]"  (11/2021 Haddad Decl. ¶ 26, ECF No. 37-1.)

11

manufacturers of those products even attempted to obtain authorization from the FDA before marketing them or introducing them into commerce. Thus, enforcing Plaintiff's trademark rights would not "reward the hasty at the expense of the diligent." *Cf. CreAgri*, 474 F.3d at 630. Instead, that is what the unlawful use doctrine would do. It would effectively penalize Plaintiff's efforts to obtain a decision from the FDA while allowing Defendants' products to escape scrutiny. For all these reasons, the Court declines to adopt the unlawful use doctrine.

Furthermore, even if the Court were to adopt the unlawful use doctrine, it is doubtful that the rule would impact the outcome here because Plaintiff has provided evidence that some of its products do not fall under the FDA's rule for ENDS products. Some of Plaintiff's disposable e-cigarettes contain no nicotine. (*See* Haddad Decl. ¶ 6, ECF No. 44-1; List of Non-Nicotine BREEZE products, ECF No. 44-6.) For example, in the picture in Section I above, the label for Plaintiff's "mint" flavored disposable e-cigarette states that the product contains "0mg of nicotine." This product uses the same BREEZE-related trademark in the same manner as Plaintiff's other e-cigarettes. Defendants do not explain how a product that contains no nicotine could be a "new *tobacco* product" or an "electronic *nicotine* delivery system" under the FDA's regulations.

When explaining the Deeming Rule, the FDA stated that "a tobacco product includes components and parts (the objects intended or reasonably expected to be used with or for the human consumption of a tobacco product that are not accessories) (e.g., e-liquids, tanks, cartridges, pods, wicks, atomizers)[.]" Deeming Rule, 81 Fed. Reg. 28,973, 29,028 (May 10, 2016). As to nicotine-free products, the FDA stated that "an e-liquid without nicotine is a component (and subject to FDA's tobacco control authorities), if it is *intended or reasonably expected to be used with or for the human consumption of a tobacco product* (e.g., with liquid nicotine) and does not

12

constitute a tobacco product accessory[.]" *Id.* at 29,017 (emphasis added). Here, Plaintiff asserts that its products are "closed" systems, meaning that the consumer cannot add other liquids or cartridges to them. Thus, Plaintiff's nicotine-free e-cigarettes are not intended or reasonably expected to be used with or for the consumption of a tobacco product.

Defendants respond that Plaintiff's nicotine-free products are subject to the FDA's regulations because those products contain "non-tobacco nicotine (NTN) – that is, nicotine not made or derived from tobacco, such as synthetic nicotine." (Defs.' Surreply Br. 3 n.1, ECF No. 53.)[3] But non-tobacco nicotine is still nicotine. If Plaintiff's nicotine-free products contain no nicotine, then logically they contain no synthetic nicotine. Thus, Defendants' argument is not persuasive.

To be clear, the Court is not making an express finding that Plaintiff's nicotine-free e-cigarettes are not governed by the FDA's Deeming Rule. Instead, the Court is evaluating the strength of the parties' arguments and evidence when deciding whether Plaintiff is likely to succeed on the merits of its claim. At this stage, the Court is not persuaded that the marketing or sale of Plaintiff's nicotine-free e-cigarettes is unlawful. And because those products are substantially similar in type and appearance to Plaintiff's ENDS products, the Court is not persuaded that the unlawful use doctrine (if the Court were to adopt it) would preclude Plaintiff from enforcing its trademark rights associated with its nicotine-free products against Defendants' ENDS products.

---

[3] Contrary to Defendants' brief (Defs.' Surreply Br. 3), Plaintiff *does not* argue that its nicotine-free e-cigarettes contain non-tobacco nicotine.

**(b) Trademark Assignments**

Next, Defendants question the validity of Plaintiff's marks due to two purportedly improper trademark assignments.

Assignment from Trucenta Holdings. Public records show that Trucenta Holdings, LLC assigned its interest and goodwill in nine standalone BREEZE marks to Plaintiff on February 4, 2002, including two marks that were registered by the U.S. Trademark Office and seven marks that were the subject of applications for a federal registration. (Trademark Assignment, ECF No. 37-8, PageID.413.) According to Defendants, of the trademark applications, six were intent-to-use applications. An application to register a trademark may not be assigned before the applicant files a verified statement of use of the mark in commerce. 15 U.S.C. § 1060(a)(1). There is an exception to this rule where the assignment is "to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing." *Id.* Defendants argue that this exception does not apply because Plaintiff is not a successor to Trucenta's business. Trucenta purportedly filed an annual statement after the assignment date and "still exists in the cannabis space according to numerous reports[.]" (Defs.' Resp. Br. 11-12, ECF No. 37.) An improper assignment renders the assignment, application, and any resulting trademark registration void. *See The Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d 1098 (T.T.A.B. 1996).

