# EXHIBIT

# G

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Select Distributors, LLC *et al*,

<table>
<tr><td>Plaintiffs,</td><td>Case No. 20-12944</td></tr>
<tr><td>v.</td><td>Judith E. Levy<br>United States District Judge</td></tr>
<tr><td>Breeze Smoke, LLC *et al*,</td><td></td></tr>
<tr><td>Defendants.</td><td>Mag. Judge Elizabeth A.<br>Stafford</td></tr>
</table>

_____/

# OPINION AND ORDER PERMANENTLY GRANTING DEFENDANT/COUNTER-PLAINTIFF BREEZE SMOKE'S MOTION FOR A PRELIMINARY INJUNCTION [22]

Before the Court is Defendant/Counter-Plaintiff Breeze Smoke, LLC's motion for a preliminary injunction against Plaintiff/Counter-Defendant Select Distributors, LLC. (ECF No. 22.)

**BACKGROUND**

On January 21, 2021, the Court held a hearing on this motion through audio-visual technology due to the ongoing COVID-19 pandemic. For the reasons set forth on the record, the Court temporarily granted Defendant's requested injunction through 11:59 p.m. on Friday, January

29, 2021. (ECF No. 51.) In the same order, the Court allowed the parties a week to resolve the case on their own terms and ordered a status update by noon on January 29, 2021. (*Id.*)

On January 29, 2021, the parties notified the Court that they were unable to reach a resolution regarding their dispute. (ECF No. 53.) Accordingly, for the reasons set forth below and on the record on January 21, 2021, the Court will grant Defendant's requested permanent injunction.

The background of this case, including the Court's detailed reasoning for its grant of this injunction, is set forth on the record of the January 21, 2021 hearing. (ECF No. 54.) During this hearing, the Court ruled that Defendant had demonstrated the four elements necessary to justify a preliminary injunction:

> 1) the likelihood that the party seeking the injunction will succeed on the merits of their claim;
>
> 2) whether the party seeking the injunction will suffer irreparable harm absent the injunction;
>
> 3) the probability that granting the injunction will cause substantial harm to others; and
>
> 4) whether the injunction will advance the public interest.

*See Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012).

For the same reasons as those set forth on the record, the Court finds now that all four elements continue to weigh in favor of issuing the permanent injunction. However, the Court will clarify one aspect of the likelihood-of-success analysis below.

**LIKELIHOOD OF SUCCESS ON THE MERITS**

Likelihood of success on the merits is the most important factor in determining whether a preliminary injunction is appropriate. *See Louisiana-Pacific Corp. v. James Hardie Building Products, Inc.*, 928 F.3d 514, 517 (6th Cir. 2019) ("As long as a [movant] demonstrates *some* likelihood of success on the merits, a court should balance rather than tally the[ preliminary injunction] factors.").

The Lanham Act governs the merits of this case. Section 43(a) of the Lanham Act governs claims for infringement of unregistered trademarks and trade dress. 15 U.S.C. § 1125(a). To prevail on such a claim, a movant must show that:

1) The movant has a protectable trademark or trade dress right; and

2) An infringer has created a likelihood of confusion, mistake, or deception as to the origin of goods as a result of the infringer's use of the mark or dress.

*See id.*; *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005).

For the reasons set forth on the record, the Court concluded the following:

- Defendant's *trademark* was protectable;
- Plaintiff had created a likelihood of confusion, mistake, or deception as to the origin of goods as a result of its use of the *trademark*;
- Defendant's *trade dress* satisfied at least two out of the three elements of protectability; and
- Plaintiff had created a likelihood of confusion, mistake, or deception as to the origin of goods as a result of its use of the *trade dress*.

(ECF No. 54.)

These four findings were sufficient to determine that Defendant was likely to succeed on the merits of its claim and that, in conjunction with the other factors of the preliminary injunction analysis, an injunction was warranted.

However, the Court took under advisement one element of the trade dress infringement analysis, which it now addresses more fully. To prove

4

trade dress infringement, a party must demonstrate by the preponderance of the evidence that

> 1) the trade dress is not functional;
>
> 2) the trade dress is distinctive in the marketplace or has acquired "secondary meaning," thereby indicating the source of the goods; and
>
> 3) the trade dress of the accused products is confusingly similar.

*Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006). For the reasons set forth on the record, the Court concluded that Defendant had satisfied the first and third element of a trade dress infringement claim: Defendant demonstrated both that the trade dress was not functional, and that the trade dress of the accused products is confusingly similar. (ECF No. 54.) However, the Court took under advisement whether Defendant had satisfied the second element: that the trade dress is either distinctive or has acquired "secondary meaning" for consumers in the marketplace. The Court now clarifies that Defendant has not demonstrated either that its trade dress is distinctive or that it has achieved secondary meaning. Though this finding does not change the preliminary injunction analysis—the temporary injunction

5

was appropriately issued on January 21, 2021 and is appropriately continued on a permanent basis today—the Court wishes to expand upon its reasoning in this opinion and order.

"For purposes of the Lanham Act, distinctiveness comes in two forms, either one of which satisfies the distinctiveness condition of protectability." *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002). "A mark or dress can be inherently distinctive if its 'intrinsic nature serves to identify a particular source.' A non-inherently distinctive mark or dress can have acquired distinctiveness through attachment of secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself." *Id.*

Thus, Defendant can satisfy this element of trade dress protectability by demonstrating either that its dress is inherently distinctive, or that the dress has achieved a secondary meaning within the marketplace.

Secondary Meaning

6

Defendants have not demonstrated secondary meaning. To show secondary meaning, "the evidence must show that in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Gen Motors Corp.*, 468 F.3d at 418. Courts apply a seven-factor test to determine whether secondary meaning exists in a trade dress context:

1) Direct consumer testimony;
2) Consumer surveys;
3) Exclusivity, length, and manner of use;
4) Amount and manner of advertising;
5) Amount of sales and number of customers;
6) Established place in the market; and
7) Proof of intentional copying.

*Id.* at 418.

Breeze Smoke's argument as to these factors is brief:

The evidence shows that consumers understand that the BREEZE Marks and Trade Dress emanate from Breeze Smoke, a market leader and highly reputable company in the industry. Breeze Smoke has continuously sold vaping products with the BREEZE Marks since May 2019 and the BREEZE Trade Dress since March 2020. It has spent millions of dollars advertising its BREEZE vaping products and sold tens of millions of dollars of products bearing the BREEZE marks and BREEZE Trade Dress. The evidence also shows that Counter-Defendants intentionally copied Breeze Smoke's

7

BREEZE Marks and BREEZE Trade Dress. These facts demonstrate that the BREEZE Marks and BREEZE Trade Dress have acquired secondary meaning and merit protection.

(ECF No. 23, PageID.207-208.)

Even with this brief response, some of Breeze Smoke's evidence weighs in its favor. As set forth on the record, Breeze Smoke's affidavits tend to suggest 1) through numerous consumer reactions that the Breeze Smoke dress is recognizable by at least some consumers; 3) that Breeze Smoke has been using its Trade Dress since March 2020; and 4) that Breeze Smoke has spent millions of dollars advertising its products bearing the marks and dress. (ECF No. 54.)

However, for the reasons set forth on the record, Defendant has not shown compelling evidence of 5) amount of sales and number of customers; 6) Defendant's established place in the market; 7) intentional copying; or 2) consumer surveys. This last requirement is particularly important, as the Sixth Circuit "has historically favored the use of consumer surveys as proof of secondary meaning," *Gen. Motors Corp.*, 468 F.3d at 419. Particularly without evidence of the place of Defendant's trade dress in the market as compared to other competitors' trade

8

dresses, the Court cannot find that Defendant has demonstrated that its trade dress has achieved secondary meaning.

Inherent Distinctiveness

Nor has Defendant demonstrated that its trade dress is inherently distinctive. As to distinctiveness, Defendant's analysis is similarly brief:

> Breeze Smoke's BREEZE Trade Dress is also inherently distinctive. The BREEZE trade dress features: a rectangular clear plastic outer box with a clear plastic lid; brightly colored cardboard with product labeling that wraps around the bottom portion of the clear plastic box; visibility of the top portion of the vaping pen through the top portion of the clear plastic box; the BREEZE Mark displayed prominently and vertically along the body of the vaping pen; and a semi-opaque plastic cap over the mouthpiece. Nothing about the BREEZE Trade Dress directly describes the product or is generic; it is unique, inherently distinctive and therefore protectable even without a showing of secondary meaning.

(ECF No. 23, PageID.207.) Notably, Defendant does not identify in its motion a particular test for determining distinctiveness. Additionally, whereas Defendant focuses its distinctiveness argument on merely describing its own product packaging, the Sixth Circuit's distinctiveness test is concerned with comparing the packaging at issue with those of others in the market:

9

[A]ny packaging may be said to have inherent distinctiveness by virtue of the breadth of colors, shapes, graphics, etc., available to the packager in designing its trade dress. In determining the strength of such trade dress, however, the analysis is different as the inquiry revolves around the "uniqueness" of the packaging.

