UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,<br><br>            Plaintiff,<br><br>v.<br><br>BREEZE SMOKE LLC,<br><br>            Defendant. | CASE NO: 1:23-CV-05406<br><br>HONORABLE THOMAS M. DURKIN, BETH W. JANTZ, PRESIDING<br><br>JURY TRIAL DEMANDED |
| BREEZE SMOKE LLC,<br><br>            Counterclaim Plaintiff,<br><br>v.<br><br>MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS, *et al.*,<br><br>            Counterclaim Defendants. | |

## <u>MIDWEST'S MEMORANDUM IN OPPOSITION TO BREEZE SMOKE'S RENEWED MOTION FOR PRELIMINARY INJUNCTION</u>

Drew G.A. Peel (ARDC# 6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
Mark C. Howland (admitted *pro hac vice*)
**CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, TX  75202

*Attorneys for Midwest Goods Inc.*

**Table of Contents**

I.    INTRODUCTION ...................................................................................................1

II.   BS'S FAILS TO ESTABLISH ITS ENTITLEMENT TO INJUNCTIVE RELIEF UNDER THE CORRECT, CONTROLLING LEGAL STANDARD ..................................3

III.  BS MUST MAKE A "CLEAR SHOWING" ON THE MERITS TO OBTAIN INJUNCTIVE RELIEF..................................................................................................3

IV.   BS'S DESIGN PATENT CLAIM CANNOT SUPPORT INJUNCTIVE RELIEF .............5

      A.    BS's D'573 Patent Differs From Its Own BREEZE PRO Vape ..............................6

      B.    Prior Art To The D'573 Patent Is Fatal To BS's Claims For Relief........................7

V.    BS'S TRADE DRESS CLAIMS DO NOT ENTITLE IT TO INJUNCTIVE RELIEF ......9

      A.    BS's Evidence Does Not Establish A Protectable Trade Dress...............................9

      B.    BS Does Not Sufficiently Establish Non-Functionality ......................................10

      C.    BS Does Not Sufficiently Establish Distinctiveness .............................................12

      D.    BS Has Not Shown Likelihood Of Confusion........................................................16

            1.    Trade Dress Comparison..............................................................................16

            2.    BS Presents No Competent Evidence Of Actual Confusion......................18

            3.    Midwest's Survey Evidence Shows No Likelihood of Confusion.............19

VI.   BALANCE OF HARM AND PUBLIC INTEREST CONSIDERATIONS......................21

VII.  BS MUST POST A BOND IF ANY INJUNCTIVE RELIEF IS AWARDED ..................21

VIII. CONCLUSION ......................................................................................................22

**Table of Authorities**

*ABC Corp. I v. The P'ships*, 52 F.4th 934 (Fed. Cir. 2022)....................................................6

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343 (Fed. Cir. 2001)......................4, 9

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987) ................................................4

*Anderson v. Larry*, 2021 WL 4745390 (N.D. Ill. Oct. 12, 2021)..................................................22

*Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415 (7th Cir. 2017)................................11

*Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.,* 653 F.3d 448 (7th Cir. 2011) .....16

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.,* 805 F. Supp. 2d 503 (N.D. Ill. 2011)...............18

*Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019)............................11, 12

*CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660 (7th Cir. 2001) ........................................18

*Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp.2d 997 (N.D. Ill. 2010)..............................5, 7

*Computer Care v. Serv. Sys. Enterprises, Inc.*, 982 F.2d 1063 (7th Cir. 1992) ...............................9

*Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.*, 717 F.2d 385 (7th Cir. 1983).........................22

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir.2008)...............................................5

*Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed. Cir.1995) ........................................................5

*Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835 (7th Cir. 2023) ..............................................3, 4

*Habitat Educ. Center v. U.S. Forest Service*, 607 F.3d 453 (7th Cir. 2010) ..................................22

*Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352 (7th Cir. 1983)............................ 16-17

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551 (Fed. Cir. 1995) ..4

*In re Becton, Dickinson & Co.*, 675 F.3d 1368 (Fed. Cir. 2012) ....................................................11

*Jiaxing Zichi Trade Co., Ltd. v. Yang*, 2021 WL 4498654 (N.D. Ill. Aug. 19, 2021) ....................14

*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999).................19

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).........................................................................3, 19

*Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358 (Fed. Cir. 2017)..........................4, 8-9

*Peabody v. Davis*, 2007 WL 9817825 (N.D. Ill. Mar. 30, 2007) ....................................21

*Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44 (7th Cir. 1980) .......................................22

*Sorensen v. WD-40 Co.*, 792 F.3d 712 (7th Cir. 2015)......................................................16

*Think Green Ltd. v. Medela AG*, 2022 WL 6123348 (N.D. Ill. Oct. 7, 2022)....................10, 11, 16

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001) ....................................9

*Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019 (Fed. Cir. 1985).............................. 11-12

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998)................................... 12-13

*Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314 (N.D. Ill. 1991) ..............................9, 12

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)............................................12

*Wal-Mart Stores, Inc. v Samara Bros., Inc.*, 529 U.S. 205 (2000).......................................10, 12, 17

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977).......................22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................3, 4

*Vandor Grp., Inc. v. Batesville Casket Co., LLC.*, 2023 WL 9056127 (S.D. Ind. Oct. 31, 2023) 4-5