Defendants provide no facts or evidence to support their assertion that the assignment occurred before the filing of statements of use. But even if Defendants are correct that the assignment and related applications are invalid, that invalidity would impact only the six BREEZE marks that were the subject of those applications. It would not impact Plaintiff's ability to enforce its rights, including its common law rights, to the BREEZE PLUS mark or the BREEZE SMOKE mark that was recently approved for registration.

14

Assignment from KMT Services. In passing, Defendants refer to an argument made by Trucenta in another case about a nunc pro tunc assignment of rights signed by Haddad, which purported to transfer certain trademark rights from KMT Services to Plaintiff. That argument, which is not part of Defendants' brief, is not properly before the Court. Moreover, the argument relies on evidence cited by Trucenta in Trucenta's brief. (*See* Trucenta Br., ECF No. 38-1.) The Court cannot evaluate that argument without the underlying evidence.

### (c) TTAB Proceedings

Defendants also note that Plaintiff's federal trademark registrations are the subject of cancellation proceedings initiated by Promontory Holdings, LLC, which has applied for federal trademark registrations for "BREEZ," for use in connection with cannabis-themed merchandise, cannabis sprays, and e-cigarettes containing cannabis. (*See* ECF No. 37-7.) Promontory Holdings contends that the BREEZE PLUS registration is invalid because Plaintiff cannot lawfully sell its ENDS products without FDA approval. (*Id.*, PageID.322.) Promontory Holdings also contends that Plaintiff's registered BREEZE marks are confusingly similar to the BREEZ mark, which allegedly predates Plaintiff's marks. (*Id.*, PageID.317.) Based on these arguments, Defendants argue that "there is a substantial likelihood that Plaintiff's marks will be invalidated[.]" (Defs.' Resp. Br. 11.) However, the Court cannot evaluate that likelihood by looking solely at assertions made by a party seeking to cancel some of Plaintiff's marks. Further, although BREEZ is similar to Plaintiff's BREEZE marks, Promontory Holdings will also have to demonstrate that it has priority over Plaintiff's registered marks, which is not clear at this stage. In short, the possibility that Promontory Holdings may succeed in the cancellation proceedings at some point in the future does not prevent Plaintiff from enforcing its existing rights against Defendants in this case.

In summary, Defendants' arguments regarding the invalidity or unenforceability of Plaintiff's marks are not persuasive.

15

### 2. Strength of the Marks

Turning to the *Frisch* factors for evaluating a likelihood of confusion, the first factor is the strength of Plaintiff's marks. As indicated above, Plaintiff's marks are suggestive because they contain the word "breeze." Suggestive marks are strong enough to be protectable, but they are not as strong as fanciful or arbitrary marks. *See Daddy's*, 109 F.3d at 281.

Another factor when evaluating the strength of the mark is the extent to which it has obtained recognition in the marketplace. *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Here, Haddad avers that Plaintiff has "generated millions of dollars in revenue from the sale of its BREEZE-branded disposable vaping pens" and that Plaintiff and its distributors have spent "millions of dollars on advertising and marketing its BREEZE-branded vaping goods and services." (Haddad Decl. ¶ 17.) But "evidence of advertising budgets . . . has an attenuated link to actual market recognition[.]" *Homeowners Grp.*, 931 F.2d at 1108. Haddad also avers that "the BREEZE Marks enjoy widespread recognition" (Haddad Decl. ¶ 23), but that assertion is conclusory and unsupported.

Defendants note that the market is somewhat crowded with similar marks. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion." *Homeowners Grp.*, 931 F.2d at 1108. "'[E]xtensive third-party uses of a trademark [may] substantially weaken the strength of a mark.'" *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 420 (6th Cir. 2012) (quoting *Homeowners Grp.*, 931 F.2d at 1108). Defendants have produced a list of trademark registrations and trademark applications from category 34 (which is for tobacco and articles used for smoking) that use a form of "breeze" in the mark, twenty-three of which are not associated with Plaintiff. (*See* ECF No. 38-2.) For example, one is an application for C-BREEZE, published on November 29, 2022. Another is an application for BREEZ, published on December 23, 2022. Also, there

16

are two registrations for BREZ and seven registrations for word marks that end in BREEZE, such as POLAR BREEZE, BLUE BREEZE, MORNING BREEZE, PISTACHIO BREEZE, CITRUS BREEZE, CACTUS BREEZE, and VAPORILLO'S SMOKIN' BREEZE. (*Id.*) And an online "vape" store has a trademark registration for a stylized version of the word "Breazy."[4] (*Id.*)

The C-BREEZE and BREEZ marks are most similar to Plaintiff's marks, but those trademark applications are relatively recent and it is not clear whether and to what extent those marks are currently in use in the marketplace. An applicant can file for registration on an "intent-to-use" basis before the mark is actually in use. Also, Plaintiff has opposed those applications.