*Gray v. Meijer, Inc.*, 295 F.3d 641, 647-48 (6th Cir. 2002) (approving the district court's finding that the trade dress was not distinctive because "[n]either the elements of the packaging, nor the product itself were exclusive or unique . . . [for example,] the term 'Chicago Style' has been widely used for many years for a variety of products"). This emphasis on distinctiveness *as compared to competitors in the market* comports with the Federal Trademark Manual's requirement that a party demonstrate distinctive "product packaging trade dress" through examination of the following four factors, famously articulated in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*:

1) Whether the packaging is a "common" basic shape or design;
2) Whether the packaging is unique or unusual in a particular field;
3) Whether the packaging is a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods; or

10

4) Whether the packaging is capable of creating a commercial impression distinct from the accompanying words.

TMEP § 1202.02(b)(ii) (citing *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)).

Because Defendant does not provide the Court with any information to compare the distinctiveness of its trade dress with others in the market—such as whether the product packaging is "common," "unique," or "a mere refinement of [] well-known form[s] of ornamentation for [its] particular class of goods"—the Court cannot find that Defendant's trade dress is distinctive on the information before it.

Though Defendant has not demonstrated on these facts that its trade dress has achieved either distinctiveness or secondary meaning, the Court reiterates its conclusion on the record that Defendant has satisfied the two other elements for trade dress protection: Defendant demonstrated both that the trade dress was not functional, and that the trade dress of the accused products is confusingly similar. *Gen. Motors Corp.*, 468 F.3d at 414. As the Court concluded during the preliminary injunction hearing, Defendant has therefore achieved "some likelihood of success" on the merits, which requires the Court to balance—rather than

11

tally—the other injunctive factors. *See Louisiana-Pacific Corp.*, 928 F.3d at 517.

**THE REMAINING PRELIMINARY INJUNCTION FACTORS**

These remaining preliminary injunction factors—irreparable injury, balancing of harms, and the public interest—continue to weigh overwhelmingly in favor of continuing the injunction. Importantly, Defendant clearly demonstrated that Plaintiff created a strong likelihood of confusion as to both the dress and the mark, which "[i]n trademark infringement causes [automatically] satisfies the irreparable injury requirement." *Lucky's Detroit, LLC v. Double L, Inc.*, 533 Fed. Appx. 553, 555 (6th Cir. 2013). Additionally, as the Court set forth on the record, the balance of the harms and the public interest also weigh heavily in favor of protecting Defendant's mark and dress, as well as preventing consumers from being misled. (ECF No. 54.)

Accordingly, for the reasons set forth in this opinion and order, as well as for the reasons set forth on the record on January 21, 2021, the Court finds that all four preliminary injunction favors weigh in favor of transforming the temporary injunction into a permanent one. Therefore, subject to the conditions set forth on the record and the following:

12

IT IS ORDERED THAT Plaintiffs/Counter-Defendants Select Distributors, LLC, SD Import, LLC, and Noor Kestou, and any of their agents, successors, assigns, and/or others in active concert or participation with them are enjoined from directly or indirectly using the capitalized mark "BREEZE" or any other mark or name including or incorporating the capitalized mark "BREEZE" and Defendant's BREEZE packaging trade dress shown below, or any other packaging or trade dress that is confusingly similar thereto as described by the Court on the record, in connection with tobacco or vaping products, or any other related products or services; and



IT IS FURTHER ORDERED that this injunction, effective immediately, shall extend permanently.

IT IS SO ORDERED.

Dated: February 8, 2021        s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 8, 2021.

                         s/William Barkholz
                         WILLIAM BARKHOLZ
                         Case Manager

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BREEZE SMOKE LLC,

     Plaintiff,

vs.

FARID JARJESS, *et al.*,

     Defendants.

Case No. 2:20-cv-13413-AJT-EAS

Hon. Arthur J. Tarnow

Magistrate Judge Stafford

## STIPULATED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

WHEREAS, Plaintiff Breeze Smoke LLC ("Breeze Smoke") and Defendants Bilal Saad, 32271 Ford Rd, LLC, Ghazwan Eeso, Rivan Eeso, EZ Smoke Shop, Inc., Fouad Aljalal, EZ Smoke Shop 2, Inc., EZ Smoke Shop Plus, Inc., Ismail Kaid Al-Madrahi, Bilal Mohamed Ali, Malek Distribution, Inc., Fuad Mugali, L Abro Distributor LLC, Luqman Abro, Reval Distributor, Riyadh Jaffo Hakeem, L and R Wholesale LLC, and Reval Hakeem hereby stipulate to the following temporary restraining order and preliminary injunction while this action is pending unless modified by a subsequent order of this Court. The parties further stipulate that Breeze Smoke shall not be required to furnish a bond in connection with this temporary restraining order and preliminary injunction.

38115760.1

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendants Bilal Saad, 32271 Ford Rd, LLC, Ghazwan Eeso, Rivan Eeso, EZ Smoke Shop, Inc., Fouad Aljalal, EZ Smoke Shop 2, Inc., EZ Smoke Shop Plus, Inc., Ismail Kaid Al-Madrahi, Bilal Mohamed Ali, Malek Distribution, Inc., Fuad Mugali, L Abro Distributor LLC, Luqman Abro, Reval Distributor, Riyadh Jaffo Hakeem, L and R Wholesale LLC, and Reval Hakeem, and any of their agents, successors, assigns, and/or others in active concert or participation with them, are enjoined from directly or indirectly using or selling any unauthorized products bearing the mark "BREEZE" or any other mark or name including or incorporating the mark "BREEZE" and Breeze Smoke's BREEZE packaging trade dress shown below, or any other packaging or trade dress that is confusingly similar thereto, in connection with vaping products containing the "Breeze" name, or any other related products or services, including but not limited to counterfeit BREEZE products, the "Sea BREEZE Plus" product, or the "Night BREEZE" product containing the "Breeze" name:

  

**IT IS FURTHER ORDERED** that Breeze Smoke is not required to furnish a bond in connection with this temporary restraining order and preliminary injunction.

**SO ORDERED.**

Dated: February 23, 2021

s/Arthur J. Tarnow
U.S. District Court Judge

38115760.1

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  February 23, 2021                        Respectfully submitted,

By:  /s/ *Andrew M. Pauwels*                     By: /s/ *Thomas W. Cunningham* (w/ permission)
Jeffrey K. Lamb                                  Thomas W. Cunningham
Andrew M. Pauwels                                Chanille Carswell
Nicholas A. Burandt                              Brooks Kushman P.C.
HONIGMAN LLP                                      1000 Town Center, 22d Floor
660 Woodward Ave., Suite 2290                    Southfield, MI 48075
Detroit, MI 48226                                (248) 358-4400
Telephone: (313) 465-7000                        tcunningham@brookskushman.com
jlamb@honigman.com                               ccarswell@brookskushman.com
apauwels@honigman.com

                                                 *Attorney for Defendants L Abro Distributor*
Mary A. Hyde                                     *LLC, Luqman Abro, Reval Distributor, Riyadh*
HONIGMAN LLP                                      *Jaffo Hakeem, L and R Wholesale LLC, and*
155 North Wacker Dr., Suite 3100                 *Reval Hakeem*
Chicago, IL 60606
Telephone:  (312) 701-9360                       By: /s/ *Matthew T. Nicols* (w/ permission)
mhyde@honigman.com                               Randall A. Pentiuk
                                                 Matthew T. Nicols
*Attorneys for the Plaintiff*                    Pentiuk, Covreur & Kobiljak, P.C.
                                                 2915 Biddle Avenue, Suite 200
                                                 Wyandotte, MI 48192
                                                 (734) 281-7100
                                                 rpentiuk@pck-law.com
                                                 mnicols@pck-law.com

                                                 *Attorneys for Defendants Bilal Saad and 32271*
                                                 *Ford Rd, LLC*

4

38115760.1

By: /s/ *Frank G. Becker* (w/ permission)
Frank G. Becker
18501 West 10 Mile Road
Southfield, MI 48075
(248) 789-2437
frankgbecker@yahoo.com

*Attorney for Defendants Ghazwan Eeso and Rivan Eeso*

By: /s/ *Muneeb M. Ahmad* (w/ permission)
Muneeb M. Ahmad
Ahmad & Akbar Law, PLLC
22815 Kelly Road
Easpointe, MI 48021
(248) 414-1470
muneeb@ahmadandakbar.com

*Attorney for Defendants EZ Smoke Shop, Inc. and Fouad Aljalal*

By: /s/ *Kim Corbin* (w/ permission)
Kim Corbin
Kim Corbin PLLC
15206 Mack Ave.
Gross Pointe Park, MI 48230
(313) 610-2689
corbinlaw@comcast.net

*Attorney for Defendants EZ Smoke Shop 2, Inc., EZ Smoke Shop Plus, Inc., Ismail Kaid Al-Madrahi, Bilal Mohamed Ali, Malek Distribution, Inc., and Fuad Mugali*

5

38115760.1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BREEZE SMOKE LLC,

      Plaintiff,

                            Case No. 1:22-cv-1182

v.