*Ziebert Int'l Corp. v. After Market Assoc., Inc.*, 802 F.2d 220 (7th Cir. 1986) ..............................16

**Other Authorities**

15 U.S.C. § 1052(f)...................................................................................12 n.5

15 U.S.C. § 1116(a)..................................................................................4

35 U.S.C. § 102.....................................................................................6

21 C.F.R. § 1143.3 .................................................................................11

37 C.F.R. § 1.56 ...................................................................................2 n.1

Fed. R. Civ. P. 56(c) ...............................................................................21

## I. **INTRODUCTION**

Midwest Goods Inc., dba Midwest Distribution Illinois ("Midwest") opposes the renewed motion for preliminary injunction ("RMPI") filed by Breeze Smoke LLC ("BS") (Dkt. ##52-55) and responds as set forth below and in the accompanying supporting papers, including the Declarations of Mudassir Yasin (Ex. 1, "Yasin Dec."), Stephen Levine (Ex. 2, "Levine Dec."), and Dr. Thomas J. Maronick (Ex. 3, "Maronick Dec.").

Midwest is and historically has been a business-to-business ("B2B") distributor of thousands of vaping products, from many different sources, of different shapes, sizes, brands, and features. (Ex. 1, Yasin Dec. ¶ 4) One such vape prominently bears the word NORTH ("the NORTH Vape"), and it is sometimes playfully advertised in connection with northern symbolism, such as shown below (*id.* ¶ 29):

 

BS sells relatively few lines of vaping products (although they claim to have made over a billion dollars selling them), each of which bears a BREEZE trademark. One of those lines, referred to as the BREEZE PRO, is at issue here. BS does not claim that any of its trademarks is infringed by the NORTH Vape, but instead asserts patent rights in a vape design, and trade dress rights in its vape and vape packaging, all of which it contends are infringed by the NORTH Vape.

Midwest previously distributed the BREEZE PRO, until public sources reported FDA issues with BS devices and BS decreased its supply of BREEZE PRO vapes to Midwest for

distribution. (Ex. 1, Yasin Dec. ¶ 10) In the meantime, and in its ordinary and ongoing efforts to meet the demands of its supply chain, Midwest continued to work with other suppliers for various offerings, and one such effort resulted in the NORTH Vape. (*Id.* ¶¶ 11-13) Once Midwest began selling the NORTH Vape, BS instigated the current dispute by sending threatening electronic communications and letters to Midwest and Midwest customers. (Dkt. #1, Compl. ¶¶ 14-43) These communications alleged intellectual property rights in its BREEZE PRO packaging and device, purportedly achieved in less than two years in the marketplace. (*Id.*) BS later added a claim under U.S. design patent No. D1,005,573 (the "D'573 patent"). (Dkt. #37, ¶¶ 137-147)

BS cannot monopolize functional vape features or vape designs described, used, or sold beforehand in the public domain under its trade dress or design patent theories. By the time BS alleges it commenced utilizing its claimed trade dresses and design patent, there were thousands of published vape designs and actual vape devices in what already had become a crowded marketplace. As shown herein, many third-party pre-existing vape designs have both functional and aesthetic features that heavily overlap ***both*** the BREEZE PRO and the NORTH Vape, which preclude BS from now retroactively claiming exclusive legal rights to such features. However, the BS threat letters that started this lawsuit, the record in the Patent Office leading to the D'573 patent,[1] the BS pleadings, and now the present RMPI all materially and wrongly ignore the factually irrefutable and extensive vape marketplace, with BS instead deflecting either to irrelevant vapes with less feature overlap, or to similar features shared by the BREEZE PRO and the NORTH Vape devices that antedate the sale of both.

---

[1] BS has a traceable vaping industry history back to at least 2013, and it claims hundreds of millions of dollars in sales, awareness of market conditions to identify "copycats," and various litigation. Yet, as discussed below, BS chose not to inform the U.S. Patent Office of a single item of its prior knowledge, despite its legal duty of candor (37 C.F.R. § 1.56) to do so, and even after it had notice of some prior art from this lawsuit.

Notably, in the present matter, BS seeks to ignore prior vaping history and art. But it did just the opposite in the U.S. Supreme Court. There, when BS sought relief from FDA prohibitions, the same Declarant who provides the factual predicate for the RMPI, Steven Haddad, swore that at least some BS products were "building on the specifications" of prior e-cigarettes dating back to 2013. (Ex. 2, Levine Dec., Ex. NN) BS should not now be permitted to assert *facts* in the alternative, exhorting its vape history now when perceived to be beneficial, but avoiding it previously when detrimental.

## II.     BS FAILS TO ESTABLISH ITS ENTITLEMENT TO INJUNCTIVE RELIEF UNDER THE CORRECT, CONTROLLING LEGAL STANDARD.

BS asserts the wrong legal standard for granting a preliminary injunction in its RMPI, claiming it "must only show that 'it has a better than negligible chance of succeeding on the merits …'" (citation and emphasis omitted) (Dkt. #53, at 7). BS is wrong. The Seventh Circuit has confirmed as "undisputed" that the BS-cited standard is "abrogated" and was "retired by the Supreme Court." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 856 n.12 (7th Cir. 2023). Accordingly, because BS relies on the wrong legal standard, its RMPI can and should be denied on these grounds alone.