The BREZ mark and the stylized Breazy mark are less similar to Plaintiff's marks and convey a different impression. The other marks (e.g., POLAR BREEZE) appear to be the names of particular flavors that would be accompanied by a house mark identifying the product source.[5] Such uses reduce the likelihood of confusion with Plaintiff's mark. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 634 (6th Cir. 2002). Nevertheless, these trademark registrations suggest that the term "breeze" (and variations thereof) is somewhat common in the marketplace for Plaintiff's products, which weakens the strength of Plaintiff's marks.

In summary, the evidence regarding the strength of Plaintiff's marks cuts in different directions.

### 3. Relatedness of Goods

Plaintiff's goods are the same type of goods as the allegedly infringing products that Defendants are selling, i.e., flavored disposable electronic vaping devices. The products are

---

[4] The owner of that mark abandoned a registration for BREAZY as a word mark.

[5] *See, e.g.*, https://mipod.com/products/desert-breeze-fume-infinity ("Desert Breeze" flavor with FUME house mark); https://www.plusdispo.com/products/plus-diamond-blue-breeze-pack-of-10 ("Blue Breeze" flavor with PLUS DIAMOND house mark); https://www.gopuff.com/p/naked-polar-breeze-3mg-e-liquid-60ml/p7658 ("Polar Breeze" flavor with NAKED house mark).

17

closely related. Even Plaintiff's nicotine-free disposable e-cigarettes are closely related to Defendant's products. This factor weighs in Plaintiff's favor.

### 4. Similarity of Marks

The similarity of the marks "is a factor of considerable weight[.]" *Daddy's*, 109 F.3d at 283. When assessing similarity, the Court considers the "'pronunciation, appearance, and verbal translation of conflicting marks.'" *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 266 (6th Cir. 2021) (quoting *Daddy's*, 109 F.3d at 283). The Court must "'view marks in their entirety and focus on their overall impressions, not individual features.'" *Id.* (quoting *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004)).

The mark on the allegedly infringing product is remarkably similar in overall impression to Plaintiff's marks, including Plaintiff's unregistered BREEZE mark for e-cigarettes, as well as its federally registered BREEZE PLUS mark and the recently registered BREEZE SMOKE word mark. The product sold by Defendants is called "Breezy *Bar*" instead of "Breeze *Smoke*" or "Breeze *Plus,*" but the "Breeze" and "Breezy" aspects are the most dominant parts of those marks. Those words are more suggestive whereas the other words in the marks are more descriptive. In addition, "Breeze" is clearly the most prominent part of Plaintiff's mark on Plaintiff's packaging, just as the "Breezy" aspect is clearly the most prominent identifier on Defendants' allegedly infringing products. On both, the term is in all capital letters at the top of the packaging. The slight difference between "Breeze" and "Breezy" does not significantly undercut the similarity. Neither does the difference between "Smoke" or "Plus" and "Bar" at the end of the respective marks. Although the Court looks at the marks in their entirety, the Court can assign "more weight to the dominant features of the marks." *AWGI*, 998 F.3d at 266. Assigning such weight does not, as Defendants suggest, violate the "anti-dissection rule," which requires courts to consider marks

as a whole. *See id.* In summary, considering the marks as a whole, the similarity of the marks weighs in Plaintiff's favor.

### 5. Evidence of Actual Confusion

Plaintiff has provided some limited evidence of confusion from a few consumers and potential purchasers. One individual took a picture of the allegedly infringing product and sent it to Plaintiff, asking, "Guys seriously is this you? It looks like a fake but please tell me[.]" (ECF No. 6-13, PageID.468.) Another asked, "This fake breeze? Or original[?]" (*Id.*, PageID.470.) Similarly, another asked, "Are these by breeze or is it a different brand?" (ECF No. 6-15, PageID.478.) A distributor asked, "Too many people asking for breezy bar . . . . Is it yours? Or u guys coming with it new?" (ECF No. 6-14, PageID.472.) These comments suggest some brief confusion about the source of Defendants' products.

Also, a couple of customers complained to Plaintiff about the quality of the allegedly infringing product, thinking that Plaintiff was the source. One complained that "he bought one [Plaintiff's] breezy 6k box vapes jolly rancher flavor and it tastes like mint and it's burnt." (ECF No. 6-16, PageID.480.) Another complained to Plaintiff that his Breezy Bar "started blowing its juice out and got really hot" after only three days of use. (*Id.*, PageID.481.) These comments are even more indicative of confusion than the statements in the previous paragraph. The comments also suggest potential harm to Plaintiff's reputation from what could be an inferior product, the quality of which Plaintiff cannot control.