                            Hon. Hala Y. Jarbou

YATIN ENTERPRISES INC., et al.,

      Defendants.
_____/

## **OPINION**

Plaintiff Breeze Smoke LLC manufactures and sells vaping products, including disposable electronic vaping devices ("e-cigarettes"). It owns several trademarks with the word "BREEZE" in them. Defendants Yatin Enterprises Inc., Mini Market, LLC, Drake Party Store, LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, and Wild Monkey Smoke Shop are a wholesaler and five party stores located in Western Michigan. Plaintiff claims that Defendants are infringing Plaintiff's trademark rights by selling disposable e-cigarettes with the name "BREEZY BAR" on the label. Before the Court are Plaintiff's motion for a preliminary injunction (ECF No. 6) and Defendants' motion for judgment on the pleadings (ECF No. 59). For the reasons herein, the Court will grant Plaintiff's motion for a preliminary injunction. The Court will grant Defendants' motion for judgment on the pleadings in part and deny it in part.

## **I. BACKGROUND**

Plaintiff sells its e-cigarettes online and in retail locations throughout Michigan and the United States under various BREEZE marks. (Haddad Decl. ¶ 15, ECF No. 6-2.) Plaintiff avers that it and its predecessor-in-interest have used "BREEZE trademarks" on vaping products since as early as 2014. (*Id.* ¶ 6.) Plaintiff owns federally registered trademarks for BREEZE PLUS and BREEZE SMOKE for use on disposable e-cigarettes. (Reg. No. 6,770,534, ECF No. 6-3,

PageID.216; Reg. No. 6,976,563.)  The latter was approved on February 14, 2023.  Plaintiff also owns a registration for BREEZE for use on apparel (Reg. No. 6,296,005, ECF No. 6-3, PageID.264), and a stylized version of the word breeze, **BRE≋ZE**, also for use on apparel (Reg. No. 6,296,004, ECF No. 6-3, PageID.268).  And it has applied for additional federal registrations for BREEZE-related word marks on disposable e-cigarettes and e-cigarette liquid, including BREEZE PALM and BREEZE PRO, asserting use as early as 2020.  (Haddad Decl. ¶ 8.)  It also owns two Michigan registrations for BREEZE, both of which assert use since 2020.  (*Id.* ¶¶ 11-12.)  The following are examples of Plaintiff's use of its BREEZE PRO, BREEZE PLUS, and BREEZE SMOKE marks on its disposable e-cigarette products:



(*Id.* ¶ 7.)

In October 2022, Plaintiff discovered that several retailers in Michigan, including Defendants, were selling disposable e-cigarettes under the name BREEZY BAR, such as the following:



(*Id.* ¶ 33.) Plaintiff is not associated with these products.

Plaintiff claims that Defendants are infringing its rights under federal and state law. Count I of the complaint asserts that Defendants are infringing Plaintiff's federally registered trademarks, in violation of the Lanham Act, 15 U.S.C. § 1114. Count II asserts that Defendants are engaged in unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a), by using Plaintiff's marks as a false designation of the origin of the infringing products. Count III asserts that Defendants are using marks similar to Plaintiff's BREEZE marks in a manner that is likely to cause confusion, in violation of Michigan's Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 et seq. Count IV asserts that Defendants' sale of the allegedly infringing products has misappropriated Plaintiff's goodwill and business reputation, constituting unfair competition under common law. Count V asserts a claim for unjust enrichment based on Defendants' conduct.

Plaintiff now moves for a preliminary injunction to enforce its rights under the Lanham Act.

## II. PROCEDURAL HISTORY

Plaintiff initially brought this action in the Eastern District of Michigan. On December 9, 2022, that court transferred the matter to this Court. Plaintiff initially sought a temporary restraining order and preliminary injunction, but the Court denied the request for a temporary restraining order because Plaintiff did not fulfill the requirements for seeking one. (*See* 12/13/2022

Order, ECF No. 25.)  Accordingly, the Court gave Defendants an opportunity to respond before considering Plaintiff's motion for a preliminary injunction.  They have now done so.

## III. PRELIMINARY INJUNCTION STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)).  The Court considers four factors when deciding whether to grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

## IV. PREIMINARY INJUNCTION ANALYSIS

### A. Likelihood of Success

At issue under Plaintiff's Lanham Act claims is the alleged infringement of Plaintiff's rights flowing from its federally registered trademarks, as well as from its marks that have not been registered at the federal level.  The Lanham Act creates a cause of action against "would-be infringers" of both registered and unregistered marks, as long as the unregistered marks are protectable.  *Matal v. Lam*, 582 U.S. 218, 225 (2017); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754,

4

761 n.4 (6th Cir. 2005) ("'Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks . . . .'" (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992))).  When determining whether Plaintiff has demonstrated a strong or substantial likelihood of success under its Lanham Act claims, the Court first examines whether its marks are protectable (if they are not registered) and then whether "'the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods . . . .'" *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 869 (6th Cir. 2022) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)).  The "usual way" to prove customer confusion is through the "eight-factor, totality-of-the-circumstances test." *Id.*  Those factors are:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Id.* (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

### 1. Protectable/Enforceable Marks

Here, Plaintiff currently possesses federal registrations for BREEZE PLUS and BREEZE SMOKE, and uses various unregistered marks on its vaping products that contain the word "breeze," including BREEZE PRO.  These marks are all suggestive in nature.[1]  They are not merely descriptive of Plaintiff's products.  Suggestive marks are generally protectable so long as they are used by the putative owner, as is the case here.  *Tumblebus*, 399 F.3d at 761.

---

[1] A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (internal quotation marks and citation omitted).

### (a) Unlawful Use Doctrine

Defendants argue that Plaintiff's marks (both registered and unregistered) are not protectable or enforceable here because they cannot lawfully be used in commerce on Plaintiff's vaping products. Plaintiff's e-cigarettes are subject to regulation by the FDA as a "new tobacco product." (*See* FDA Letter, ECF No. 37-1, PageID.199.) Specifically, the FDA requires that manufacturers of electronic nicotine delivery systems ("ENDS") obtain approval from the FDA before selling or marketing their products. The Court of Appeals has explained the history of the FDA's regulations as follows:

> In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (TCA) to regulate tobacco products and to empower the FDA to conduct the regulation. Pub. L. No. 111-31, 123 Stat. 1776 (2009). The statute recognized the FDA as the primary federal regulatory authority regarding the manufacture, marketing, and distribution of tobacco products. *Id.* § 3(1), 123 Stat. at 1781. The Act applies to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco," and also authorizes the Secretary of Health and Human Services (HHS) to subject through regulation any other tobacco product to the statute's requirements. 21 U.S.C. § 387a(b). The Secretary carries out this responsibility through the FDA. *See id.* § 393(d)(2).
>
> Manufacturers of new tobacco products that were not on the market as of February 15, 2007 or that were modified after that date must obtain premarket authorization prior to marketing their products. *Id.* § 387j(a). The TCA contains multiple pathways for tobacco manufacturers to seek authorization to market their products. *See* 21 U.S.C. §§ 387j(a)(2)(A)(i)–(ii), 387j(b)–(c), 387e(j)(1), 387e(j)(3). The relevant path here is the premarket tobacco application, in which a manufacturer may file a premarket application that contains information regarding the product's health risks, a statements of the product's ingredients, the product's manufacturing information, and samples of the product and its proposed labeling. 21 U.S.C. § 387j(b)-(c). A tobacco product that is marketed without the appropriate authorization can face civil and criminal enforcement action by the FDA. 21 U.S.C. §§ 331(a)-(c), 332, 334, 387b(6).
>
> In May 2016, the FDA promulgated the "Deeming Rule," which deemed cigars, pipe tobacco, and electronic nicotine delivery systems (e-cigarettes) to be tobacco products subject to the TCA. 81 Fed. Reg. 28,974, 28,982–84 (May 10, 2016). When the Deeming Rule took effect in August 2016, as many as 25,000 products already on the market became subject to, and would suddenly be in violation of, 21 U.S.C. § 387j(a). . . . The FDA announced that it would stagger compliance periods for deemed tobacco products that were already on the market on the effective date

6

of the Deeming Rule, during which time the FDA would not bring enforcement actions against the manufacturers of newly-regulated tobacco products for failure to obtain premarket authorization. 81 Fed. Reg. at 28,977-78. This was intended to allow time for manufacturers of newly deemed products to come into compliance. Originally, the FDA required premarket tobacco applications to be submitted by August 8, 2018. Id. at 29,010–11, 29,106. In May 2017, the FDA extended the compliance period by three months. 82 Fed. Reg. 22,338, 22,340 (May 15, 2017). Finally, the FDA issued new guidance in August 2017 that extended the compliance period to August 8, 2022 for most e-cigarettes.

*Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 498 (6th Cir. 2020) (footnote omitted).

Here, Plaintiff applied to the FDA for approval of its ENDS products, and the FDA denied its application. *See Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 504-06 (6th Cir. 2021) (discussing Plaintiff's application). Without such authorization, those products are considered "misbranded" under the Federal Food, Drug, and Cosmetic Act ("FDCA"), and Plaintiff is prohibited from introducing or delivering them into the marketplace. (*See* FDA Letter, PageID.198.)

Defendants rely on what some courts have called the "unlawful use doctrine." This "doctrine" first arose in administrative proceedings involving the registration or cancellation of a trademark. Although the Lanham Act requires only a "use[] in commerce" to establish trademark rights, 15 U.S.C. § 1051(a)(1), "[i]t has been the consistent position of [the Trademark Trial and Appeal Board ("TTAB")] and the policy of the Patent and Trademark Office that a 'use in commerce' means a '*lawful* use in commerce[.]'" *The Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850 (T.T.A.B. June 29, 1982) (emphasis added). Thus, according to the TTAB, "the shipment of goods in violation of federal statute, including the [FDCA], may not be recognized as the basis for establishing trademark rights." *Id.*

The TTAB "has added substantial gloss to the lawful use requirement since its introduction." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 3:20cv400 (DJN), 2022 WL 17477062, at *6 (E.D. Va. Dec. 6, 2022). For example, a use is unlawful only if "the issue of compliance has previously been determined . . . by a court of government agency having

competent jurisdiction over the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q. 2d 2045, 2047 (T.T.A.B. 1988). In addition, "there must be some nexus between the use of the mark and the alleged violation before the unlawfulness of a shipment can be said to result in the invalidity of a registration." *Gen. Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270 (T.T.A.B. 1992). Further, because "many [legal] requirements are purely technical in nature" and are "relatively harmless" and correctable, the TTAB evaluates the "materiality" of the violation before cancelling a registration. *Id.*

Some federal courts, including the Courts of Appeal for the Ninth and Tenth Circuits, have extended the TTAB's unlawful use doctrine to infringement suits such as this one, allowing an alleged infringer to raise the issue as an affirmative defense to infringement. *See, e.g.*, *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000). In contrast, the Courts of Appeal for the Fifth and Eleventh Circuits have declined to adopt the doctrine without expressly rejecting it. *See Perry v. H.J. Heinz Co. Brands, LLC*, 994 F.3d 466 (5th Cir. 2021); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016). The Court of Appeals for the Sixth Circuit has not addressed the issue and, so far as the Court is aware, no district court in this Circuit has expressly adopted or rejected the use of the doctrine in infringement cases.

Arguments in favor of applying the doctrine to infringement cases are, first, that extending trademark rights to unlawful uses "would . . . put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." *CreAgri*, 474 F.3d at 630. Second, "as a policy matter,

8

to give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations would be to reward the hasty at the expense of the diligent." *Id.*

Arguments against applying the doctrine to infringement cases are, first, that it would be inconsistent with the statutory and regulatory scheme for adjudicating trademark rights. The doctrine "has its home . . . in TTAB proceedings to challenge registrations and/or to cancel previously issued registrations[.]" *VPR Brands, LP v. Shenzhen Weiboli Tech. Co.*, No. 22-81576-CIV-CANNON, 2023 WL 2317165, at *6 (S.D. Fla. Feb. 23, 2023). Those proceedings are "the primary vehicle for cancellation of registered marks." *Id.* The Lanham Act does not permit a plaintiff to sue in federal court to cancel a trademark. *Beasley v. Howard*, 14 F.4th 226, 235-36 (3d Cir. 2021); 5 McCarthy on Trademarks & Unfair Competition § 30:110 (5th ed.). Litigants in an infringement case should not be able to avoid the TTAB process by raising a defense that is arguably equivalent to the cancellation of trademark rights. And "trademark holders should not be required to repeatedly litigate the question of use to enforce their rights," when that question is better addressed in administrative proceedings. *Jergenson v. Inhale Int'l Ltd.*, No. 22 CV 2040, 2023 WL 167413, at *4 (N.D. Ill. Jan. 12, 2023). Second, there is no private right of action under the FDCA. The FDA is responsible for enforcing that statute, and that agency should be the one to determine in the first instance whether the trademark holder has complied with the statute. Third, and relatedly, applying the rule to infringement suits makes the Court "a potential collateral enforcer of hundreds of labeling and licensing laws" that are beyond the scope of trademark law. 3 McCarthy on Trademarks & Unfair Competition § 19:123 (5th ed.). This makes trademark litigation "more complicated and more expensive for trademark owners." *Id.* Fourth, the rule "lacks a statutory basis" and purportedly "serves no useful purpose related to trademark law." *Id.*

The first argument against adopting the unlawful use doctrine is not persuasive because defendants in trademark infringement suits routinely raise arguments that attack the validity or enforceability of the trademark at issue. After all, a trademark registration creates only a "rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). Defendants can rebut this presumption in a trademark infringement suit without resorting to cancellation proceedings. *See id.*

The second and third arguments against adopting the unlawful use doctrine are not as pertinent here as they are in other cases. For instance, in *CreAgri* and *Perry*, the trademark holders failed to comply with relatively minor, technical issues regarding the labeling of their products. In *CreAgri*, the product label did not identify the accurate amount of nutrients in the product. *CreAgri*, 474 F.2d at 631. In *Perry*, the product label omitted information about the ingredients the product contained. *Perry*, 994 F.3d at 475. The inaccurate product labeling in those two cases meant that the plaintiffs' products were being sold in an improper manner under the FDCA. However, those labeling issues were immaterial because they were easily correctable and they had no connection to the plaintiffs' trademark rights. In contrast, the FDA's regulations here have prohibited Plaintiff from selling or marketing any of its ENDS products before obtaining FDA approval. There is nothing Plaintiff could have done, or can do at the moment, to change that. Altering its product labels would not make the sale of those products legal. Consequently, federal law bars Plaintiff from selling or marketing its ENDS products. And because a trademark must be used in commerce in order to obtain and maintain trademark rights, the FDA's decision potentially

10

impairs Plaintiff's ability to sustain its rights.[2]  Accordingly, unlike the labeling errors in *CreAgri*

and *Perry*, the legal restrictions faced by Plaintiff are significant and material to its trademark

rights.

Also, unlike the products in *CreAgri* and *Perry*, Plaintiff's ENDS products have already

been examined by the federal agency responsible for enforcing the FDCA.  The FDA has expressly

determined that Plaintiff cannot market or sell those products.  Thus, this Court is not faced with

the possibility of usurping the role of the agency responsible for assessing Plaintiff's compliance

with the FDCA.  And for similar reasons, applying the unlawful use doctrine here would not make

this litigation significantly more expensive because the unlawfulness of Plaintiff's products has

been established.

On the other hand, the fourth argument against adopting the unlawful use doctrine gives

the Court pause.  The Lanham Act does not expressly require a "legal" use in commerce.  In other

words, it does not require that the trademark user comply with all applicable federal laws when

using its trademark in commerce.  Also, the doctrine has no obvious connection to trademark law

or to the purposes of the Lanham Act, which protect the trademark holder's reputation and the

goodwill associated with its products.  However "anomalous" it may be to give federal trademark

protection to uses that violate other federal statutes, Congress did not expressly require compliance

with other federal laws as a condition for obtaining or enforcing trademark rights.  The Court

declines to add a requirement that is not found in the statute itself.

In addition, adopting the doctrine here would have an odd result because Defendants'

products are also governed by the FDA's regulations, yet there is no evidence that the

---

[2] There is evidence that Plaintiff's sales have been impacted.  Plaintiff's Managing Member, Steven Haddad, represented in a sworn declaration filed with the Court of Appeals that, since the FDA's denial of Plaintiff's application, Plaintiff's distributors "have not made any additional orders of Breeze Smoke products[.]"  (11/2021 Haddad Decl. ¶ 26, ECF No. 37-1.)

manufacturers of those products even attempted to obtain authorization from the FDA before marketing them or introducing them into commerce. Thus, enforcing Plaintiff's trademark rights would not "reward the hasty at the expense of the diligent." *Cf. CreAgri*, 474 F.3d at 630. Instead, that is what the unlawful use doctrine would do. It would effectively penalize Plaintiff's efforts to obtain a decision from the FDA while allowing Defendants' products to escape scrutiny. For all these reasons, the Court declines to adopt the unlawful use doctrine.

Furthermore, even if the Court were to adopt the unlawful use doctrine, it is doubtful that the rule would impact the outcome here because Plaintiff has provided evidence that some of its products do not fall under the FDA's rule for ENDS products. Some of Plaintiff's disposable e-cigarettes contain no nicotine. (*See* Haddad Decl. ¶ 6, ECF No. 44-1; List of Non-Nicotine BREEZE products, ECF No. 44-6.) For example, in the picture in Section I above, the label for Plaintiff's "mint" flavored disposable e-cigarette states that the product contains "0mg of nicotine." This product uses the same BREEZE-related trademark in the same manner as Plaintiff's other e-cigarettes. Defendants do not explain how a product that contains no nicotine could be a "new *tobacco* product" or an "electronic *nicotine* delivery system" under the FDA's regulations.