## III.    BS MUST MAKE A "CLEAR SHOWING" ON THE MERITS TO OBTAIN INJUNCTIVE RELIEF.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; citations omitted). A preliminary injunction is "never awarded as of right," and the movant "must establish that he is likely to succeed on the merits, he is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). The Seventh Circuit imposes "a

significant burden" under which a movant must show a likelihood of success on the merits of its claims, which "must exceed 'a mere possibility' of success[,]" and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without injunctive relief. *Grubhub*, 80 F.4th at 843. The movant must demonstrate how it proposes to prove the key elements of its case. *Id.* Furthermore, in each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

A preliminary injunction is "not to be routinely granted." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1554 (Fed. Cir. 1995). "To establish a likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted claims and that its infringement claim will likely withstand the alleged infringer's challenges to patent validity and enforceability." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017). "A preliminary injunction should not issue if the accused infringer 'raises a substantial question concerning either infringement or validity.'" *Id.* (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001)). Indeed, if the alleged infringer "raises a substantial question concerning ... infringement ..., *i.e.*, asserts an infringement ... defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Amazon.com, Inc.*, 239 F.3d at 1350–51 (citation omitted).

In a trademark case, once the movant establishes a likelihood of success on the merits, it is statutorily entitled to a presumption of irreparable harm, but that presumption is rebuttable. 15 U.S.C. § 1116(a); *Vandor Grp., Inc. v. Batesville Casket Co., LLC*., 2023 WL 9056127, at *3 (S.D. Ind. Oct. 31, 2023) (holding presumption was rebutted when movant failed to "offer evidence to support its claim that it has and will continue to suffer loss of good will, prospective business

on other fronts, and loss of market share").

In the present case, each of BS's theories – whether design patent or trade dress – includes numerous factors, and for each theory, BS has failed to meet the proper legal standard, on one, if not many, of those factors. Accordingly, BS's preliminary injunction motion should be denied.

## IV. <u>BS'S DESIGN PATENT CLAIM CANNOT SUPPORT INJUNCTIVE RELIEF.</u>

BS asserts infringement of the D'573 patent, which it purports to have received by assignment of a China patent, CN306673860. A "design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1011 (N.D. Ill. 2010) (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)). For those ornamental and nonfunctional aspects, "the inquiry that governs analysis of design patent infringement is 'whether an ordinary observer, *familiar with the prior art*, would be deceived into thinking that the accused design was the same as the patented design.'" *Id*. (citing *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008)) (emphasis added). "When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." *Egyptian Goddess, Inc.*, 543 F.3d at 676. "[W]hen the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art." *Id.* at 678.

Stated simply, BS's evidence fails materially in at least two alternative respects: (1) it provides no side-by-side analysis, *as opposed to solely pictures*, of its patent design with the NORTH Vape; and (2) it ignores actual prior art and Federal Circuit legal precedent, by pointing the Court to vapes having little resemblance to its D'573 patent design.

### A.  BS's D'573 Patent Differs From Its Own BREEZE PRO Vape.

The RMPI Haddad Declaration ¶80 states the "BREEZE PRO product is the commercial embodiment of the D'573 patent." That statement is demonstrably inaccurate, as shown in the following illustration, comparing the D'573 patent Figure 2 to the BREEZE PRO.



As highlighted by added red dashed boxes, in each illustration the vape has a flat base with rounded corners, to the right of which is a "U-shape" interface to the vape body. However, between that base and U-shape, the D'573 patent has five circles, while the BREEZE PRO has a single rounded rectangle. Distinctions such as these become critical when a ***proper*** legal analysis is applied, because "where a dominant feature of the patented design and the accused products ... appears in the prior art, the focus of the infringement substantial similarity analysis in most cases will be ***on other features*** of the design" while the "shared dominant feature from the prior art will be no more than a background feature of the design" *ABC Corp. I v. The P'ships*, 52 F.4th 934, 942 (Fed. Cir. 2022) (emphasis added). As shown below, in this case, all dominant features at issue are in the prior art, so the subtle distinctions "***on other features***" as noted above are not only "the focus," but they also preclude a viable patent infringement claim.

### B.  Prior Art To The D'573 Patent Is Fatal To BS's Claims For Relief.

Prior art is defined in 35 U.S.C. § 102 to include worldwide subject matter in printed publications (including published patent documents) and devices publicly available or used, or on sale or sold, subject to certain exceptions not relevant here. The following illustrates a left-to-right, top-to-bottom, chronology[2] of selected prior art from 2019 to the D'573 patent design filing date

---

[2] The (f) in two of the illustrated vapes indicates the patent filing date.

of February 3, 2022, and it then concludes with the design from that patent (bottom right image).



As is clear from these images, and as is further detailed in the Yasin Declaration, all vapes *functionally* include a body for holding by the user and housing components, which interfaces with a mouthpiece for the user to draw vapor. (Ex.1, Yasin Dec. ¶¶ 17, 31-32)[3] Such functional features are not and cannot be protected by a design patent. *Competitive Edge, Inc.*, 763 F. Supp. 2d at 1011. Further, the above prior art shows: (i) each oblong vape body base is either squared or rounded to some extent; (ii) the mouthpiece can have different degrees of contours; (iii) the vape/body interface can be straight or curved, when viewed either sidewise or front/back; and (iv) many indicate the brand on an area of the vape. Indeed, survey evidence, discussed in Section V.D.3, *infra*, shows that "ordinary observers" would likely find these vapes to look mostly alike and either indistinguishable, or, if distinguishable, then distinguished *by the brand name they display*. As to branding, the NORTH Vape prominently bears the "NORTH" brand name, which has nothing whatsoever in common with the "BREEZE PRO" brand name.