Bela Sareen, the President of Yatin Enterprises, avers that "Yatin Enterprises is not aware of any instances of confusion between the Breezy Bars and the Breeze Pros sold by the Plaintiff." (Sareen Decl. ¶ 19, ECF No. 37-2.) However, that assertion mentions only one of Plaintiff's trademarks and one type of product. It avoids mention of Plaintiff's standalone BREEZE and

19

BREEZE SMOKE marks, and the particular uses of those marks, that are most similar to the mark on the allegedly infringing product.

In short, the few instances of confusion tilt this factor slightly in favor of Plaintiff.

### 6. Marketing Channels

Defendants concede that the same marketing channels are used. (Defs.' Resp. Br. 22, ECF No. 37.) Indeed, Defendants have sold Plaintiff's products as well as the allegedly infringing ones. This factor weighs in Plaintiff's favor.

### 7. Degree of Purchaser Care

"The degree of customer care—i.e., how carefully a consumer selects a particular good or service—may also affect the possibility of consumer confusion." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 796-97 (6th Cir. 2015). Plaintiff's disposable e-cigarettes sell for $11 to $20 each. (Hadded Decl. ¶ 20.) Common sense suggests that consumers will not pay a high degree of care when purchasing a relatively inexpensive, disposable product like an e-cigarette, which makes confusion more likely. *See Gray v. Meijer*, 295 F.3d 641, 649 (6th Cir. 2002) ("[T]he average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products[.]"); c*f. Grubbs*, 807 F.3d at 797 ("[C]onfusion is less likely in cases involving expensive or unusual services or unusually skilled buyers[.]").

Defendants argue that evidence that one of Plaintiff's distributors asked, "too many people asking for breezy bar . . . is it yours?" suggests that customers are discerning and understand that Breezy Bar is a different product. But as Plaintiff notes, that question suggests confusion as to the *source* of the Breezy Bar product, which is what trademark rights are meant to guard against. This factor weighs in Plaintiff's favor.

### 8. Defendants' Intent in Selecting Mark

"The intent factor concerns the defendant's 'intent to benefit' from the other mark's recognition." *AWGI*, 998 F.3d at 268 (quoting *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 435 (6th Cir. 2017)). "'If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.'" *Daddy's*, 109 F.3d at 286 (quoting *Homeowners Grp.*, 931 F.2d at 1111).

Here, Plaintiff argues that Defendants were aware of its trademarks when they sold the allegedly infringing products because Defendants also sell Plaintiff's products. "[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* And "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Id.*

Defendants respond that they did not select the contested mark because they did not manufacture those products and have no affiliation with the manufacturer. They simply purchased those products from the marketplace.

Neither party cites a case in which a court examined whether the intent of a *distributor*, who did not select the mark that was applied to the product and instead purchased the product from the marketplace, is relevant to the likelihood-of-confusion analysis. At any rate, this factor plays no significant role here because intent is difficult to determine; knowledge of the senior mark can permit an inference of an intent to benefit from that senior mark, but it does not necessarily demonstrate that intent. Furthermore, the other factors discussed above are sufficient on their own to demonstrate a likelihood of confusion.

In summary, on balance, the likelihood-of-confusion factors weigh in Plaintiff's favor. In other words, Plaintiff has shown a substantial likelihood of success on its claims under the Lanham Act.

21

**B. Irreparable Injury**

Next, the Court considers whether Plaintiff has shown the possibility of irreparable injury in the absence of an injunction. Because Plaintiff has shown a likelihood of success on the merits of its Lanham Act claims, it is entitled to a presumption of irreparable harm. 15 U.S.C. § 1116(a); *see Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 555 (6th Cir. 2013) ("In trademark infringement cases, a likelihood of confusion or possible risk to the requesting party's reputation satisfies the irreparable injury requirement.").

Defendants argue that Plaintiff would suffer no harm because its goods are not marketable under the FDA's order. But as discussed above, that is not necessarily the case for all of Plaintiff's products. Moreover, the Court declines to adopt the unlawful use doctrine, so the Court's focus is on whether Plaintiff can enforce its trademark rights. Even if Plaintiff cannot legally sell most of its products for the time being, those trademark rights have not disappeared. Neither has the goodwill associated with those marks. Plaintiff can enforce those rights against Defendants, who are potentially profiting off the goodwill developed by Plaintiff by selling a product with a mark that is similar to Plaintiff's marks.