When explaining the Deeming Rule, the FDA stated that "a tobacco product includes components and parts (the objects intended or reasonably expected to be used with or for the human consumption of a tobacco product that are not accessories) (e.g., e-liquids, tanks, cartridges, pods, wicks, atomizers)[.]" Deeming Rule, 81 Fed. Reg. 28,973, 29,028 (May 10, 2016). As to nicotine-free products, the FDA stated that "an e-liquid without nicotine is a component (and subject to FDA's tobacco control authorities), if it is *intended or reasonably expected to be used with or for the human consumption of a tobacco product* (e.g., with liquid nicotine) and does not

12

constitute a tobacco product accessory[.]" *Id.* at 29,017 (emphasis added). Here, Plaintiff asserts that its products are "closed" systems, meaning that the consumer cannot add other liquids or cartridges to them. Thus, Plaintiff's nicotine-free e-cigarettes are not intended or reasonably expected to be used with or for the consumption of a tobacco product.

Defendants respond that Plaintiff's nicotine-free products are subject to the FDA's regulations because those products contain "non-tobacco nicotine (NTN) – that is, nicotine not made or derived from tobacco, such as synthetic nicotine." (Defs.' Surreply Br. 3 n.1, ECF No. 53.)[3] But non-tobacco nicotine is still nicotine. If Plaintiff's nicotine-free products contain no nicotine, then logically they contain no synthetic nicotine. Thus, Defendants' argument is not persuasive.

To be clear, the Court is not making an express finding that Plaintiff's nicotine-free e-cigarettes are not governed by the FDA's Deeming Rule. Instead, the Court is evaluating the strength of the parties' arguments and evidence when deciding whether Plaintiff is likely to succeed on the merits of its claim. At this stage, the Court is not persuaded that the marketing or sale of Plaintiff's nicotine-free e-cigarettes is unlawful. And because those products are substantially similar in type and appearance to Plaintiff's ENDS products, the Court is not persuaded that the unlawful use doctrine (if the Court were to adopt it) would preclude Plaintiff from enforcing its trademark rights associated with its nicotine-free products against Defendants' ENDS products.

---

[3] Contrary to Defendants' brief (Defs.' Surreply Br. 3), Plaintiff *does not* argue that its nicotine-free e-cigarettes contain non-tobacco nicotine.

**(b) Trademark Assignments**

Next, Defendants question the validity of Plaintiff's marks due to two purportedly improper trademark assignments.

Assignment from Trucenta Holdings. Public records show that Trucenta Holdings, LLC assigned its interest and goodwill in nine standalone BREEZE marks to Plaintiff on February 4, 2002, including two marks that were registered by the U.S. Trademark Office and seven marks that were the subject of applications for a federal registration. (Trademark Assignment, ECF No. 37-8, PageID.413.) According to Defendants, of the trademark applications, six were intent-to-use applications. An application to register a trademark may not be assigned before the applicant files a verified statement of use of the mark in commerce. 15 U.S.C. § 1060(a)(1). There is an exception to this rule where the assignment is "to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing." *Id.* Defendants argue that this exception does not apply because Plaintiff is not a successor to Trucenta's business. Trucenta purportedly filed an annual statement after the assignment date and "still exists in the cannabis space according to numerous reports[.]" (Defs.' Resp. Br. 11-12, ECF No. 37.) An improper assignment renders the assignment, application, and any resulting trademark registration void. *See The Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d 1098 (T.T.A.B. 1996).

Defendants provide no facts or evidence to support their assertion that the assignment occurred before the filing of statements of use. But even if Defendants are correct that the assignment and related applications are invalid, that invalidity would impact only the six BREEZE marks that were the subject of those applications. It would not impact Plaintiff's ability to enforce its rights, including its common law rights, to the BREEZE PLUS mark or the BREEZE SMOKE mark that was recently approved for registration.

14

Assignment from KMT Services.  In passing, Defendants refer to an argument made by Trucenta in another case about a nunc pro tunc assignment of rights signed by Haddad, which purported to transfer certain trademark rights from KMT Services to Plaintiff.  That argument, which is not part of Defendants' brief, is not properly before the Court.  Moreover, the argument relies on evidence cited by Trucenta in Trucenta's brief.  (*See* Trucenta Br., ECF No. 38-1.)  The Court cannot evaluate that argument without the underlying evidence.

### (c) TTAB Proceedings

Defendants also note that Plaintiff's federal trademark registrations are the subject of cancellation proceedings initiated by Promontory Holdings, LLC, which has applied for federal trademark registrations for "BREEZ," for use in connection with cannabis-themed merchandise, cannabis sprays, and e-cigarettes containing cannabis.  (*See* ECF No. 37-7.)  Promontory Holdings contends that the BREEZE PLUS registration is invalid because Plaintiff cannot lawfully sell its ENDS products without FDA approval.  (*Id.*, PageID.322.)  Promontory Holdings also contends that Plaintiff's registered BREEZE marks are confusingly similar to the BREEZ mark, which allegedly predates Plaintiff's marks.  (*Id.*, PageID.317.)  Based on these arguments, Defendants argue that "there is a substantial likelihood that Plaintiff's marks will be invalidated[.]"  (Defs.' Resp. Br. 11.)  However, the Court cannot evaluate that likelihood by looking solely at assertions made by a party seeking to cancel some of Plaintiff's marks.  Further, although BREEZ is similar to Plaintiff's BREEZE marks, Promontory Holdings will also have to demonstrate that it has priority over Plaintiff's registered marks, which is not clear at this stage.  In short, the possibility that Promontory Holdings may succeed in the cancellation proceedings at some point in the future does not prevent Plaintiff from enforcing its existing rights against Defendants in this case.

In summary, Defendants' arguments regarding the invalidity or unenforceability of Plaintiff's marks are not persuasive.

15

## 2. Strength of the Marks

Turning to the *Frisch* factors for evaluating a likelihood of confusion, the first factor is the strength of Plaintiff's marks. As indicated above, Plaintiff's marks are suggestive because they contain the word "breeze." Suggestive marks are strong enough to be protectable, but they are not as strong as fanciful or arbitrary marks. *See Daddy's*, 109 F.3d at 281.

Another factor when evaluating the strength of the mark is the extent to which it has obtained recognition in the marketplace. *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Here, Haddad avers that Plaintiff has "generated millions of dollars in revenue from the sale of its BREEZE-branded disposable vaping pens" and that Plaintiff and its distributors have spent "millions of dollars on advertising and marketing its BREEZE-branded vaping goods and services." (Haddad Decl. ¶ 17.) But "evidence of advertising budgets . . . has an attenuated link to actual market recognition[.]" *Homeowners Grp.*, 931 F.2d at 1108. Haddad also avers that "the BREEZE Marks enjoy widespread recognition" (Haddad Decl. ¶ 23), but that assertion is conclusory and unsupported.

Defendants note that the market is somewhat crowded with similar marks. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion." *Homeowners Grp.*, 931 F.2d at 1108. "'[E]xtensive third-party uses of a trademark [may] substantially weaken the strength of a mark.'" *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 420 (6th Cir. 2012) (quoting *Homeowners Grp.*, 931 F.2d at 1108). Defendants have produced a list of trademark registrations and trademark applications from category 34 (which is for tobacco and articles used for smoking) that use a form of "breeze" in the mark, twenty-three of which are not associated with Plaintiff. (*See* ECF No. 38-2.) For example, one is an application for C-BREEZE, published on November 29, 2022. Another is an application for BREEZ, published on December 23, 2022. Also, there

16

are two registrations for BREZ and seven registrations for word marks that end in BREEZE, such as POLAR BREEZE, BLUE BREEZE, MORNING BREEZE, PISTACHIO BREEZE, CITRUS BREEZE, CACTUS BREEZE, and VAPORILLO'S SMOKIN' BREEZE. (*Id.*) And an online "vape" store has a trademark registration for a stylized version of the word "Breazy."[4] (*Id.*)

The C-BREEZE and BREEZ marks are most similar to Plaintiff's marks, but those trademark applications are relatively recent and it is not clear whether and to what extent those marks are currently in use in the marketplace. An applicant can file for registration on an "intent-to-use" basis before the mark is actually in use. Also, Plaintiff has opposed those applications.

The BREZ mark and the stylized Breazy mark are less similar to Plaintiff's marks and convey a different impression. The other marks (e.g., POLAR BREEZE) appear to be the names of particular flavors that would be accompanied by a house mark identifying the product source.[5] Such uses reduce the likelihood of confusion with Plaintiff's mark. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 634 (6th Cir. 2002). Nevertheless, these trademark registrations suggest that the term "breeze" (and variations thereof) is somewhat common in the marketplace for Plaintiff's products, which weakens the strength of Plaintiff's marks.