---

[3] Each of the prior art illustrations in the table above is detailed in the Yasin Dec. ¶¶ 38-65.

Notwithstanding the crowded prior art field, BS makes **no** allegation about what non-functional, not-shown-by-prior-art, D'573 patent ornamental features are legally protectable. And, by extension, BS likewise makes no showing how such a feature(s), if any, exist in or are infringed by the NORTH Vape. Hence, this Court and Midwest are left to guess, and the required preliminary injunction standards of clear showing or likely proven are utterly unmet.

Nevertheless, in an effort to inform the Court, and out of an abundance of caution to present a defense in the face of BS's fatally flawed and legally deficient accusations, additional details regarding the D'573 Patent, relevant prior art, and the NORTH Vape, are provided in the Yasin Declaration. As reflected in the patent, the D'573 design includes at least the following features: (i) a base structure with a frontally-visible interface separating it from the body; (ii) a U-shape to the frontally-visible interface separating the vape base and body; (iii) a U-shaped interface between the vape body and mouthpiece; (iv) a different mouthpiece width-to-height ratio, presenting a relatively tall mouthpiece; (v) radial (or rounded) base corners; and (vi) five identically-shaped circles in the base. (Ex. 1, Yasin Dec. ¶ 56) The NORTH Vape does not include **any** of these six features, and certainly not any grouping of some or all of them, so as to satisfy the ordinary observer design patent infringement test or the preliminary injunction standard.

The dominant feature similarities between the NORTH Vape and a prior art example are also instructive, as shown to the left and right, respectively, below.

 

BS's requested injunction casts a wide net that would not only bar sales of the NORTH product on the left but also would impermissibly bar sales of products that embody prior art (including patented design features), such as the example on the right.

In view of the preceding, BS has not shown "that it will likely prove infringement,"

*Metalcraft of Mayville, Inc.*, 848 F.3d at 1364, and Midwest has raised at least a substantial question concerning infringement, both of which require denial of the RMPI insofar as it is based on the patent in suit. *Amazon.com, Inc.*, 239 F.3d at 1350-51.

**V.     BS's TRADE DRESS CLAIMS DO NOT ENTITLE IT TO INJUNCTIVE RELIEF.**

To establish a trade dress claim, BS must prove: (1) a sufficiently identified trade dress; (2) that is non-functional; (3) that is a distinctive means to identify its source; and (4) whose similarity to the allegedly infringing trade dress creates a "likelihood of confusion" on the part of relevant consumers. *Computer Care v. Serv. Sys. Enterprises, Inc.*, 982 F.2d 1063, 1067-68 (7th Cir. 1992); *Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1318 (N.D. Ill. 1991). Merely showing that functional or aesthetic features are similar is ***not*** enough. Indeed, "in many instances ***there is no prohibition against copying goods and products*** … unless an intellectual property right such as a patent or copyright protects an item," so without such protection such goods will be subject to copying. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (emphasis added). BS, by stretching only its BREEZE trademark, seeks to achieve the very goal *TrafFix* discourages; namely, to extend its rights in the source-identifying word BREEZE, and potentially common yet ***legally unprotectable*** product attributes, to preclude sales of a competing product that is prominently branded with the source-distinguishing brand NORTH.

**A.     BS's Evidence Does Not Establish A Protectable Trade Dress.**

BS alleges it owns a number of "BREEZE" trademarks, but it does ***not*** allege Midwest infringes any such trademarks. Instead, BS seeks to transmute its ***trademark*** rights into ***trade dress*** rights by including its trademark as part of its listed trade dress (*see* Dkt. #53, at 2, RMPI Br., Section II.B). Removing the word BREEZE from the BS trade dress listings leaves only a clear rectangular box, a cardboard medium on which non-protectable factual information is printed, and some physical vape attributes (collectively, the "Non-BREEZE Attributes").

As to the Non-BREEZE Attributes, BS alleges its trade dress is separable into two forms: (1) one relating to its product box, called the "BREEZE PRO Product Packaging Trade Dress"; and (2) the other relating to its vaping device or devices, called the "BREEZE PRO Product Design Trade Dress." This tactic is unsurprising, as a finding of a *packaging* trade dress would provide BS what it likely hopes is a lower proof threshold, as *packaging* trade dress, if not functional, can be protectable if it is inherently distinctive; in contrast, *product design* trade dress has a tougher evidentiary road, as it can never be inherently distinctive. *See, e.g.*, *Wal-Mart Stores, Inc. v Samara Bros., Inc.*, 529 U.S. 205, 215 (2000).

But, BS provides no clear showing or likely proof, or even legal argument, as to how or why consumers would separate the BREEZE PRO device and its outer packaging into two separate trade dresses. BS sells (and in many instances, advertises) the packaged BREEZE PRO device as a single unit, and it claims rights that its outermost packaging is clear plastic, in which case a portion of the vape is visible even when packaged; hence, the consumer perception is of the clear box with the vape inside – a singular trade dress. Further, once the BREEZE PRO is enclosed within its clear box, the vape is partially obscured and the overall visible area (and impression) is in large part dominated by the legally-unprotectable elements of the box and cardboard label. Moreover, doubts as to "ambiguous" trade dresses are resolved by treating them as product design trade dresses that can never be inherently distinctive. *Wal-Mart Stores*, 529 U.S. at 215. Accordingly, the alleged BS trade dress ought to be considered solely as a product design trade dress; but either way, BS's claimed trade dresses are not protectable.