Defendants contend that the equities weigh against enforcing Plaintiff's rights because Plaintiff's ENDS products are not legal. But that argument does not help Defendants, who are in the same position. Defendants do not claim that the Breezy Bar products have been approved, let alone evaluated, by the FDA.

**C. Substantial Harm to Others**

The next factor is the harm to others from the injunction. As far as harm to Defendants is concerned, an injunction will prevent Defendants from selling the Breezy Bar product. However, that product is one of many products sold by Defendants. It is also one of several different brands

22

of disposable ENDS products sold by Defendants, in a market with multiple options. Thus, there is less likelihood that an injunction will cause significant harm to Defendants' businesses.

Defendants argue that an injunction against them "will not solve Plaintiff's alleged problem" because Defendants are local Michigan stores and the allegedly infringing product is sold nationwide. (Defs.' Resp. Br. 23.) An injunction may not stop the sale of Breezy Bar products entirely, but that is not the showing required of Plaintiff at this stage. It is sufficient for Plaintiff to show that stopping *Defendants'* sale of those products will prevent irreparable harm arising from those sales. It has made that showing.

### D. Public Interest

The public interest is served by enforcing Plaintiff's existing trademark rights and preventing the sale of products that are likely to create confusion in the marketplace.

### E. Balance of Factors

On balance, the factors weigh in favor of a preliminary injunction.

### F. Security Requirement

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "While this language appears to be mandatory, 'the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.'" *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). The parties have not briefed this issue, so any decision on the matter would be arbitrary. The Court will not enter an injunction until after the parties submit briefing on the requirement to post security.

In summary, the Court will grant Plaintiff's request for a preliminary injunction but will not enter the injunction until the parties provide further direction on the security requirement in Rule 65(c).

## V. JUDGMENT ON THE PLEADINGS

### A. Standard

Defendants seek judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim." *HDC*, 675 F.3d at 611. Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to

24

in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### B. Analysis

#### 1. Lanham Act (Counts I, II)

Defendants argue that Plaintiff fails to state a claim under the Lanham Act because Plaintiff's products are unlawful under the FDCA. As discussed above, however, the Court declines to adopt the unlawful use doctrine. Moreover, Plaintiff sells some nicotine-free vaping products under the BREEZE SMOKE mark. (*See* Compl. ¶ 18 (showing "mint" product with "0mg of nicotine").) Defendants have not adequately explained why such products would be governed by the FDA's regulations. Thus, their argument for dismissal is not persuasive.

#### 2. MCPA (Count III)

Defendants further argue that Plaintiff does not state a MCPA claim because its products are regulated by the FDA. The MCPA does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). Under that exemption, "the relevant inquiry 'is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 519 (Mich. 2007) (quoting *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999)). Accordingly, because the FDA regulates the marketing of ENDS products, Defendants argue that the MCPA does not apply to those products. *See Duronio v. Merck & Co.*, No. 267003, 2006 WL 1628516, at *7 (Mich. Ct. App. June 13, 2006) ("Because the general marketing and advertising activities underlying plaintiff's MCPA claim are authorized and regulated under laws administered by the FDA, the exemption in MCL 445.904(1)(a) applies to plaintiff's MCPA claim.").

Plaintiff responds that its nicotine-free products are not governed by the FDA's regulations. However, the marketing and sale of *Defendants'* ENDS products is the target of Plaintiff's MCPA claim. Those activities are regulated by the FDA. Plaintiff does not allege that Defendants sell nicotine-free products. Indeed, all the examples of Defendants' products that are pictured in the complaint state that they contain nicotine. (*See* Ex. C. to Compl., ECF No. 1-4.) Accordingly, the exemption applies and Plaintiff fails to state a claim under the MCPA.

## VI. CONCLUSION

For the reasons stated herein, the Court will grant Plaintiff's motion for a preliminary injunction, but the Court will not issue the injunction until after the parties provide further briefing regarding the security requirement. The Court will grant Defendants' motion for judgment on the pleadings, in part, as to Count III of the complaint.

The Court will enter an order consistent with this Opinion.


Dated: April 25, 2023                    /s/ Hala Y. Jarbou
                                         HALA Y. JARBOU
                                         CHIEF UNITED STATES DISTRICT JUDGE

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

       Plaintiff,

                                    Case No. 1:22-cv-1182

v.

                                    Hon. Hala Y. Jarbou

YATIN ENTERPRISES INC., et al.,

       Defendants.

_____/

## PRELIMINARY INJUNCTION ORDER

In accordance with the Court's April 25, 2023, opinion and its order entered this date:

**IT IS ORDERED** that Defendants Yatin Enterprises Inc., Mini Market LLC, Drake Party Store LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, Wild Monkey Smoke Shop, and any of their agents, successors, assigns, and/or others in active concert or participation with them are **ENJOINED** from directly or indirectly using the name or mark "BREEZY," or any other name or mark including or incorporating that term, in connection with the marketing or sale of tobacco or vaping products, or any other related products or services.