In summary, the evidence regarding the strength of Plaintiff's marks cuts in different directions.

### 3. Relatedness of Goods

Plaintiff's goods are the same type of goods as the allegedly infringing products that Defendants are selling, i.e., flavored disposable electronic vaping devices. The products are

---

[4] The owner of that mark abandoned a registration for BREAZY as a word mark.

[5] *See, e.g.*, https://mipod.com/products/desert-breeze-fume-infinity ("Desert Breeze" flavor with FUME house mark); https://www.plusdispo.com/products/plus-diamond-blue-breeze-pack-of-10 ("Blue Breeze" flavor with PLUS DIAMOND house mark); https://www.gopuff.com/p/naked-polar-breeze-3mg-e-liquid-60ml/p7658 ("Polar Breeze" flavor with NAKED house mark).

closely related. Even Plaintiff's nicotine-free disposable e-cigarettes are closely related to Defendant's products. This factor weighs in Plaintiff's favor.

### 4. Similarity of Marks

The similarity of the marks "is a factor of considerable weight[.]" *Daddy's*, 109 F.3d at 283. When assessing similarity, the Court considers the "'pronunciation, appearance, and verbal translation of conflicting marks.'" *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 266 (6th Cir. 2021) (quoting *Daddy's*, 109 F.3d at 283). The Court must "'view marks in their entirety and focus on their overall impressions, not individual features.'" *Id.* (quoting *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004)).

The mark on the allegedly infringing product is remarkably similar in overall impression to Plaintiff's marks, including Plaintiff's unregistered BREEZE mark for e-cigarettes, as well as its federally registered BREEZE PLUS mark and the recently registered BREEZE SMOKE word mark. The product sold by Defendants is called "Breezy *Bar*" instead of "Breeze *Smoke*" or "Breeze *Plus,*" but the "Breeze" and "Breezy" aspects are the most dominant parts of those marks. Those words are more suggestive whereas the other words in the marks are more descriptive. In addition, "Breeze" is clearly the most prominent part of Plaintiff's mark on Plaintiff's packaging, just as the "Breezy" aspect is clearly the most prominent identifier on Defendants' allegedly infringing products. On both, the term is in all capital letters at the top of the packaging. The slight difference between "Breeze" and "Breezy" does not significantly undercut the similarity. Neither does the difference between "Smoke" or "Plus" and "Bar" at the end of the respective marks. Although the Court looks at the marks in their entirety, the Court can assign "more weight to the dominant features of the marks." *AWGI*, 998 F.3d at 266. Assigning such weight does not, as Defendants suggest, violate the "anti-dissection rule," which requires courts to consider marks

18

as a whole. *See id.* In summary, considering the marks as a whole, the similarity of the marks weighs in Plaintiff's favor.

### 5. Evidence of Actual Confusion

Plaintiff has provided some limited evidence of confusion from a few consumers and potential purchasers. One individual took a picture of the allegedly infringing product and sent it to Plaintiff, asking, "Guys seriously is this you? It looks like a fake but please tell me[.]" (ECF No. 6-13, PageID.468.) Another asked, "This fake breeze? Or original[?]" (*Id.*, PageID.470.) Similarly, another asked, "Are these by breeze or is it a different brand?" (ECF No. 6-15, PageID.478.) A distributor asked, "Too many people asking for breezy bar . . . . Is it yours? Or u guys coming with it new?" (ECF No. 6-14, PageID.472.) These comments suggest some brief confusion about the source of Defendants' products.

Also, a couple of customers complained to Plaintiff about the quality of the allegedly infringing product, thinking that Plaintiff was the source. One complained that "he bought one [Plaintiff's] breezy 6k box vapes jolly rancher flavor and it tastes like mint and it's burnt." (ECF No. 6-16, PageID.480.) Another complained to Plaintiff that his Breezy Bar "started blowing its juice out and got really hot" after only three days of use. (*Id.*, PageID.481.) These comments are even more indicative of confusion than the statements in the previous paragraph. The comments also suggest potential harm to Plaintiff's reputation from what could be an inferior product, the quality of which Plaintiff cannot control.

Bela Sareen, the President of Yatin Enterprises, avers that "Yatin Enterprises is not aware of any instances of confusion between the Breezy Bars and the Breeze Pros sold by the Plaintiff." (Sareen Decl. ¶ 19, ECF No. 37-2.) However, that assertion mentions only one of Plaintiff's trademarks and one type of product. It avoids mention of Plaintiff's standalone BREEZE and

19

BREEZE SMOKE marks, and the particular uses of those marks, that are most similar to the mark on the allegedly infringing product.

In short, the few instances of confusion tilt this factor slightly in favor of Plaintiff.

### 6. Marketing Channels

Defendants concede that the same marketing channels are used. (Defs.' Resp. Br. 22, ECF No. 37.) Indeed, Defendants have sold Plaintiff's products as well as the allegedly infringing ones. This factor weighs in Plaintiff's favor.

### 7. Degree of Purchaser Care

"The degree of customer care—i.e., how carefully a consumer selects a particular good or service—may also affect the possibility of consumer confusion." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 796-97 (6th Cir. 2015). Plaintiff's disposable e-cigarettes sell for $11 to $20 each. (Hadded Decl. ¶ 20.) Common sense suggests that consumers will not pay a high degree of care when purchasing a relatively inexpensive, disposable product like an e-cigarette, which makes confusion more likely. *See Gray v. Meijer*, 295 F.3d 641, 649 (6th Cir. 2002) ("[T]he average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products[.]"); c*f. Grubbs*, 807 F.3d at 797 ("[C]onfusion is less likely in cases involving expensive or unusual services or unusually skilled buyers[.]").

Defendants argue that evidence that one of Plaintiff's distributors asked, "too many people asking for breezy bar . . . is it yours?" suggests that customers are discerning and understand that Breezy Bar is a different product. But as Plaintiff notes, that question suggests confusion as to the *source* of the Breezy Bar product, which is what trademark rights are meant to guard against. This factor weighs in Plaintiff's favor.

20

### 8. Defendants' Intent in Selecting Mark

"The intent factor concerns the defendant's 'intent to benefit' from the other mark's recognition." *AWGI*, 998 F.3d at 268 (quoting *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 435 (6th Cir. 2017)). "'If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.'" *Daddy's*, 109 F.3d at 286 (quoting *Homeowners Grp.*, 931 F.2d at 1111).

Here, Plaintiff argues that Defendants were aware of its trademarks when they sold the allegedly infringing products because Defendants also sell Plaintiff's products. "[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* And "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Id.*

Defendants respond that they did not select the contested mark because they did not manufacture those products and have no affiliation with the manufacturer. They simply purchased those products from the marketplace.

Neither party cites a case in which a court examined whether the intent of a *distributor*, who did not select the mark that was applied to the product and instead purchased the product from the marketplace, is relevant to the likelihood-of-confusion analysis. At any rate, this factor plays no significant role here because intent is difficult to determine; knowledge of the senior mark can permit an inference of an intent to benefit from that senior mark, but it does not necessarily demonstrate that intent. Furthermore, the other factors discussed above are sufficient on their own to demonstrate a likelihood of confusion.

In summary, on balance, the likelihood-of-confusion factors weigh in Plaintiff's favor. In other words, Plaintiff has shown a substantial likelihood of success on its claims under the Lanham Act.

## B. Irreparable Injury

Next, the Court considers whether Plaintiff has shown the possibility of irreparable injury in the absence of an injunction. Because Plaintiff has shown a likelihood of success on the merits of its Lanham Act claims, it is entitled to a presumption of irreparable harm. 15 U.S.C. § 1116(a); *see Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 555 (6th Cir. 2013) ("In trademark infringement cases, a likelihood of confusion or possible risk to the requesting party's reputation satisfies the irreparable injury requirement.").

Defendants argue that Plaintiff would suffer no harm because its goods are not marketable under the FDA's order. But as discussed above, that is not necessarily the case for all of Plaintiff's products. Moreover, the Court declines to adopt the unlawful use doctrine, so the Court's focus is on whether Plaintiff can enforce its trademark rights. Even if Plaintiff cannot legally sell most of its products for the time being, those trademark rights have not disappeared. Neither has the goodwill associated with those marks. Plaintiff can enforce those rights against Defendants, who are potentially profiting off the goodwill developed by Plaintiff by selling a product with a mark that is similar to Plaintiff's marks.

Defendants contend that the equities weigh against enforcing Plaintiff's rights because Plaintiff's ENDS products are not legal. But that argument does not help Defendants, who are in the same position. Defendants do not claim that the Breezy Bar products have been approved, let alone evaluated, by the FDA.

## C. Substantial Harm to Others

The next factor is the harm to others from the injunction. As far as harm to Defendants is concerned, an injunction will prevent Defendants from selling the Breezy Bar product. However, that product is one of many products sold by Defendants. It is also one of several different brands

22

of disposable ENDS products sold by Defendants, in a market with multiple options.  Thus, there is less likelihood that an injunction will cause significant harm to Defendants' businesses.