## B. BS Does Not Sufficiently Establish Non-Functionality.

Trade dress is not protectable if it is functional. *See, e.g.*, *Think Green Ltd. v. Medela AG*, 2022 WL 6123348, at *6 (N.D. Ill. Oct. 7, 2022). A product attribute may be found to be functional in several ways, including if it is essential to the article's use or purpose, affects its cost or quality,

or "is a competitive necessity, that is, if its exclusive use would put competitors at a significant non-reputation-related disadvantage." *Id.* (quotation marks omitted). And while "[f]unctionality is a factual question, … the bar for functionality is so low that it can often be decided as a matter of law[.]" *Id.* (citing *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 419-420 (7th Cir. 2017)); *see also Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 492 (7th Cir. 2019) (evaluating various factors that inform functionality analysis, including "the utilitarian properties of the item's unpatented design elements" and the "effect of the design feature on an item's quality or cost").

BS's purported evidence that its Non-BREEZE Attributes are not functional consists of: (i) unsupported conclusions that should be stricken and disregarded (Dkt. #54, Haddad Dec. ¶¶ 18, 21, 26);[4] and (ii) the existence of alternative packaging and device designs employed by some other market participants (*id.*, ¶ 29). BS offers **no evidence** that any individual feature is protectable. For example, how could a rectangular clear plastic box not be either utilitarian or a competitive necessity, simply because of competitive choice? Additionally, packaging has a finite number of shapes, and one of the most common is a rectangle (given the longitudinal shape of vaping devices). BS says nothing of the manifest functionality of a cardboard label, which is a utilitarian, low-cost, print medium that presents factual information to the consumer of the vape brand, flavor, volume, and type, and an FDA-mandated nicotine warning (*see* 21 C.F.R. §1143.3).

Where, as here, an overall design is functional, even the inclusion of a few arbitrary or otherwise nonfunctional features will not prevent the design as a whole from being deemed functional, and, accordingly, not a protectable trade dress. *See In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1374 (Fed. Cir. 2012) (citing *Textron, Inc. v. U.S. Int'l Trade Comm'n*,

---

[4] Midwest has filed a Motion to Strike the Haddad Declaration based, in part, on his conclusory and unsupported statements. (Dkt. #64)

753 F.2d 1019, 1026-27 (Fed. Cir. 1985)).

### C.     <u>BS Does Not Sufficiently Establish Distinctiveness.</u>

Protectable "trade dress" under the Lanham Act is defined as a "product design that is so distinctive it identifies the product's source." *Bodum*, 927 F.3d at 491. For trade dress in ***product design***, as here, the Supreme Court expressly cautions that "consumer predisposition to equate the [product] feature with the source ***does not*** exist." *Wal-Mart Stores*, 529 U.S. at 213 (emphasis added). Indeed, ***even when unusual product designs exist***, which is ***not*** the case here as shown above, consumers typically view such designs as something ***other than*** a source designator. *Id.*

Additionally, in order to be legally and protectably distinctive, BS's purported packaging trade dress must be either inherently distinctive or acquire distinctiveness through secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992). As to BS's purported product design trade dress, it must acquire secondary meaning to be distinctive, yet ***almost invariably product trade dress serves purposes other than source identification***. *See Wal-Mart Stores*, 529 U.S. at 213.

With respect to inherent distinctiveness, *Turtle Wax* denied a preliminary injunction, in part finding the asserted trade dress was a basic shape or design, common and not unique in its field, and a "combination and refinement of elements already in abundance in the field[,]" with "no single component [as] truly unique." *Turtle Wax, Inc.*, 781 F. Supp. at 1319-1320. The opinion held that some combination and refinement does ***not*** constitute inherently distinctive trade dress, as to rule otherwise would essentially extend trade dress protection to every new compilation of elements in a particular field and would run afoul of the likelihood of confusion doctrine.

With respect to secondary meaning (or "acquired distinctiveness"), it "is acquired when, 'in the minds of the public, the primary significance of a product feature … is to identify the source of the product rather than the product itself.'" *Thomas & Betts Corp. v. Panduit Corp.*,