**IT IS FURTHER ORDERED** that Plaintiff is not required to furnish a bond in connection with this preliminary injunction.

Dated: May 16, 2023                  /s/ Hala Y. Jarbou
                                      HALA Y. JARBOU
                                      CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

BREEZE SMOKE LLC,

      Plaintiff,

vs.

YATIN ENTERPRISES INC., MINI MARKET LLC,
DRAKE PARTY STORE LLC, PENNFIELD PARTY
STORE, MIDTOWN SMOKE SHOP, INC., SG, LLC,
WILD MONKEY SMOKE SHOP, PRICE POINT
DISTRIBUTORS INC., SULEIMAN CAPITAL INC. and
JOHN DOES 1-10.

      Defendants.

CASE NO. 1:22-cv-01182-HYJ-SJB

Hon. Hala Y. Jarbou

**STIPULATED PERMANENT INJUNCTION AGAINST YATIN ENTERPRISES, INC., MINI MARKET LLC, DRAKE PARTY STORE LLC, PENNFIELD PARTY STORE, MIDTOWN SMOKE SHOP, INC., SG, LLC, AND WILD MONKEY SMOKE SHOP**

WHEREAS, Plaintiff Breeze Smoke LLC ("Plaintiff") and Defendants Yatin Enterprises, Inc. ("Yatin"), Mini Market LLC, Drake Party Store LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, and Wild Monkey Smoke Shop (collectively the "Store Defendants"), by and through their respective counsel, hereby stipulate and agree to the following permanent injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. Yatin and the Store Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers, distributors, servants, employees, and/or others in active concert or participation with, for, by, through, or under them are enjoined from directly or indirectly:

    a. using the mark "BREEZE" or "BREEZY" or any other mark or name including

48877078.1

or incorporating, or that is confusingly similar to, the BREEZE Marks, as defined in Paragraphs 31-34 of the First Amended Complaint, ECF No. 98, in connection with any electronic nicotine delivery systems ("ENDS") products, vaping and tobacco products, or any related goods and services, without Breeze Smoke's express authorization;

b. engaging in trademark infringement, unfair competition, false designation of origin, or any other activities that misappropriate or infringe Breeze Smoke's trademark rights;

c. aiding, assisting, or abetting any other party in the acts prohibited by (a) through (d) above.

2. Yatin and the Store Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers, distributors, servants, employees, and/or others in active concert or participation with, for, by, through, or under them are further ordered to:

a. immediately cease importing, manufacturing, distributing, offering, selling, advertising, marketing, or promoting any BREEZY-branded products, including but not limited to the Infringing Products, as defined in Paragraph 41-43 of the First Amended Complaint, ECF No. 98, or any other products or services that infringe Breeze Smoke's rights in its BREEZE Marks;

b. within seven (7) days of this order submit an affidavit swearing to compliance with the terms of paragraph 2a;

c. within seven (7) days of this order:

i. deliver to Breeze Smoke all inventory of any BREEZY-branded

2

48877078.1

products in their possession, custody or control, or

    ii.  to the extent that Yatin or any of the Store Defendants asserts that it has returned or otherwise shipped or delivered any inventory of BREEZY-branded products to any other individual or entity since April 25, 2023, provide to Breeze Smoke a detailed description of how, where, when and to whom or to what entit(ies) such inventory was sent, as well as shipping records and any other documentation reflecting the same;

d.  within seven (7) days of this order, provide to Breeze Smoke copies of all records relating to their trade in any BREEZY-branded products, including:

    i.  records sufficient to reflect all sales of any BREEZY-branded products;

    ii.  records sufficient to reflect all profits Yatin and the Store Defendants netted from sales of the BREEZY-branded products;

    iii.  all communications with Defendants Price Point Distributors, Inc. and Suleiman Capital, Inc.; and

    iv.  records sufficient to identify the entities selling BREEZY-branded products to Yatin and the Stores Defendants, such that Breeze Smoke can trace BREEZY-branded products upstream, as well as downstream sufficiently to allow Breeze Smoke to verify quantities sold against purchase records and current inventory;

e.  not to sell BREEZY-branded products or any other product bearing the name "breeze" or any term that is similar to any of Breeze Smoke's BREEZE Marks, as defined in Paragraph 35 of the First Amended Complaint, ECF No. 98, without express authorization from Breeze Smoke;

3

48877078.1

f. refrain from contesting any of Breeze Smoke's federal, state, or common law trademark or trade dress rights relating to Breeze Smoke's BREEZE products;

g. aiding, assisting, or abetting any other party in the acts prohibited by (a) through (f) above.