Defendants argue that an injunction against them "will not solve Plaintiff's alleged problem" because Defendants are local Michigan stores and the allegedly infringing product is sold nationwide. (Defs.' Resp. Br. 23.)  An injunction may not stop the sale of Breezy Bar products entirely, but that is not the showing required of Plaintiff at this stage.  It is sufficient for Plaintiff to show that stopping *Defendants'* sale of those products will prevent irreparable harm arising from those sales.  It has made that showing.

### D. Public Interest

The public interest is served by enforcing Plaintiff's existing trademark rights and preventing the sale of products that are likely to create confusion in the marketplace.

### E. Balance of Factors

On balance, the factors weigh in favor of a preliminary injunction.

### F. Security Requirement

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  "While this language appears to be mandatory, 'the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.'"  *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).  The parties have not briefed this issue, so any decision on the matter would be arbitrary.  The Court will not enter an injunction until after the parties submit briefing on the requirement to post security.

In summary, the Court will grant Plaintiff's request for a preliminary injunction but will not enter the injunction until the parties provide further direction on the security requirement in Rule 65(c).

## V. JUDGMENT ON THE PLEADINGS

### A. Standard

Defendants seek judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim." *HDC*, 675 F.3d at 611. Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to

24

in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### B. Analysis

#### 1. Lanham Act (Counts I, II)

Defendants argue that Plaintiff fails to state a claim under the Lanham Act because Plaintiff's products are unlawful under the FDCA. As discussed above, however, the Court declines to adopt the unlawful use doctrine. Moreover, Plaintiff sells some nicotine-free vaping products under the BREEZE SMOKE mark. (*See* Compl. ¶ 18 (showing "mint" product with "0mg of nicotine").) Defendants have not adequately explained why such products would be governed by the FDA's regulations. Thus, their argument for dismissal is not persuasive.

#### 2. MCPA (Count III)

Defendants further argue that Plaintiff does not state a MCPA claim because its products are regulated by the FDA. The MCPA does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). Under that exemption, "the relevant inquiry 'is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 519 (Mich. 2007) (quoting *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999)). Accordingly, because the FDA regulates the marketing of ENDS products, Defendants argue that the MCPA does not apply to those products. *See Duronio v. Merck & Co.*, No. 267003, 2006 WL 1628516, at *7 (Mich. Ct. App. June 13, 2006) ("Because the general marketing and advertising activities underlying plaintiff's MCPA claim are authorized and regulated under laws administered by the FDA, the exemption in MCL 445.904(1)(a) applies to plaintiff's MCPA claim.").

Plaintiff responds that its nicotine-free products are not governed by the FDA's regulations. However, the marketing and sale of *Defendants'* ENDS products is the target of Plaintiff's MCPA claim. Those activities are regulated by the FDA. Plaintiff does not allege that Defendants sell nicotine-free products. Indeed, all the examples of Defendants' products that are pictured in the complaint state that they contain nicotine. (*See* Ex. C. to Compl., ECF No. 1-4.) Accordingly, the exemption applies and Plaintiff fails to state a claim under the MCPA.

## VI. CONCLUSION

For the reasons stated herein, the Court will grant Plaintiff's motion for a preliminary injunction, but the Court will not issue the injunction until after the parties provide further briefing regarding the security requirement. The Court will grant Defendants' motion for judgment on the pleadings, in part, as to Count III of the complaint.

The Court will enter an order consistent with this Opinion.

Dated: April 25, 2023                /s/ Hala Y. Jarbou
                                         HALA Y. JARBOU
                                         CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,

      Plaintiff,

v.

                                Case No. 1:22-cv-1182

YATIN ENTERPRISES INC., et al.,

                                Hon. Hala Y. Jarbou

      Defendants.

_____/

## PRELIMINARY INJUNCTION ORDER

In accordance with the Court's April 25, 2023, opinion and its order entered this date:

**IT IS ORDERED** that Defendants Yatin Enterprises Inc., Mini Market LLC, Drake Party Store LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, Wild Monkey Smoke Shop, and any of their agents, successors, assigns, and/or others in active concert or participation with them are **ENJOINED** from directly or indirectly using the name or mark "BREEZY," or any other name or mark including or incorporating that term, in connection with the marketing or sale of tobacco or vaping products, or any other related products or services.

**IT IS FURTHER ORDERED** that Plaintiff is not required to furnish a bond in connection with this preliminary injunction.

Dated: May 16, 2023                         /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| BREEZE SMOKE LLC, | |
| Plaintiff, | CASE NO. 1:22-cv-1182-HYJ-SJB |
| vs. | Hon. Hala Y. Jarbou |
| YATIN ENTERPRISES INC., MINI MARKET LLC, DRAKE PARTY STORE LLC, PENNFIELD PARTY STORE, MIDTOWN SMOKE SHOP, INC., SG, LLC, WILD MONKEY SMOKE SHOP, PRICE POINT DISTRIBUTORS INC., SULEIMAN CAPITAL INC. and JOHN DOES 1-10. | |
| Defendants. | |

**STIPULATED PERMANENT INJUNCTION AGAINST YATIN ENTERPRISES, INC., MINI MARKET LLC, DRAKE PARTY STORE LLC, PENNFIELD PARTY STORE, MIDTOWN SMOKE SHOP, INC., SG, LLC, AND WILD MONKEY SMOKE SHOP**

WHEREAS, Plaintiff Breeze Smoke LLC ("Plaintiff") and Defendants Yatin Enterprises, Inc. ("Yatin"), Mini Market LLC, Drake Party Store LLC, Pennfield Party Store, Midtown Smoke Shop, Inc., SG, LLC, and Wild Monkey Smoke Shop (collectively the "Store Defendants"), by and through their respective counsel, hereby stipulate and agree to the following permanent injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. Yatin and the Store Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers, distributors, servants, employees, and/or others in active concert or participation with, for, by, through, or under them are enjoined from directly or indirectly:

    a. using the mark "BREEZE" or "BREEZY" or any other mark or name including

or incorporating, or that is confusingly similar to, the BREEZE Marks, as defined in Paragraphs 31-34 of the First Amended Complaint, ECF No. 98, in connection with any electronic nicotine delivery systems ("ENDS") products, vaping and tobacco products, or any related goods and services, without Breeze Smoke's express authorization;

b. engaging in trademark infringement, unfair competition, false designation of origin, or any other activities that misappropriate or infringe Breeze Smoke's trademark rights;

c. aiding, assisting, or abetting any other party in the acts prohibited by (a) through (d) above.

2. Yatin and the Store Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers, distributors, servants, employees, and/or others in active concert or participation with, for, by, through, or under them are further ordered to:

a. immediately cease importing, manufacturing, distributing, offering, selling, advertising, marketing, or promoting any BREEZY-branded products, including but not limited to the Infringing Products, as defined in Paragraph 41-43 of the First Amended Complaint, ECF No. 98, or any other products or services that infringe Breeze Smoke's rights in its BREEZE Marks;

b. within seven (7) days of this order submit an affidavit swearing to compliance with the terms of paragraph 2a;

c. within seven (7) days of this order:

i. deliver to Breeze Smoke all inventory of any BREEZY-branded

2

products in their possession, custody or control, or

ii. to the extent that Yatin or any of the Store Defendants asserts that it has returned or otherwise shipped or delivered any inventory of BREEZY-branded products to any other individual or entity since April 25, 2023, provide to Breeze Smoke a detailed description of how, where, when and to whom or to what entit(ies) such inventory was sent, as well as shipping records and any other documentation reflecting the same;

d. within seven (7) days of this order, provide to Breeze Smoke copies of all records relating to their trade in any BREEZY-branded products, including:

i. records sufficient to reflect all sales of any BREEZY-branded products;

ii. records sufficient to reflect all profits Yatin and the Store Defendants netted from sales of the BREEZY-branded products;

iii. all communications with Defendants Price Point Distributors, Inc. and Suleiman Capital, Inc.; and

iv. records sufficient to identify the entities selling BREEZY-branded products to Yatin and the Stores Defendants, such that Breeze Smoke can trace BREEZY-branded products upstream, as well as downstream sufficiently to allow Breeze Smoke to verify quantities sold against purchase records and current inventory;

e. not to sell BREEZY-branded products or any other product bearing the name "breeze" or any term that is similar to any of Breeze Smoke's BREEZE Marks, as defined in Paragraph 35 of the First Amended Complaint, ECF No. 98, without express authorization from Breeze Smoke;

3

f.   refrain from contesting any of Breeze Smoke's federal, state, or common law trademark or trade dress rights relating to Breeze Smoke's BREEZE products;

g.   aiding, assisting, or abetting any other party in the acts prohibited by (a) through (f) above.