138 F.3d 277, 291 (7th Cir. 1998). The insufficient evidence BS provides includes objectionable conclusions, references to BS's sales efforts and revenue that are at best ambiguous (Dkt. #54, Haddad Dec. ¶¶ 33-35, 40-43), and third-party knockoffs using words that are the same or similar to BREEZE trademarks (*id.*, ¶¶ 17-19; 32-36; 38-43; 47; 49-52). This all presumptively ties to the BREEZE trademark, not any trade dress. Indeed, BS offers no consumer survey(s), and nothing whatsoever to prove that any purported expenditure or any consumer recognition (including knockoffs) attaches to trade dress specifically, as opposed to other obvious things that might address such recognition, such as the use of a BREEZE brand, the product attributes, or even using attractive or famous endorsers. All of this readily ties to selling branded vapes, not imparting any *separate* recognition or source identifier to a purported trade dress that BS appears to tacitly acknowledge is nothing but a purported arbitrary combination of commonplace features and attributes well known and frequently used in the marketplace. Some parties use "look for" advertising or product silhouettes to develop consumer recognition in an item separate from its brand – yet BS offers no evidence of such an effort. Instead, to the extent BS is suggesting its sales figures establish a "primary significance," BS ignores the *primary* source-identification legal requirement and plays the same sleight of hand from the threat letters it sent to Midwest and others; to wit, it recites the history of sales and efforts related to its BREEZE *trademark* or "IP," but not with any provable nexus of such efforts to the non-functional trade dress.[5]  In other words, sales success or advertising expenditures do not establish, *ipso facto*, that it is a protectable trade dress that is responsible for such sales success or that consumers have come to identify such trade dress

---

[5] Even taking BS's claims of commercial activity as signifying secondary meaning, its alleged trade dress entered the market less than two years before the NORTH product. Thus, if BS had sought to register its trade dress, which it admits it has not, Lanham Act Section 2(f), 15 U.S.C. § 1052(f) would not be available to BS to establish a prima facie case for its trade dress having secondary meaning, because such a registration requires trade dress use *for at least five years*. BS's short market existence is less than 40% of the five-year Section 2(f) requirement.

as a source designator as a result of such advertising expenditures.

BS's insufficient evidence of distinctiveness, for either its vape or packaging, is further highlighted by the publications (including on the internet and patent documents) and vapes of others in the same business, rendering indistinct various items that overlap or are shared in the industry. *See, e.g.*, *Jiaxing Zichi Trade Co., Ltd. v. Yang*, 2021 WL 4498654, at *3 (N.D. Ill. Aug. 19, 2021) ("To acquire ownership … the party claiming ownership must have been the first to actually use the mark in the sales of goods and services. … This standard applies to trade dress….") (citations and quotation marks omitted). For example, the crowded vaping market, prior to the BS patent filing or use of claimed trade dresses, is well illustrated in Section IV.B, *supra*. Also abundant in the vaping marketplace are the color black, for either vape body or vape mouthpiece, vapes with oblong bodies that are plainly functional, vapes with contoured mouthpieces, and vapes with a fully-flat base. (Ex. 1, Yasin Dec. ¶¶ 38-76) Further, the Court can and should take judicial notice of public records that are cited in and made exhibits to Midwest's Complaint (*see* Dkt. #1, Compl. ¶¶ 51-67), none of whose authenticity has been disputed, as well as the judicially-noticeable materials Midwest submitted in support of its pending Motion to Dismiss (Dkt. # 57).

Lastly, clear vape packaging was evident in publications in the U.S. by May 14, 2013, and also common in the marketplace, prior to the alleged August 18, 2021 BREEZE PRO marketplace entry, as were clear vape packaging with cardboard labels of different manners and information, some of which are shown below (Ex. 1, Yasin Dec. ¶¶ 110-121):



At a minimum, the above evidence raises substantial questions about the alleged distinctiveness of BS's alleged trade dress and vastly outweighs the scant evidence BS offers in support of distinctiveness, precluding BS from establishing a likelihood of success on its trade dress infringement claims. For good measure, however, consider further the similarity of the purported BREEZE PRO packaging trade dress to the following vape packaging that predated it (Ex. 1, Yasin Dec. ¶ 134):



**D.** **BS Has Not Shown Likelihood Of Confusion.**

**1.** **Trade Dress Comparison**

Likelihood of confusion can only be ascertained once an identifiable/protectable trade dress is established. Thus, because BS has failed to plead or prove a plausible protectable trade dress, it cannot prove a likelihood of confusion. *See Think Green Ltd.,* 2022 WL 6123348, at *6-*7. Additionally, the Seventh Circuit has stated:

> "To decide whether there is a likelihood of confusion ... a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.,* 653 F.3d 448, 455 (7th Cir. 2011). Possible confusion is not enough; rather, confusion must be "probable." 4 *McCarthy, supra* § 23:3.

*Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (alterations in original).

BS repeatedly alleges that the vapes at issue are either "virtually" or "nearly" identical, which is demonstrably false. First and perhaps foremost, the NORTH Vape ***prominently bears the word NORTH***, appearing multiple times on both the vape and packaging:



In contrast, and far from being "identical," both the BS packaging and device, whether considered separable or inseparable trade dresses, ***prominently include multiple instances of the word "BREEZE*.*"***

"[W]here the brand name is prominently stressed in the label," as here, "there is not likely to be any confusion as to the source, which is the essence of trademark infringement." *Ziebert Int'l Corp. v. After Market Assoc., Inc.*, 802 F.2d 220, 227 (7th Cir. 1986)); *see also*, *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983) ("[I]f one word or feature of a

composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements."). BS should not be allowed to avoid the "very essence" of trademark law on the one hand by claiming its trademark as part of a protectable trade dress, with remaining elements being unprotectable, while on the other hand avoiding the trademark comparison of BREEZE versus NORTH. Otherwise, any trademark owner could add its trademark to a combination of known marketplace items, and lay *exclusionary* legal claim to those additional items. Indeed, as the Supreme Court has stated, "Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness." *Wal-Mart Stores*, 529 U.S. at 213.