3. Yatin and the Store Defendants expressly acknowledge that Breeze Smoke owns trademark rights in its BREEZE marks, including, but not limited to, the BREEZE mark, the BREEZE SMOKE mark, the BREEZE PLUS mark, and the BREEZE PRO mark, which are embodied, in part, in numerous United States Trademark Registrations and Applications, in addition to its longstanding common law trademark rights therein, all as described in Paragraphs 31-34 of the First Amended Complaint filed in the Litigation ("BREEZE Marks"). Defendants further acknowledge that the BREEZE Marks are valid and enforceable and they agree not to challenge Breeze Smoke's assertion that it is the rightful owner of the BREEZE Marks and not to challenge the validity or enforceability of the BREEZE Marks in connection with Breeze Smoke's BREEZE Goods and Services as defined in Paragraph 35 of the First Amended Complaint filed in the Litigation and related goods and services.

4. Yatin and the Store Defendants agree that Breeze Smoke is entitled to immediate injunctive relief and damages should Yatin and the Store Defendants violate the terms of this Stipulated Permanent Injunction.

IT IS FURTHER ORDERED that Breeze Smoke is not required to furnish a bond in connection with this permanent injunction.

SO ORDERED.

4

48877078.1

_____

Hon. Hala Y. Jarbou
United States District Chief Judge


Dated: _____

48877078.1

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  July 28, 2023                                        Respectfully submitted,

By:  /s/ *Mary A. Hyde*                                  By: /s/ *Todd A. Holleman*
Mary A. Hyde (P83066)                          Todd A. Holleman (P57699)
Jenna E. Saunders                                    Jacob L. Carlton
HONIGMAN LLP                                       MILLER JOHNSON
155 North Wacker Dr., Suite 3100          45 Ottawa Ave. SW
Chicago, IL 60606                                     Suite 1100
Telephone:  (312) 701-9360                    Grand Rapids, MI 49503
mhyde@honigman.com                           (616) 831-1700
jsuanders@honigman.com                        hollemant@millerjohnson.com
                                                                  carltonj@millerjohnson.com

Jeffrey K. Lamb (P76738)
HONIGMAN LLP                                       *Attorney for Yatin and the Store Defendants*
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com

*Attorneys for the Plaintiff*

6

## **CERTIFICATE OF SERVICE**

I certify that on July 28, 2023 a copy of the foregoing was electronically filed with the

Clerk of Court using the ECF system which will send notification to all counsel of record.

*/s/ Mary A. Hyde*
*One of the Attorneys for Breeze Smoke LLC*

48877078.1

Exhibit B

49355548.1

Case: 1:23-cv-05406 Document #: 9-5 Filed: 10/13/23 Page 46 of 52 PageID #:629

WARNING: This product contains nicotine. Nicotine is an addictive chemical.



Search Product Name / Type or Brand

Home / New Products / NORTH 5000 PUFFS 550MAH RECHARGEABLE DISPOSABLE DISPLAY OF 10





# NORTH 5000 PUFFS 550MAH RECHARGEABLE DISPOSABLE DISPLAY OF 10

♡♡♡♡♡   No reviews yet   Write a Review

Log in for pricing

Rewards

Case: 1:23-cv-05406 Document #: 9-5 Filed: 10/13/23 Page 47 of 52 PageID #:630

| OPTION | IN STOCK | PRICE | QTY |
|---|---|---|---|
| **BLUE RASPBERRY** SKU: 701980365874 | 60 in Stock | Log in for pricing | − + |
| **BLUEBERRY MINT** SKU: 6975199971254 | 56 in Stock | Log in for pricing | − + |
| **BLUEBERRY WATERMELON** SKU: 6975199971278 | 48 in Stock | Log in for pricing | − + |
| **BUBBLE GUM FREEZE** SKU: 6975199971292 | 58 in Stock | Log in for pricing | − + |
| **CHERRY COLA** SKU: 701980365836 | 18 in Stock | Log in for pricing | − + |
| **CHERRY LEMON** SKU: 701980365850 | 68 in Stock | Log in for pricing | − + |
| **COCONUT BANANA** SKU: 6975199971315 | 59 in Stock | Log in for pricing | − + |
| **GRAPE SODA** SKU: 6975199971339 | 39 in Stock | Log in for pricing | − + |
| **GUM MINT** SKU: 701980365911 | 84 in Stock | Log in for pricing | − + |
| **KIWI STRAWBERRY ICE** SKU: 701980365867 | 11 in Stock | Log in for pricing | − + |
| **LUSH ICE** SKU: 701980365812 | 49 in Stock | Log in for pricing | − + |
| **MIGHTY MINT** SKU: 701980365881 | 53 in Stock | Log in for pricing | − + |
| **MOCHA FRAPPE** SKU: 6975199971452 | 20 in Stock | Log in for pricing | − + |