3.   Yatin and the Store Defendants expressly acknowledge that Breeze Smoke owns trademark rights in its BREEZE marks, including, but not limited to, the BREEZE mark, the BREEZE SMOKE mark, the BREEZE PLUS mark, and the BREEZE PRO mark, which are embodied, in part, in numerous United States Trademark Registrations and Applications, in addition to its longstanding common law trademark rights therein, all as described in Paragraphs 31-34 of the First Amended Complaint filed in the Litigation ("BREEZE Marks").  Defendants further acknowledge that the BREEZE Marks are valid and enforceable and they agree not to challenge Breeze Smoke's assertion that it is the rightful owner of the BREEZE Marks and not to challenge the validity or enforceability of the BREEZE Marks in connection with Breeze Smoke's BREEZE Goods and Services as defined in Paragraph 35 of the First Amended Complaint filed in the Litigation and related goods and services.

4.   Yatin and the Store Defendants agree that Breeze Smoke is entitled to immediate injunctive relief and damages should Yatin and the Store Defendants violate the terms of this Stipulated Permanent Injunction.

5

IT IS FURTHER ORDERED that Breeze Smoke is not required to furnish a bond in connection with this permanent injunction.

SO ORDERED.

Dated: July 31, 2023

/s/Hala Y. Jarbou
HALA Y. JARBOU
Chief United States District Judge

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  July 28, 2023

Respectfully submitted,

By:  /s/ *Mary A. Hyde*
Mary A. Hyde (P83066)
Jenna E. Saunders
HONIGMAN LLP
155 North Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone:  (312) 701-9360
mhyde@honigman.com
jsuanders@honigman.com

Jeffrey K. Lamb (P76738)
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com

*Attorneys for the Plaintiff*

By: /s/ *Todd A. Holleman*
Todd A. Holleman (P57699)
Jacob L. Carlton
MILLER JOHNSON
45 Ottawa Ave. SW
Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
hollemant@millerjohnson.com
carltonj@millerjohnson.com

*Attorney for Yatin and the Store Defendants*

6

## CERTIFICATE OF SERVICE

I certify that on July 28, 2023 a copy of the foregoing was electronically filed with the

Clerk of Court using the ECF system which will send notification to all counsel of record.

/s/ Mary A. Hyde
One of the Attorneys for Breeze Smoke LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

BREEZE SMOKE LLC,

      Plaintiff,

vs.

YATIN ENTERPRISES INC., MINI MARKET LLC,
DRAKE PARTY STORE LLC, PENNFIELD PARTY
STORE, MIDTOWN SMOKE SHOP, INC., SG, LLC,
WILD MONKEY SMOKE SHOP, PRICE POINT
DISTRIBUTORS INC., SULEIMAN CAPITAL INC. and
JOHN DOES 1-10.

      Defendants.

CASE NO. 1:22-cv-1182-HYJ-SJB

Hon. Hala Y. Jarbou

**STIPULATED PERMANENT INJUNCTION
AGAINST SULEIMAN CAPITAL INC. AND PRICE POINT DISTRIBUTORS INC.**

WHEREAS, Plaintiff Breeze Smoke LLC ("Plaintiff") and Defendants Suleiman Capital,

Inc. ("Suleiman") and Price Point Distributors Inc. d/b/a Price Point New York ("Price Point," and

collectively with Suleiman, "Defendants"), by and through their respective counsel, hereby

stipulate and agree to the following permanent injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers,

   distributors, servants, employees, and/or others in active concert or participation with,

   for, by, through, or under them are enjoined from directly or indirectly:

   a. using the mark "BREEZE" or "BREEZY" or any other mark or name including

      or incorporating, or that is confusingly similar to, the BREEZE Marks, as

      defined in Paragraphs 31-34 of the First Amended Complaint, ECF No. 98,

      PageID.2257, in connection with any electronic nicotine delivery systems

("ENDS") products, vaping and tobacco products, or any related goods and services, without Breeze Smoke's express authorization;

b. engaging in trademark infringement, unfair competition, false designation of origin, or any other activities that misappropriate or infringe Breeze Smoke's trademark rights;

c. aiding, assisting, or abetting any other party in the acts prohibited by (a) through (d) above.

2. Defendants and any of their agents, successors, assigns, subsidiaries, affiliates, officers, distributors, servants, employees, and/or others in active concert or participation with, for, by, through, or under them are further ordered to:

a. immediately cease importing, manufacturing, distributing, offering, selling, advertising, marketing, or promoting any BREEZY-branded products, including but not limited to the Infringing Products, as defined in Paragraphs 41-43 of the First Amended Complaint, ECF No. 98, or any other products or services that infringe Breeze Smoke's rights in its BREEZE Marks;

b. within seven (7) days of this order submit an affidavit swearing to compliance with the terms of paragraph 2a;

c. within seven (7) days of this order:

   i. deliver to Breeze Smoke all inventory of any BREEZY-branded products in their possession, custody or control, or

   ii. to the extent that either Defendant asserts that it has returned or otherwise shipped or delivered any inventory of BREEZY-branded products to any other individual or entity since April 25, 2023, provide

2

to Breeze Smoke a detailed description of how, where, when and to whom or to what entit(ies) such inventory was sent, as well as shipping records and any other documentation reflecting the same;

d.  within seven (7) days of this order, provide to Breeze Smoke copies of all records relating to their trade in any BREEZY-branded products, including:

    i.  records sufficient to reflect all sales of any BREEZY-branded products;

    ii.  records sufficient to reflect all profits Defendants netted from sales of the BREEZY-branded products; and

    iii.  records sufficient to identify the entities selling BREEZY-branded products to Defendants, such that Breeze Smoke can trace BREEZY-branded products upstream, as well as records of downstream purchases sufficient to allow Breeze Smoke to verify quantities sold against purchase records and current inventory; provided that records of downstream purchases shall not be required to disclose the names and/or addresses of Defendants' customers;

e.  not to sell BREEZY-branded products or any other unauthorized product bearing the name "breeze" or any term that is similar to any of Breeze Smoke's BREEZE Marks, as defined in Paragraphs 31-34 of the First Amended Complaint, ECF No. 98;

f.  refrain from contesting any of Breeze Smoke's federal, state, or common law trademark or trade dress rights relating to Breeze Smoke's BREEZE products;

g.  within seven (7) days of this order, file or cause to be filed all paperwork necessary to abandon U.S. Trademark Application Nos. 97/687,668 and

3

97/687,659 for the marks BREEZY BAR and BREEZY and any other applications or registrations consisting of or incorporating the term "breezy" or "breeze" they have filed or have caused to be filed anywhere in the world and agree to never file any other applications in the U.S. or anywhere else for any marks incorporating the terms "breeze" or "breezy" or that are otherwise similar to Breeze Smoke's trademarks; and

h. aiding, assisting, or abetting any other party in the acts prohibited by (a) through (g) above.

3. Defendants expressly acknowledge that Breeze Smoke owns trademark rights in its BREEZE marks, including, but not limited to, the BREEZE mark, the BREEZE SMOKE mark, the BREEZE PLUS mark, the BREEZE PRO mark, which are embodied, in part, in numerous United States Trademark Registrations and Applications, in addition to its longstanding common law trademark rights as described in Paragraphs 31-34 of the First Amended Complaint filed in the Litigation ("BREEZE Marks"). Defendants further acknowledge that the BREEZE Marks are valid and enforceable and they agree not to challenge Breeze Smoke's assertion that it is the rightful owner of the BREEZE Marks and not to challenge the validity or enforceability of the BREEZE Marks in connection with Breeze Smoke's BREEZE Goods and Services as defined in Paragraph 35 of the First Amended Complaint filed in the Litigation and related goods and services;

4. Defendants further agree that Breeze Smoke is entitled to immediate injunctive relief and damages should Defendants violate the terms of this Stipulated Permanent Injunction.

IT IS FURTHER ORDERED that Breeze Smoke is not required to furnish a bond in connection with this preliminary injunction.

SO ORDERED.

/s/Hala Y. Jarbou
HALA Y. JARBOU
Chief United States District Judge

Dated: August 25, 2023

STIPULATED AS TO FORM AND SUBSTANCE:

Dated:  August 25, 2023

By: /s/ *Mary A. Hyde*
Mary A. Hyde (P83066)
Jenna E. Saunders
HONIGMAN LLP
155 North Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone:  (312) 701-9360
mhyde@honigman.com
jsuanders@honigman.com

Jeffrey K. Lamb (P76738)
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com

*Attorneys for the Plaintiff*

Respectfully submitted,

By: /s/ *Meredith Lloyd*
Meredith Lloyd
BOCHNER PLLC
1040 6th Ave., 15th Fl.
New York, NY 10018
Telephone: (212) 433-2655
meredith@bochner.law

*Attorney for Defendants Suleiman Capital Inc.*
*and Price Point Distributors Inc.*
*d/b/a Price Point New York*

**CERTIFICATE OF SERVICE**

I certify that on August 25, 2023 a copy of the foregoing was electronically filed with the Clerk of Court using the ECF system which will send notification to all counsel of record.

> _/s/ Mary A. Hyde_
> _One of the Attorneys for Breeze Smoke LLC_

7