In addition to the NORTH Vape bearing the word NORTH, it further differs materially from the BREEZE PRO in at least eleven respects: (i) the NORTH Vape is bigger (in height, width, depth, and weight); (ii) it has a different, simplistic, and years-in-the-market existing oblong body shape; (iii) it has no separate base with rounded bottom corners; (iv) it has a different interface shape with its mouthpiece; (v) it has a different height-to-width ratio in its mouthpiece; (vi) it uses a prominence of the color black in its branding area; (vii) it is rechargeable; (viii) it has color-changing e-fluid and charge indicators; (ix) it offers users thousands more "puffs" before its liquid capacity is fully depleted; (x) it has a different set of flavor offerings; and (xi) it lists its flavor in a consistent font when the flavor includes multiple words. (Ex. 1, Yasim Dec. ¶¶ 13, 104-107)

Additionally, even if there were any protectability to the BREEZE PRO Packaging Trade Dress, the NORTH Vape packaging has various distinctions, which mitigate against a likelihood of confusion. Particularly, and in contrast to the BREEZE PRO image in Section V.C, *supra*, the NORTH Vape is packaged in a sleeve, not a longitudinally-separable rectangular box. Further, the

17

NORTH Vape sleeve differs from the BREEZE PRO Packaging Trade Dress in its size, in the relative fullness it provides when the vape is within the sleeve, and with the use of a black rubber plug that both encloses the sleeve and retains the vape, as shown below (Ex. 1, Yasin Dec. ¶¶ 130-134):



### 2. BS Presents No Competent Evidence Of Actual Confusion.

While BS acknowledges evidence of actual confusion is "entitled to substantial weight in the … analysis," it presents no competent, admissible evidence of actual confusion (Dkt. #53, at 14, quoting *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)). Despite claiming to sell over one billion dollars' worth of BREEZE Smoke Trade Dress products, *id.* at 5, BS cites only four unauthenticated hearsay statements as evidence of actual confusion. *Id.* at 14. Two of these *de minimis* examples are anonymous posts on a social media site, and two are purported text or email messages with unidentified and/or unauthenticated other parties—each of which Midwest has moved to strike as unauthenticated and inadmissible hearsay. (*See* Dkt. #64)

Even if this evidence were admissible (and it is not), "[s]ome incidence of actual confusion, if *de minimis*, is insufficient to establish a likelihood of confusion." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.,* 805 F. Supp. 2d 503, 521 (N.D. Ill. 2011) (citation omitted); *see also, id.* at 520 (holding accounts of alleged confusion by unknown customers in internet postings are

hearsay); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092-93 (10th Cir. 1999) (finding seven examples of actual confusion insufficient to support a finding of likelihood of confusion). As BS cites no consumer survey evidence or expert opinion supporting a likelihood of confusion, and it has failed to cite a single piece of admissible evidence as to actual consumer confusion, it has not carried its burden of persuasion "***by a clear showing***" that it is likely to succeed on the merits. *Mazurek*, 520 U.S. at 972 (stating movant's burden).

### 3. Midwest's Survey Evidence Shows No Likelihood Of Confusion.

In contrast to BS's utter lack of competent evidence regarding likelihood of confusion, Midwest submits with this Brief the Declaration and expert report of Dr. Thomas J. Maronick, an Emeritus Professor of Marketing in the School of Business and Economics at Towson University. (*See* Ex. 3, Maronick Dec.) Dr. Maronick has served as an expert witness in federal and state courts across the country in trademark, advertising, and unfair competition matters. (*Id.* at Ex. 1, Maronick Report ("Maronick Report"), at 3-4; Maronick Report at Ex. B)

Dr. Maronick designed two surveys with 444 and 203 respondents, respectively, for this case. (Maronick Report at 6) In the first survey, he utilized a "two-room" *Squirt* design, a standard and well-accepted format in which an image of either the BS vape product or the BS vape packaging is shown in Room 1, and the product or packaging for an array of competing brands is later shown in Room 2. (*Id.* at 7) The 444 respondents were randomly assigned to four groups— two for a vape study, and two for a vape packaging study. A "Test Group" for the vape study was shown a BS vape in Room 1 followed by a lineup of competing vapes in Room 2 that included the NORTH Vape. A "Control Group" for the vape study was shown the same BS vape in Room 1 followed by an array of competing vapes in Room 2 that substituted a Control ("SEA" branded vape) for the NORTH vape in the Test Group lineup. Similar Test and Control Groups were used

19

for the packaging study, with a "SHMIZZ" brand vape packaging substituted as the Control for the NORTH packaging. Respondents were then asked whether any of the vapes/packaging in Room 2 came from the same company as that in room 1 (BS vape/packaging), and if so, which vapes/packages and why they thought so. (*Id.* at 7-11, 15-18) To factor out the "noise" that is implicit in such surveys, results for the Test (NORTH) and Control (SEA/SHMIZZ) vapes/packages were then compared to determine whether NORTH vapes/packages were confused with BS vapes/packages at a rate higher than the Control by a statistically significant amount. (*Id.*)

Dr. Maronick found that in each study—vape and packaging—some responses indicated that each of the five vapes or packages in the Room 2 lineup was from the same or an affiliated company as the BS vape/package in Room 1. (Maronick Report at 12-14, Tables 3, 4, 7; 18-20, Tables 9, 10, 13) But ***there was no statistically significant difference in the number of respondents associating the Test and Control products with the BS product***, and so Dr. Maronick found there was no likelihood of confusion as to the BS and NORTH vapes or packaging. (*Id.* at 12-15, 18-21)