| OPTION | IN STOCK | PRICE | QTY |
|---|---|---|---|

Case: 1:23-cv-05406 Document #: 9-5 Filed: 10/13/23 Page 48 of 52 PageID #:631

| OPTION | IN STOCK | PRICE | QTY |
|---|---|---|---|
| **ORANGE MANGO WATERMELON**<br>SKU: 701980365805 | 37 in Stock | Log in for pricing | −   + |
| **PINA COLADA**<br>SKU: 701980365829 | 38 in Stock | Log in for pricing | −   + |
| **PINEAPPLE PASSION**<br>SKU: 6975199971353 | 56 in Stock | Log in for pricing | −   + |
| **RASPBERRY LEMON**<br>SKU: 6975199971407 | 38 in Stock | Log in for pricing | −   + |
| **RASPBERRY MINT**<br>SKU: 6975199971445 | 53 in Stock | Log in for pricing | −   + |
| **STRAWBERRY BANANA**<br>SKU: 701980365843 | 41 in Stock | Log in for pricing | −   + |
| **TROPICAL SUMMER**<br>SKU: 701980365898 | 58 in Stock | Log in for pricing | −   + |
| **VANILLA TOBACCO**<br>SKU: 701980365904 | 20 in Stock | Log in for pricing | −   + |

**Ask Questions?**

DESCRIPTION | PRODUCT REVIEWS

Introducing the North 10ML 5000 Puffs: Elevate Your Vaping Experience with Wisemen Wholesale!

**Features:**

- 10ml prefilled e-liquid for 5000 puffs
- 550mAh battery for lasting vaping pleasure
- Premium mesh coil for smooth draws
- E-liquid and battery indicators for convenience

- Overcharge protection for added safety

**12 Available Flavors:**

1. Blue Raspberry
2. Cherry Cola
3. Cherry Lemon
4. Gum Mint
5. Kiwi Strawberry Ice
6. Lush Ice
7. Mighty Mint
8. Orange Mango Watermelon
9. Pina Colada
10. Strawberry Banana
11. Tropical Summer
12. Vanilla Tobacco

Discover the epitome of vaping luxury with the North 10ML 5000 Puffs, available exclusively at wholesale parices at Wisemen Wholesale. Each device is prefilled with 10ml of delicious e-liquid, offering 5000 puffs of pure pleasure. Enjoy smooth draws with the premium mesh coil and stay informed with e-liquid and battery indicators. Choose from a variety of 12 delightful flavors and experience the ultimate vaping journey today!

## Related Products















ELF BAR 5000 PUFF DISPOSABLE DISPLAY OF 10

GEEK BAR 5000 PUFF MESH COIL DISPOSABLE DISPLAY OF 10

LOST VAPE ORION BAR 7500 PUFF DISPOSABLE VAPE DISPLAY OF 10

JUBI X 6000 PUFFS RECHARGEABLE 5% NICOTINE DISPOSABLE DISPLAY OF 10

ELFBAR PI9000 5% NIC RECHARGEABLE DISPOSABLE 9000 PUFF DISPLAY OF 10

Case: 1:23-cv-05406 Document #: 9-5 Filed: 10/13/23 Page 50 of 52 PageID #:633

In Stock: 0 Left

Log in for pricing

Log in for pricing

Log in for pricing

Log in for pricing

Log in for pricing

## Customers Also Viewed



LOST MARY SPACE EDITION BY ELF BAR 5000 PUFF DISPOSABLE DISPLAY OF 10

Log in for pricing

OUT OF STOCK

BREEZE SMOKE PRO 2000 PUFF DISPOSABLES DISPLAY OF 10

In Stock: 0 Left

Log in for pricing

LOST MARY MO5000 EDITION BY ELF BAR 5000 PUFF DISPOSABLE DISPLAY OF 5

Log in for pricing

E.B DESIGN BC5000 DISPOSABLE 5000 PUFFS DISPLAY OF 10

Log in for pricing

SALE 5%

FUNKY REPUBLIC TI7000 BY ELFBAR 7000 PUFFS DISPOSABLES DISPLAY OF 5

Log in for pricing

LOST VAPE ORION BAR 7500 PUFF DISPOSABLE VAPE DISPLAY OF 10

Log in for pricing



WISEMENWHOLESALE

Your email address

**Subscribe our newsletter**



Case: 1:23-cv-05406 Document #: 9-5 Filed: 10/13/23 Page 52 of 52 PageID #:635