Dr. Maronick's second survey was a follow-up to his first survey to assess any potential likelihood of confusion if the NORTH and BS vape packages were viewed together in the same lineup (with a Control lineup containing the SHMIZZ package substituted for the NORTH package). (*Id.* at 22-23) Once again, Dr. Maronick found ***no statistically significant differences in the Test and Control Group responses***, suggesting no likelihood of confusion between the BS and NORTH packages. (*Id.* at 23-25) "The results of the two studies reported here demonstrate there is no likelihood of confusion between North vape products or the North package and either the Breeze vape/pen or the Breeze vape package among consumers in the target market for vape products." (*Id.* at 26)

## VI. BALANCE OF HARM AND PUBLIC INTEREST CONSIDERATIONS.

BS argues that Midwest (and the other Counterclaim Defendants) would not be harmed by the requested injunction because they would still be able to sell products other than the NORTH Vape. If that were the relevant test, it would be a basis for any frivolous injunction demand to stop sales by a party selling more than one product. Such an argument does not "balance" harm; it simply contends the harm could be worse. Inasmuch as BS asserts it has achieved over a billion dollars in sales in a competitive market (Dkt. #54, Haddad Dec. ¶ 46), surely the same "balance" mindset can permit it to endure the competition of one more *legitimate* player in the market.

BS further predicates its public interest arguments, and request for equity, on two things. First, BS argues the public interest is served by avoiding likely confusion, but BS has not come close to establishing a likelihood of such confusion. Second, BS speculates on the safety and FDA compliance of the NORTH Vape. In contrast, one need not speculate with respect to BS, as one can evaluate public governmental records to see that BS has had its PMTA(s) denied and received a subsequent FDA warning not to sell certain goods (Ex.2, Levine Dec., Exs. C-H), yet BS makes no representation that it has stopped sales, and, at least when this lawsuit started, BS had various products for sale on its website. (*see*, *e.g.*, Levine Dec., Ex. MM) Meanwhile, the entire downstream consuming line from Midwest, including businesses with economic impact and end-users entitled to personal choice, has a right to evaluate and purchase non-infringing articles, without the impediment of anticompetitive threats from a party without valid rights to interfere with their purchase decisions.

## VII. BS MUST POST A BOND IF ANY INJUNCTIVE RELIEF IS AWARDED.

Federal Rule of Civil Procedure 65(c) requires security when a preliminary injunction issues, although cases have allowed exceptions "in narrow circumstances, none of which are at issue in this case." *Peabody v. Davis*, 2007 WL 9817825, at *5 (N.D. Ill. Mar. 30, 2007) (citing

cases); *see also*, *Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.*, 717 F.2d 385, 391 (7th Cir. 1983) (waiver of a bond is a "dispensation narrowly construed in this circuit"); *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980) (holding that "absent extraordinary circumstances, the court errs in not granting" request for bond).

BS has failed to demonstrate any extraordinary circumstances that would justify bond waiver here. For instance, BS swears it "generated over one billion dollars in [vaping pen] revenues" (Dkt. #54, Haddad Dec. ¶ 46), yet it cites inapt cases waiving a bond due to indigence. *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977); *Anderson v. Larry*, 2021 WL 4745390, at *16 (N.D. Ill. Oct. 12, 2021). Or, BS argues Midwest "is not in danger of damages from the injunction." But the Seventh Circuit holds where the non-movant "may lose money as a result of the … preliminary injunction," even if just "a little," the Court should not waive the bond. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010). Requiring Midwest (and its customers) to stop selling and distributing the NORTH Vape will necessarily cause substantial monetary losses to Midwest and downstream entities. BS's argument that it will be irreparably injured by competition from Midwest, yet Midwest will not suffer any damages if the NORTH Vape is barred from the market, is simply not credible. BS's final argument is based on its claimed "strong likelihood of success on the merits." As discussed above, BS has not made an extraordinarily strong showing that would justify waiver of the bond.

The Court should therefore set any bond high enough to cover losses Midwest may suffer from an erroneously issued preliminary injunction. *Habitat Educ. Ctr.*, 607 F.3d at 459.

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, Midwest respectfully requests that this Court deny BS's Renewed Motion for Preliminary Injunction and award Midwest such further and additional relief as the Court determines is just and appropriate here.

Dated: February 2, 2024

Respectfully submitted,

 /s/   Drew G.A. Peel
Drew G.A. Peel (ARDC# 6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Tel: (312) 275-0337
Fax: (312) 733-3952
dpeel@rdaplaw.net

Stephen L. Levine (*pro hac vice* admitted)
Texas Bar No. 12258100
Kelli M. Hinson (*pro hac vice* admitted)
Texas Bar No. 00793956
Mark C. Howland (admitted *pro hac vice*)
Texas Bar No. 24027240
**CARRINGTON, COLEMAN, SLOMAN
 & BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, TX  75202
Tel: (214) 855-3000
slevine@ccsb.com
khinson@ccsb.com
mhowland@ccsb.com

*Attorneys for Midwest Goods Inc.*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/      Drew G.A. Peel*
Drew G.A. Peel