**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,** | **CASE NO: 1:23-CV-05406** |
| **Plaintiff,** | **HONORABLES THOMAS M. DURKIN & BETH W. JANTZ, PRESIDING** |
| **v.** | **JURY TRIAL DEMANDED** |
| **BREEZE SMOKE LLC,** | |
| **Defendant.** | |
| **BREEZE SMOKE LLC,** | |
| **Counterclaim Plaintiff,** | |
| **v.** | |
| **MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,** *et al.*, | |
| **Counterclaim Defendants.** | |

<u>**MIDWEST'S BRIEF IN SUPPORT OF ITS FIRST OMNIBUS DISCOVERY MOTION**</u>

Drew G.A. Peel (ARDC# 6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
Mark C. Howland (admitted *pro hac vice*)
Andrea C. Reed (admitted *pro hac vice*)
**CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, TX 75202

*Attorneys for Midwest Goods Inc.*

**Table of Contents**

Table of Authorities.................................................................................................. ii

I.      MOTION TO STAY RELIEF-RELATED DISCOVERY ....................................................1

        A.      BS Is Not Likely to Succeed on the Merits.................................................2

        B.      BS Is Already Harassing Midwest's Customers and Suppliers ...............................4

        C.      The Court Can and Should Partially Stay Discovery................................7

II.     MOTION FOR PROTECTIVE ORDER.........................................................................10

III.    CONCLUSION.......................................................................................................13

**Table of Authorities**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
2018 WL 11268486, (M.D. Fla. Aug. 2, 2018)................................................................12

*Armament Sys. & Procedyres., Inc. v. IQ Hong Kong, Ltd.*,
2005 WL 8162995 (E.D. Wis. June 2, 2005) ...................................................................8

*digEcor, Inc. v. e.Digital Corp.*, 2008 WL 4335539 (D. Utah Sept. 16, 2008)............................12

*In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331 (N.D. Ill. 2005) .................................................8

*Kraft Foods Glob., Inc. v. Dairilean, Inc.*, 2011 WL 1557881 (N.D. Ill. Apr. 25, 2011) ................7

*Magarl, L.L.C. v. Crane Co.*, 2004 WL 2750252 (S.D. Ind. Sept. 29, 2004) .................................8

*Murata Mfg. Co. v. Bel Fuse Inc.* ("*Murata I*"),
2004 WL 1194740 (N.D. Ill. May 26, 2004) ................................................. 10-11, 11 n. 18, 12

*Murata Mfg. Co. v. Bel Fuse, Inc.* ("*Murata II*"), 234 F.R.D. 175 (N.D. Ill. 2006) ..............10 n.18

*U.S. Steel Crop. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984) ....................................................7

*Red River Fiber Optic Corp. v. Verizon Servs. Corp.*,
2012 WL 13026822 (N.D. Tex. Jan. 10, 2012)........................................................................12

*Revolutionary Software, Inc. v. Eclipsys Corp.*,
2007 WL 1655564 (N.D. Cal. June 7, 2007) ................................................................11 n. 19

*Robinson v. Walgreen Co.*, 2021 WL 2453069 (N.D. Ill. June 16, 2021)....................................... 7-8

*Rodriguez v. Ford Motor Co.*, 2022 WL 704780 (N.D. Ill. Mar. 9, 2022)....................................7, 8

*Sadler v. Retail Props.*, 2013 WL 12333447 (N.D. Ill. Sept. 27, 2013)..........................................8

*VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307 (Fed. Cir. 2014) ...................................10

**Other Authorities**

Fed. R. Civ. P. 26(c) ....................................................................................................................7, 12

Fed. R. Civ. P. 26(d)........................................................................................................................8

Pursuant to the Court's June 10, 2024 Order (the "Order"), Midwest Goods Inc. ("Midwest") files this brief in support of its First Omnibus Discovery Motion, seeking to: (1) stay damages and other relief-related discovery between it and Breeze Smoke LLC ("BS"), pending a finding of liability on BS's infringement counterclaims; and (2) prevent BS from continuing its inappropriate contacts with Midwest's customers and suppliers.

## I. MOTION TO STAY RELIEF-RELATED DISCOVERY

Midwest respectfully requests a temporary and partial discovery stay, tailored to relief-related information sought by each party (whether damages or equitable), and to be removed to the extent necessary only once each BS infringement contention survives an eventual summary judgment determination. In the Order, the Court indicated its belief that some Midwest sales data and customer information needs to be produced. Midwest has done so, producing over 2,000 pages of invoices to date, and it also has committed to producing additional *targeted* ESI information relating to potentially relevant communications with any Midwest customers, and more granular sales information for customers already joined as parties to this lawsuit or whom BS has already subpoenaed. While the Order noted the Court's "strong disinclination to phasing discovery" at that juncture, shortly after the hearing, Judge Durkin denied BS's preliminary injunction motion. Midwest has put forward a reasonable compromise proposal that protects Midwest's competitive interests while permitting proportionate discovery of potentially relevant documents and data, but BS has refused to accept the Order's suggested moratorium or anything less than disclosure of all Midwest documents and data relating to sales, including identification information for each of the approximately 1,250 Midwest customers.[1]

---

[1] Midwest tried compromise; BS refused. Specifically, Midwest confidentially provided to BS particular NORTH vape sales percentages represented by the five downstream customers already identified in this suit (the three counterclaim defendants and two third-party BS-issued-subpoena recipients). In response, BS refused to: (i) accept discovery as to these parties as sufficient; (ii)

1

Accordingly, while the Court may be strongly disinclined to phase discovery in general, here, such a stay is particularly appropriate and necessary given that (1) Judge Durkin has held that BS to date has not shown it is likely to succeed on the merits of its claims, (Dkt. No. 99, p. 15 *et seq.* (copy attached as **Exhibit A** hereto)); (2) BS has refused to agree to any reasonable compromise; and (3) BS has repeatedly suggested it will pursue other parties from information it obtains through discovery, and it also has demonstrated it will misuse such information (*see infra* Section I.B.). A stay will balance and mitigate ongoing competitive harms to Midwest, given the highly competitive marketplace in which the parties operate, and further efficient resolution of key issues.

### A.     *BS Is Not Likely to Succeed on the Merits.*

After reviewing the lengthy submissions and evidence presented by both parties, Judge Durkin opined, on multiple alternate grounds, that BS had not shown it was likely to succeed on any of its claims against Midwest. (Ex. A, Dkt. No. 99) Although Judge Durkin held BS should have the opportunity to support its claims through discovery, he likewise noted that BS had not shown a likelihood of success given, among other things, the "common" or "generic" forms of multiple pre-existing oblong-body and contoured-mouthpiece vape products in the market and the inclusion in such products, for design patent purposes, of the "dominant feature at issue here." Judge Durkin further noted that the additional discovery that would be relevant would be discovery addressed to: (1) whether BS's packaging and product trade dress are distinctive in light of the similarities of BS's design to preexisting products (*id.*, pp. 7-9); (2) the functionality of BS's design (*id.*, p. 10); (3) claimed secondary meaning (*id.*, p. 19); (4) actual or likelihood of confusion (*id.*,

---

commit to not adding newly-identified downstream customers to this suit; or (iii) provide a number or even a range, of what quantity—in absolute or sales percentage terms—of downstream customers it demanded that Midwest disclose. *See* **Exhibit R**, July 5, 2024, Midwest and BS email exchange on respective discovery positions.

p. 12); and (5) the differences and similarities of the design features of the design patent, the NORTH vape, and the prior art (*id.*, p. 14). But much of this evidence, if it exists, would come from sources other than Midwest.[2] The evidence Midwest possesses on these issues, primarily the general consumer-impressing aesthetics and external design of the NORTH vape, and now also the SOUTH vape, have already been produced by Midwest (other than ESI, the review and production of which is ongoing for both Midwest and BS), in addition to expert survey evidence. In contrast, the other invasive and burdensome areas for which BS seeks discovery regarding Midwest's customers, suppliers, and extremely detailed sales information[3], will do nothing to push BS's allegations over the hurdle from "plausible" to "likely," but does threaten substantial harm to Midwest.

Recall that ***Midwest filed this lawsuit*** complaining of BS's threatening and business interfering communications, to Midwest and its customers, that falsely accuse Midwest of selling "copycat" products and infringing BS's trade dress and subsequent design patent. (Dkt. No. 2) Judge Durkin demonstrably dispelled BS's "copycat" allegations. (Ex. A, Dkt. No. 99) Yet BS is using its unsupported claims as a vehicle to do more damage to Midwest through discovery. BS's remaining requested "damages" discovery seeks more information about Midwest's customers that would allow it a veritable roadmap to Midwest's costly and proprietary market strategies, to further threaten and harass those customers, and to cause Midwest further competitive injury. Such results are not warranted, particularly in light of Judge Durkin's Opinion that BS had not demonstrated it

---

[2] As Judge Durkin's Opinion notes, consumer surveys BS commissions can be used as evidence for either secondary meaning or likelihood of confusion. (Ex. A, Dkt. No. 99, pp. 8, 19, 22) The Opinion further observed that the meager anecdotal evidence BS submitted in support of its motion was entitled to little, if any, weight. (*Id.*, p. 22) Similarly, when BS has sued others for counterfeiting (not an issue here), it has produced evidence of confusion where ***it*** is contacted by purchasers of the alleged counterfeits, so there again, such information came directly from BS, not the party it was challenging.

[3] *See* Section I.C, *infra*.

was likely to succeed on the merits of its claims given the probative marketplace and prior art – something that no amount of other competitively-sensitive discovery can overcome.

### B. BS Is Already Harassing Midwest's Customers and Suppliers.

BS began demanding that Midwest and its customers stop selling NORTH vapes almost a year ago, yet its lack of evidence supporting its claims and demands was laid bare by it filing multiple bases in its preliminary injunction request. Since the time that BS's demands commenced, Midwest and BS have repeatedly met and conferred on information exchange, without resolution.[4] Midwest sought in good faith to negotiate its objections to BS's requests for sensitive competitive information, and BS responded by suing certain of Midwest's customers, including more recently confronting two additional non-party/downstream Midwest customers, sending each a threatening cease-and-desist letter and a subpoena.[5]

Additionally, Midwest disclosed its NORTH vape supplier to BS during the course of this case, and BS has now used that information to make undisclosed and inappropriate contact with that supplier (and, apparently, third parties purporting to represent Midwest). Evidently, these communications started over four months ago, but to date, BS has produced no such communications to Midwest, other than to misleadingly excerpt from them in filing its recent request to the Court for leave to again amend its counterclaims. (Dkt. No. 101) On information and belief, Midwest has since learned of certain related communications, as shown below and additionally in **Exhibit G**.

BS's Managing Member is Steven Haddad, and he also was the sole BS Declarant offering

---

[4] *See* **Exhibit B**, transcript before J. Jantz on May 29, 2024; *see also* **Exhibit C**, email communications between Midwest and BS counsel regarding discovery matters; **Exhibit D**, Midwest discovery letter.

[5] *See* **Exhibit E**, BS cease and desist letter to Vape District; **Exhibit F**, BS cease and desist letter to Green Light Wholesale Inc. (*See also* Dkt. No. 89, Vape District's Motion to Quash and Exhibits thereto)

"evidence" in support of BS's failed preliminary injunction motion. Mr. Haddad wears many high-ranking hats, not just for BS, but also for what BS only recently admitted is at least one of its "two nationwide distributors," KMT Services LLC. (Dkt. No. 102, ¶1) Mr. Haddad is also evidently a licensed attorney.[6] Nonetheless, posing as a disinterested BS representative, Mr. Haddad solicited Midwest's NORTH vape supplier under the pretense that BS wanted to "discuss partnering" with that very supplier and that BS is "unhappy with [its own] manufacturer," as shown below.

**RE: North Brand is from our company**

发件人： **Steven** <steven@breezesmoke.com>

时 间：

2024 年 3 月 21 日(星期四) 凌晨 0:57

翻译全文 |

收件人：

龚赌钧 <gong@smisscigarette.com>

抄 送：

Tiffany Shaba <tiffany.s@capitalcsc.com>

Hi,
Can we schedule a call to discuss partnering with you guys? We are getting to be unhappy with our manufacturer. Please let Tiffany know when you're able to talk on Teams for 30 minutes.

-------------------------------------------
Thank you,
**Steven Haddad**

Shown by example above, some of Mr. Haddad's communications to Midwest's supplier also include Taffany Shaba, whose email domain reveals a different entity, Capital Sales Company, which BS has recently represented is the other of its two nationwide distributors. So, Mr. Haddad's communications readily demonstrate him seeking information from Midwest's supplier, for the competitive use of BS, KMT Services LLC, and Capital Sales Company, all of which are Midwest competitors. In this tripartite manner and evidently via email, Zoom calls, and WhatsApp, Mr.

---

[6] *See* image from Michigan state bar website, as **Exhibit H**, hereto.

Haddad has apparently communicated numerous times with Midwest's supplier, indicating, *inter alia*, that "we are going out of business soon because of north," while at the same time, BS has repeatedly touted its alleged manufacturing success, quality control, and sales to the Court.



Worse yet, Mr. Haddad also sought Midwest's sales and product information from the Midwest supplier and expressly stated that BS was "looking for the next great thing to compete with North":



The preceding is a reckless and wanton admission that BS seeks to improve its competitive position via information obtained during this lawsuit. Remarkably, Mr. Haddad has now also filed a sworn statement in this case that he welcomed into his company a person he believed to be a Midwest representative, and he essentially improperly cross-examined this person for Midwest information while knowing that Midwest is represented by counsel in this matter. (Dkt. No. 102, ¶¶3–5; Dkt. No. 102-1, ¶¶112–114)

Accordingly, Midwest's concerns about what BS will do with additional competitive information are not speculative and hypothetical but have been validated over a considerable period of time by BS's actions in this case, and indeed as effected by BS personnel up to its Managing Member, Steven Haddad. Indeed, Mr. Haddad has sworn before other courts that he is "responsible for overseeing the manufacturing and quality control of production, purchasing, sales, account, and managing inventory levels" for BS.[7] With this heightened role and declared responsibilities, Mr. Haddad has demonstrated an eagerness to contact and solicit information from Midwest suppliers and personnel purportedly representing Midwest. *See Kraft Foods Glob., Inc. v. Dairilean, Inc.*, 2011 WL 1557881, at *2 (N.D. Ill. Apr. 25, 2011) (citing *U.S. Steel Crop. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984)) ("Courts look to an individual's involvement in 'competitive decisionmaking' as grounds for barring access to trade secrets or otherwise confidential information.").

### C.     *The Court Can and Should Partially Stay Discovery.*

The Court has broad discretion in managing discovery. *Rodriguez v. Ford Motor Co.*, 2022 WL 704780, at *1 (N.D. Ill. Mar. 9, 2022) (Durkin, J.). Under Rule 26(c), parties may request a protective order that "for good cause, limit[s] the scope of discovery or control[s] its sequence to

---

[7] *See* Declaration of Steven Haddad, Breeze-MG011051, as **Exhibit I**, hereto.

7

'protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *Robinson v. Walgreen Co.*, 2021 WL 2453069, at *1 (N.D. Ill. June 16, 2021). The Court may also control the sequence of discovery under Rule 26(d). *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 336 (N.D. Ill. 2005).

When deciding whether to partially stay discovery, the Court should consider: "(1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party, (2) whether a stay will simplify the issues in question and streamline the trial, and (3) whether a stay will reduce the burden of litigation on the parties and on the court." *Rodriguez*, 2022 WL 704780, at *1 (quoting *Sadler v. Retail Props.*, 2013 WL 12333447, at *1 (N.D. Ill. Sept. 27, 2013) (Durkin, J.) (collecting cases)). Here, all factors weigh in favor of a stay, and other courts in this Circuit have stayed or otherwise protected damages-related discovery in similar circumstances. *See, e.g., Armament Sys. & Procedyres., Inc. v. IQ Hong Kong, Ltd.*, 2005 WL 8162995, at *2 (E.D. Wis. June 2, 2005) (staying "damage discovery … until dispositive motions on liability are decided"); *Magarl, L.L.C. v. Crane Co.*, 2004 WL 2750252, at *16 (S.D. Ind. Sept. 29, 2004) (granting stay of damages discovery between competitors because it "would require the disclosure of commercial information," and despite entry of a protective order, "there is almost always a risk of the inadvertent disclosure of protected information").

Staying post-liability discovery, relating to damages and equitable relief, is consistent with the parties' respective discovery conduct to date and will reduce the parties' discovery burden. Currently, BS has: (i) provided virtually none of its own damages-related discovery (*e.g.*, customer identification and detailed BS Pro vape sales data); (ii) refused to reciprocate Midwest's cooperation in providing BS's (or KMT or Capital Sales) organizational information; (iii) failed to produce information about a BS-related entity, KMT Services, through which BS previously

sold its product to Midwest; (iv) failed to address repeated inquiries into how Midwest might efficiently obtain information regarding the Chinese inventor and/or Chinese assignor of the D'573 patent under which BS asserts rights in this case; and (v) as determined by Judge Durkin's Opinion, (Ex. A, Dkt. No. 99), and in discovery refusals since, repeatedly failed to meaningfully clarify the alleged scope of its intellectual property or how such property is perceived to be infringed. Meanwhile, Midwest provided a summary of sales data, an offer to characterize sales geography, a company organization chart, descriptions of various Midwest personnel roles and groups, a relatively larger number of ESI custodians, and not only illustrations of a large number of prior vapes on the market and in literature but also an identification of a subset thereof from which BS could assess and clarify how it can legally assert expansive rights in view of this prior art (which it still has not meaningfully done). Meanwhile, BS seeks from Midwest:

1. Customer-specific and identification information - invoices to customers and agreements with customers[8];
2. Granular sales information related to specific products[9];
3. Competitive information, including documents related to Midwest's decisions to sell certain products, its profits and losses, forecasts, its pricing decisions, its advertising and marketing[10];
4. Supplier information - agreements, import records and invoices, manufacturing information[11];
5. FDA/PMTA information[12];
6. Damages information;[13] and
7. Wide-ranging inquiries into other Midwest distributed products (*e.g.*, SOUTH or not-yet-in-existence vapes) or plans to distribute products in the future.[14]

Given the above, a partial discovery stay is warranted. Moreover, the stay can always be

---

[8] Illustrative of these requests are BS's requests for production (RFP) Nos. 14, 25, 27, 45; and interrogatory (ROG) Nos. 1, 12. Copies of BS's RFPs and ROGs are in **Exhibit J** and **Exhibit K**, respectively.
[9] RFP Nos. 4, 5, 32; ROG Nos. 8, 10.
[10] RFP Nos. 9, 12, 13, 14, 23, 28, 29, 30, 31.
[11] RFP Nos. 4, 5, 12, 13, 14, 25; ROG No. 6.
[12] RFP Nos. 34, 35; ROG No. 7.
[13] RFP No. 57; ROG No. 16.
[14] RFP Nos. 70–80.

lifted later, for example, if BS's infringement claims survive summary judgment, at which point BS can seek relevant, non-privileged relief-related discovery. *See VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1318 (Fed. Cir. 2014) ("A stay will not diminish the monetary damages to which VA will be entitled if it succeeds in its infringement suit—it only delays realization of those damages").

## II. MOTION FOR PROTECTIVE ORDER

In addition, or in the alternative, the Court should enter a protective order protecting Midwest from having to disclose its sensitive customer information and/or prohibiting BS from contacting Midwest's customers and suppliers pending liability resolution. As evident from this lawsuit, Midwest and BS are direct competitors. Moreover, while BS initially indicated to the Court that BS has 20 or 25 employees (*see* Dkt. No. 88, p. 18), it advertises in print and video that it has "over 3200 workers" in "its factory in Shenzhen, China."[15] With its resources and size, BS continues to confront and pose a threat to Midwest's customers and suppliers, in BS's attempt to improve its competitive position and disrupt Midwest's business. Additionally, BS now admits it has leadership personnel, at least one who uses two different surnames (Mark Kareem or Mark Faraj),[16] who perform duties for multiple entities, including BS and its two nationwide distributors, KMT Services LLC and Capital Sales Company,[17] both of which also compete with Midwest.

Courts grant protective orders in situations like this to "prevent the disclosure of a party's customers" and to "preclude a party from contacting customers of the other party, on the basis that the potential harm to the party from whom discovery is sought outweighs the importance of the

---

[15] Breeze-MG000377, attached as **Exhibit L**, hereto.
[16] *See* Ex. B, May 29, 2024 Tr., 12:13-14:23. Mark Faraj is listed as the Agent in the Articles of Organization for BS and Annual Statement for KMT Services, as shown in **Exhibit M** and **Exhibit N**, respectively. Both Steven Haddad and Mark Faraj are identified by the FDA in its warning letter to BS, dated May 25, 2023, shown in **Exhibit O**.
[17] Ex. B, May 29, 2024 Tr., 17:13-20:24.

information to the party seeking that information." *Murata Mfg. Co. v. Bel Fuse Inc.* ("*Murata I*"), 2004 WL 1194740, at \*5 (N.D. Ill. May 26, 2004).[18] In *Murata I*, Murata accused Bel Fuse of patent infringement and sought discovery of Bel Fuse's customer identities and sales by volume, price, model, date, and customer. *Id.* at \*1–2. Bel Fuse objected, and the court **granted** a protective order because the demand would "seriously harm [Bel Fuse] from a competitive standpoint," notably because Murata was likely to use this information to subpoena Bel Fuse's customers in an attempt to hurt Bel Fuse's customer goodwill and "attempt to create leverage in settlement discussions." *Id.* at \*3–4.

Midwest raises the same harms here, not speculatively,[19] as such harms are already underway as detailed above. Additionally, in at least two hearings in this lawsuit, BS has stated its intention to identify and pursue (and it has pursued) Midwest customers. Specifically, beyond the named counterclaim defendants, BS sent cease and desist letters[20] and subpoenas[21] to Vape District and Green Light Wholesale Inc., both non-party Midwest downstream customers. The letter to Green Light outright declares it is the result of discovery BS obtained in this lawsuit. Accordingly, BS is already using competitive information for "interrogating and subpoenaing [Midwest's] customers," which the *Murata I* court refused to allow. *See id.* at \*6. Further, BS has refused to state what number, or percent, of additional Midwest customers it might pursue, even though it was warned early in this case (December 7, 2023) by Judge Durkin that such actions "may be

---

[18] The *Murata I* court reiterated its reasoning later and maintained in place the competitive protections, when the same claimant sought reconsideration. *See Murata Mfg. Co. v. Bel Fuse, Inc.* ("*Murata II*"), 234 F.R.D. 175 (N.D. Ill. 2006).

[19] *See Revolutionary Software, Inc. v. Eclipsys Corp.*, 2007 WL 1655564, at \*2 (N.D. Cal. June 7, 2007) (distinguishing *Murata* where there was no showing the movant would suffer any harm from its competitor contacting its customers).

[20] (*See* Dkt. Nos. 89 and 89-1 (Vape District is a d/b/a of non-party Parkhill Properties, LLC); *see also* Exs. E and F)

[21] *See* **Exhibit P** and **Exhibit Q**, BS subpoenas to Vape District and Green Light Wholesale Inc., respectively.

unnecessarily complicating this case." (Dkt. No. 88, p. 19)

The *Murata* court relied on Rule 26(c) for authority "to prohibit one party from contacting the customers of its adversary." *Murata I*, 2004 WL 1194740, at *6. It found the burden on the alleged infringer was high, given the product supplier's "legitimate concern that its business could suffer substantial harm if its customers are dragged into this case." *Id.* The scales tipped further toward finding the burden of this discovery outweighed the benefit of producing this information since future dispositive motions "could eliminate the need for the discovery of Bel Fuse's customers altogether." *Id.*

Other courts have followed the "legitimate concern" of *Murata I*. One court found that producing customer names to a competitor "is presumptively harmful." *Red River Fiber Optic Corp. v. Verizon Servs. Corp.*, 2012 WL 13026822, at *1 (N.D. Tex. Jan. 10, 2012). Another court found a competitor's subpoena "could cause [the movant's] customers to infer that [it] has no authorization" to sell its products. *digEcor, Inc. v. e.Digital Corp.*, 2008 WL 4335539, at *5 (D. Utah Sept. 16, 2008). Numerous other courts acted similarly. *See id.* at *5 (collecting cases). This Court should as well.

Should the Court grant Midwest's request for a protective order, if and when BS survives summary judgment on its infringement claims, it could then request the Court to lift the protective order if it can, in fact, raise a meritorious argument that contacting customers is necessary to prove its damages. *Cf. Aatrix Software, Inc. v. Green Shades Software, Inc.*, 2018 WL 11268486, at *4 (M.D. Fla. Aug. 2, 2018) (distinguishing *Murata I* based on proceeding to proof of damages, since "customer identifying information" may not be relevant to validity but might be relevant to damages to show lost profits).

### III. CONCLUSION

For the forgoing reasons, Midwest respectfully requests the Court grant its motion to stay relief-related discovery pending a resolution of liability in the cause and enter a protective order prohibiting BS from contacting Midwest's customers pending resolution of this litigation, along with any other relief to which it may be entitled.

Dated: July 10, 2024

Respectfully submitted,

*/s/ Drew G.A. Peel*

Drew G.A. Peel (ARDC# 6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Tel: (312) 275-0337
Fax: (312) 733-3952

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
Mark C. Howland (admitted *pro hac vice*)
Andrea C. Reed (admitted *pro hac vice*)
**CARRINGTON, COLEMAN, SLOMAN
 & BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, TX  75202

*Attorneys for Midwest Goods Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Drew G.A. Peel
Drew G.A. Peel

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| MIDWEST GOODS INC. d/b/a MIDWEST DISTRIBUTION ILLINOIS, | |
| Plaintiff, | |
| v. | |
| BREEZE SMOKE LLC, | No. 23 C 5406 |
| Defendant. | Judge Thomas M. Durkin |
| BREEZE SMOKE LLC, | |
| Counter Plaintiff, | |
| v. | |
| MIDWEST GOODS INC. d/b/a MIDWEST DISTRIBUTION ILLINOIS; WISEMAN WHOLESALE, INC.; SPEED WHOLESALE, INC.; WORLD WHOLESALE, INC.; and LIGHT VIEW LLC, | |
| Counter Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Midwest Goods Inc. filed this lawsuit seeking a declaratory judgment that Breeze Smoke LLC does not own a protectable trade dress interest in its vape pen product the "Breeze Pro." In response, Breeze Smoke filed counterclaims that Midwest's vape pen product (which is trademarked "North") infringes Breeze Smoke's design patent and trade dress rights. Breeze Smoke then filed a motion for a preliminary injunction under 15 U.S.C. § 1116(a) and 35 U.S.C. § 283, and Midwest



moved to dismiss Breeze Smoke's counterclaims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Both motions are denied.

## Background

Here are the relevant products:



Here is Breeze Smoke's design patent compared to Midwest's product:



And here is the prior art identified by Midwest, compared against Breeze Smoke's design patent in the lower right box:



**Analysis**

## I.      Motion to Dismiss

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023).

## A. Trade Dress Claim

"To plead a claim of trade dress infringement involving the overall appearance of a product, a plaintiff must [first] offer a precise expression of the character and scope of the claimed trade dress." *APP Grp. (Canada) Inc. v. Rudsak USA Inc.*, 2024 WL 89120, at *1 (2d Cir. Jan. 9, 2024). Having alleged a sufficiently precise trade dress claim, a plaintiff must then allege that its trade dress: "(1) is nonfunctional; (2) is either inherently distinctive or has acquired a secondary meaning; and (3) is likely to be confused with [the competing trade dress] by members of the consuming public." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1166 (9th Cir. 2009); *see also Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1067-68 (7th Cir. 1992) ("In order to prove trade dress infringement, the plaintiff must establish that: (1) its trade dress is 'inherently distinctive' or has acquired 'secondary meaning'; (2) the similarity of the defendant's trade dress to that of the plaintiff creates a 'likelihood of

confusion' on the part of consumers; and (3) the plaintiff's trade dress is "non-functional.").

Both product packaging and product design can be protectable trade dress. However, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000).

### 1. Expression

Midwest acknowledges that Breeze Smoke claims protectable trade dress in both its product's packaging and design. *See* R. 58 at 5. Yet, Midwest argues that Breeze Smoke's product "is not plausibly separable into two trade dresses," because the product's box is transparent plastic such that the product's design can be seen through the packaging and thus forms "a singular trade dress" with the packaging. *Id.*

Midwest has cited no authority that the use of transparent packaging collapses the trade dress analysis into a "singular trade dress," even though such analysis is customarily separated into packaging or product design. There is a categorial difference between a product's packaging and its design. And it is not uncommon for packaging to be partially transparent to display the product. Moreover, as Midwest concedes, Breeze Smoke has pled two separate trade dresses. Perhaps ultimate factual analysis will require a finding the Breeze Smoke has a "singular trade dress" as Midwest argues. But that is not a basis to find that Breeze Smoke's allegation of two separate trade dress is not plausible.

### 2. Distinctive Packaging

"In order to be inherently distinctive, the trade dress must be either arbitrary or suggestive, rather than generic or descriptive." *Computer Care*, 982 F.2d at 1069. The Seventh Circuit has explained that a "district court's determination that a plaintiff's trade dress is inherently [distinctive] is a finding of fact," *id.*, and as such is not generally amenable to dismissal on the pleadings.

This case is no exception. Breeze Smoke claims that its transparent plastic box packaging, with a wrap-around cardboard sleeve, displaying certain text and trademarks on the sleeve, is arbitrary and therefore distinctive. A plastic box with a cardboard wrapping is not uncommon. So, at that general level of description, Breeze Smoke's packaging might be described as generic. But such packaging also is not descriptive of the vape pen product. A vape pen could be packaged in any number of ways, so the transparent plastic box with a cardboard wrapping is plausibly arbitrary. Even this brief analysis of the arguments on both sides reveals why discovery is necessary to resolve these factual disputes.

Midwest cites two cases where courts granted motions to dismiss trade dress claims as not plausible. But those cases are readily distinguishable. One concerned the layout of a restaurant, which is too far afield from the trade dress of a consumer product. *See* R. 58 at 9 (citing *Plum Markets, LLC v. Compass Group USA, Inc.*, 2021 WL 323791, at *2 (N.D. Ill. Feb. 1, 2021)). In the other case, the plaintiff failed to even attach a photo of the alleged trade dress leaving the court at a loss regarding what trade dress the plaintiff was claiming. *See* R. 58 at 9 (citing *Mighty Deer Lick,*

6

*Inc. v. Morton Salt, Inc.*, 2020 WL 635904, at *8 (N.D. Ill. Feb. 11, 2020)). Neither of these cases suggest that Breeze Smoke's claim of distinctive trade dress is not plausible. The same is true for the case Midwest cites denying a preliminary injunction on a trade dress claim. *See* R. 58 at 10 (citing *Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1318 (N.D. Ill. 1991)). The higher standard for a preliminary injunction means that case has little relevance to the plausibility of Breeze Smoke's claims.

Midwest also argues that Breeze Smoke's packaging is too similar to the trade dresses of other competitors that pre-existed Breeze Smoke's trade dress:



R. 58 at 8. Midwest argues that the Court can make a finding regarding distinctiveness as a matter of law by reviewing the photos of these products and packaging. Midwest's argument may have merit, but Breeze Smoke is not obligated to address it at the pleading stage. Breeze Smoke has a right to develop a record through discovery regarding the packaging Midwest cites, as well as that of other competing products.

"Distinctiveness" is a question of fact made with reference to the competing products on the market. Midwest has identified products that appear favorable to its argument. But the ultimate significance of the product to the distinctiveness of Breeze Smoke's product's packaging trade dress is better analyzed in light of a full factual record after discovery.

### 3.    Distinctive Design

As mentioned, a product design can only be distinctive if it has acquired secondary meaning. "Secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992). Secondary meaning is generally established by evidence such as "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id*.

Here, Breeze Smoke alleges that it makes significant advertising expenditures and that its competitors (both Midwest and others) intentionally copy its design. *See* R. 63 at 10 (citing the complaint and associated exhibits). These allegations indicate that Breeze Smoke is a significant player in the vape pen market, such that its competitors copy its designs, and consumers reflexively compare new vape pen products to Breeze Smoke's product. These allegations are sufficient to plausibly allege that Breeze Smoke's product design has achieved secondary meaning.

Midwest argues that these allegations do not in fact establish secondary meaning, by comparing Breeze Smoke's design to other products on the market. *See*

8

R. 67 at 5-6. But like the Court's discussion of "distinctiveness," this sort of analysis is not appropriate at the pleading stage. Perhaps the product designs Midwest highlights will be the only evidence in the record after discovery. But Breeze Smoke is not obligated to present all of its favorable evidence at the pleading stage. The question is, rather, whether Breeze Smoke's allegations plausibly demonstrate secondary meaning, and plausibility is a relatively low bar. Having established a plausible claim, Breeze Smoke is entitled to the opportunity to take discovery and present the Court with additional facts and testimony relevant to Midwest's arguments concerning the similarities of Breeze Smoke's design to preexisting products.

### 4. Functionality

Midwest argues that Breeze Smoke's packaging and design are functional. "A product feature is considered functional and is ineligible for [Lanham Act] protection if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 644 (7th Cir. 2020). Like "distinctiveness" and "secondary meaning," "[f]unctionality is a factual question." *Id.* at 643. However, "the bar for functionality is so low that it can often be decided as a matter of law." *Id.* Nevertheless, a decision as a matter of law generally comes at summary judgment on the basis of facts revealed in discovery. *See id.* (the holding that "functionality" can be decided as a matter of law was made by the Seventh Circuit in affirming a summary judgment decision).

With respect to Breeze Smoke's packaging, Midwest argues that a plastic box wrapped in cardboard is the epitome of functionality, asking the rhetorical question, "how could a rectangular clear plastic box package not be . . . utilitarian?" R. 58 at 6. But the question is not whether the packaging has a function, because all packaging performs a function. The question is whether the particular form of packaging is essential or necessary to the product, and Breeze Smoke alleges that its choice of packaging is entirely arbitrary and therefore distinct. To the extent Midwest argues otherwise, resolution of that dispute requires discovery regarding the product, the packaging, and the market of competing products.

Whether the design of Breeze Smoke's vape pen includes any non-functional aspects is a closer call. Midwest points out that all vape pens appear to be designed with an oblong rectangular body and a rounded mouthpiece, both necessary to a vape pen's function. But Breeze Smoke identifies more detailed aspects of its design that plausibly do not contribute to its function. *See* R. 63 at 3 (e.g., rounded corners, flat bottom). Whether these details are functional and whether they are sufficiently distinctive and significant to constitute protectable trade dress, can only be decided with additional factual investigation into the product's function and the designs of competing products.

Midwest encourages the Court to undertake that analysis on this motion with reference to the product designs Midwest has attached to its complaint and its motion. Midwest argues that the Court should take judicial notice of the documents showing these designs. *See* R. 58 at 8. But as the Court explained above, Breeze

10

Smoke is not under any obligation to account for this information in its pleadings. Midwest has cited no authority establishing such an obligation. Rather, trade dress (and design patent) cases often involve expert analysis of the product and markets, which assists the Court in understanding the relevant elements, including functionality. Breeze Smoke is not obligated to produce such evidence at this stage. Instead, as long as its allegations are plausible—and, as discussed, Breeze Smoke has plausibly alleged package and product design details that are plausibly non-functional—it should have the opportunity to produce additional evidence at a later stage of the case.

### 5. Confusion

"Likelihood of confusion" is the last element of a trade dress claim. The Seventh Circuit has explained that "[i]n determining likelihood of confusion, [a court should consider] the type of trademark in issue, the similarity of the designs and the products, the identity of retail outlets and purchasers, identity of advertising media utilized, any evidence of actual confusion, and whether [the defendant] intends to pass off its product as that of [the plaintiff]." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 805 (7th Cir. 2002).

Midwest argues that where, as here, "the brand name is prominently stressed in the label, there is not likely to be any confusion as to the source, which is the essence of trademark infringement." R. 58 at 11 (quoting *Ziebert Int'l Corp. v. After Market Assoc., Inc.*, 802 F.2d 220, 227 (7th Cir. 1986)). Perhaps this is true. But Breeze Smoke has clearly articulated the similarities between its product packaging

and design and that of Midwest. *See* R. 63 at 11-12. Breeze Smoke has also alleged that its product and Midwest's product are sold by the same retailers, often side-by-side on the shelf. Breeze Smoke has also plausibly alleged that its brand is strong with reference to the amount it spends on advertising and evidence of consumers mentioning Breeze Smoke's products in comparison to competitors. These allegations are sufficient to plausibly allege a likelihood of confusion.

Midwest argues that these allegations demonstrate merely "conceivable confusion," when "probable confusion" is required. *See* R. 58 at 12. This is true in that the Seventh Circuit has explained that ultimately proving "likelihood of confusion" requires a plaintiff to prove that confusion is "probable." *See Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). But this does not mean that Breeze Smoke must demonstrate that confusion is probable at this stage of the proceedings. Rather, Breeze Smoke must merely plausibly allege that confusion is probable. And like "distinctiveness" and "functionality," "likelihood of confusion" is also "a highly fact dependent inquiry." *See Specht v. Google Inc.*, 758 F.Supp.2d 570, 584 (N.D. Ill. 2010) ("The Seventh Circuit treats likelihood of confusion as a question of fact"). To the extent it can be decided as a matter of law, that occurs on summary judgment, as is exemplified by the cases Midwest cites. Breeze Smoke has plausibly alleged a likelihood of confusion, so dismissal is not appropriate prior to discovery.

### B. Design Patent Claim

To demonstrate design patent infringement, a plaintiff must demonstrate by a preponderance of the evidence that "an ordinary observer, familiar with the prior

art . . . would be deceived into believing the [accused product] is the same as the patented [product]." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 681 (Fed. Cir. 2008). It is not unheard of for a district court to grant a motion to dismiss a design infringement claim, finding that the plaintiff has not plausibly alleged that the ordinary observer would be deceived. *See, e.g., Parker v. Kimberly-Clark Corp.*, 2012 WL 74855 (N.D. Ill. Jan. 10, 2012). But in such cases, the "the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear 'substantially the same' to the ordinary observer." *Egyptian Goddess,* 543 F.3d at 678; *see also Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 933-34 (Fed. Cir. 2014) (affirming a grant of a motion under Rule 12(b)(6) because the district court "properly concluded that '*plain differences*' exist between the accused products and the patented design") (emphasis added); *cf. Parker*, 2012 WL 74855, at *3 (granting a motion to dismiss where the court found that "an ordinary observer would *easily distinguish* the [accused design] from the [claimed design]") (emphasis added). If the claimed and accused designs are "sufficiently distinct," then the question of which "features would be significant to the ordinary observer is a question of fact," generally requiring discovery. *See International Seaway Trading Corp. v. Walgreens Corp.,* 589 F.3d 1233, 1241-42 (Fed. Cir. 2009).

Midwest does not argue that the claimed and accused designs are plainly distinct. Rather, Midwest makes arguments regarding the "elements" of each design that are shared with the prior art. *See* R. 58 at 13-14. While these arguments are

relevant to what elements would be significant to the ordinary observer, and thus, whether the ordinary observer would be deceived, these arguments also implicitly concede that there are similarities between the claimed and accused designs, and it is only with reference to the details of the claimed and accused designs as compared to the prior art that the significance of similarities and differences can be assessed. These similarities—the oblong body, the curved mouthpiece, etc.—are sufficient to plausibly state a claim for infringement. Whether the differences are minor or significant in light of the prior art is an analysis courts customarily perform on summary judgment after discovery, with the benefit of expert testimony regarding the design features. Thus, dismissal for failure to state a claim is not appropriate.

## II.    Preliminary Injunction

Unlike the plausibility standard of Rule 12(b)(6), a plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Breeze Smoke adds little to the allegations in its complaint in its attempt to demonstrate that it is likely to succeed on its claims. While those allegations are sufficient to survive Midwest's

14

motion to dismiss, the plausibility of Breeze Smoke's allegations is insufficient to establish a likelihood of success on the merits.

### A.    Design Patent Claim

"To show a likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted [design patent] claims." *ABC Corp. I v. P'ships & Unincorporated Assocs. Id'd on Schedule "A"*, 52 F.4th 934, 942 (Fed. Cir. 2022). This means that the plaintiff must demonstrate that any defense raised "lacks substantial merit." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001). For a design patent claim, the "estimated likelihood of success in establishing infringement is governed by Federal Circuit law." *Revision Mil., Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012).

As discussed with respect to Midwest's motion to dismiss, to show infringement, a plaintiff must demonstrate that "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Crocs v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010). "Where a patented design and an accused product are not 'plainly dissimilar,' the court must conduct a three-way analysis comparing the accused product, the patented design, and the prior art." *ABC Corp*, 52 F.4th at 942 (citing *Egyptian Goddess*, 543 F.3d at 677-78). Where there is a "dominant feature" across the prior art, the patents in suit, and the accused products, "the focus of the infringement substantial similarity analysis in most cases will be on other features of the design." *Id.* In other words, the "shared dominant feature from the prior art

15

will be no more than a background feature of the design, necessary for a finding of substantial similarity but insufficient by itself to support a finding of substantial similarity." *Id.*

Here, the dominant feature is the oblong body with a contoured mouthpiece at one end. Breeze Smoke argues that the claimed and accused products share the "same overall shape and structure." R. 53 at 17. But the "overall shape and structure" is the dominant feature shared with the prior art identified by Midwest. *See* R. 66 at 7. Breeze Smoke identifies different prior art, but that does not change the fact that the prior art identified by Midwest includes the dominant feature at issue here.

Subtracting the dominant feature of the prior art reveals several differences between the accused and claimed design. Breeze Smoke's D'573 Patent shows a rounded base, whereas Midwest's product shows a square base. The D'573 Patent does not show a trademark, whereas Midwest's product does. The D'573 Patent shows a "cupped" mouthpiece, whereas the mouthpiece on Midwest's product more sharply slopes to meet the oblong body.

Breeze Smoke argues that these differences are "minor." *See* R. 72 at 11. But the Federal Circuit has explained that when the relevant designs possess the same dominant feature, the ordinary observer's attention "will be drawn to those aspects of the claimed design that differ from the [dominant feature exhibited by the] prior art." *Egyptian Goddess*, 543 F.3d at 676. Here, what Breeze Smoke characterizes as "minor" differences plausibly stand out when the dominant oblong body and mouthpiece are removed from the equation. *See ABC Corp.*, 52 F.4th at 942 ("where

16

a dominant feature of the patented design and the accused products . . . appears in the prior art, *the focus* of the infringement substantial similarity analysis in most cases will be on other features of the design.") (emphasis added). For these reasons, the Court finds that Breeze Smoke has not demonstrated a likelihood of success on its design patent claim.

### B.    Trade Dress Claim

Midwest's arguments that Breeze Smoke has failed to establish a likelihood of success on its trade dress infringement claim are similar to the arguments Midwest made in support of its motion to dismiss. But whereas those arguments were insufficient to undermine the plausibility of Breeze Smoke's allegations, they indicate that Breeze Smoke has not demonstrated a likelihood of success.

### 1.    Distinctive Packaging

Breeze Smoke argues that the "particular configuration of the wraparound label and rectangular box" is distinctive because it "is arbitrary and allows the consumer to recognize the product as a Breeze product." R. 72 at 4. But the only evidentiary support for this statement is the appearance of Breeze Smoke's packaging. It says nothing about the distinctiveness of the packaging in comparison to competitor's products on the market.

Breeze Smoke argues that its packaging is "inherently distinctive because it allows the consumer to instantly recognize the product as a Breeze Smoke Good or Service." R. 53 at 8-9. But the only support Breeze Smoke offers for this assertion is the declaration of Steven Haddad, who is Breeze Smoke's managing member. *See* R.

17

54. While Haddad likely has significant knowledge of Breeze Smoke's business, his opinion about "distinctiveness"—a legal question for the Court—carries little weight.

Breeze Smoke urges the Court to focus not on the plastic box or the cardboard wrapper alone, but their arbitrary combination. As the Court acknowledged on the motion to dismiss, the packing is arbitrary to the extent that it is not necessary to package a vape pen product. On the other hand, there is nothing unusual about a plastic box with a cardboard wrapper. It is one of many common or generic forms of packaging. And the arbitrary choice of one of many generic forms of packaging does not make the packaging distinctive. The packaging remains generic even though its choice may have been arbitrary. Additional evidence might reveal the distinctive nature of what is otherwise generic. But without more evidence, the Court cannot find that Breeze Smoke is likely to successfully prove that its packaging is distinctive.

Breeze Smoke's failure to demonstrate a likelihood of success in proving distinctive packing is a sufficient basis by itself to deny Breeze Smoke's motion for preliminary injunction, because "distinctiveness" is a necessary element of the claim. Nevertheless, the Court also finds that Breeze Smoke has failed to demonstrate a

18

likelihood of success in proving "secondary meaning" and "a likelihood of confusion," and so will address those issues to provide guidance to the parties.[1]

### 2.    Distinctive Design

Breeze Smoke argues that its packaging and design have achieved secondary meaning for four primary reasons. One, "Breeze Smoke has spent significant amounts of money advertising the Breeze Smoke Trade Dress and generated . . . over one billion dollars in sales from the underlying product." R. 53 at 9. Two, "retailers frequently advertise that they carry Breeze Smoke's [products] alongside images displaying the Breeze Smoke Trade Dress." *Id.* Three, "customers readily associate copycat products with Breeze Smoke." *Id.* at 10. And four, Breeze Smoke's competitors intentionally copy Breeze Smoke's trade dress. *Id.*

This is all evidence that Breeze Smoke is a successful company. But "success" is not equivalent to secondary meaning. "[S]econdary meaning is acquired when in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). In other words, secondary meaning is not just success, but some primary place in the market. That is why in assessing "secondary meaning," courts generally look at "consumer testimony" and "consumer surveys" in order to ascertain the trade dress's "place in the market." *See id.* Breeze

---

[1] Whether Breeze Smoke can show that its packaging and product design is "not functional" is a closer call that is unnecessary for the Court to address for the time being.

Smoke has not presented any such evidence to the Court. Without it, the Court cannot find that Breeze Smoke is likely to successfully prove secondary meaning.

### 3. Confusion

"Likelihood of confusion" is the last and "keystone" element of a trade dress claim. *See Sorensen*, 792 F.3d at 726. The Seventh Circuit has explained that "[i]n determining likelihood of confusion, [a court should consider] the type of trademark in issue, the similarity of the designs and the products, the identity of retail outlets and purchasers, identity of advertising media utilized, any evidence of actual confusion, and whether [the defendant] intends to pass off its product as that of [the plaintiff]." *AM Gen.*, 311 F.3d at 805.

Breeze Smoke argues that it is likely to successfully demonstrate a likelihood of confusion because: (1) Midwest's packaging and design is "virtually identical" to Breeze Smoke's; (2) the products are marketed to the same consumers; (3) vape pen consumers "typically do not exercise a high degree of care in making their purchase"; (4) "Breeze Smoke Trade Dress enjoys widespread consumer Recognition" and "consumers associate the Infringing Products with Breeze Smoke"; and (5) there is evidence of actual confusion. *See* R. 53 at 13-14.

The primary problem with these arguments is that they are all based on the declaration of Breeze Smoke's managing member, Steven Haddad. As discussed, Haddad has personal knowledge of Breeze Smoke's business and marketing practices. And he has some knowledge of the characteristics of the retailers that sell Breeze Smoke products and the consumers who purchase them. But his opinion about the

20

similarity between the Breeze Smoke's and Midwest's products, or Breeze Smoke's standing with consumers, is inherently biased, and thus carries little weight with the Court. Further, his opinion is the only evidence Breeze Smoke has presented to support its argument that "consumers of disposable vaping pens do not exhibit a high degree of care when purchasing such products because they are not particularly expensive." *See* R. 54 at 16. Haddad's opinion on this point is not based on any particular evidence or data and thus is entirely conclusory, so the Court disregards it.

Lastly, Breeze Smoke's evidence of "actual confusion" is insufficient to establish that Breeze Smoke it likely to prove it. The evidence consists of the following: (1) two comments on You Tube videos; (2) a comment on Reddit; (3) five text message threads between unidentified individuals; and (4) two emails, which Breeze Smoke attributes to its customers and distributors. *See* R. 37-9; R. 37-10. Breeze Smoke highlights the statements in these communications that appear to be evidence of consumers or retailers confusing Breeze Smoke's competitors with Breeze Smoke, or seeking clarification as to which products belong to Breeze Smoke.

These statements are evidence of confusion, but the Court finds that they are insufficient to establish of a likelihood that Breeze Smoke will prove actual confusion. Breeze Smoke provides little to no context for these statements. The authenticity of statements taken from the internet cannot be established, so they carry little evidentiary value. Even if the internet comments could be verified, statements from ten individuals is not strong evidence of the market as a whole, especially without

21

evidence of the context in which the statements were made. Generally, "likelihood of confusion" is proven with consumer surveys or expert testimony, because that is evidence from which inferences about the entire market can be drawn. The only evidence that Breeze Smoke has presented is that these ten individuals were confused. Ten individuals, in what Breeze Smoke has characterized as a multi-million-dollar industry, *see* R. 54 at 15, is insufficient evidence for the Court to find a likelihood that Breeze Smoke will prove there is actual confusion in the market as a whole.

## Conclusion

Therefore, Midwest's motion to dismiss [57] is denied, and Breeze Smoke's motion for a preliminary injunction [52] is denied. Additionally, Midwest's motion to strike the Haddad declaration [64] is denied as moot.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated:  May 30, 2024

22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDWEST GOODS, INC., d/b/a )
MIDWEST DISTRIBUTION )
ILLINOIS, )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　 )
-vs- ) Case No. 23 C 5406
　　　　　　　　　　　　　　　　　 )
BREEZE SMOKE, LLC, )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　Defendant. )
_____ )
BREEZE SMOKE, LLC, )
　　　　　　　　　　　　　　　　　 )
　　　Counterclaim Plaintiff, )
　　　　　　　　　　　　　　　　　 )
-vs- )
　　　　　　　　　　　　　　　　　 )
MIDWEST GOODS, INC., d/b/a )
MIDWEST DISTRIBUTION )
ILLINOIS, WISEMAN WHOLESALE, )
INC., SPEED WHOLESALE, INC., )
WORLD WHOLESALE, INC., and )
LIGHT VIEW, LLC, ) Chicago, Illinois
　　　　　　　　　　　　　　　　　 ) May 29, 2024
　　　Counterclaim Defendants. ) 10:15 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH W. JANTZ

APPEARANCES:

For the Plaintiff:　　　　RACHLIS DUFF  & PEEL, LLC
　　　　　　　　　　　　　　　BY:  MR. DREW GEORGE PEEL
　　　　　　　　　　　　　　　542 South Dearborn Street, Suite 900
　　　　　　　　　　　　　　　Chicago, Illinois  60605
　　　　　　　　　　　　　　　(312) 733-3950
Court Reporter:

CHARLES R. ZANDI, CSR, RPR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 2144-G
Chicago, Illinois  60604
Telephone:  (312) 435-5387
email:  Charles_zandi@ilnd.uscourts.gov

Exhibit

B

exhibitsticker.com

APPEARANCES:   (Continued)

For the Plaintiff:         CARRINGTON, COLEMAN, SLONAN &
                           BLUMENTHAL, L.L.P.
                           BY:  MR. STEPHEN L. LEVINE
                           901 Main Street, Suite 5500
                           Dallas, Texas  75202
                           (214) 855-3025


For the Defendant:         HONIGMAN MILLER SCHWARTZ and COHN, LLP
                           BY:  MR. JEFFREY KIERSTEAD LAMB
                           600 Woodward Avenue, Suite 2290
                           Detroit, Michigan  48226
                           (313) 465-7404

                           HONIGMAN LLP
                           BY:  MR. VIKRAM ALEXANDER MATHRANI
                                MS. JENNA ELIZABETH SAUNDERS
                                MR. DAVID JOSEPH ROULO
                                MS. KALEN CHURCH
                           155 North Wacker Drive, Suite 3100
                           Chicago, Illinois  60606
                           (312) 701-9300


For Counterclaim           COLE SADKIN, LLC
Defendants Wisemen         BY:  MR. ANTHONY FERNANDO SCARPINITI
Wholesale, Inc.,           1652 West Belmone Avenue, Suite 1
World Wholesale,           Chicago, Illinois  60657
Inc., Light View,          (312) 548-8610
LLC, and Green Light:


For Deponent Parkhill      SPENCER FANE
Properties, LLC,           BY:  MS. TORI S. LEVINE
d/b/a Vape District:       5700 Grande Parkway, Suite 650
                           Plano, Texas  75024
                           (972) 324-0300

(Proceedings heard in open court:)

THE CLERK: 23 Civil 5406, Midwest versus Breeze Smoke.

THE COURT: Okay. Everyone have a seat. We'll take introductions first. We'll start with Midwest.

MR. PEEL: Good morning, your Honor. Drew Peel and Steve Levine on behalf of Midwest Goods.

THE COURT: Okay. And how about for Breeze Smoke?

MR. LAMB: Jeff Lamb and Vik Mathrani and our colleagues Jenna Saunders, David Roulo, and Kalen Church for Breeze Smoke.

THE COURT: Okay. And last time we had some third parties here? Is anyone here -- okay. Go ahead, yes.

MR. SCARPINITI: Good morning, your Honor. Anthony Scarpiniti on behalf of counterclaim defendants World Wholesale, Wiseman Wholesale, and Light View, LLC.

MS. LEVINE: Tori Levine on behalf of Vape District.

THE COURT: Okay. Great.

Sorry, everyone. This is not our usual courtroom, so we're taking a little longer to get everything set up. Just bear with us.

MR. SCARPINITI: My apologies, your Honor. I also represent Green Light, which is a third party to this action as well.

THE COURT: Okay. Okay. Thanks, guys.

Okay, folks. So, what I want to do is I want to start with your discussions since the joint status report on May 10th and whether any further agreements have been reached. So, whoever wants to go first on that.

MR. PEEL: Sure, your Honor. This is Drew Peel. I'll start out with Midwest.

We have, subsequent to filing the joint status report, shared with Breeze the search terms that we're applying to the collective ESI to determine which documents we'll review for responsiveness, privilege, and so forth. So, we did that on, I think, the 14th of May. And Breeze shared their search terms with us, I believe, yesterday afternoon.

In addition, I think the most significant thing that has occurred, I believe Thursday of last week, the 23rd, Breeze advised that it intended to amend to add in the SOUTH products as accused products and asked us to advise by the following day, close of business, whether we would oppose that and whether we would agree to a briefing schedule. And we responded the following day and asked for more information, particularly as it pertains to: What does this mean for the pending motion to dismiss, which has been briefed and pending a long time? What does it mean for the pending preliminary injunction motion? And I think that's where things sit at the moment.

Beyond that, communications between and among the

parties, I'm not aware of anything material, but if I'm missing anything, Mr. Lamb, please.

MR. LAMB: I agree with Mr. Peel. I'd also add, your Honor, we made a significant document production last week, in addition to providing --

THE COURT: Would you speak up a little so -- use the mic if you could because it makes it easier for all of us up here.

MR. LAMB: No problem, your Honor. This is Jeff Lamb for Breeze Smoke. Last week, Breeze Smoke also made a significant additional document production and, as Mr. Peel said, provided the search terms that Midwest had requested.

THE COURT: Okay.

MR. LAMB: Other than that, the parties remain at an impasse on the discovery issues that we teed up in our joint status report and that Breeze Smoke feels are, you know, ripe for motion practice if the Court directs.

THE COURT: And so was there a decision on whether or not to oppose the amending of the complaint, or where does that stand?

MR. PEEL: Again, we asked for some more information from Breeze about what that would mean in terms of the pending motions and asked to see a draft of their pleading because we're not really sure what their theories are, whether it's both trade dress infringement as well as design patent

infringement and in what respects they're asserting that.

So, we simply asked for more information to -- so we could decide whether we would oppose it, whether we would oppose it in part. So, that's where things sit.

THE COURT: Okay. So, what can Breeze tell us on that?

MR. LAMB: Your Honor, we got that request late at the start of the holiday weekend. Our client's been traveling overseas. We haven't had an opportunity to connect with them on Midwest's request.

I think we're unlikely to want to share our draft pleading with them in advance of filing our motion for leave to amend. We're happy to discuss the claims, but we need to review the request with our client and give them a response, you know, certainly by the end of this week. We want to move the case forward.

THE COURT: The request for what?

MR. LAMB: We asked if they were going to oppose our motion for leave to amend under Rule 15, and Midwest demurred and said, "We'd like more information before we tell you if we're going to oppose that motion."

I mean, personally, we feel like it's highly likely that Midwest is going to oppose that motion no matter what we tell them, but, you know, we're engaging in good faith with the request; nor did they respond to our request for a

briefing schedule of two weeks to respond to the motion, one week to reply to keep the case moving. So, that was our bid to them.

THE COURT: So, the issue itself has been out there for a while, so it seems to me you should be able to have some thoughts on whether or not it would affect the motion to dismiss or the preliminary injunction because that's pending in front of the district judge. To not let him know right away that it might affect that is a problem, so what's the position on that?

MR. LAMB: I don't think it affects the motion to dismiss or the preliminary injunction at all, your Honor. We're moving for preliminary injunction with respect to the NORTH product. Judge Durkin -- if we can get the discovery that we need to advance that motion and have that hearing, we'll know the answer to that, and then we can consider where we are with respect to the SOUTH product.

But this case has been pending for eight months. Our motion for preliminary injunction has been pending since, I think, November. We want to move this case along. We don't want to -- we don't want to delay it. We certainly don't want to hang it up because they've introduced a new infringing product with, you know, more, we believe, intentionally infringing marketing messages. That shouldn't hold up our case in chief against NORTH.

But we do believe it's appropriate to bring those claims in this court, in this action. It's newly discovered evidence. It's timely, and it's appropriate to bring here rather than starting over with an entirely new case.

THE COURT: And so based on that representation that, in their view, it won't affect the motion to dismiss or the pending preliminary injunction, what's Midwest's position?

MR. PEEL: Well, again, your Honor, we're not sure what the theories of infringement are, what particular aspects they're asserting; but I think we would have an issue with it being unrelated to and not affecting the pending motions.

I think my guess would be if the pending motions are meritorious with respect to the motion to dismiss or with respect to the preliminary injunction motion, that might well have implications for whether similar motions addressed to the SOUTH product or the -- an argument that the amendment would be futile, you know, would decide that.

But again, without seeing the nature of the claims, the particular claims that they're saying are infringed, the particular ways in which they're saying that trade dress is infringed, whether it's both packaging and the trade dress design or whether there's some difference in the design being charged as to SOUTH, it's hard to respond in the abstract, your Honor. Even if we think as between the parties it's unrelated, that doesn't mean Judge Durkin will think that.

THE COURT: Right, yeah. So, obviously, this will -- maybe not so obviously, but this will be a Judge Durkin question. It will be for him to decide, but we need to let him know right away. So, what I'd like to do is set a date by which that motion to amend will get on file.

MR. LAMB: Your Honor, we'd propose to take until no later than June 4th, next Tuesday, to file that motion.

THE COURT: Okay. And then Midwest can take a look at it at that point; and then obviously, it will be up to Judge Durkin to set a briefing schedule to his liking.

And I should say, he may take a different view of timing on that, but what I want to do is alert him to that issue right away, given that there are pending motions in front of him, so that he's not spending unnecessary perhaps duplicative time. Just highlight that for him. Set a date certain. Obviously, he may address that differently. That would be up to him.

Let me go through some other issues. I have my agenda set here. These are in no particular order, folks, so don't read anything into the order other than the way that I prepped for today.

So, one of the issues from the JSR was that Midwest needed to have firm dates by which its identified custodians were to have their cell phones imaged. So, what's the status of that?

MR. PEEL: We do have such dates, your Honor. The issue is these are Android devices, Samsung phones; and they cannot do the collection remotely like you could do with an iPhone so they actually have to be physically onsite, and our executives who have the phones have to be there as well.

So, we do have dates certain arranged for that. By the end of next week, all phones will be imaged from all identified custodians.

THE COURT: Okay. What I would say on that to your clients is that's a firm date, by the end of next week. And the alternative is that I set a date and they show up in my courtroom and we do it here.

So, it will be done by the end of the next week. Obviously, if there's family emergencies or things of that nature, of course, we'll give quarter for that; but it's been outstanding for a while, so they need to keep that date.

MR. PEEL: Very well, your Honor.

THE COURT: Okay. Very good. And then it was kind of around the same area of the JSR. I know you were going to talk to your e-discovery vendor on their sort of production timeline. So, what can you tell me about that?

MR. PEEL: Sure. We've come up with the search terms to apply to the data. As indicated in the JSR, there are some 1.4 million documents currently to have those search terms applied to.

Based on the search terms that we've shared with Breeze counsel, we expect that there's a reasonable number of documents and that within the next 60 days or so we should be able to complete our review and production of responsive ESI barring anything unforeseen; and of course, we have some additional data coming from the phones, but don't anticipate that will materially impact that schedule.

THE COURT: Okay. And is the phone data -- so, it will be collected by the end of next week. Will that be on the same production timetable?

MR. PEEL: Yes, your Honor.

THE COURT: Okay. And then were there any other agreed productions by either side for which we need to set due dates? How about from Midwest first? Anything else that you're working on?

MR. PEEL: Your Honor, there is an ESI issue that we flagged briefly in the JSR. There is a single custodian --

THE COURT: Right.

MR. PEEL: -- for whom we asked ESI be collected. His name is Mark Kareem. He is mentioned in some of the exhibits to the complaint, and he was also in our Rule 26(a)(1) disclosures.

We're not certain why he's not among the custodians that they've attached. It may be because he's an employee of a third party that they've taken the position that they're not

in possession, custody, or control of. I'm not sure.

So, there's further dialogue that we believe needs to happen on that because we do believe Mr. Kareem is a relevant custodian to have ESI collected from and reviewed, but we have not completed discussions on that ground yet.

We also just got their search terms, your Honor. We do have a few questions we expect we'll be following up with them regarding. We would expect that to occur within the next week.

MR. LAMB: So, on the Mark Kareem issue, I was unaware this was a problem, your Honor.

THE COURT: Sure.

MR. LAMB: Mr. Kareem uses two surnames, Kareem and Faraj. We identified him as Mark Faraj in our disclosures. He's one of our custodians. We're collecting and producing his documents. So that's not an issue.

MR. PEEL: Okay. Thank you for that clarification.

MR. LAMB: Your Honor, we'd just ask that if the Court's comfortable with the 60-day timeline to produce ESI, we put in some signposts or interim deadlines for rolling productions so that we're not getting a 100,000-document data dump on July 29th, and that, you know, documents be produced in the ordinary course every couple of weeks as they clear the review and production pipeline.

That's what we intend to do. We think it's

appropriate. It allows parties to prepare simultaneously for depositions and digest the evidence that's being produced. So, we'd ask the Court to enter some interim deadlines for the parties to make reasonable productions.

THE COURT: Midwest?

MR. PEEL: Your Honor, we intend to make rolling productions. I don't think it's appropriate for your Honor to specify any volume or specific dates in that regard. If it's a problem, we can always come back to your Honor and revisit it, but I don't expect it will be.

THE COURT: Okay. Yeah, I think that's fine.

You know, let me go back to the surname issue for a second here. And I'm glad we worked it out, but this was one that -- this was in paragraph 7 of the JSR, right?

MR. PEEL: Yes, your Honor.

THE COURT: Okay. So, why didn't you guys talk about it? I mean, that seems like a really easy thing to talk about, like, "Hey, he has two surnames, and it's the same guy."

I'll say that concerns me because it suggests to me that the communication flow is not where it needs to be if it's such an easily fixed issue. I mean, I'll tell you it's frustrating that I read the JSR and thought about, "That should be fixed, right?"

So, tell me what's going on there with the

communication.

MR. PEEL: Your Honor, there has been communication, and there's been an effort on our side to memorialize things in writing. And this is simply one issue that we did not flag early on as a significant issue. There was some delay in us getting back --

THE COURT: Well, it was in the JSR, right?

MR. PEEL: Correct, correct. There was some delay in getting back to us in terms of what custodians would be reviewed.

We did ask for -- we gave them some information about an org. chart for our organization to assist in identifying custodians and asked that they do the same. They never responded to that request. We assumed that they were refusing it.

But your Honor is correct. We could have been better in that communication, should be better in that communication.

THE COURT: Mr. Lamb?

MR. LAMB: I agree, your Honor. I don't -- we have communicated periodically. We've exchanged e-mails since the JSR. I didn't realize that Mr. Kareem was an issue. I must have missed it in the joint status report. We're happy to clear it up. I'm sorry that it took so long.

I will say, though, that the parties have dug in on substantive -- real substantive disputes over the scope of

discovery.

THE COURT: I understand. We'll get to those.

MR. LAMB: And the fact that we're at an impasse on those makes it difficult to engage on the issues where you're nibbling around the edges. You know what I mean? We need to --

THE COURT: Why? I mean, I certainly understand that on substantive issues, there can be an impasse, and at some point, I'll have to rule; and as professionals, you can just have a disagreement.

But when it's a matter of, "Hey, this guy you think is a separate guy is the same guy," that seems -- it's just -- I'm not trying to call you out, but it just seems concerning to me that those kinds of things are not getting fixed easily. And I guess, are you guys talking on the phone, or is it just e-mail?

MR. PEEL: It's both e-mail and phone discussions.

THE COURT: Okay. Okay.

MR. PEEL: And, your Honor, again, part of the thinking here also was to see some of their production and to see custodians identified in that. I'm sure they're going to take the same wait-and-see approach. We've, I think, come up with a list of appropriate custodians, but both sides need to see some of that ESI produced, your Honor, and have a further discussion.

So, part of it's a timing and strategic issue, what to push on at this point. And Mr. Lamb is correct, there are more substantive issues which have been occupying our attention.

THE COURT: Okay. How about for Breeze? Any agreed productions that are outstanding at this point?

MR. LAMB: Well, your Honor, I think we're a little ahead of Midwest in terms of doing our data intake from e-mails and cellphones, and we're working through that.

Obviously, we're happy to stick to the same schedule that the Court puts in place for Midwest and make rolling productions of e-mails and text messages and messaging app messages as we've got those available to produce. We want to advance the ball in discovery as quickly as possible.

We're also proactively identifying additional relevance custodians as they come up. We're not -- you know, as that happens, we'll disclose those to Midwest. We're not trying to hide the ball here. This is about getting other documents and other evidence in place so that we can resolve those issues.

THE COURT: Yeah, I don't think you're trying to hide the ball. I'm just suggesting -- I'm just commenting on the communication, right? Because it shouldn't take being in court to figure out it's the same guy. I don't mean to harp on it, but I want to encourage that. This is going to be a

long road; and I agree we need to focus on some of the big-ticket items, but the rest of the stuff I hope you guys can work out going forward.

Just again, kind of going along my agenda here, we do have Vape District's motions under advisement, so I'm not going to have those argued today, but we'll get you a ruling by mail on those.

Okay. I know you've got the dispute over the relevance of the SOUTH vaping device, but I'm going to put that to the side because it will depend, I think, in part upon Judge Durkin, how he's going to handle the motion to amend the complaint.

Tell me a little bit about the entities Capital Sales and KMT. I guess I was -- just wanted to understand what the basis of the objection was.

So, Mr. Lamb, if you could go ahead and explain what the basis of the objection is with respect to the Capital Sales and KMT entities.

MR. LAMB: Sure, your Honor. Capital Sales and KMT are two nationwide distributors of Breeze Smoke products. They are separate corporate entities with some common owners to Breeze Smoke, but also several owners who are not members of Breeze Smoke, so they're separate corporate entities. They're not parties to this lawsuit. There are no claims pending against them. They haven't asserted any claims.

And the Midwest counsel indicated that they were interested in securing discovery from Capital and KMT. They asked if we would accept subpoenas for them, and we said, "Yes, we will accept subpoenas for them, but we're not going to produce their documents by way of party discovery. That would be an issue for us in this case. It would be an issue for us in other litigation."

And, you know, we also said that Capital and KMT would reserve their rights to review the subpoena and assert appropriate objections to the scope of the discovery that was sought. We haven't seen the subpoena or document rider yet, so we haven't advanced the ball past that, your Honor, again, not holding up discovery in any way, but insisting on the proper method for securing non-party discovery that may be relevant to the case. That's all.

THE COURT: Okay. Mr. Peel?

MR. PEEL: Your Honor, this is of concern for us. Some of the key individuals on their side appear to have multiple hats, the officers of KMT and/or Capital, as well as of Breeze. And so, you know, our thought was if there's one repository of ESI, why is it that we have to serve third-party subpoenas to get at that pot and have it reviewed for responsiveness?

They've said there's these corporate separateness that we need to respect. Okay. We are also considering

amending our complaint to add in KMT and Capital as parties because some of the communications that we contend are tortiously interfering with our clients appear to be potentially by one of those entities or the other and not necessarily just Breeze.

And so that's part of what's been taking a while on our side in terms of figuring out: Do we seek leave to amend to add them in as party defendants at this point? What does that do to the rest of the case? So, we were taking some time on that issue, your Honor.

But, you know, it is a live issue, and we -- you know, if we decide not to add them as parties, we'll serve subpoenas. We appreciate the offer to accept service of those subpoenas, and we'll work through those issues as they come.

MR. LAMB: So, just to respond briefly to one of those points, your Honor.

THE COURT: Yeah, um-hum.

MR. LAMB: We're not in any way hiding any Capital or KMT employees who may be dual-hatted from party discovery in this case. If they have Breeze Smoke e-mail addresses and they've conducted business on behalf of Breeze Smoke, we're collecting that ESI, and we're producing it as party discovery for Breeze Smoke.

But Capital and KMT have large nationwide

distribution networks where they conduct business as Capital and KMT to their downstream customers, and that information isn't Breeze Smoke's to share; and it's not appropriate to secure that information, to the extent it's relevant to this case, via party discovery.

Again, we're not trying to put up a roadblock, but it is important for the companies that we represent to maintain their corporate formalities and their separateness for a whole bunch of reasons. And I think, obviously, if we have to, we'll be happy to brief that.

THE COURT: I don't think we need to, though, because what I hear Mr. Peel saying is, "Hey, we're deciding between" -- and I don't mean to put words in your mouth, Mr. Peel, so you'll correct me if I'm wrong, but what I thought I heard him say was, "We're deciding as between amending our claims, and if not, we'll serve third-party subpoenas," is that right?

MR. PEEL: That's correct, your Honor.

THE COURT: So, I don't know that you're at loggerheads on that. It's just a matter of when Midwest decides on that, they can do that. At some point, obviously, as we get down the road, you know, Judge Durkin may be more or less open to amendment, so folks will have to decide what timeframe makes sense.

MR. PEEL: Sure, your Honor. And again, the

pleadings aren't even settled in this case. As your Honor is aware, we haven't answered their counterclaim. At this point, we moved to dismiss. And my guess is there will be additional discovery related to that as well, as part of that process, with this amendment coming up.

We'll confer with Breeze in advance, obviously, about any of this stuff and see what agreements we can come to in that regard.

THE COURT: Okay. So, I'm glad to hear you both shared search terms. That's good. And so I'll have you continue working on that as an iterative process.

Moving on to Breeze had committed to supplement its patent interrogatories by June 24th, but not trade dress. So, tell me a little bit, Mr. Lamb, what the distinction here is from your point of view.

MR. MATHRANI: Your Honor, this is Vik Mathrani for Breeze Smoke.

THE COURT: Sure.

MR. MATHRANI: So, we have committed to supplement the interrogatories that were served, 1, 2, and 3. There have only been three interrogatories that Midwest has served. They all relate to patents. The interrogatories don't relate in any way to trade dress.

So, we've committed to supplementing those interrogatories as written. So, I don't know if -- from our

perspective, we don't see a live dispute there.

MR. LEVINE: Your Honor, may I respond?

THE COURT: Sure.

MR. LEVINE: Steve Levine on behalf of Midwest.

THE COURT: Sure.

MR. LEVINE: Breeze has taken the position in this case, attested to by a sworn declaration of Mr. Haddad, that their commercial -- excuse me, that their Breeze Smoke device is the commercial embodiment of their trade dress. So, we see that essentially as substantially overlapping by the position they're taking that their trade dress and their design patent theories are, at least in some part, overlapping.

So, counsel for Breeze is correct that our interrogatories were directed to the design patent; but to the extent that they're contending that the design patent is substantially overlapping the trade dress, we see the existing interrogatories as directed to both, which we've explained at a meet-and-confer.

Be that as it may, we are certainly amenable to propounding essentially duplicative interrogatories as to both the trade dress and the design patent, if that's necessary. We don't see it as necessary, and we see it just as extending the process.

Also of note is we've been talking about these contentions as they are fundamental to the liability phase of

the case for months now and have gotten essentially no meaningful response, either in discovery or in any other form, for that matter.

So, this is a fundamental issue. Judge Durkin has had at least one significant decision here in our court in 2022, where he pointed out that functionality is a threshold issue in a trade dress case, and these interrogatories are directed to that. Existing responses we got didn't address that at all, and in the last meet-and-confer, we were told that they needed two months to initially address them.

So, while we look forward to getting the answers in another month or so, we are dubious as to what might be coming.

THE COURT: Mr. Mathrani?

MR. MATHRANI: Your Honor, yes, I'll respond to that briefly. We are happy to propound responses to any interrogatories that they give us. If they want to add interrogatories about trade dress, we are happy to answer those; but we can only answer what's written right now, and right now, the interrogatories are just about patents. We can't answer questions based on a verbal statement.

So, happy to answer any interrogatories that they send to us.

THE COURT: Okay. Mr. Levine, how long would you like to get them over to Mr. Mathrani and his team?

MR. LEVINE:  I'm sorry?

THE COURT:  How long would you like to get your interrogatories on trade dress over to Mr. Mathrani and his team?

MR. LEVINE:  We'll send those next week.

THE COURT:  So, we'll say by the end of next week. And how long -- usual 30 days for response there for Breeze?

MR. LAMB:  To respond.

MR. MATHRANI:  To respond?  So, to respond to the patent-related interrogatories, I think we gave them a date of June 24th; and to respond to any new interrogatories, we could respond within the default date in the federal rules, I believe 30 days.

THE COURT:  Yeah, that's what I said.

MR. MATHRANI:  Yes.

THE COURT:  So, that's okay?

MR. MATHRANI:  Yes.

THE COURT:  Great.  Okay.

Okay.  This is sort of a big-ticket item, and it may need to -- let me just start with this sort of big-ticket item and sort of give you my perspective.  And again, I'm not going in any particular order, folks, just as I prepared from the JSR.

So, a lot of disputes over sales and purchase data. What I would say is this:  I don't see a world in which both

sides aren't going to produce some of that. What exactly is produced is a different matter, but I think that stuff's going to be fair game. You guys sued each other. Your clients have to know this is what happens, for better or for worse.

I understand, however, that that stuff is sensitive and there are some trust issues here, so, you know, my thought is: Can we do something creative that would make people more comfortable, like attorneys' eyes only or something like that, if you're concerned?

Otherwise, you know, we'll take motion practice on it, but I think the clients need to realize I don't see a world in which some of this is not produced. That's what happens in litigation.

What's relevant, proportional, okay, that's to be determined, but I'd like thoughts on whether or not attorneys' eyes only or some other creative solution would help. Because there seems to be an impasse, a reluctance, understandable reluctance to share this stuff that I think is at least at some portion fair game, so happy to take thoughts on that and go from there.

MR. PEEL: Your Honor, Drew Peel on behalf of Midwest.

As your Honor undoubtedly saw in the JSR, this has led to our thinking about potentially staging or sequencing discovery because this stuff will be relevant at some point,

but the concern is the competitive harm that we may suffer before then if it's used to, you know, harass other customers, drive away business, and so forth. And that is a concern. And I'm not sure there is a creative solution here that can address that.

We do have a two-tier protective order in place with a highly confidential designation already. It's just there can be inadvertent disclosure even with that, which is of concern to us.

And the request at the moment has been for every document relating to every sale, every invoice, every purchase order, every communication with a customer, everything. And we don't see a need for that, certainly as regards to the preliminary injunction motion that's pending, and we're not even sure that stuff will be ever necessary. But regardless, we don't think it's necessary now, and we do have a competitive concern.

So, I'm all for exploring creative solutions to work this out, but if the creative solution is we produce everything now, then I think we may need to brief that, your Honor.

THE COURT: Sure. And, Mr. Peel, I'll let you and your team respond, but let me -- not respond because it's sort of an open -- it sort of goes on both sides, here; but let me ask you, Mr. Peel -- I'm sorry, I meant Mr. Lamb to respond.

Mr. Peel, I presume -- whoever wrote the JSR said the following. "We believe this is highly sensitive information sought by a competitor whose lawyers have expressly advised that they intend to use it to confront customers and suppliers in a manner that may violate the confidentiality order in place here."

That's a really strong accusation. What --

MR. PEEL: Sure, your Honor.

THE COURT: What was the basis for that? Because I would hope that before sort of saying that you would expect other lawyers would engage in inappropriate conduct, that there's got to be a real strong basis for that. I'll tell you that had me a little concerned, so why don't you explain that.

MR. PEEL: Sure, your Honor. We had a meet-and-confer in early April, and, you know, it addressed, among other things, this request for customer information. And we asked them what the purpose was that they sought it.

And one of the things that they said early on was, "Well, we get the right to enforce our IP against others who are infringing, so we intend to use it for, among other things, that purpose."

And as your Honor may recall, the confidentiality order has certain restrictions on the purpose for which confidential information or highly confidential information

28

can be used, limiting it basically to use in this lawsuit.

We did not accuse them of violating the protective order. We didn't say, you know, there's no way this could be done consistent with the protective order; but we expressed it as a concern and that's why we raised the concern, your Honor, about that.

We are not making the accusation here, but it was something that came up in a meet-and-confer telephonically. It was based on what Breeze's counsel said in that telephonic meet-and-confer; and I believe we documented that in a subsequent e-mail, and we're happy to share that with the Court if it's necessary or appropriate.

THE COURT: Mr. Lamb?

MR. LAMB: Your Honor, can I start back a step at what we're really talking here for discovery and then address that last point about the protective order?

THE COURT: Sure, yeah.

MR. LAMB: So, their customers are not -- that we're talking about here for discovery are sellers of this product in the marketplace. There's nothing secret about them. Midwest customers are, you know, distributors and retailers of these products.

And it is timely -- or time-consuming and expensive to identify them via purchases on the web and at retail locations to identify these customers, but they're all --

they're all witnesses or potential witnesses in the case. Obviously, we don't want to call all of them as witnesses. Obviously, we don't want to depose all of them.

But Midwest's marketing and sales practices of these products, NORTH and SOUTH, are directly at issue in both -- in the liability phase of this case and with respect to the preliminary injunction. And we absolutely have to have that discovery in order to prove up likelihood of confusion and intentional infringement. Right?

So, there's no -- there's no phasing of the case that defers discovery of who the customers are and what the marketing communications have been and what the volume of sales to various customers has been. Those issues are directly relevant to likelihood of confusion and infringement and intentional infringement.

So, yes, we want to secure discovery from key customers who've received, you know, large volumes of NORTH or SOUTH, and understand what the marketing communications were for those products because we can see, obviously just on social media with respect to the Vape District subpoena, how these products are being marketed, as a Breeze killer, as devices that look exactly like a Breeze.

That's not me making it up. That's one of Midwest's customers broadcasting that to the entire world on TikTok, and that goes right to the core of our case, not damages, but

liability and likelihood of confusion in the preliminary injunction.

So, we've never really understood the basis for deferring any of this discovery because it's core to the initial phases of the case. And that -- that gets to the protective order, right? There's nothing in the protective order that prohibits us from serving subpoenas on witnesses in this case. Right?

We have to take the depositions of these customers to understand what marketing communications were made to them, what representations Midwest's salespeople made to these customers about NORTH and whether it was a new version of Breeze or the same as Breeze or Breeze in a different box, right? That's core discovery in this case, and it needs to be conducted sooner rather than later.

And so from our perspective, what's happened here is an eight-month, drag-your-feet delay game by Midwest to avoid us taking that core critical discovery, and none of that violates the protective order.

We can make it attorneys' eyes only, but we still have to have the ability to serve subpoenas for appropriate, you know, reasonably scoped documents and serve subpoenas for depositions on key customers who've received marketing communications.

Now, we don't know any -- hardly any of those people

right now because we haven't gotten any of those communications produced by Midwest. Obviously, over the next couple of months, we should get that production. But there's no reason to hide the ball on this.

These are not end users of a product who are using it in secret and who don't want to be ashamed of the fact that they vape. These are companies that purchase and sell vapes. There's nothing secret about that. There's no right to engage in commerce in secret in the United States.

MS. LEVINE: Your Honor, Tori Levine for Vape District. I would like to be heard at this point because he just opened it up and started talking about my client. And the concern is very real.

I've represented the vaping industry for over seven years. I've had over 200 lawsuits, product liability lawsuits, not these. And I represent at least 75 different clients. And I'll tell you, my clients, who they buy from and who they sell to is highly confidential information.

And when I had a conversation with Mr. Lamb, he promised me that one of the reasons that he wanted to know where Vape District bought its products is because he was going to go out and subpoena them. And sitting right next to me is another -- not even a party in this case, but when one of these parties, I can't remember -- you can tell -- Worldwide identified Green Space, he hauled off and served a

subpoena on them.

And it's not just serving a subpoena. Then he starts in like, "You can't sell any NORTH, and I want your client's personal cellphone."

And he did ask me for our customer information. So, this whole line about not wanting to shame somebody or produce who's the end user buying it is not exactly what happens when we get outside of this courtroom.

And if we don't -- I totally agree with the phased discovery. If these two parties haven't even exchanged all their information, why are we going to small business owners? And my guy is not a big guy. He's got brick and mortar stores in Ohio. He's got -- he doesn't even have 100,000 followers on TikTok.

And the reason he got targeted, which they're not telling you, is because Breeze contacted him a few years ago and offered to pay him to put their products on social media; and he said, "No. I give honest reviews of my products." And he doesn't like their product.

And furthermore, you can't even buy their product right now because the FDA has issued warning letters to retailers and everybody else in the industry not to sell Breeze because of youth vaping and targeting to a children's market. That's not my making it up. That's why my clients have concern.

So, when we're having the meet-and-confer, I asked Mr. Lamb, "Well, what do you want my client to sell? He shouldn't have to shut down his business. You haven't even proven your case. This looks like damages discovery to me." And he's like, "Well, I'm entitled to it. And I'm entitled to go talk to all these people. And I'm entitled to go to your distributors."

Well, my client's concerned that then his other distributors may not sell to him anymore because they don't want to get one of these subpoenas that's so broad. And then if you pick up the phone and try to talk to him, it's like, "I want your ESI. I want this."

And probably the reason, if the Court's watched my client's TikTok, I mean --

THE COURT: I have not. I mean, guys, I'm not going to -- I mean, we are getting like --

MS. LEVINE: He's --

THE COURT: I read the motions that are filed. I do not have time to go out and watch the TikTok videos, to be honest with you.

MS. LEVINE: Right. One view of that would be like he's tongue in cheek; and if he called it a Breeze killer, it was probably on that day he was angry because somebody associated with Breeze or one of their entities constantly trolls his TikTok account and puts up things like, "What about

Breeze?"

THE COURT: All right, guys. I don't want to get in a fight about TikTok wars here. Okay? What I want to focus on is in terms of Midwest's -- you know, is your -- is your concern -- your general concern, is it the confidentiality and sensitivity of this information, or is it relevance and proportionality?

MR. PEEL: Your Honor, I think it's both, and it's also the fact that it's not limited to them just serving subpoenas on third parties. They're also serving cease and desist letters threatening litigation. At least to our knowledge, that's the case with Vape District and I believe with respect to Green --

MS. LEVINE: Space.

MR. PEEL: -- Space as well.

And so what the *Murata* cases say is, look, that's real competitive harm, where you're going after the customer identities, and even the service of a subpoena on a customer may lead the customer to get cold feet and stop sales.

So, that is the real competitive concern here, your Honor, as outlined in that case. And there's nothing that we're aware of here which is going to address that. It's not clear -- they haven't asked for like the top 10 customers. They haven't asked for things like that.

We have thousands of customers, your Honor, some of

which are very small mom-and-pop shops, some of which get a subpoena, you know, they'll go nuts, and they'll drop us. And again, that's a competitive harm that we suffer for something that we don't think's necessary at this point.

Yes, they've asked for customer confusion. We are reviewing ESI custodians for anything -- we've come up with search terms to create that. If something comes up, they'll get that stuff. But why do they need invoices and purchase orders and SKU information and stuff like that? How does that bear on customer confusion? It's not clear to us that it has any relevance to that, your Honor.

THE COURT: Okay.

MR. PEEL: So that's where the deep-seated genuine concern is. Even things that are stamped, "Highly Confidential," there can be inadvertent disclosure.

There's also questions about we don't disagree that they can serve subpoenas on third parties that they have a reasonable good faith belief may have discoverable information, but our understanding is that's not the extent of what they're doing here.

And even the service of a subpoena, as the *Murata* case makes clear, can be sufficient to dissuade customers to continue in purchasing relationships and lead to other kinds of harm.

And again, a lot of this is just because we don't

have any decisions at this point. Right? We don't know whether the IP they're claiming is good IP or not. We don't know, you know, whether they'll be successful with a PI or not. We don't know any of this stuff.

And so we're trying to go cautiously forward. We're trying to make stuff available in the near term that we think is relevant to the liminal liability issues, which Judge Durkin's summary judgment and other opinions recently say, "Look, functionality, that's a liminal issue to determine with respect to trade dress and other things," as my much more learned colleague Mr. Levine has stated.

So that's why we're taking a go slow approach with respect to that stuff. They have our sales numbers. We've given them breakout by time period. We've agreed to stipulate that the sales are nationwide because there was some suggestion that that information was relevant to the preliminary injunction, so we've offered to stipulate to that.

But in terms of the very granular customer information they're now demanding we provide, we just don't think at this juncture in the case that's necessary, and it may never be necessary.

THE COURT: Mr. Lamb, let me ask you this: If -- you said that this information is necessary now, which I take as sort of a word for relevant. I guess it's broader than that. But do you need the subpoenas now as well, or do you need the

underlying information?

MR. LAMB: Well, your Honor, we need the sales data, right, that shows who these customers -- who these customers are.

THE COURT: Let me clarify because I think I phrased that poorly, and it's my fault.

If the concern I'm hearing is that the turning over of the data -- or one concern, turning over the data will lead to lots of subpoenas to small entities that are customers, and that will upset business. Could you put off that for a while until you get -- until you get and work with the sales data, the underlying sales data?

MR. LAMB: So, there are two issues, right?

THE COURT: Sure.

MR. LAMB: There are two buckets of data. There's sales, right, how many units of products, right, to which customers? That's one bucket. That's relevant for a couple of different things.

Then there's the communications with those customers about how to market the product. Right? This is a product, NORTH, that came to market, was marketed aggressively as the next Breeze.

THE COURT: But they would have that stuff. You wouldn't need a subpoena to get that stuff.

MR. LAMB: I don't know if they have that stuff.

THE COURT: Why wouldn't they have it?

MR. LAMB: That's why we served subpoenas. Because what you heard was a very careful answer that we're looking for documents about evidence of confusion.

They're not -- I don't think they purport to product every document, every communication they have with a customer that mentions the word "Breeze" or "Breeze Smoke." If they're going to produce that, then no, maybe we don't have to subpoena the customers who are on the other sides of those communications.

But I have no confidence today that they're going to produce every communication with a customer about how they marketed NORTH and every communication with a customer that mentions "Breeze" or "Breeze Smoke."

THE COURT: Well, there's a -- so, to me, there's a difference there. So, there may be a dispute over whether that's relevant and proportional, and that's okay. We can get into that argument. But the idea that a third-party subpoena is appropriate, seeking arguably duplicative information because we don't think they'll turn it over, that doesn't strike me as a good argument.

MR. LAMB: That's one argument. The other arguments are we need to be able to understand what these customers, these distributors understood the connection between Breeze Smoke and NORTH to be. Right? That goes right to confusion.

And we need to understand how those customers subsequently marketed the product to end consumers. This all goes to confusion and to the strength of our trade dress. And those are core elements of our case.

So, I mean, I understand, I think, where the Court's going, can we cabin some of this to minimize the scope. And we don't want to serve 1,000 subpoenas. I mean, the administrative burden alone in terms of prosecuting those subpoenas is overwhelming. We're not crazy. But we do need to get at the evidence --

THE COURT: Particularly if they're out of district, right? Because that's -- they're going to be enforced in other districts, and that's going to take longer.

MR. LAMB: Of course, your Honor. But this is an issue and problem, and we're talking about 100 million sales sold now in a year. It's a big case, and it buys a lot of discovery. It's important discovery. This isn't -- this isn't, you know, the tail of the dog here. This is core discovery in this case that goes to confusion and harm.

And so I'm happy to explore with Midwest how we cabin this; but we're eight months in, and they're just refusing to turn it over, and that's a real problem for us. Right?

I mean, we have to be able to prove up our case about how they marketed this product, how their customers reacted to

it, how their customers marketed the product to end consumers. And getting the information from their customers, the distributors who are the middlemen between the retailers and in some cases large retailers is critical discovery. I mean, it's absolutely relevant.

And what we're asking to do is proportional. We're talking about a year's worth of sales data of two products, two vape pens, NORTH and SOUTH. So, they make it seem like --

THE COURT: Well, not necessarily yet, right, on SOUTH?

MR. LAMB: Well, I do need to put something on the record about SOUTH later, but we're talking about two products here.

THE COURT: I mean, I'll tell you SOUTH is off the table for me unless Judge Durkin rules that you can amend the complaint.

MR. LAMB: Can I address that right now, your Honor?

THE COURT: Sure.

MR. LAMB: As we said in our status report, and as we're prepared to brief to the Court, SOUTH is critically relevant whether we file a claim against it or not because design-around evidence goes directly to functionality, which Mr. Levine just told you was the key issue in this case for our trade dress claim, functionality of our trade dress design.

And they've come out with a new design, and court after court says if you can design around the accused product, if you can design around the trade dress that's been asserted, then that trade dress isn't functional. And Mr. Levine just said that was the key issue in this case.

And now they've come out with a new product that has very subtle changes in its design, we don't think enough; but that evidence is critically relevant in this case because it goes to our claims against NORTH.

And, your Honor, if you're not persuaded by that, we're happy to brief it. It doesn't have to be a long brief, but there is case after case that says that this evidence of design-around is relevant to our trade dress claims and relevant to our patent claims right now against NORTH.

And again, this is not burdensome discovery. They started selling this product a few months ago.

THE COURT: Mr. Peel, does it do anything for you that Breeze Smoke might be willing to cabin some of the subpoena practice?

I mean, Mr. Lamb, I don't mean to put words in your mouth, but that's what I understood, that you're willing to have a discussion about that because you recognize that subpoenaing 1,000 entities doesn't work, either. Do I have that correct?

MR. LAMB: That's correct, your Honor.

THE COURT: Okay.

MR. LAMB: I'm happy to work with them on how to avoid having to do that.

THE COURT: Okay. Mr. Peel, does that do anything?

MR. PEEL: Your Honor, I will, of course, confer with my client. You know, one way to look at proportionality would be to say, "Okay. What are your top ten customers in terms of the largest volume sales," maybe limit anything third party to those customers, make sure that it doesn't include cease and desist and stuff like that.

Maybe something like that I could discuss with my client. I haven't discussed this previously. I'm not in a position to make any commitments. But we can explore those alternatives if the Court is requiring that we do so.

Let me, if I could, just respond briefly to remarks Mr. Lamb made addressed to why the SOUTH stuff is relevant now because we don't believe it is, and again, it gets to proportionality and some other issues.

THE COURT: Sure.

MR. PEEL: So, we have already agreed to provide design-around evidence relating to the NORTH product. And that's -- you may have seen that in the letter, in our response to I think their discovery request No. 8 in their first set. We said we would provide those documents, and we will provide those documents.

So, if those documents reflect that SOUTH was, in fact, an effort to design around claimed infringement by NORTH, they'll get those documents even though they mention SOUTH. We don't think it is. We don't think there are any such documents, but we've already committed to producing design-around related documents that are relevant to the only product in suit at the moment.

So, we don't think it would be proportional to say as well that you get every single document related to SOUTH, not just limited to design-around. One of the things we've asked them is, "You've asked for every document relating to SOUTH, none of it limited to design-around stuff," and they said, "We get the whole enchilada now." Again, we don't think that's proportionate. We don't think that's what the cases say.

And by the way, he says there are many cases that support the relevance of design-around evidence in a case like this one. We asked them to supply us with those cases in the meet-and-confers. In the correspondence, as I'm sure your Honor saw, they said, "You'll see it in our motion."

We're aware that they've cited some cases in the Vape District pleading. I've taken a look at those cases, your Honor. They don't really address this -- these issues.

One of those cases relates to design-around evidence and questions about privilege, so there was no real issue about whether design-around was relevant for these cases.

The other one related to evidence at trial and the fact that alternative designs existed might speak in some respect to functionality. But that case was post-trial, post jury verdict, a completely different thing. It had nothing to do with what's relevant for discovery.

So to date, I haven't seen any of these many cases they claim exist with respect to design-around evidence, and certainly, we'd want to brief those issues to you.

THE COURT: So, let's do this. I would like -- let me give you some general thoughts. I'm going to have you discuss cabining, however you want to sort of style it here; and then what I'll take is one omnibus motion from each side, and you guys will need to decide -- we're going to use the default 15 pages in our district, and you guys can decide what's worthwhile of the Court's attention in those 15 pages.

That can be sales and purchasing. It can be the SOUTH products. At some point, we really need to focus on what is sufficiently at impasse and sufficiently important that it calls for court intervention because I can't -- I can't referee everything.

So, let me give you some general thoughts, though, in terms of getting there.

In terms of -- you can argue phasing if you want in that one motion, but I'll tell you, I'm really reluctant to phase in most cases. I do it occasionally, but it just leads

to more fights.

Probably by the time that this motion practice is completed and I get you a decision, which is not going to be next week or next month, it's probably going to take longer than that, you'll know from Judge Durkin perhaps what those other rulings are. I don't know what his timeframe is, but you may have those. So, I don't think phasing really helps. I think we just need to take it as it comes.

In terms of the cabining, can you agree on some limits on subpoenas, I think that would make sense. I think you should have a discussion, so I want you to build in your ability to discuss with your clients and discuss with each other, some ability to do that. But otherwise, I'll -- you know, as I said, I'll take a motion from each side, and then take responses.

What are the parties' thoughts on how long you'd like to meet and confer on sort of the cabining issues and then get motions on file with me?

MR. PEEL: Your Honor, this is Mr. Peel speaking just for myself. I'm traveling Thursday and Friday of this week, and I'm also out Wednesday through Friday of next week, so I would like at least two weeks maybe from this Friday, if that's not overly indulgent.

THE COURT: For the meet -- I want you guys to meet and confer first.

MR. PEEL: Sure.

THE COURT: And I want phone or video, not just over e-mail, and time to talk with your clients. So, you tell me.

MR. PEEL: Sure. We can certainly have such a meet-and-confer -- I believe it's the week of June 10th, possibly do it early next week. But as I say, I'm out the rest of this week --

THE COURT: Okay.

MR. PEEL: -- and Wednesday through Sunday of next week.

THE COURT: So that would be by -- let me bring this up here.

MR. PEEL: We can do that via Zoom, if that's helpful.

THE COURT: Yeah, good. Let's do via Zoom.

So, that would be by the 14th of June.

Mr. Lamb, does that work for you and your team?

MR. LAMB: Yes, your Honor. We're happy to meet and confer that week.

I do have some concerns about how this process affects the production of ESI by Midwest that's supposed to now be completed by July 29th. Right? I mean, they're standing on objections to the core discovery in this case, from our perspective.

So, we're now in a situation where Breeze Smoke is

going to be obligated to produce all of its ESI by July 29th. They're going to stand on these objections, and we're going to brief it; and we're going to have the case completely stalled out, from our perspective, and I just think that's fundamentally unfair to Breeze Smoke.

They filed this case as plaintiff. We're here because they sued us, and now they've completely stalled out discovery in this case for a year. And I'm going to talk to my client and explain that to them, but that's a fundamentally unfair outcome to our client, who has diligently prosecuted this discovery dating back to November.

THE COURT: So, Mr. Peel, I presume there's things you'll be producing in the interim.

MR. PEEL: Correct, your Honor. We are moving forward with the ESI. There may be -- you know, again, the customer information they're asking for, things like invoices, purchase orders, SKU information, pricing and stuff like that, that stuff can be readily collected and produced if the Court compels us to produce it at that juncture if we can't work out some other cabining.

THE COURT: Right. Putting aside -- I think it's sort of not obvious entirely, but the big-ticket items that are at issue that I'll take briefs on and I'll give you a decision. But I'm just being up front with you, it's not going to be next week. It's not going to be next month.

MR. PEEL:  Right.

THE COURT:  Let me finish.  That's not Midwest's fault, Mr. Lamb.  That's how long it takes the Court to rule.

But what I'm asking Mr. Peel is:  Putting aside some of these disputes, and knowing that you may have to produce twice, are there things that you still intend to produce in the next 60 days that aren't at issue?

MR. PEEL:  Yes.

THE COURT:  Give me examples.

MR. PEEL:  Any communications with customers that go to confusion based on the search terms that we've come up with, you know, would be among the documents produced.  It's among the documents they've said are relevant to their PI.  It's the things that we're prioritizing.

They have other requests about development and designing of our trade dress and stuff like that.  They're getting some of those documents as well.

I forget all of the categories of documents that they've asked for, but they've asked for a lot of stuff that's unrelated to customer identity and the very granular sales information that I think we have the issue with; and all of that we'll be reviewing and producing within the next 60 days.

THE COURT:  And, Mr. Lamb, I understand your frustration; and part of that is just how long it takes me to rule on motions, but I don't know what better I can do at this

point other than rule on the spot, which I don't want to do. I want to get this right. I want to look at the cases and do the right thing here. So, maybe I'm missing your point, but they're going to produce stuff in the interim, and I think that's the best we can do.

MR. LAMB: Let me just -- can I just ask one question, your Honor?

THE COURT: Sure, um-hum.

MR. LAMB: Because I just didn't understand what Mr. Peel said. On one hand, they're going to stand on objections to producing invoices or sales records that identify their customers, but on the other hand they're going to produce e-mails and text messages with those customers?

I don't think they're going to produce any e-mails or text messages with those customers. I don't think they're going to want to disclose their names in e-mails and text messages about their marketing practices any more than they're going to want to disclose their names in invoices and purchase orders.

And so that leaves me in a position of I'm going to get some rolling production over June and July with none of the information that I actually want while we wait for these rulings. Meanwhile, Breeze Smoke is incurring enormous expense to roll out all of its document production and be done and ready to tee this case up for a preliminary injunction

ruling. And that's what's fundamentally unfair.

So, I understand where the Court's coming from, but it puts us in a real pickle in this case, your Honor, and I don't understand how --

THE COURT: What can I do differently?

MR. LAMB: Can you direct Mr. Peel to produce all of the communications with their customers that identify Breeze, that use the word "Breeze" or "Breeze Smoke" so that we don't have this hair-splitting about evidence --

THE COURT: No. I just don't know enough about it. Guys, I'm just being honest with you. I wish I could do it on the fly. Some of these things, I've given you my thoughts. I've said pretty directly I'm not -- likely not going to do phasing, which is what you guys wanted.

The things I can do on the fly, I will; but some of these things, particularly when we're talking case law, I need to get it right. I need to understand. I know you guys know these cases really well. I get it. But I've got to have it in writing sometimes. That's the best I can do.

MS. LEVINE: Your Honor, maybe I can help. It seems like just from listening to this that a big portion of what Mr. Lamb is concerned about is marketing practices and my client's -- I know we're not talking about TikTok, but my client's TikTok videos seem to be at the core of these motions.

And having talked to my client, I know he came up with all that on his own, so perhaps I could offer, for the limited purpose of how things are marketed, what did anyone tell him about marketing, where did his ideas come up for these TikToks that are embedded in the motion, I'd be willing to produce him for a Zoom deposition on those narrow issues.

What's difficult is the ESI that Breeze Smoke wants us to conduct and turning over his cellphone and manually looking through e-mails or, you know, imaging his computer.

But if we want to have a short deposition, which I think might help everybody understand from the person who said the most puffery on the Internet, I can produce him for that limited purpose. I'd be happy to. And I think that may give both sides some clarity about, you know, where those comments came from.

THE COURT: Mr. Lamb?

MR. LAMB: Your Honor, it's not very productive to take a deposition of someone without their documents.

THE COURT: I understand.

MR. LAMB: All that's going to happen is I'm going to ask him, "Do you have text messages or e-mails with anyone from Midwest or any upstream distributors about any of this," he's going to say yes or no, and we're going to be right back at, "Okay. We need to produce your documents and then take a second deposition."

THE COURT: Yeah, I appreciate the offer, but I tend to agree.

MS. LEVINE: Your Honor, he's not going to say that. What he's going to say is, "Nobody told me how to market." Other than these -- getting these multiple, "Hey, this is on sale now," there's not going to be anything. So, I would be searching for a needle in a haystack.

My client came up with all of those comments on his own without consulting with anybody, and he can confirm that. And I'm not saying this is the one and only deposition, but it's a lot more efficient to me just to let him ask my client under oath, "Are you the ones that came up with that? Did anybody suggest to you this? Where did you get that idea?"

Because it's not going to be from someone else. It's going to be from my client. That's just the way he is.

THE COURT: But I think Mr. Lamb's point is, and I get it, is he shouldn't have to take your client's word for it. That's why we do written discovery, that he gets to look at the underlying documents, the communications to make sure that he has information he needs to properly depose your client and make sure he's telling the truth.

MS. LEVINE: Well, here's where we get into proportionality because --

THE COURT: Sure. I understand that.

MS. LEVINE: Because now, as a third party, not even

involved in the litigation, he wants an image of multiple cellphones, an image of computers, and all of this forensic ESI discovery, which is expensive; and it's really a burden on an individual brick and mortar small business based in Ohio.

THE COURT: I understand. But that's a different issue. But I appreciate you raising that. I just don't think it fixes the issue, but, you know, I appreciate it.

Okay. So, we'll have you -- we'll have the parties meet and confer via Zoom by June 14th in an effort to maybe reach some consensus on some of the issues we've discussed, you know, keeping in mind, as I said, I'm unlikely to allow for phasing for the reasons I've said. I don't see SOUTH as particularly relevant. But you guys will decide at each of your motions what you think is most important for me to decide for you at this point and make some decisions in that regard.

Following those meet-and-confers, one or more, by June 14th, when do folks want to get their respective motions on file? And I'm going to allow for responses so you don't have to anticipate what the other person is going to argue here, but -- because I presume there's things that Midwest wants from Breeze that you're not getting at this point; is that fair to say?

MR. PEEL: Fair to say, your Honor.

THE COURT: Okay. So, following June 14th, how long

would everyone like to get their motions on file?

MR. LAMB: Your Honor, we'd definitely like to get our motions on file by the end of the month. I'm just looking at my calendar to see what day that is.

THE COURT: Okay. Sure.

MR. LAMB: June 28th, and that puts the July 4th holiday early in the response window for everybody, so that isn't really an issue.

MR. PEEL: Your Honor, we can probably make that work. I am out of town and away on a previously scheduled vacation the 22nd through the 29th of June, but if we need to have it on file by the 28th, we'll do that.

THE COURT: No, you -- guys, with my turnaround time, I'm not going to ruin people's family vacations. So, Mr. Peel, you tell me --

MR. PEEL: My wife thanks you.

MR. LAMB: I too am on vacation that week and volunteered to ruin my own.

THE COURT: That's okay. I appreciate that, but it's not fair of me to ask you to do that when that's going to -- I'm not going to have a decision for you that much quicker. We'll do the best we can to turn around these things as soon as we can, but we don't need to go to those lengths. So what's a comfortable date for both sides here?

MR. PEEL: The following week is -- does include a

holiday, so July 8th, does that make sense?

MR. LAMB: I'd go the 10th. I'm not going to kill this crew over July 4th for that.

THE COURT: Okay. Then July 10th.

MR. LAMB: But then a quick response, your Honor. How about by July 24th, two weeks. These are discovery motions. We can turn them around in two weeks.

THE COURT: Is that okay, Mr. Peel?

MR. LAMB: No replies.

THE COURT: Generally, no.

MR. LAMB: Good.

THE COURT: If there's something in particular that I need or want, I'll ask for it.

Is that okay, Mr. Peel, by July 24th?

MR. PEEL: Could we just have until the 26th?

THE COURT: Sure.

MR. PEEL: That's Wednesday to Friday.

THE COURT: All right. If there's something I need in reply, I will ask for it, but generally no.

Take a look at my standing order on discovery motions. So, what I require is, you know, copies of the discovery requests, any responses. And those don't count against your 15 pages. Those are exhibits. But I like to see the original thing to compare to the arguments you're making.

If you can reach any agreements -- let me say this. If you can reach any agreements between yourselves, that shouldn't cut into your 15 pages. You guys could file something joint by that date of July 10th to let me know that, because I'd like to incentivize some agreements, and I don't want that cutting into your 15 pages.

But it's really got to be like an actual joint status report, like, "We both agree, and we're signing it," not like another, you know, "This is our position. This is their position." If that's what it is, I'm going to toss it and just look at the motions, honestly. If you can really write out for me, "We've agreed to do the following," and both are okay with that, then I'll take it and it's not going to cut into your 15 pages.

Let me see if there's anything else I had on my agenda here.

Okay. That's what I had. Anything else from either side in the way of either questions or other issues?

MR. PEEL: Not from Midwest, your Honor.

MR. LAMB: No, not from Breeze Smoke, either, your Honor. Thank you so much for your attention.

THE COURT: Okay. Great. And we'll write out what we've gone over for you in a minute order so you've got it, and then we'll work forward from here.

Thanks, guys.

MR. PEEL:  Thanks, your Honor.

MR. LAMB:  Thank you, your Honor.

MR. SCARPINITI:  Thank you, your Honor.

THE CLERK:  Court is in recess.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Charles R. Zandi*                    *June 10, 2024*

Charles R. Zandi                    Date
Official Court Reporter

# Steve L. Levine

| | |
|---|---|
| **From:** | Mathrani, Vikram A. <VMathrani@honigman.com> |
| **Sent:** | Friday, April 26, 2024 12:47 PM |
| **To:** | Drew Work; Roulo, David J. |
| **Cc:** | Anthony Scarpiniti; Mason Cole; Lamb, Jeffrey K.; Saunders, Jenna E.; Berndt, William B.; Steve L. Levine; Mark C. Howland; Kelli M. Hinson |
| **Subject:** | RE: [EXTERNAL] Follow-up from 4/11/24 Meet-and-confer |

**WARNING:** This email originated from outside our email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Drew,

A few items in response to your email below:

1)      Breeze Smoke's custodian list is Steven Haddad, Mark Faraj, Scott Haddad, and Rafi Kashat.  Breeze Smoke has collected their documents.  There are no additional Breeze Smoke custodians to add to the list at present.

2)      Breeze Smoke reiterates its position that it can only produce documents within its possession, custody, or control.  Breeze Smoke cannot produce third party documents.  Honigman can accept service of subpoenas to Capital Sales and KMT, but please note that those entities will likely object to the subpoenas.

3)      We have received your April 23, 2024 letter regarding patent interrogatories and attached references.  While Breeze Smoke disagrees with the characterizations in the letter, it will agree to supplement its patent-related interrogatory responses by June 24, 2024.

Regards,
Vik


Vikram A. Mathrani
_____

**HONIGMAN LLP**
O  312.701.9313
vmathrani@honigman.com


This e-mail may contain confidential or privileged information.  If you are not the intended recipient, please delete it and notify the sender of the error.

**From:** Drew Work <dpeel@rdaplaw.net>
**Sent:** Wednesday, April 17, 2024 9:15 AM
**To:** Mathrani, Vikram A. <VMathrani@honigman.com>; Roulo, David J. <DRoulo@honigman.com>
**Cc:** Anthony Scarpiniti <ascarpiniti@colesadkin.com>; Mason Cole <mcole@colesadkin.com>; Lamb, Jeffrey K. <JLamb@honigman.com>; Saunders, Jenna E. <JSaunders@honigman.com>; Berndt, William B. <WBerndt@honigman.com>; Steve L. Levine <SLevine@CCSB.com>; Mark C. Howland <MHowland@CCSB.com>; Kelli M. Hinson <khinson@CCSB.com>
**Subject:** Follow-up from 4/11/24 Meet-and-confer

1



**Exhibit**

**C**

[EXTERNAL EMAIL]

Vik & David -

Thank you for your time last Thursday. As discussed, I write to briefly memorialize what was discussed and agreed upon based on my notes and memory. If you think I've omitted anything important, or this summary is inaccurate in any regard, then please let me know.

1. Only Midwest & Breeze participated in the call on 4/11/24, which lasted from approximately 2PM - 3:30 PM.  On the call for Midwest were Drew Peel, Steve Levine, and Mark Howland; on the call for Breeze were Vik Mathrani and David Roulo.

2. The parties began with a brief discussion regarding the status of ESI collection, designation of custodians, and related topics. Midwest is checking on the additional custodians recently identified by Breeze, it believes one of the additional names may be a nickname from someone already identified, and it will revert as soon as practicable to confirm inclusion of these additional custodians or discuss alternatives if the volume, burden, etc. warrant such a discussion. In terms of Breeze custodians, Midwest confirmed that Breeze can table the two custodians as to which Breeze raised questions, but Midwest again asked, consistent with the request in its March 20, 2024 letter, for a list of custodians similar to the one it provided to Breeze so that Midwest can determine if any additional custodians need to be added, and Breeze indicated that it would endeavor to provide the same in the near future. Breeze also invited Midwest to share any search terms it believes should be applied and indicated that Breeze would share the terms it intended to use in the near future.

3. The parties next turned to a discussion of Breeze's April 5, 2024 letter responding to Midwest's March 20, 2024 letter.

    a. **<u>Ordinary Course Limitation</u>**. A brief discussion was had regarding Breeze's objection to the production of documents not created/maintained in the ordinary course of its business. Midwest agrees that Breeze need not create documents to respond to production requests, but Midwest does not agree that Breeze can withhold responsive, non-privileged documents merely because they were not created, maintained or received in connection with some non-ordinary-course business activity. Breeze

thereafter confirmed that while it would not create documents to respond to production requests, it would not otherwise withhold documents on the basis of whether they were created or received in the ordinary course of Breeze's business.

b. **Request No. 66**.  A discussion was had regarding Breeze's objections to Request No. 66, which asked for certain information in the possession of Breeze's officers and principals. Midwest explained that different entities were involved in dealings with Midwest  (identified on p. 4 of Midwest's March 20, 2024 letter). Breeze advised that it objected, among other things, because such documents were not in the possession, custody or control of Breeze, which then led to a discussion of whether Midwest would need to subpoena such entities separately and/or make them parties to this lawsuit in order to assure that it received responsive documents maintained by Breeze officers, principals etc. but which are characterized and records and documents that are not in the possession, custody or control of Breeze. Midwest advised that its preference was that it not need to add the identified third-party entities as parties to the lawsuit and not issue subpoenas separately, and Breeze said it would further consider the matter and report back. While a date was not discussed for when Breeze would advise as to its position, Midwest suggests that the date for everything be the same April 26, 2024 date that is referenced in Breeze's April 5, 2024 letter addressed to issues with Midwest's discovery responses and objections.

c. **Undefined Terms**. A brief discussion was had regarding certain terms that Breeze identified in its April 5, 2024 letter as needing a definition. In general, Midwest intends those terms to have the ordinary meanings that they would be ascribed in litigation of this type. Further, a discussion was had as to where certain of the terms came from, and, following this discussion, it appears that Breeze will not be withholding responsive documents based on its definition objections, and, if necessary, further discussion can be had as to any such definitional issues.

d. **Rule 26(a)(1) Documents**. A brief discussion was had as to Breeze's objection to Request No. 1, which asked Breeze to produce the documents it identified in its initial disclosures. Midwest explained that its understanding of the scope of this Request is that it is merely asking for production of those documents Breeze had in mind that it may use to support its claims or defenses; it was not asking for production of documents, that would undermine its claims or defenses, and Breeze presumably knew what documents it was referring to when it made its disclosures. Breeze confirmed that it would produce responsive documents that it may use to support its claims or defenses.

e. **Trade Dress Development.** A discussion was had as to certain limitations included in Breeze's responses to certain production requests addressed to the development of Breeze's trade dress. Such trade dress should include that to which Breeze claims it has rights, which we includes its contention of separate rights in its vape design and its packaging. Additionally, such information should include access to information Breeze received from the Chinese inventor and the assignor (and we still have not receive any indication of whether Breeze will provide access to either). Midwest explained that it needs documents regarding not just the initial development, but also any subsequent modifications to the trade dress, and that Breeze's responses to the production requests had in some instances appeared to limit the production to only the original trade dress and not include any subsequent modifications/adjustments. Breeze confirmed that it would produce responsive documents that were not limited to the original development of the trade dress but also would include any modifications, adjustments to the same.

f. **Chinese Patents**. A brief discussion was had regarding a Chinese patent application that also was identified by granted patent number, which may have been based on an patent number erroneously stated in Breeze's letter, but properly identified in the Midwest Request. Midwest explained that the patent, it believed, is available on-line and likely already in Breeze's counsel's possession as the same law firm also was involved in transferring ownership of and prosecuting the design patent in suit. Nonetheless, Midwest offered to supply a copy of the patent if necessary, and Breeze said it would double check and follow up as needed.

g. **Interrogatory Nos. 1, 2, 3**. A brief discussion was had regarding Breeze's objections to Midwest Interrogatory Nos. 1-3, which are addressed to contentions that Midwest believes it needs discovery regarding in order to defend against Breeze's assertions of infringement in the preliminary injunction hearing and otherwise. There was further discussion regarding applicable legal standards. Midwest advised that if Breeze was not prepared to provide more information regarding its contentions, then Midwest likely would need to move to compel given its need to defend against infringement claims in any PI hearing. Midwest noted that Breeze's Declarant Haddad has taken the position that the "Breeze Pro product is the commercial embodiment of the D'573 Patent" (see para. 80, Dkt #54). As such, the Midwest interrogatories bear on both the design patent, and the trade dress elements from that patent, including issues of functionality under both design patent and trade dress law. There also was discussion regarding Midwest identifying a subset of the prior art references it was most urgent for Breeze to disclose its contentions regarding. Breeze said it would further consider its positions, and it would supplement its contention interrogatory responses at some point, although Breeze did not commit to doing so before any PI hearing or proceedings. Midwest will seek relief with the court if it is not advised of Breeze's positions, particularly those on which it has the legal burden, in sufficient detail and with sufficient advance notice of any such PI hearing.

4. The parties finally had a discussion of Breeze's April 5, 2024 letter raising certain issues with Midwest's discovery responses and objections to date, although addressing only three issues during the call while reserving all rights with respect to other issues.

    a. **<u>Sales/Purchasing Information</u>**. A discussion was had as to sales information Midwest has produced to date. Breeze advised that the production of sales information by Midwest to date was insufficient and inadequate. Breeze contends that Midwest must supply customer and distributor names, must provide details regarding product SKUs, profits, and losses, should provide invoices, should provide information as to the geographic regions for sales, should provide profit and loss information, and also should provide information regarding Midwest purchases from its suppliers. Breeze advised that it believes it is entitled to and needs this information for any preliminary injunction hearing, and it also needs it so that Breeze can pursue other parties who may be infringing Breeze's patents and/or trade dress. Midwest advised that it did not agree that all of the foregoing information was needed or necessary at the preliminary injunction stage, and it understood its obligation to produce sales information on or before 4/2/24 to be limited to sales information that is relevant to a preliminary injunction proceeding. Midwest further asked if Breeze would be satisfied with the production of some (but not all) of this sales information - and Breeze indicated that it would not be. Midwest further noted that if Breeze intended to use confidential and highly confidential information produced in discovery to pursue third parties, then that may violate the Confidentiality Order entered in this case and raise other concerns. Midwest's counsel advised that they would further discuss the issue with their client and respond on or before the April 26, 2024 deadline referenced in Breeze's letter as to Midwest's position and whether and to what extent it would supply further information at this early juncture of discovery. Breeze indicated that it expected to move to compel if Midwest did not produce everything Breeze is asking for in this regard. At the conclusion of the discussion, Midwest noted that despite Breeze's multiple references to what Midwest has thus produced on sales, reciprocally to date, Breeze has provided no meaningful sales documents of its Trade Dress, as requested for example in Midwest Requests 28-31. Midwest also reminded Breeze that Midwest has pleaded tortious interference claims, and to the extent that Breeze argues that it is entitled to seek information from Midwest customers, so too should Midwest be able to do so with not only Breeze customers, but also the Breeze-related entities that have sold Breeze Pro and potentially tortiously interfered with Midwest's sales of the NORTH product.

    b. **<u>Communications re Customer Confusion</u>**. A brief discussion was had as to communications relating to customer confusion. Breeze noted that it needs customer communications etc. that are relevant to the issues of consumer confusion and inquired as to the status of production of such documents. Midwest advised that these communications, to the extent if any that they exist, would be part of the ESI collected, reviewed and produced, but that custodians and search terms had to first be agreed upon, and Midwest had only just been advised of some additional custodians.

c. **Regulatory/Litigation Materials**. A brief discussion was had as to certain regulatory materials and litigation materials that Breeze has requested and propounded interrogatories regarding. Midwest advised that consistent with its responses to date, it did not itself manufacture and produce the accused products, and it was looking into whether it had responsive documents and information. Midwest advised that it would supplement its production and/or interrogatory responses on or before April 26, 2024 to confirm it was producing additional documents/information or had no responsive documents/information.

Best regards,

Drew Peel

***********************************

Drew G.A. Peel
RACHLIS DUFF & PEEL, LLC
542 South Dearborn, Suite 900
Chicago, IL 60605
Direct: (312) 275-0337
Fax: (312) 733-3952
Mobile: (708) 227-6653
Email: dpeel@rdaplaw.net
Website: www.rdaplaw.net

EMAIL CONFIDENTIALITY NOTICE

This transmission may be subject to: (1) the attorney-client privilege; (2) the attorney work product privilege; or (3) strictly confidential. If you are not the intended recipient, you may not disclose, print, copy or disseminate this information. If you believe that you have received this email in error, then please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail is a violation of federal criminal law.

# Rachlis Duff & Peel, LLC

542 SOUTH DEARBORN STREET, SUITE 900
CHICAGO, ILLINOIS 60605

Drew G.A. Peel
(312) 275-0337
dpeel@rdaplaw.net

(312) 733-3950
FACSIMILE (312) 733-3952

*www.rdaplaw.net*

April 30, 2024

By Email:

Jeffery Lamb
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI. 48226
jlamb@honigman.com

Vikram Mathrani
William Berndt
Jenna Saunders
David Roulo
HONIGMAN LLP
155 N. Upper Wacker Drive, Suite 3100
Chicago, IL 60606
mhyde@honigman.com
vmathrani@honigman.com
wberndt@honigman.com
jsaunders@honigman.com
droulo@honigman.com

Dear Counsel:

On behalf of my client, Plaintiff/Counterclaim Defendant Midwest Goods Inc. dba Midwest Distribution Illinois ("Midwest"), I write in response to Mr. Mathrani's email of April 26, 2024, and in further follow-up to the parties' communications relating to certain discovery issues. Please accept this letter as Midwest's continuing effort to confer with Breeze Smoke, LLC ("Breeze") in a good-faith attempt to resolve disputes regarding discovery, consistent with the applicable requirements of: (1) the Federal Rules of Civil Procedure, including, but not limited to, Rules 26, 33, 34, and 37; (2) the Local Rules for the United States District Court of the Northern District of Illinois ("Local Rules"), including, but not limited to, Local Rule 37.2; and (3) minute



and standing orders of United States District Court Judge Thomas Durkin and United States Magistrate Judge Beth W. Jantz.

For ease of reference, we will address the categories of documents and data referenced in Mr. Mathrani's April 26, 2024 email in the order in which they appear.

Before moving to that discussion, however, we believe that insofar as Breeze's purpose for demanding production of granular sales data and documents, and related, highly-sensitive competitive information, is addressed to demonstrating future entitlement to damages or other permanent or provisional remedies, then we believe these demands are premature. *See, e.g.*, *Murata Mfg. Co., Ltd. v. Bel Fuse, Ltd.*, 2004 WL 1194740 (N.D. Ill. 2004) (denying patent holder's motion to compel production of alleged infringer's customer lists due to potential competitive harm to alleged infringer's business); *Murata v. Bel Fuse, Ltd.*, 234 F.R.D. 175 (N.D. Ill. 2006) (refusing to lift protective order to permit discovery of infringer's customer lists notwithstanding assertions of changed circumstances). Indeed, please be advised that in light of these concerns, Midwest is considering moving for the staging of discovery, prioritizing in the near term discovery addressed to liability issues, while deferring to a later juncture (*e.g.*, after the patent in suit has been construed, the trade dress defined, and/or dispositive motions have been decided) discovery addressed to damages and remedy issues. Nor do we believe Judge Durkin or Jantz has foreclosed such staging of discovery in a case like this one, where discovery may be misused as an instrument to compete unfairly, and where, regardless, there is a risk of inadvertent disclosure of highly-sensitive competitive information.

## A.    <u>Documents/Data Regarding Midwest's Suppliers/Vendors.</u>

In terms of the NORTH Products, Breeze's Interrogatory No. 2 asked Midwest to "[I]dentify all sources from which Midwest has purchased Accused Products" (which "Accused Products" were defined as the NORTH product referenced in Breeze's counterclaim), and, while Midwest objected on relevance grounds, it then proceeded to identify Midwest's two sources for the "Accused Products." Similarly, Breeze Production Request No. 11 asked Midwest to produce "[D]ocuments sufficient to identify each of Your source(s) for any of the Accused Products," and, in response, Midwest agreed to "produce documents sufficient to identify its source(s) for any of the Accused Products." In addition, Midwest has agreed to produce: (i) "any written agreements between Midwest Goods and any other party for the manufacturing … of the Accused Products" (Resp. to Req. No. 13); and (ii) "documents sufficient to disclose Accused Product volumes supplied by its supplier and sold to its customer" (Resp. to Req. No. 25).

In terms of the SOUTH Products, Breeze's Second Set of Production Requests asked for the production of, *inter alia*: (i) "All documents or communications referring or relating to the source of the SOUTH Vapes" (Request No. 77); and (ii) "All purchase and sales records relating to the SOUTH vapes, including but not limited to import records and invoices from Your suppliers and to Your customers" (Request No. 79). In response, Midwest objected to these and related Requests respecting the SOUTH vapes on several grounds, including that they were not addressed

to documents that are relevant to the claims and defenses currently at issue in the lawsuit, given that Breeze has not, to date, asserted that the SOUTH vapes infringe its purported trade dress or design patent.

At Breeze's request, its counsel and Midwest's counsel spoke by telephone on April 24, 2024 regarding, *inter alia*, Midwest's objections to the production of documents responsive to Breeze's Second Set Of Production Requests that were addressed to SOUTH vapes (*i.e.*, Request Nos. 70-79; hereafter, the "SOUTH Requests"). During the call, Breeze's counsel advised that they believed such documents were relevant to "design around" issues, given Breeze's belief that the SOUTH vapes were an attempt to avoid the Breeze trade dress and design patent through design changes, although Breeze did not believe that those efforts were successful and was considering asserting claims that the SOUTH vapes also infringed Breeze's trade dress and/or design patent. Midwest's counsel indicated that it would consider any case law Breeze counsel wished to provide establishing its entitlement to discovery addressed to such "design around" issues, but Breeze's counsel indicated that it would instead brief the issue to the Court. Midwest's counsel also indicated that even if such "design around" issues were relevant, then it seemed like the scope of Midwest's SOUTH Requests was overly broad and that such "design around" issues already may be encompassed by the production of documents responsive to other requests Breeze had propounded relating to the NORTH (Accused) Products.[1]

On April 26, 2024, Mr. Mathrani's email indicated that Breeze understood that Midwest was refusing to produce the following documents for both the NORTH and SOUTH Products, and that therefore disputes respecting the production of these documents were "ripe for adjudication" (presumably by means of a Breeze motion to compel):

1. Purchase orders to Midwest's supplier(s) for vape pens, packaging, and e-liquids present.
2. Invoices from suppliers for the same.
3. Summary purchase data exported from Midwest's inventory or accounting system for the same from beginning to present, showing at least source company location and contact information, SKU, flavor, quantity, date, unit and total price.
4. Documents sufficient to show identity / source of pens, packaging, and e-liquid if not shown on purchase orders.

It is **_not_** apparent to Midwest that the production of any of the aforementioned documents for either the NORTH or SOUTH Products would be relevant to any "design around" issues

---

[1] *See, e.g.*, Resp. to Req. No. 8 (subject to objections, "Midwest will produce any non-privileged documents and communications it is able to locate after a reasonable search … sufficient to show any non-privileged design efforts taken to avoid alleged infringement of the purported BREEZE PRO Packaging Trade Dress … or the purported BREEZE Product Design Trade Dress….")

currently present in the existing lawsuit, nor does Midwest believe that any "design around" issues could warrant discovery into the SOUTH Products more generally at this juncture. Nor is it apparent that any of the aforementioned documents has any relevance to Breeze's pending preliminary injunction motion or to arguments for a permanent injunction. Moreover, it is not proper to propound discovery for the purposes of a fishing expedition, to potentially find new and different as yet unpled claims to assert; rather, discovery is limited to requests for documents and information that are relevant to pled claims and defenses. *See, e.g.*, *Sirazi v. Panda Express, Inc.*, 2009 WL 4232693, at *4 (N.D. Ill. Nov. 24, 2009) ("Indeed, the Seventh Circuit has often said that discovery is not to be used as a fishing expedition.") (internal quotation marks omitted; collecting cases).

**Notwithstanding the foregoing, if Breeze can provide an explanation as to why such documents have any relevance to the pending preliminary injunction motion or liability issues, then Midwest may consider producing additional documents such as purchase orders and invoices involving the identified suppliers. If, however, the only relevance pertains to remedies, then, per the discussion above, we think such discovery should be deferred at this juncture. Moreover, Midwest has already agreed to produce non-privileged documents responsive to Breeze's requests addressed to potential "design around" issues with respect to the NORTH Products (*i.e.*, Request No. 8), and will produce any such documents in due course.**

### B.        <u>Documents/Data Regarding Midwest's Sales</u>

As to the NORTH Products, Breeze's Interrogatory No. 8 asked Midwest to "State, on a month-by-month basis, Midwest's total sales of the Accused Products from date of first sale to the present, including units sold, monetary revenue, and profits derived from the sales." Midwest objected to this interrogatory on several grounds, including concerns regarding Breeze's prior tortious conduct, protecting Midwest's supply chain from harassment, and relevance and proportionality, but, subject to those objections, Midwest stated that it "will produce documents pursuant to Federal Rule of Civil Procedure 33(d) from which Midwest Goods' total sales of the Accused Products, including units sold, can be ascertained." And, consistent with this response, Midwest produced a summary of NORTH Product sales, indicating unit numbers, revenues, and broken out by time period. (*See* MIDWEST003619) And while Breeze document production requests asked for the production of "All documents and communications related or referring to the … sale … of the Accused Products" (Request No. 4) or the "sale … of the Accused Product Packaging" (Request No. 5), Midwest objected to these Requests on overbreadth and other grounds, while inviting further meet-and-confer discussions regarding the same.

On April 5, 2024, Breeze sent a letter to Midwest, complaining of certain purported deficiencies with respect to Midwest's responses and objections to Breeze's first set of interrogatories and first set of production requests, but none of the aforementioned responses was identified in that letter as problematic.

On April 11, 2024, counsel for Breeze and Midwest discussed discovery issues raised by each party, and during that call, counsel for Breeze asserted that they should receive far more granular sales data than had been provided to date, including purchase orders, invoices, and other such documents. When Midwest asked why the production of such documents and information was required, Breeze responded that it needed this information to pursue other alleged infringers of its purported trade dress and design patent. Midwest's counsel thereafter expressed concern that insofar as Breeze intended to use documents produced in discovery and subject to the Confidentiality Order that had been stamped HIGHLY CONFIDENTIAL or CONFIDENTIAL for the purpose of pursuing other putative infringers, then that would appear to violate restrictions imposed by the Confidentiality Order entered in this case. Nevertheless, Midwest advised that it would further consider whether it would supply additional sales information and data at this juncture and report back on or before April 26, 2024.

As to the SOUTH Products, on April 15, 2024, Midwest served its responses and objections to Breeze's second set of production requests.[2] Breeze asked for "All documents or communications related to or referring to the … sale … of the SOUTH Vapes" (Request No. 70) and "the … sale … of the packaging of the SOUTH Vapes" (Request No. 71), as well as "All documents or communications referring to or relating to the sale of the SOUTH vapes, including but not limited to, invoices, purchase orders, sales receipts, and sales summaries" (Request No. 78). Midwest objected to each of these Requests on the grounds that they sought documents pertaining to SOUTH Products that were not relevant to the pled claims and defenses currently at issue in the lawsuit.

During a subsequent call of Breeze's and Midwest's counsel on April 24, 2024, Breeze again inquired with respect to sales data and information, and Midwest's counsel advised that Midwest was willing to address Breeze's request respecting geographic scope information[3] by stipulating that its sales of the NORTH Product had been nationwide but did not believe additional information, such as customer invoices, purchase orders, etc. was essential at this juncture.

On April 26, 2024, Mr. Mathrani's email identified the following sales documents and data as those that Breeze intended to file a motion to compel regarding if Breeze did not agree to produce the same:

---

[2] Midwest served corrected responses and objections on April 16, 2024, but none of the corrections pertained to the requests at issue here.

[3] Notably, at the March 7, 2024 hearing before Magistrate Judge Jantz, Breeze's lead counsel indicated, among other things, that knowing whether the sales at issue were "nationwide" was important in terms of proving harm to Breeze's goodwill and the competitive impact.

1. Purchase orders from Midwest's customers for vape pens.
2. Invoices to Midwest's customers for same.
3. Summary sales data exported from Midwest's inventory or accounting system for same from beginning to present, showing at least purchaser company location and contact information, SKU, flavor, quantity, date, unit and total price.

Given the current procedural status and stage of discovery, the only reason for Breeze insisting on the production of the foregoing documents at this juncture appears to be Breeze's desire to identify other targets of litigation with respect to claims of infringing its purported trade dress and design patent (or using the threat of the same for settlement leverage). However, as noted above, applicable rules do not sanction the use of discovery for such "fishing expeditions," nor do we believe the Confidentiality Order in place in this case would permit Breeze to use information gleaned from documents Midwest produced that are designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL to pursue third parties. Moreover, Midwest has a legitimate concern that Breeze's actions in this regard are intended to tortiously interfere with Midwest's existing and expected business relationships with its customers, and thus the production of such documents would merely compound matters. *See also Murata Mfg. Co., supra*.

**Nevertheless, in an effort to compromise, Midwest stands by its proposal to stipulate that the sales information it has provided is for sales nationwide.**

## C.     Documents/Data Regarding FDA & Product Safety

As to the NORTH Products, Breeze Interrogatory No. 7 asks Midwest to "Identify all Premarket Tobacco Applications [PMTAs] Midwest has submitted to the FDA for the Accused Products." In response, Midwest objected that the information sought by this interrogatory is not relevant to the claims and defenses at issue. Further, Breeze Interrogatory No. 12 asks Midwest to "Identify all complaints, concerns, or other negative customer feedback that Midwest has received relating to Midwest's offer and sale of the Accused Products." In response, Midwest responded that it had no responsive information, but its investigation was ongoing and it would supplement if and when appropriate. In Breeze Request for Production No. 34 it asked for the production of "All documents and communications related or referring to complying with FDA regulations regarding the sale of the Accused Products, including but not limited to, any Premarket Tobacco Applications." In response, Midwest objected on relevance and other grounds. In Breeze Request for Production No. 35 it asked for the production of "All documents and communications with the FDA or any other state or federal regulator related or referring to the Accused Products." In response, Midwest once again objected on relevance and other grounds. And, to our knowledge, Breeze has not propounded any document production requests like Nos. 34 and 35 that are addressed to SOUTH Products.

On April 5, 2024, Breeze wrote Midwest a letter complaining about Midwest's refusal to produce documents responsive to Requests Nos. 34 and 35 and information responsive to

Interrogatory No. 7, asserting that this information was relevant to the "public harm" factor put at issue by Breeze's pending motion for preliminary injunction.

On April 11, 2024, counsel for Breeze and Midwest spoke by telephone, and Breeze's counsel again reiterated their belief that the PMTA and FDA documents and information sought were relevant to their motion for preliminary injunction, and counsel for Midwest said they would further consider their position in this regard and report back in the near future.

On April 24, 2024, counsel for Breeze and Midwest again spoke by telephone, and again reiterated the demand for PMTA and FDA documents, this time for the SOUTH Products as well.

On April 26, 2024, Mr. Mathrani's email identified the following documents as those for which it would move to compel if Midwest did not agree to produce the same:

1. Any PMTAs submitted to FDA for any NORTH or SOUTH products
2. Documents showing testing of e-liquid or filled vape pen for consistency / content / safety
3. Documents related to Midwest's decision to seek or not seek FDA approval or submit PMTAs for NORTH and SOUTH Products.

Notwithstanding the foregoing, Breeze still has **_not_** identified any basis for discovery into these subjects as they pertain to SOUTH Products (which are not part of the pending case or preliminary injunction motion), or why such inquiries, clearly directed to *utilitarian* aspects of these vapes, have any relevance to Breeze claims for SOUTH (or NORTH) Products, which are legally confined to external appearances and ornamentality. Midwest believes that Breeze does not have a good-faith basis for currently demanding the production of the same – which is why its most recent set of production requests did not include a specific request for the same. Accordingly, Midwest stands on its objections with respect to the request for any of the aforementioned documents addressed to the SOUTH Products.

**As to the NORTH Product, in an effort to compromise, and without admitting that any such information is relevant to the pending preliminary injunction motion or otherwise, Midwest will: (i) supplement its Responses to Breeze Interrogatory No. 7, and mark them HIGHLY CONFIDENTIAL; and (ii) supplement its Responses to Breeze Interrogatory No. 12, mark them HIGHLY CONFIDENTIAL, and indicate in its supplement that Midwest will produce documents respecting any health and safety complaints or issues that have arisen with respect to the NORTH Products, although currently, Midwest does not believe any such documents exist although its investigation is continuing. Finally, as to its responses to Breeze Production Requests No. 34 and 35, Midwest will supplement its responses to indicate that it will produce any responsive, non-privileged documents. Further, Midwest will supplement these discovery responses on or before May 6, 2024.**

Page 8

### D.    <u>Documents/Data Regarding Other Product Data</u>

Breeze Production Request No. 70 asks for "All documents or communications related or referring to the … design … of the SOUTH Vapes," and Request No 71 asks for "All documents or communications related or referring to the … design … of the packaging of the SOUTH Vapes." In response, Midwest objected to both Requests, *inter alia*, the grounds that they sought documents that were not relevant to the pled claims and defenses currently at issue in the lawsuit.

On April 24, 2024, counsel for Breeze and Midwest spoke further by phone, and again, the only justification[4] for propounding discovery addressed to SOUTH Products that was offered by Breeze was that it somehow was relevant to "design around" issues, although counsel for Breeze was unwilling or unable to articulate how such "design around" evidence was relevant and/or admissible with respect to any claim or defense in this case and was unwilling to provide any case law for such proposition.

On April 26, 2024, Mr. Mathrani's email identified the following documents as those for which it would move to compel if Midwest did not agree to produce the same:

1.    Documents related to the design for SOUTH pen / packaging, including specifically those referencing NORTH or Breeze Smoke Products in any way.
2.    All communications with Midwest's supplier(s) and customers related to the SOUTH product, specifically those related to the product's design and flavors, and those referencing NORTH or Breeze Smoke products in any way.

Once again, these requests on their face are not specifically focused on any "design around" issues to Midwest's knowledge. As explained during the parties' meet-and-confer, we are willing to reconsider our position on discovery of certain information relating to SOUTH Products if Breeze can provide authority for the proposition that such requests are reasonably calculated to lead to the discovery of relevant, admissible evidence. Moreover, as set forth above, Midwest already has agreed to produce any non-privileged documents respecting efforts to avoid infringement that would include any "design around" efforts involving the NORTH Products.

\*   \*   \*

We hope that the foregoing is sufficient to resolve the parties' disputes respecting the SOUTH Products and other matters. If not, we are confident that the Court will find our positions well-supported, reasonable, and appropriate here.

---

[4] Breeze counsel also mentioned that somehow the SOUTH vape discovery would bear on the issue of functionality, but upon being asked to explain such a position by Midwest counsel, Breeze counsel had no substantive response.

Page 9

Best regards,

Drew G.A. Peel

*One of Midwest's Counsel*

cc.     See attached service list



Jeffrey K. Lamb
Office: 313.465.7404
jlamb@honigman.com

*Via FedEx and Email*
vapedistrict1@gmail.com

**Exhibit**

**E**

March 26, 2024

Mr. Naser (aka "Nas") Dawud
Parkhill Properties LLC dba Vape District
19398 Saratoga Trail
Strongsville, OH 44136

Re:     *Infringement of Breeze Pro Intellectual Property*

Dear Mr. Dawud:

We represent Breeze Smoke, LLC ("Breeze Smoke") in intellectual property litigation matters.  Breeze Smoke demands that you immediately cease your unlawful sale and offer for sale of North and South vaping products that infringe Breeze Smoke's patent and trade dress intellectual property rights (the "Infringing Products").

**As set forth in further detail below, we demand that you <u>immediately</u> cease all marketing, advertising, promotion and sales of the line of North and South products and provide us with the contact information for each and every individual or entity that has ever supplied you with such products and the dates of such supply. <u>If we do not receive a full and complete response to this letter within seven (7) days, Breeze Smoke will take all available legal action against you without further notice.</u>**

As you surely know, our client is the owner of the immensely popular BREEZE brand, which is among the most successful brands in the vaping industry in the United States and beyond. Breeze Smoke's most popular product is its BREEZE PRO disposable vape pen, which is the highest quality all-in-one vaping system ever introduced in the market.  Breeze Smoke sells its products in various ways, including by licensees online and at a substantial number of brick-and-mortar locations.  By itself and through its predecessors-in-interest, Breeze Smoke has been using its BREEZE mark since at least as early as 2014 in connection with vaping products, including but not limited to e-liquids and other goods and services related to electronic cigarettes.

In addition to its longstanding common law rights, Breeze Smoke owns federal registrations for its family of BREEZE trademarks, including BREEZE U.S. Reg. Nos. 6,296,005 and 6,296,004 (class 25); BREEZE SMOKE U.S. Reg. No. 6,976,563 (class 34); BREEZE PLUS U.S. Reg. No. 6,770,534 (class 34); and BREEZE PRO U.S. Reg. No. 6,992,438 (class 34).  Breeze Smoke also owns several U.S. Trademark Applications for BREEZE and several other BREEZE-formative marks, including BREEZE PALM, BREEZE SMOKE stylized, BREEZE PRIME, BREEZE LIFE, and BREEZE ELITE.  In addition, Breeze Smoke owns several state registrations

for its BREEZE-formative marks. The aforementioned registrations and applications are collectively referred to as (the "BREEZE Marks"). The BREEZE Marks have developed widespread consumer recognition and represent substantial goodwill to Breeze Smoke. The BREEZE Marks are particularly strong because they constitute a family of trademarks.

Breeze Smoke was awarded U.S. Design Patent D1,005,573 S ("the D'573 Patent"), a copy of which is attached as **Exhibit A**. Breeze Smoke has commercialized the designs claimed in the D'573 Patent, which have been successful products for Breeze Smoke.

Further, Breeze Smoke's BREEZE PRO products also bear a highly distinctive trade dress. An example showing the highly distinctive shape of the BREEZE PRO disposable e-cigarette is shown below.



Breeze Smoke's BREEZE PRO products are also sold in a highly distinctive packaging that consumers associate exclusively with Breeze Smoke. An example is below:



Breeze Smoke has learned that you are advertising and marketing the sale of disposable e-cigarettes that infringes the D'573 Patent and the BREEZE PRO disposable e-cigarette trade dress.

Specifically, you are marketing the North vape pen manufactured by Midwest Goods Inc., dba Midwest Distribution Illinois ("Midwest"). Examples of this use are below.



*Source*:
https://www.facebook.com/photo.php?fbid=659725179593058&set=pb.100066667457590.-2207520000&type=3



*Source*:
https://www.facebook.com/photo.php?fbid=732793598952882&set=pb.100066667457590.-2207520000&type=3

You are also advertising and marketing that you are intend to commence sales of a related South vape product manufactured by Midwest, that will presumably be offered for sale at your Vape District store. An image of the South product is below.



The design of the North and South vape products are the same or substantially the same as the design protected by our client's D'573 Patent. Moreover, the trade dress of these products is virtually identical; the only difference is that these products bear the North or South branding instead of the BREEZE PRO and BREEZE SMOKE marks that belong to our client.

You even acknowledge these similarities in your social media video in which you state, "if you love North, you're gonna love the South . . . they're calling it the BREEZE killer for a reason because it looks exactly like the BREEZE." A screenshot of this statement is below.



*Source*:
https://www.tiktok.com/@nasdistrict/video/7348193723186351406?_r=1&_t=8kpiTo9UIPq

Breeze Smoke takes the enforcement of its intellectual property portfolio seriously and considers this matter of utmost importance.  In fact, Breeze Smoke currently has patent and trade dress infringement claims pending against the manufacturer of the North and South vape pens, Midwest, that is pending in the Northern District of Illinois, Case No. 1:23-cv-05406.

Your activities, both individually and collectively, appear designed to and will inevitably cause confusion with the BREEZE PRO vaping pen trade dress and also infringe our client's patent.  Accordingly, your actions violate constitute trade dress infringement and patent

infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Patent Act, 35 U.S.C. §§1 *et seq.*, and related claims under related state law.

Based on the foregoing, Breeze Smoke demands that you provide us with written assurances that it will **immediately**:

(1) Cease and desist all use, sales and offer for sale of the Infringing Products, including all marketing and promotion thereof in any medium;

(2) Provide us with an accounting of your sales pertaining to the Infringing Products, including:  a) total number of items purchased, and the purchase price; b) total number of Infringing Products sold; c) gross and net profit per item; d) total gross and net profits associated with the sale of the Infringing Products.  Please support your figures with your sales records;

(3) Provide us with the name(s), address(es), telephone number(s), and email address(es) of each and every individual or entity that has ever supplied your company with any Infringing Products. Include the date that you received each supply of inventory of the Infringing Products from each individual or entity that supplied your company with the Infringing Products;

(4) Turn over to us all inventory of the Infringing Products in your possession or control, and tell us whether you are awaiting any additional inventory that is still in transit (and if so, provide us the details of those orders or shipments).

**If we do not receive written confirmation of the above and your full and complete response within seven (7) days of this letter, Breeze Smoke will take all available legal action against you without further notice.  However, if you cooperate with us, Breeze Smoke will look upon such cooperation favorably.**

If you have any questions, please contact me or my colleague copied hereon.

Nothing in this letter waives any rights, remedies, claims, causes of action, or defenses of Breeze Smoke, all of which are expressly reserved.

# HONIGMAN ®

March 26, 2024
Page 7

Very truly yours,

HONIGMAN LLP

Jeffrey K. Lamb

cc:     Rachel M. Hofstatter, Esq.
        rhofstatter@honigman.com

Enclosure



Jeffrey K. Lamb
Office: 313.465.7404
jlamb@honigman.com

***Via FedEx***
**and Email: rhgreenlight@gmail.com**

April 23, 2024

> **Exhibit**
>
> **F**
>
> exhibitsticker.com

Mr. Rabee Hamayel, Owner
Green Light Wholesale Inc.
10200 Mulberry Ln, Unit D
Bridgeview, IL 60455-6017

Re:     *Infringement of Breeze Pro Intellectual Property*

Dear Mr. Hamayel:

We represent Breeze Smoke, LLC ("Breeze Smoke") in intellectual property litigation matters. Breeze Smoke demands that you immediately cease your unlawful sale and offer for sale of North vaping products that infringe Breeze Smoke's patent and trade dress intellectual property rights (the "Infringing Products").

**As set forth in further detail below, we demand that you <u>immediately</u> cease all marketing, advertising, promotion and sales of the line of North products and provide us with the contact information for each and every individual or entity that has ever supplied you with such products and the dates of such supply. <u>If we do not receive a full and complete response to this letter within seven (7) days, Breeze Smoke will take all available legal action against you without further notice</u>.**

As you surely know, our client is the owner of the immensely popular BREEZE brand, which is among the most successful brands in the vaping industry in the United States and beyond. Breeze Smoke's most popular product is its BREEZE PRO disposable vape pen, which is the highest quality all-in-one vaping system ever introduced in the market. Breeze Smoke sells its products in various ways, including by licensees online and at a substantial number of brick-and-mortar locations. By itself and through its predecessors-in-interest, Breeze Smoke has been using its BREEZE mark since at least as early as 2014 in connection with vaping products, including but not limited to e-liquids and other goods and services related to electronic cigarettes.

In addition to its longstanding common law rights, Breeze Smoke owns federal registrations for its family of BREEZE trademarks, including BREEZE U.S. Reg. Nos. 6,296,005 and 6,296,004 (class 25); BREEZE SMOKE U.S. Reg. No. 6,976,563 (class 34); BREEZE PLUS U.S. Reg. No. 6,770,534 (class 34); and BREEZE PRO U.S. Reg. No. 6,992,438 (class 34). Breeze Smoke also owns several U.S. Trademark Applications for BREEZE and several other BREEZE-formative marks, including BREEZE PALM, BREEZE SMOKE stylized, BREEZE PRIME,

BREEZE LIFE, and BREEZE ELITE, BREEZE POD, BREEZE PRO DISCREET and BREEZE PLUS DISCREET.  In addition, Breeze Smoke owns several state registrations for its BREEZE-formative marks.  The aforementioned registrations and applications are collectively referred to as (the "BREEZE Marks").  The BREEZE Marks have developed widespread consumer recognition and represent substantial goodwill to Breeze Smoke.  The BREEZE Marks are particularly strong because they constitute a family of trademarks.

Breeze Smoke was awarded U.S. Design Patent D1,005,573 S ("the D'573 Patent"), a copy of which is attached as **Exhibit A**.  Breeze Smoke has commercialized the designs claimed in the D'573 Patent, which have been successful products for Breeze Smoke.

Further, Breeze Smoke's BREEZE PRO products also bear a highly distinctive trade dress. An example showing the highly distinctive shape of the BREEZE PRO disposable e-cigarette is shown below.



Breeze Smoke's BREEZE PRO products are also sold in a highly distinctive packaging that consumers associate exclusively with Breeze Smoke. An example is below:



Breeze Smoke is currently involved in an active federal district court case against Light View LLC ("Light View") and other parties, Case No. 1:23-CV-05406, *Midwest Goods Inc. dba Midwest Distribution Illinois v. Breeze Smoke, LLC*, now pending in the United States District Court for the Northern District of Illinois (the "Lawsuit"). Through the course of discovery in the Lawsuit, Breeze Smoke has learned that you are advertising and marketing the sale of disposable e-cigarettes that infringe the D'573 Patent and the BREEZE PRO disposable e-cigarette trade dress. Specifically, you supplied Light View with at least 900 North vape pens with a sale price totaling at least $6,750.

The design of the North vape products are the same or substantially the same as the design protected by our client's D'573 Patent. Moreover, the trade dress of these products is virtually identical; the only difference is that these products bear the North branding instead of the BREEZE PRO and BREEZE SMOKE marks that belong to our client.

Breeze Smoke takes the enforcement of its intellectual property portfolio seriously and considers this matter of utmost importance. Your activities, both individually and collectively, appear designed to and will inevitably cause confusion with the BREEZE PRO vaping pen trade dress and also infringe our client's patent. Accordingly, your actions violate constitute trade dress infringement and patent infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Patent Act, 35 U.S.C. §§1 *et seq.*, and related claims under related state law.

Based on the foregoing, Breeze Smoke demands that you provide us with written assurances that it will **<u>immediately</u>**:

(1) Cease and desist all use, sales and offer for sale of the Infringing Products, including all marketing and promotion thereof in any medium;

(2) Provide us with an accounting of your sales pertaining to the Infringing Products, including: a) total number of items purchased, and the purchase price; b) total number

of Infringing Products sold; c) gross and net profit per item; d) total gross and net profits associated with the sale of the Infringing Products. Please support your figures with your sales records;

(3) Provide us with the name(s), address(es), telephone number(s), and email address(es) of each and every individual or entity that has ever supplied your company with any Infringing Products. Include the date that you received each supply of inventory of the Infringing Products from each individual or entity that supplied your company with the Infringing Products;

(4) Turn over to us all inventory of the Infringing Products in your possession or control, and tell us whether you are awaiting any additional inventory that is still in transit (and if so, provide us the details of those orders or shipments).

**If we do not receive written confirmation of the above and your full and complete response within seven (7) days of this letter, Breeze Smoke will take all available legal action against you without further notice. However, if you cooperate with us, Breeze Smoke will look upon such cooperation favorably.**

If you have any questions, please contact me or my colleague copied hereon.

Nothing in this letter waives any rights, remedies, claims, causes of action, or defenses of Breeze Smoke, all of which are expressly reserved.

Very truly yours,

HONIGMAN LLP

Jeffrey K. Lamb

cc:     Rachel M. Hofstatter, Esq.
        rhofstatter@honigman.com

Enclosure

**EXHIBIT A**



US0D1005573S

(12) **United States Design Patent**    (10) Patent No.:    **US D1,005,573 S**

**Wang**    (45) Date of Patent:    ** **Nov. 21, 2023**

---

(54) **DISPOSABLE E-CIGARETTE**

(71) Applicant: **Breeze Smoke, LLC**, Hazel Park, MI (US)

(72) Inventor: **Shenyi Wang**, Shenzhen (CN)

(73) Assignee: **Breeze Smoke, LLC**, Hazel Park, MI (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/791,735**

(22) Filed: **Feb. 3, 2022**

(51) **LOC (14) Cl.** .............................................. **27-07**

(52) **U.S. Cl.**
USPC ........................................................ **D27/162**

(58) **Field of Classification Search**
USPC ....... D27/100, 101, 162, 163–165, 167, 169,
D27/172, 183, 185–192, 194; D23/360,
D23/366; D24/110, 110.5
CPC .......... A24F 40/00; A24F 40/10; A24F 40/20;
A24F 40/40; A24F 40/42; A24F 40/44;
A61M 15/00; A61M 15/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D799,113 | S | * | 10/2017 | Qiu | D27/101 |
| D863,673 | S | * | 10/2019 | Lai | D27/162 |
| D875,306 | S | * | 2/2020 | Pan | D27/167 |
| D884,269 | S | * | 5/2020 | Lai | D27/162 |
| D885,655 | S | * | 5/2020 | Ding | D27/162 |
| D903,936 | S | * | 12/2020 | He | D27/162 |
| D908,952 | S | * | 1/2021 | Guo | D27/101 |
| D912,890 | S | * | 3/2021 | Liu | D27/162 |
| D926,359 | S | * | 7/2021 | Liu | D27/162 |
| D937,479 | S | * | 11/2021 | Lai | D27/162 |
| D949,468 | S | * | 4/2022 | Michaud | D27/162 |
| D957,047 | S | * | 7/2022 | Liu | D27/162 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 305823569 | * | 12/2019 |
| CN | 306673860 | * | 3/2021 |

OTHER PUBLICATIONS

New Breeze Pro Vape Review—Youtube, posted Sep. 4, 2021, [retrieved Jul. 17, 2023]. Retrieved from internet: https://www.youtube.com/watch?v=t8rvHC7O8uE (Year: 2021).*

(Continued)

*Primary Examiner* — Nicole C Shiflet
*Assistant Examiner* — Karen M. Jones
(74) *Attorney, Agent, or Firm* — Honigman LLP

(57)    **CLAIM**

I claim the ornamental design for a disposable e-cigarette, as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view of the disposable e-cigarette in accordance with the principles of the present disclosure;
FIG. **2** is a front elevational view of the disposable e-cigarette of FIG. **1**;
FIG. **3** is a rear elevational view of the disposable e-cigarette of FIG. **1**;
FIG. **4** is a left side view of the disposable e-cigarette of FIG. **1**;
FIG. **5** is a right side view of the disposable e-cigarette of FIG. **1**;
FIG. **6** is a top plan view of the disposable e-cigarette of FIG. **1**; and,
FIG. **7** is a bottom plan view of the disposable e-cigarette of FIG. **1**.
The broken lines in the drawing views show portions of the disposable e-cigarette that form no part of the claimed design. The shade lines in the drawing views show contour and not surface ornamentation of the disposable e-cigarette.

**1 Claim, 3 Drawing Sheets**



(56)     **References Cited**

### U.S. PATENT DOCUMENTS

D972,772 S   *   12/2022   Li   ................................ D27/162
2021/0227882 A1*   7/2021   Hijma   ..................... A24F 40/42
2022/0400774 A1*   12/2022   Jabber   ....................... A24F 7/00

### OTHER PUBLICATIONS

Breeze Pro—Vapor Shoppe—Twitter, posted Oct. 21, 2021, [retrieved Jul. 17, 2023]. Retrieved from internet: https://twitter.com/VaporShoppeON/status/1451314472732274688 (Year: 2021).*

Smok Nord Kit Review _ Planet of the Vapes, posted Dec. 17, 2018, [retrieved Jul. 17, 2023]. Retrieved from internet: https://www.planetofthevapes.co.uk/reviews/pod-systems/smok-nord-kit.html (Year: 2018).*

Artery Pal LT Review _ Planet of the Vapes, posted Oct. 30, 2020, [retrieved Jul. 17, 2023]. Retrieved from internet: https://www.planetofthevapes.co.uk/reviews/pod-systems/artery-pal-lt.html (Year: 2020).*

\* cited by examiner



FIG. 1



**FIG. 2**



**FIG. 3**



**FIG. 6**



**FIG. 7**

**FIG. 4**     **FIG. 5**



**13:56**

**Steven— Breeze**
最后上线时间：今天 13:51

3月22日 周五

🔒 消息和通话都进行端到端加密。对话之外的任何人，甚至包含 WhatsApp 都无法读取或收听。
**了解更多。**

Steven— Breeze 已成为联系人。

Hi Gong I will call you on WhatsApp no more zoom
22:14

视频通话
5分钟    22:14

www.youtube.com
https://www.youtube.com/watch?v=l0eMQ4Kjlyg
www.youtube.com

https://www.youtube.com/watch?v=l0eMQ4Kjlyg
22:20 ✓✓

this is about the smiss    22:20 ✓✓

Thank you brother    22:21

I do really suggest you to visit smiss .big thx    22:22 ✓✓

3月25日 周一

Good morning Steven. May I know why are you unhappy with your

Exhibit

G

exhibitsticker.com



**Steven— Breeze**
最后上线时间：今天 13:51

looking forward your coming

15:47 ✓✓

4月9日 周二

Hi steven .the model of breeze prime is with 1500mAh Battery,which means that the cost is more expensive than the device that is with the rechargeable function ,but only 10ml this device is with. If this device is with rechargeable function ,which means the price more economical and the capacity is more big(Maybe the capacity of E-jucie is 12 ml-15ml)but the size is similar . this is my thoughts

11:22 ✓✓

4月18日 周四



This is our latest product with 4 me coil

21:4

Do you make these products?



17 millions pcs of disposable vape be ordered within 4 months.   19:41 ✓✓

> Steven— Breeze
> Just want to see how many we think we can do

I am confused with this? is it possible to explain more? thx   10:38 ✓✓

> 您
> 📷 This is our latest product with 4 mesh coil



I will show you a video about this device this week. if you are looking for some devices or want an ODM device.pls let me know.   10:50 ✓✓

Hi Steven I know that maybe you are not interested in to looking some new Designs or switch your current supplier to another. But I still would like to make some new designs for breeze only in advance for further. I will combine your design with what design is popular at USA market to create some new designs   20:26 ✓✓



**13:57**

**Steven— Breeze**
最后上线时间：今天 13:51

For example to add a display function + airflow function and boost function + rechargeable functions like this. I think what I will to do is helpful for you in future
20:27

Hi Gong please send over some designs for me to review but don't put Breeze on anything until I approve
21:26

I am looking for the next great thing to compete with North they took all of our business. We need something to do more than 2m units per month
21:27

**Steven— Breeze**
Hi Gong please send over some designs for me to review but don't put Breeze on anything until I approve

Yes my boss
21:37

**Steven— Breeze**
I am looking for the next great thing to compete with North they took all of our business. We need something to do more tha...

What kinds of designs are you looking for so that I can make some designs for reference
21:3

Anything just help us make some



**Steven— Breeze**
最后上线时间：今天 13:51

for reference
21:38

Anything just help us make some sales we are going out of business soon because of north
21:53

Now the qty of north is down
21:54

Design and cost is very important if you want to compare with north.
21:54

They still sold 20 million units in less than one year
21:54

I will retire if we can sell like that
21:54

Please help me retire
21:55

Yes I will do what I can do to help you
21:55

Why the breeze prime without the rechargeable function ??  I think the cost of breeze prime is more expensive than north.
21:57

We cannot sell Breeze Prime all sit on our shelves even below cost because of North 120000 puffs
21:57

So you see that the breeze need more





Thank you I will review this with my partners by next week and get back to you
19:40

My pleasure and looking forward your feedbacks
19:40

4月26日 周五

btw the Ejuice of North is from our branch company that is a Eliquid company
已编辑 11:59

5月6日 周一

Hi steven this Friday I will share you some design for you Any feedbacks have you got from your partner?
15:14

btw will you attend the dubai vape expo on 12th-14th June?
15:52

No feedback yet sorry my partner is in Turkey doing his hair transplant
19:50

I will not be attending sorry
19:50

**Steven— Breeze**
No feedback yet sorry my partner is in Turk doing his hair transplant













21:40 ✓✓

20ml + transparent tank + curved screen

21:41 ✓✓

5月22日 周三

Hi Steven my director I will head to USA around on 17 th July !! I will arrange the prototype and my director will give you the prototypes. The first model is 15 ml but I don't know which device do you like. And the second prototype is with curved screen + 18ml-20 ml !!

19:28 ✓✓

I will make a new Id with curved screen. But this ID will follow the design of breeze prime

19:29 ✓✓



19:31

19:31

**Steven— Breeze**
最后上线时间：今天 19:09

COLA 19:31 ✓✓

Both designs are with 15 ml so which one do you like ? I will do a prototype for you
19:32 ✓✓

5月24日 周五

Good morning Steven if you don't know which model of 15ml do you like. so I suggest you this one as follow
11:07 ✓✓

您
📷 照片



this design 11:07 ✓✓

星期一

Hi steven How are you doing .The champs show is on 23th-26th July. and my director will be there .BTW have you partner backed to usa? how is his hair???? successful?
16:04 ✓✓

Will you be there too? 19:19

I ding have the visa of USA 21:10 ✓✓

I also want go to your coun
21:11 ✓✓



**Steven— Breeze**
最后上线时间：今天 20:04

But I can wait for you bcs you told me that you will visit shenzhsn again during the end of this summer
21:11 ✓✓

Yes I am hoping for Visa for China
21:20

Yes we are waiting for you and your partner. I can't control myself to check  your partner's hair if he will come with you
21:21 ✓✓

Lolll  21:21 ✓✓

Haha yes it is growing like a chia pet. Maybe me and you will also go to turkey
21:46

For hair ??  Good idea  21:57 ✓✓

your partner must be a good sample lolll  I think
21:58 ✓✓

Yes we will take the hair from our back and butt and put it on top of our head it will be like new
22:00

I have no hair on my back and butt. But my butt groove have a lots of h⁃i
22:0

Lolll  22:04 ✓✓




The State Bar of Michigan has verified this Lawyer's status, however the photo and profile information have been provided directly by the Lawyer. Neither the State Bar of Michigan nor ReliaGuide recommend or endorse any lawyer.

Home > Search Results > Steven Haddad



## Steven Haddad
### Capital Sales Company

⊘ **Attorney Verified**   ⊘ **Active Member in Good Standing**

About      Associations      Contact Info      Licenses

**CONNECTING WITH**

### Steven Haddad
**Capital Sales Company**

⬇ **Download vCard**

📞 **Phone**              ✉ **Email**              🌐 **Web**

**Primary Address**

📍  1471 E 9 Mile Rd
    Hazel Park, MI 48030-1960

**ACCREDITATIONS**



# EXHIBIT B

**Exhibit**

**I**

exhibitsticker.com

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| BREEZE SMOKE, LLC, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Case No. 21-3902 |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, | ) |
| Respondent. | ) |
| | ) |

## <u>DECLARATION OF STEVEN HADDAD</u>

I, Steven Haddad, declare as follows:

1.      I am employed by Breeze Smoke LLC ("Breeze Smoke"), where I have worked since September 2020. I am currently the Managing Member of Breeze Smoke. I am responsible for overseeing the manufacturing and quality control of production, purchasing, sales, accounting, and managing inventory levels. I also must stay informed regarding regulatory decisions and analyze how those decisions impact Breeze Smoke's financial outlook.

2.      I am competent to testify regarding the matters set forth in this declaration, which are based on my knowledge and personal experience, as well as information provided to me by others at Breeze Smoke in the course of my employment.

1

**A351**

Breeze-MG011051

## I. THE IMPORTANCE OF ENDS PRODUCTS TO BREEZE SMOKE'S BUSINESS

3. Breeze Smoke is a Limited Liability Corporation and a manufacturer, marketer and distributor of electronic-nicotine-delivery-system ("ENDS") products. Breeze Smoke started selling products in May 2019.

4. Breeze Smoke markets disposable pod-based ENDS devices, which come in multiple different flavors. Breeze Smoke markets its ENDS devices exclusively to adults as providing a convenient way for adult smokers to switch from traditional combustion cigarettes. Breeze Smoke sells its products directly to retails stores and through authorized distributors.

5. Breeze Smoke is committed to preventing the sale and distribution of its ENDS products to underage users. Breeze Smoke works hard to comply with all federal and state regulation to prevent sales to minors. Breeze Smoke offers free print materials to partners at retail stores and Authorized Distributors regarding the rules of sales of ENDS products, including stickers, pamphlets, and educational signs. These free print materials are intended to educate retail stores and Authorized Distributors regarding safety measures they should use in sales of ENDS products, including checking the photo ID of everyone under the age of 27 who attempts to purchase Breeze Smoke products; selling products only to customers who are 21 and older; not selling products in a vending machine unless in an adult-only facility; and not giving away free samples. Breeze Smoke does

2

**A352**

Breeze-MG011052

not use cartoons or other designs in marketing materials that could be seen as attracting minors. Breeze Smoke also does not use social media influencers, celebrities, or other influential persons to promote its products. Furthermore, Breeze Smoke advertises that its products are only intended for adult smokers of legal purchase age, and not appropriate for underage individuals, former smokers, or people who have never smoked.

6.     In 2020, Breeze Smoke's annual revenue was $63,228,022 and net profit was $22,514,239. Last year, the gross revenue generated by products covered by the U.S. Food and Drug Administration's ("FDA") September 16, 2021 marketing denial order ("Order")[1] was roughly $36,000,000, making up 57% of Breeze Smoke's gross revenue for the year. Breeze Smoke's entire business is comprised of its ENDS products.

## II.   BREEZE SMOKE DEVELOPED ITS PMTAS BASED ON FDA GUIDANCE, BUT FDA ISSUED A MARKETING DENIAL ORDER AFTER IMPOSING NEW REQUIREMENTS FOR APPROVAL

### A. Breeze Smoke's Understanding of FDA Requirements

7.     When Breeze Smoke began marketing its ENDS products, the FDA had not yet established a process for reviewing PMTAs for this product category. ENDS products were not originally subject to premarketing review when Congress

---

[1] See Addendum Ex. 1.

3

**A353**

Breeze-MG011053

enacted legislation providing the FDA with authority to regulate tobacco products.[2] When the FDA subsequently "deemed" that ENDS products should be regulated as tobacco products, it announced that it would exercise its enforcement discretion to allow ENDS products to remain on the market while FDA developed rules for ENDS product PMTAs and then actually processed those PMTAs.[3]

8.     FDA issued final guidance in June 2019 titled, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry*, stating, "[I]n general, FDA does not expect that applicants will need to conduct long-term studies to support an application."[4] FDA reiterated this position in a notice of proposed rulemaking issued on September 25, 2019, explaining that the FDA did "not expect that long-term clinical studies (*i.e.*, those lasting approximately 6 months or longer) will need to be conducted for each PMTA."[5]

9.     FDA guidance on the timing for its review of PMTAs for ENDS products has shifted over time.  In August 2017, FDA issued guidance providing for a phase-in period of until August 2022 before ENDS products would face

---

[2] *The Family Smoking Prevention and Tobacco Control Act of 2009* (TCA), 21 U.S.C. § 387 *et seq.*

[3] 81 Fed. Reg. 28,974, 28,977-78 (May 10, 2016).

[4] FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry* (June 2019), at 12-13.

[5] *Premarket Tobacco Product Applications and Recordkeeping Requirements*, 84 Fed. Reg. 50,556, 50,619 (Sept. 25, 2019).

4

**A354**

Breeze-MG011054

potential enforcement of PMTA requirements.[6] The guidance further specified that the FDA did not intend to prioritize enforcement of the PMTA requirements "until the agency renders a decision on [the manufacturer's] application … or the application is withdrawn."[7] In the midst of litigation, and following an adverse order from a district court in Maryland,[8] FDA issued new guidance in January 2020.[9] It set a PMTA compliance deadline for May 2020, and indicated that the agency would prioritize enforcement of any ENDS product offered for sale after that date for which a manufacturer had not submitted a PMTA or had received a negative action from FDA on a timely submitted application.[10] The May 2020 deadline was subsequently extended in light of the COVID-19 pandemic until September 9, 2020.[11]

---

[6] FDA, *Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule: Guidance for Industry* (Aug. 2017) at 5, 10.

[7] *Id.* at 3.

[8] *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019).

[9] FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization* (Revised) (orig. Jan. 2020, rev'd Apr. 2020) at 31.

[10] *Id.* at 5, 27.

[11] FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)* (Apr. 2020) (orig. Jan 2020, rev'd Apr. 2020) at 11, 31-33.

5

**A355**

Breeze-MG011055

### B. Breeze Smoke's PMTAs

10.    Breeze Smoke developed its PMTAs by relying on FDA's June 2019 Guidance, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry*, and FDA's September 25, 2019 proposed rule, 84 Fed. Reg. 50,556. In particular, Breeze Smoke relied on FDA's advice that manufacturers need not conduct its own long-term studies. Instead, Breeze Smoke supplied an array of studies consistent with FDA's guidance.

11.    Breeze Smoke first contacted FDA on July 27, 2020 to let the agency know that Breeze Smoke had hired Marc Sanchez as its Official Correspondent and Representative concerning any issues under the Food Drug and Cosmetic Act, Title 21 of the Code of Federal Regulations (the "FD&C Act") and related laws and regulations. Breeze Smoke then submitted its PMTAs on September 3, 2020, complying with the FDA deadline for submission by September 9, 2020. Breeze Smoke submitted PMTAs to FDA covering ten ENDS products with different flavors, all of which are disposable pod-based devices. Breeze Smoke has separately submitted PMTAs for a separate line of products titled "Breeze Pro." The Breeze Pro line of products is not at issue in this petition for review.

12.    Based on FDA guidance, Breeze Smoke submitted PMTAs that were tens of thousands of pages in length, and which included reports of scientific studies and consumer research. Preparing Breeze Smoke's various PMTAs cost

6

**A356**

Breeze-MG011056

approximately $11.25 million. Breeze Smoke attempted to go above and beyond what the guidance suggested was required for compliance. Outside scientific consultants and legal counsel were involved in preparing the PMTAs.

13. Breeze Smoke's PMTAs included a robust review of the literature on the benefits of ENDS products. The literature review included several comprehensive studies that spanned several years.[12] For example, Breeze Smoke included a study from the Journal of American Medical Association's Network Open titled "Associations of Flavored e-Cigarette Uptake With Subsequent Smoking Initiation and Cessation" involving 17,929 participants, which concluded that "[r]elative to vaping tobacco flavors, vaping nontobacco-flavored e-cigarettes was not associated with increased youth smoking initiation but was associated with an increase in the odds of adult smoking cessation."[13] Breeze Smoke also included two surveys from the Consumer Advocates for Smoke-Free Alternatives Association. The first surveyed 8,500 respondents and concluded that "the longer a person vapes, the less likely they are to continue to smoke."[14] The second had over 7,000 respondents and showed the majority of individuals who vaped and

---

[12] Addendum, Ex. 3(e), at A60-61.

[13] *Id.* at A68-69.

[14] *Id.* at A70.

7

**A357**

Breeze-MG011057

smoked cigarettes stopped use of cigarettes within two years of beginning to vape.[15]

14. Breeze Smoke also conducted its own survey in retail stores, receiving 164 customer responses.[16] Respondents overwhelmingly found vaping products helpful in keeping them from smoking cigarettes,[17] and specifically reported that "flavored e-liquids were important to them in choosing to vape instead of smoke cigarettes."[18]

15. Breeze Smoke also provided a Competitive Survey Analysis and Regulatory Review of competitor products, summarizing the FDA Warning Letters related to marketed practices aimed at appealing to minors.[19] Breeze Smoke conducted this analysis to ensure that Breeze Smoke's marketing practices would help to prevent unlawful youth access. Breeze Smoke also described the preemptive steps it was taking to minimize the attractiveness of its products to minors, including with regard to product labeling, product naming, and product marketing.[20]

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at A71.

[18] *Id.* at A72.

[19] Addendum, Ex. 3(c), at A38.

[20] *Id.* at A47-48.

8

**A358**

Breeze-MG011058

16. Breeze Smoke included information about the process controls and quality assurance procedures to ensure that Breeze Smoke ENDS are manufactured consistently to specification. Breeze Smoke engaged with Avomeen, LLC, an FDA registered lab performing analytical testing for PMTAs. The Avomeen testing confirmed that the toxicological profile of Breeze Smoke ENDS are essentially identical and indicate a potential relative benefit compared to combustible cigarettes.

### C. FDA Issues a Marketing Denial Order

17. On September 17, 2020, FDA responded, indicating it accepted Breeze Smoke's PMTAs, and again on October 8, 2020 to indicate that Breeze Smoke's application met the filing requirements. On January 5, 2021, FDA informed Breeze Smoke that its PMTAs would move forward in the review process. On August 19, 2021, FDA informed Breeze Smoke that its products had entered a scientific review.

18. On September 16, 2021, FDA issued the Order in which it concluded that Breeze Smoke's "new products . . . lack sufficient evidence to demonstrate that the marketing of these products is appropriate for the protection of public health."[21] The Order addressed nine of Breeze Smoke's ten flavored products in its September 3, 2020 submission. One product from the September 3, 2020

---

[21] *See* Addendum, Ex. 1, at A1.

9

Breeze-MG011059

submission, a tobacco-flavored disposal ENDS product, remains under review. Breeze Smoke's "Breeze Pro" product line also remains under review.

19.     The Order faulted Breeze Smoke for failing to include "robust and reliable evidence . . . regarding the magnitude of the potential benefit to adult smokers."[22] The Order stated that such evidence "could have been provided using a randomized controlled trial and/or longitudinal cohort study that demonstrated the benefit of [Breeze Smoke's] flavored ENDS products over an appropriate comparator tobacco-flavored ENDS."[23]

20.     Under the FDA's guidance, Breeze Smoke had no reason to believe that randomized controlled trials or longitudinal cohort studies were necessary to secure PMTA approval and thus to avoid adverse enforcement consequences. If FDA had provided Breeze Smoke with notice that such studies were necessary, then Breeze Smoke would have made the additional investment needed to conduct those studies. Breeze Smoke was at all times willing to work cooperatively with FDA to address any perceived deficiencies with its PMTAs, but FDA did not identify any such deficiencies until it issued the Order denying Breeze Smoke's PMTAs for failure to comply with previously undisclosed requirements. Even in the Order, FDA did not include a list of deficiencies, instead stating "it is not practicable to identify at this time an exhaustive list of all possible deficiencies."

---

[22] *Id.* at A2.
[23] *Id.*

10

**A360**

Breeze-MG011060

21. In the Order denying Breeze Smoke's PMTAs, FDA instructed Breeze Smoke that it "cannot introduce or deliver for introduction these products into interstate commerce in the United States."[24] FDA stated that failure to comply "may result in FDA regulatory action *without further notice*"[25] (emphasis added), including civil money penalties, seizure or injunction.

22. It is my understanding that, since August 2021, FDA has issued several hundred market denial orders ("MDOs") for over a million ENDS products. These MDOs appear to derive from a standard form, as my understanding is that the FDA has generally premised its denial orders on the same new requirements for robust studies such as randomized controlled trial or longitudinal cohort studies to show the benefits of access to flavored ENDS products for adult users.

23. It is also my understanding that many PMTAs remain pending before the FDA, including the applications of market leaders, such as Juul. These products remain on the market pending FDA review.

## III. BREEZE SMOKE IS SUFFERING IMMEDIATE, IRREPARABLE INJURY BY VIRTUE OF THE ORDER

24. The Order is already irreparably harming Breeze Smoke by impairing its relationships with existing distributors, retailers and customers, as well as by

---

[24] *Id.* at A1.
[25] *Id.* at A2.

Breeze-MG011061

preventing Breeze Smoke from obtaining new distributors, retailers and customers. Absent a stay of the Order, Breeze Smoke will continue to suffer injuries that would not be remediated even if it prevails in its challenge to the Order.

25.     First, Breeze Smoke is already losing contracts with its existing distributors.  For example, Breeze Smoke's largest distributor cancelled $900,000 worth of orders immediately following notice of the Order.  Breeze Smoke is concerned that other distributors will soon follow suit.  Once distributors reach agreement with other ENDS competitors, in my experience, it will be difficult to regain that business as Breeze Smoke's reputation as a reliable supplier will already be tarnished.  Furthermore, Breeze Smoke is unable to enter partnerships with any additional distributors.

26.     Second, Breeze Smoke is already losing business with current retailers.  Breeze Smoke's retailer customers have told me that since the Order issued, Breeze Smoke competitors like Juul have tried to persuade the retailers to replace inventory of Breeze Smoke products with their own competing products. Retailers are putting signs in store fronts targeted to Breeze Smoke customers saying they will no longer carry Breeze Smoke products.[26]  It is my understanding that competitors like Juul remain able to sell their products, including products with flavors other than tobacco, by virtue of the fact that FDA has not issued

---

[26] A true and correct copy of one such sign is attached as Exhibit A to this Declaration.

12

**A362**

Breeze-MG011062

decisions on all submitted PMTAs. I have no reason to believe that these competitors are otherwise differently situated from Breeze Smoke.

27. Third, if Breeze Smoke is unable to distribute its ENDS products to stores, its customers are likely to switch to similar products offered by other brands. Once customers go with a new product, it is difficult to recapture customer loyalty.

28. Breeze Smoke is also losing the benefit of the goodwill it has established in these brands as distributors, retailers and customers are switching to competitor products with no ability to know when Breeze Smoke sales will begin again.

29. The Order is impacting sales of Breeze Smoke's products beyond the nine products covered by the Order. FDA has published notice that it denied Breeze Smoke's PMTA without specifying which products are covered by the Order. Therefore, distributors do not understand that Breeze Smoke has products that are not covered by the Order, and thus distributors are cancelling orders for all Breeze Smoke products. Retailers also do not understand that Breeze Smoke sells products that are not covered by the Order, and accordingly are choosing not to carry any of Breeze Smoke's products. While Breeze Smoke is working hard to educate its distributors and retailers as to the more limited scope of the Order, the

13

**A363**

Breeze-MG011063

Order is still creating significant confusion that is harming Breeze Smoke's entire business.

30. Breeze Smoke is taking immediate action to cease the manufacturing of all its ENDS products in order to comply with the Order. Breeze Smoke will incur significant costs from stopping manufacturing that it will be unable to recover at the end of litigation. Breeze Smoke must shut down existing supply chains, and the manufacturers will move on to manufacturing for competitors or producing other items. Breeze Smoke will be left without a supplier even if it ultimately succeeds in this challenge to the FDA's Order, resulting in significant delays in returning to capacity.

31. Furthermore, once Breeze Smoke is forced out of the market, competitors such as Juul can seize Breeze Smoke's market share, and in my experience, it will be very difficult to convert lost market share back to Breeze Smoke's products.

32. Absent a stay, the Order will force Breeze Smoke to begin laying off employees. Breeze Smoke directly employs three people and has eight independent contractors, all of whom could lose their jobs.

Breeze-MG011064

I declare under penalties of perjury that the foregoing is true and correct.

Executed on October 13, 2021

Steven Haddad

Breeze-MG011065

# EXHIBIT A

Breeze-MG011066



**A367**

Breeze-MG011067

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MIDWEST GOODS INC., DBA MIDWEST DISTRIBUTION ILLINOIS,

    Plaintiff,

    vs.

BREEZE SMOKE, LLC,

    Defendant.

---

Breeze Smoke LLC,

    Counter-Claimant,

    vs.

Midwest Goods Inc., dba Midwest Distribution Illinois, Wisemen Wholesale, Inc., Speed Wholesale, Inc., World Wholesale, Inc., Light View LLC,

    Counterclaim Defendants.

CASE NO. 1:23-CV-05406

HONORABLE THOMAS M. DURKIN

---

## DEFENDANT BREEZE SMOKE LLC'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF MIDWEST GOODS INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant/Counterclaim Plaintiff Breeze Smoke LLC ("Breeze Smoke") by and through its undersigned counsel, submits its First Set of Requests for Production to Plaintiff/Counterclaim Defendant Midwest Goods Inc. ("Plaintiff"). Plaintiff shall produce each document, thing and item of electronically stored information listed below for inspection and copying, and said production shall be made accompanying Plaintiff's service of its responses to these Requests at the offices of

**Exhibit**

**J**

exhibitsticker.com

Honigman LLP, 155 N. Wacker Dr., Suite 3100, Chicago, IL 60606, or at such other place as the parties may agree, within thirty (30) days of service. Plaintiff's attention is further drawn to its continuing duty to supplement its responses to these Requests in accordance with Fed. R. Civ. P. 26(e).

### DEFINITIONS

1. The terms "Plaintiff," "You," or "Your" refers to Plaintiff/Counterclaim Defendant Midwest Goods Inc. and its present and former directors, officers, employees, parent organization(s), subsidiary organization(s), predecessors in interest, successors in interest, divisions, servants, agents, attorneys, consultants, partners, associates, investigators, representatives, accountants, financial advisors, distributors, entities acting in joint venture or partnership with or having investment relationships with Plaintiff, or any other person acting on its behalf, pursuant to its authority or subject to its control.

2. The terms "Defendant" and "Breeze Smoke" refer to Defendant Breeze Smoke LLC.

3. The terms "Case" or "Litigation" refers to the above captioned litigation filed in the United States District Court for the Northern District of Illinois.

4. The term "Complaint" means the operative Complaint filed in the above titled action by Plaintiff (Dkt. No. 1).

5. The term "Counterclaims" means the First Amended Counterclaims (Dkt. No. 37) filed by Breeze Smoke in response to the allegations made by Plaintiff in the Complaint.

6. The term "BREEZE Marks" means Breeze Smoke's BREEZE trademarks, registrations, and applications including its common law rights therein and as listed in ¶¶ 25-33 of the Answer and Counterclaims.

7.      The term "BREEZE PRO Packaging Trade Dress" refers to Breeze Smoke's BREEZE PRO product packaging trade dress identified in ¶¶ 41-42 of the Counterclaims.

8.      The term "BREEZE PRO Product Design Trade Dress" refers to Breeze Smoke's BREEZE PRO product design trade dress identified in ¶¶ 51-52 of the Counterclaims.

9.      The term "Breeze Smoke IP" refers collectively to the BREEZE PRO Packaging Trade Dress, the BREEZE PRO Product Design Trade Dress, and U.S. Patent No. D1,005,573 (D'573 Patent).

10.     The terms "Asserted Patent" or "Patent-in-Suit" means the D'573 Patent.

11.     The term "Breeze Smoke Products" refers to the products that Breeze Smoke offers in connection with its BREEZE Marks, including the products identified in ¶ 34 of the Counterclaims.

12.     The term "Accused Products" refers to the NORTH products identified in ¶¶ 73-78 of the Counterclaims.

13.     The term "Accused Product Packaging" refers to the product packaging of the NORTH products as identified in ¶¶ 73-78 of the Counterclaims.

14.     The term "USPTO" means the United States Patent and Trademark Office.

15.     The term "FDA" means the United States Food and Drug Administration.

16.     The terms "person" or "persons" mean, without limitation, any individual or firm, association, organization, joint venture, trust, partnership, corporation, or other collective organization or entity.

17.     The terms "document" and "documents" are used herein in the broadest sense permissible under Rule 34 of the Federal Rules of Civil Procedure, and include, but are not limited to, any thing, any written, recorded or tangible graphic matter, or any other means of preserving

data, expression, facts, opinions, thoughts, images, or other information of any kind, including without limitation all non-identical copies, drafts, outtakes, subsequent versions, worksheets and proofs, however created or recorded, including without limitation audio tapes, annotations, calendars, correspondence, data or information of any kind recorded on compact disks, digital video diskettes, or any other type or form of diskettes for use with computers or other electronic devices, or any hard drive, diary entries, electronic recordings of any kind, email, memoranda, notes, photographs, reports, telephone slips and logs, video cartridges and videotapes, and sites, databases, or other means of information storage or retrieval on the Internet or the World Wide Web. Any comment or notation appearing on any document or thing, and not part of the original, is to be considered a separate document or thing. If a draft document or thing has been prepared in several copies that are not identical, or if the original identical copies are no longer identical due to subsequent notation, each non-identical document is a separate document. These terms are to be interpreted broadly to include documents stored in any medium and specifically includes electronically stored information ("ESI") and documents maintained in electronic form on Plaintiff's websites, servers, and stand-alone computers and hard drives.

18. The terms "communication" or "communications" mean every manner or method of the disclosure, transfer, transmission, or exchange of information, in whatever form, by whatever means, including, but not limited to, oral, written, face-to-face, telephone, facsimile, network transfer, electronic mail, BlackBerry messages, voice-mail, text messages, postal mail, personal delivery, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and

4

another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal. This definition also includes all transcripts, summaries, electronic recordings, audio tapes and audio files constituting, reflecting or transcribing such communications.

19. The terms "thing" or "things" shall be interpreted broadly and include, but are not limited to, products, parts, machines, equipment, prototypes, specimens, models, devices, apparatuses, and commercially manufactured items.

20. The terms "constitute" or "constituting," "concern" or "concerning," "relate" or "relating," "pertain" or "pertaining," "refer" or "referring," "regard" or "regarding," and "reflect" or "reflecting" shall mean, in addition to their customary and usual meaning, discuss or discussing, mention or mentioning, embody or embodying, contain or containing, concern or concerning, pertain or pertaining, evidence or evidencing, negate or negating, describe or describing, assess or assessing, record or recording, show or showing, support or supporting, underlie or underlying, summarize or summarizing, report or reporting, and, without limitation, in any way legally, logically or factually connected with the matter discussed.

21. The terms "include," "includes," and "including" mean including but not limited to.

22. "All" shall be construed to include "any" and "each," "any" shall be construed to include "all and "each," and "each" shall be construed to include "all" and "any," in each case as is necessary to bring within the scope of these Requests documents and things that might otherwise be construed as outside their scope.

23. The plural form of any word shall include the singular form and the singular form

shall include the plural.

24. The term "date," means the exact day, month, and year if ascertainable or if not, Your best approximation thereof.

25. The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive, whichever makes the request more inclusive.

26. All pronouns shall be construed to refer to the masculine, feminine, or gender neutral, in singular or plural, as in each case make the request more inclusive.

**INSTRUCTIONS**

1. These requests shall apply to all items (*e.g.*, documents or things) in Your possession, custody, or control at the present time, as well as all items that come into Your possession, custody, or control. If You know of the existence, past or present, of any items requested below, but are unable to produce such items because they are not presently in Your possession, custody or control, You shall so state and shall provide a written statement setting forth:

      (a)    the identity of the item;

      (b)    the nature of the item (*e.g.*, letter, memorandum, or chart);

      (c)    the identity of the person(s) who created/authored the item;

      (d)    the identity of the person(s) who received a copy of the item;

      (e)    the date of the item;

      (f)    a brief description of the subject matter of the item;

      (g)    any person(s) who has possession, custody, or control of the item.

2. If no documents are responsive to a particular request, state that no responsive documents exist.

3.     For any responsive items (*e.g.*, documents or things) that have been lost, destroyed, withheld from production, or redacted, for any reason, You shall provide a written statement setting forth:

(a)     the identity of the item;

(b)     the nature of the item (*e.g.*, letter, memorandum, or chart);

(c)     the identity of the person(s) who created/authored the item;

(d)     the identity of the person(s) who received a copy of the item;

(e)     the date of the item;

(f)     a brief description of the subject matter of the item;

(g)     the circumstances of the loss or destruction of the item;

(h)     any fact, statute, rule, or decision upon which You rely in withholding or redacting the item.

4.     If You decline to produce any document or part thereof based on a claim of privilege or any other claim, describe the nature and basis of Your claim and the information withheld in a manner sufficient:

(a)     to disclose the facts upon which You rely in asserting Your claim;

(b)     to permit the grounds and reasons for withholding the information to be unambiguously identified; and

(c)     to permit the information withheld to be unambiguously identified.

5.     All documents requested are to be produced in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as in the original.

6. If You object to a request, You must state whether any responsive materials are being withheld on the basis of that objection.

**REQUESTS FOR PRODUCTION**

**Request No. 1:**

All documents referring or relating to Breeze Smoke, the Breeze Smoke IP, and/or the Breeze Smoke Products.

**RESPONSE:**

**Request No. 2:**

All documents referring or relating to Plaintiff's knowledge of or awareness of Breeze Smoke and/or the Breeze Smoke Products, including but not limited to documents sufficient to show the date You first became aware of Breeze Smoke and each of the Breeze Smoke Products.

**RESPONSE:**

**Request No. 3:**

All documents referring or relating to Your knowledge of or awareness of the Breeze Smoke IP, and/or Breeze Smoke's claims or allegations against You, including but not limited to documents sufficient to show the date You first became aware of the Breeze Smoke IP , and/or such claims or allegations.

**RESPONSE:**

**Request No. 4:**

All documents or communications related or referring to the conception, design, research,

development, manufacture, testing, use, marketing, modifying, sale, offer for sale, importation, exportation, and supply of the Accused Products.

**RESPONSE:**

**Request No. 5:**

All documents or communications related or referring to the conception, design, research, development, manufacture, testing, use, marketing, modifying, sale, offer for sale, importation, exportation, and supply of the Accused Product Packaging.

**RESPONSE:**

**Request No. 6:**

All documents and communications relating or referring to an alternative design for any feature of the Accused Products.

**RESPONSE:**

**Request No. 7:**

All documents and communications relating or referring to an alternative design for any feature of the Accused Product Packaging.

**RESPONSE:**

**Request No. 8:**

All documents and communications related or referring to any effort by You to avoid

infringement of the Breeze Smoke IP.

**RESPONSE:**


**Request No. 9:**

All documents or communications referring or relating to Your decision to sell, market, or distribute any of the Accused Products.

**RESPONSE:**


**Request No. 10:**

All documents referring or relating to Your knowledge of or awareness of the Accused Products, including but not limited to documents sufficient to show the date You first became aware of the Accused Products and the individuals involved.

**RESPONSE:**


**Request No. 11:**

Documents sufficient to identify each of Your source(s) for any of the Accused Products.

**RESPONSE:**


**Request No. 12:**

All communications between You and each of Your source(s) that refer or relate to any of the Accused Products.

**RESPONSE:**

**Request No. 13:**

All documents and communications referring or relating to any agreements or potential agreements between You and any other party involving the Accused Products, or the manufacturing, advertising, promotion, marketing, distribution, or sale of the Accused Products.

**RESPONSE:**


**Request No. 14:**

All documents or communications referring or relating to any license, agreement, understanding, or other grant or transfer of rights between You and any other party concerning the Accused Products.

**RESPONSE:**


**Request No. 15:**

Representative samples of all of the Accused Products that You have sold, offered to sell, distributed, or marketed.

**RESPONSE:**


**Request No. 16:**

All documents or communications referring or relating to the Accused Products, including but not limited to, documents or communications comparing the Accused Products on the one hand, and the Breeze Smoke IP or any Breeze Smoke Products on the other hand.

**RESPONSE:**

**Request No. 17:**

All documents or communications referring or relating to the time, place, and manner of Your first sale in the United States of an Accused Product.

**RESPONSE:**


**Request No. 18:**

All documents or communications referring or relating to any search, including but not limited to any trademark search reports, survey, poll, patent prior art searches, or investigation, of any product packaging or product design related to the Accused Products.

**RESPONSE:**


**Request No. 19:**

All documents or communications referring or relating to any actual or purported confusion or mistake between the Accused Products and any Breeze Smoke Product, including but not limited to any inquiries as to whether the Accused Products are associated with, sponsored by, affiliated with, or connected with Breeze Smoke, or whether any Breeze Smoke Products are associated with, sponsored by, affiliated with, or connected with You or the Accused Products.

**RESPONSE:**


**Request No. 20:**

To the extent Plaintiff contends that the Accused Products are not likely to cause confusion with Breeze Smoke and/or the Breeze Smoke Products, all documents or communications that support or refute that contention.

**RESPONSE:**


**Request No. 21:**

All documents regarding past, current, or planned advertising, marketing, or promotion of the Accused Products including but not limited to electronic, internet, social media, print, television, or radio commercials or spots and documents sufficient to show the time period(s) during which each advertisement, marketing material, or promotional material was used.

**RESPONSE:**


**Request No. 22:**

Representative samples of each unique advertisement or promotional material displaying an Accused Product.

**RESPONSE:**


**Request No. 23:**

Documents, reports, or communications sufficient to show Your total amount of expenditure on advertising and marketing of the Accused Products on a monthly and yearly basis.

**RESPONSE:**


**Request No. 24:**

All documents relating to the types of customers and/or end user(s) to whom You market, offer, or sell the Accused Products, including but not limited to documents relating to customer and/or end user demographics and purchasing habits.

**RESPONSE:**


**Request No. 25:**

All purchase and sales records relating the Accused Products, including but not limited to import records and invoices from Your suppliers and to Your customers.

**RESPONSE:**


**Request No. 26:**

Documents sufficient to reflect Plaintiff's organizational structure.

**RESPONSE:**


**Request No. 27:**

All documents or communications consisting of, referring to, or relating to any complaints or inquiries from purchasers of the Accused Products.

**RESPONSE:**


**Request No. 28:**

Documents sufficient to show Your total revenue, income, and profit, on a monthly and yearly basis, from selling the Accused Products.

**RESPONSE:**


**Request No. 29:**

Documents sufficient to show Your total revenue, income, and profit, on a monthly and

yearly basis, from selling the Breeze Smoke Products.

**RESPONSE:**

**Request No. 30:**

All documents relating to Plaintiff's projections of future sales, anticipated profit margins, anticipated costs, and/or anticipated profit and loss of the Accused Products since the first sale of the Accused Products.

**RESPONSE:**

**Request No. 31:**

All documents relating to the pricing of the Accused Products including the factors that were included in setting such pricing, any changes to such pricing, any competitive factors influencing or tending to influence such pricing, and the reasoning for any changes in pricing.

**RESPONSE:**

**Request No. 32:**

All documents, communications, or reports referring to the Accused Products in relation to any other product that You sell or have sold, including those that show Your total sales, revenue, and/or profits derived from the Accused Products in relation to the other products that You sell or have sold, including any Breeze Smoke Products.

**RESPONSE:**

**Request No. 33:**

All documents relating and referring to the description, structure, function, or operation of any Accused Product and its subcomponents, including but not limited to, product sheets, drawings, diagrams, schematics, functional specifications, and all prior versions and revisions of the foregoing.

**RESPONSE:**


**Request No. 34:**

All documents and communications related or referring to complying with FDA regulations regarding the sale of the Accused Products, including but not limited to, any Premarket Tobacco Product Applications.

**RESPONSE:**


**Request No. 35:**

All documents and communications with the FDA or any other state or federal regulator related or referring to the Accused Products.

**RESPONSE:**


**Request No. 36:**

Documents sufficient to show Your document retention policy.

**RESPONSE:**

**Request No. 37:**

All documents that support or refute Your responses to the Interrogatories served by Breeze Smoke, including all documents referred to in answering the Interrogatories and all documents identified in response to the Interrogatories.

**RESPONSE:**

**Request No. 38:**

All documents relating or referring to any demands made or lawsuits filed against You by anyone for claims of trademark infringement, trade dress infringement, counterfeiting, and/or related claims.

**RESPONSE:**

**Request No. 39:**

All documents that You may rely on at a hearing or trial in this Litigation.

**RESPONSE:**

**Request No. 40:**

All documents You receive in response to a subpoena in this Litigation, whether served by You or another party.

**RESPONSE:**

**Request No. 41:**

All documents produced or provided to You by a third-party in connection with this Litigation, whether or not in response to a subpoena or formal discovery request.

**RESPONSE:**

**Request No. 42:**

To the extent You contend that Breeze Smoke lacks rights in its Breeze Smoke IP, all documents or communications that support or refute that contention.

**RESPONSE:**

**Request No. 43:**

All documents and communications relating and referring to the legal and factual basis and supporting evidence for Your contentions that the Accused Products and Accused Product Packaging do not infringe the Breeze Smoke IP.

**RESPONSE:**

**Request No. 44:**

All documents and communications relating or referring to the manufacturing process for the Accused products, including any quality control measures.

**RESPONSE:**

**Request No. 45:**

All documents and communications referring or relating to all distributors, stores, or retail outlets, including but not limited to smoke shops and convenience stores that purchase or have purchased the Accused Products from Plaintiff or have had any oral or written agreement, contract, license, or purchase order relating to the Accused Products with Plaintiff.

**RESPONSE:**

**Request No. 46:**

All documents relating to any contention Plaintiff may make that the Asserted Patent is invalid for failure to satisfy the conditions for  Patentability, including, but limited to, those specified in 35 U.S.C. §§ 102, 103, 112, or 171.

**RESPONSE:**

**Request No. 47:**

A copy of each item of prior art that You have knowledge of or awareness of that allegedly anticipates the Asserted Patent or allegedly renders it obvious.

**RESPONSE:**

**Request No. 48:**

A copy of each item of prior art that You contend limits the claim scope of the Asserted Patent in any way.

**RESPONSE:**

**Request No. 49:**

A copy of each item of prior art that You contend allows You to avoid infringement of the Asserted Patent.

**RESPONSE:**


**Request No. 50:**

To the extent You contend that the Asserted Patent is unenforceable, all documents and things relating to the legal and factual basis supporting such contention.

**RESPONSE:**


**Request No. 51:**

All documents relating to any contention Plaintiff may make that the Asserted Patent is functional or not ornamental.

**RESPONSE:**


**Request No. 52:**

All documents relating to the scope and/or construction or possible construction of the claim of the Asserted Patent.

**RESPONSE:**


**Request No. 53:**

All documents authored or contributed to by each person that You intend to offer as an expert witness related to the subject matter identified in their testimony, all documents that You or anyone acting on Your behalf has shown or otherwise made available to such expert(s), all

documents identified or received by each expert relating to this case, and all requests of each such expert for information or documents.

**RESPONSE:**


**Request No. 54:**

All documents and communications with third parties concerning this Litigation.

**RESPONSE:**


**Request No. 55:**

All documents relied upon or referred to by Plaintiff in preparing the Complaint in this Litigation.

**RESPONSE:**


**Request No. 56:**

All documents referenced in Plaintiff's Complaint in this Litigation.

**RESPONSE:**


**Request No. 57:**

All documents that relate to Plaintiff's claims for damages in this Litigation.

**RESPONSE:**


**Request No. 58:**

All documents that relate to Plaintiff's Claim that Defendant does not own a protectable

interest in its asserted trade dress and product packaging.

**RESPONSE:**


**Request No. 59:**

All documents that relate to Plaintiff's Claim that Defendant engaged in Federal Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a).

**RESPONSE:**


**Request No. 60:**

All documents that relate to Plaintiff's Claim that Defendant engaged in Tortious Interference with Business Expectancy.

**RESPONSE:**


**Request No. 61:**

All documents that relate to Plaintiff's Claim that Defendant violated the Deceptive Trade Practices Act.

**RESPONSE:**


**Request No. 62:**

All documents that relate to Plaintiff's Claim that Defendant engaged in common law disparagement.

**RESPONSE:**

**Request No. 63:**

All documents that relate to Plaintiff's Claim that this is an exceptional case.

**RESPONSE:**


**Request No. 64:**

All documents that relate to Plaintiff's Claim that it is entitled to attorneys' fees.

**RESPONSE:**


**Request No. 65:**

All documents that relate to Plaintiff's Claim that it is entitled to an injunction.

**RESPONSE:**


**Request No. 66:**

All documents and things relating to the legal and factual basis and supporting evidence for each of Your affirmative defenses You may make in Your Answer to the Complaint, or have made once such Answer is filed.

**RESPONSE:**


**Request No. 67:**

All documents and communications relating or referring to any other party to this Litigation.

**RESPONSE:**

Dated:  December 22, 2023                    Respectfully submitted,


                                             By:  /s/ *Mary A. Hyde*
                                             Jeffrey K. Lamb
                                             HONIGMAN LLP
                                             660 Woodward Ave., Suite 2290
                                             Detroit, MI 48226
                                             Telephone:  (313) 465-7000
                                             jlamb@honigman.com

                                             Mary A. Hyde
                                             William B. Berndt
                                             Vikram A. Mathrani
                                             David J. Roulo
                                             Jenna E. Saunders
                                             HONIGMAN LLP
                                             155 North Wacker Dr., Suite 3100
                                             Chicago, IL 60606
                                             Telephone:  (312) 701-9360
                                             mhyde@honigman.com
                                             wberndt@honigman.com
                                             vmathrani@honigman.com
                                             droulo@honigman.com
                                             jsaunders@honigman.com
                                             *Attorneys for the Defendant/Counterclaim Plaintiff*
                                             *Breeze Smoke LLC*

24

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on December 22, 2023, I served the foregoing BREEZE SMOKE'S FIRST

SET OF REQUESTS FOR PRODUCTION upon the following counsel of record via email:


Drew G.A. Peel (ARDC #6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
**CARRINGTON, COLEMAN, SLOMAN,**
 **& BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, Texas 75202

*Attorneys for Plaintiff*


/s/ *Mary A. Hyde*
*One of the Attorneys for*
*Defendant/Counterclaim Plaintiff*
*Breeze Smoke LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MIDWEST GOODS INC., DBA MIDWEST DISTRIBUTION ILLINOIS,

       Plaintiff,

vs.

BREEZE SMOKE, LLC,

       Defendant.

_____

Breeze Smoke LLC,

       Counter-Claimant,

vs.

Midwest Goods Inc., dba Midwest Distribution Illinois, Wisemen Wholesale, Inc., Speed Wholesale, Inc., World Wholesale, Inc., Light View LLC,

       Counterclaim Defendants.

CASE NO. 1:23-CV-05406

HONORABLE THOMAS M. DURKIN

## DEFENDANT BREEZE SMOKE LLC'S FIRST SET OF INTERROGATORIES TO PLAINTIFF MIDWEST GOODS INC.

Defendant Breeze Smoke LLC ("Defendant" or "Breeze Smoke") serves these Interrogatories pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure to Plaintiff/Counterclaim Defendant Midwest Goods Inc. ("Plaintiff" or "Midwest"). With respect to Defendant's Interrogatories, requests thereto are to be answered separately and fully in writing under oath by Midwest, within (30) days of service. Midwest's attention is further drawn to its continuing duty to supplement its responses to these Requests in accordance with Fed. R. Civ. P. 26(e).

**Exhibit**

**K**

exhibitsticker.com

## DEFINITIONS

All of Breeze Smoke LLC's Interrogatories and Requests (for Production and for Admission), whether presently or subsequently propounded, are subject to the Definitions set forth in Breeze Smoke LLC's First Set of Requests for Production unless otherwise indicated.

## INSTRUCTIONS

All of Defendant's Interrogatories whether presently or subsequently propounded, are subject to the definitions and instructions set forth below unless otherwise indicated:

1.      Each Interrogatory shall be answered separately and fully in writing and under oath, unless it is objected to, in which event the reasons for the objections shall be stated with specificity. Notwithstanding any objection(s) to an Interrogatory, You should respond to each Interrogatory to the extent You are able.

2.      Midwest shall be under a continuing obligation to supplement its answers to these Interrogatories as provided in Rule 26(e)(1) of the Federal Rules of Civil Procedure.

3.      Each Interrogatory calls for not only Midwest's knowledge, but also all information that is available to Midwest by reasonable inquiry and due diligence, including inquiry of Midwest's directors, officers, shareholders, managing agents, and representatives, including but not limited to Midwest's affiliates and Midwest's attorneys.

4.      No Interrogatory shall be read as limiting any other Interrogatory.

5.      If, in responding to these Interrogatories, You claim any ambiguity in interpreting an Interrogatory, or a definition or instruction applicable thereto, such claim shall not be utilized by You as a basis for refusing to respond but, instead, You shall set forth as part of Your response the language deemed to be ambiguous and the interpretation that You used in responding to the Interrogatory.

2

6.      If, in responding to these Interrogatories, You object to a request on the ground that it is too broad, please provide all information responsive to any portion(s) of the request that You concede are relevant.

7.      Whenever in these Interrogatories there is a request to "identify" a communication, You shall:  (1) state the date and place of such communication; (2) identify each Person who was present at, involved in, connected with, or who participated in such communication; (3) identify the type of communication (*e.g.*, letter, telegram, conference, meeting, telephone conversation, email); and (4) state the substance of such communication.

8.      Whenever in these Interrogatories there is a request to "identify" a document, You shall set forth:  (1) the individual(s) who prepared the document; (2) the individual(s) who drafted the document; (3) the individual(s) who received or approved the document; (4) the type of document (*e.g.*, letter, memorandum, tape recording, or other form of document); and (5) a description of it with the specificity required on a subpoena.  Further, whenever in these Interrogatories there is a request to "identify" a document, You may produce the document to Breeze Smoke in lieu of specifically identifying the document as required by this instruction if: (1) the document contains the information required by this instruction; (2) You describe the document specifically enough for Breeze Smoke to locate the document in Your document production; and (3) You clearly state in Your response to the Interrogatory that You will produce the identified document.

9.      Whenever in these Interrogatories there is a request to "identify" a conversation, discussion or meeting, You shall:  (1) identify all individuals who participated or were present; (2) set forth the date of the conversation or meeting; (3) set forth the location at which it occurred, or

in the case of a telephone conversation, the location of each party; and (4) describe the substance of the discussion.

10. For any information withheld based on any ground, including privilege, provide a written statement setting forth: (1) the identity of all person(s) from and to whom the information has been communicated and the dates of such communications; (2) a brief description of the subject matter of the information; and (3) the legal ground relied upon in withholding the information.

11. The singular form of a word shall be interpreted as including the plural. Pronouns shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most inclusive. The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the Interrogatory more inclusive. The use of the present tense shall be construed to include the past tense, and vice versa, so as to make the Interrogatory inclusive rather than exclusive.

# INTERROGATORIES

**Interrogatory No. 1:**

Identify all distributors, stores, or retail outlets, including but not limited to smoke shops and convenience stores, that purchase or have purchased Accused Products from Midwest or have had any oral or written agreement, contract, license, or purchase order relating to Accused Products with Midwest.

**RESPONSE:**


**Interrogatory No. 2:**

Identify all sources from which Midwest has purchased Accused Products, including the name of individuals with whom Midwest communicated regarding such purchases.

**RESPONSE:**


**Interrogatory No. 3:**

Identify who conceived of and designed the Accused Products and state the date of such conception and design.

**RESPONSE:**


**Interrogatory No. 4:**

Identify who conceived of and designed the Accused Product Packaging and state the date of such conception and design.

**RESPONSE:**

**Interrogatory No. 5:**

Describe in detail the manufacturing process for the Accused Products.

**RESPONSE:**


**Interrogatory No. 6:**

Describe in detail the quality control mechanisms for the manufacturing process of the Accused Products.

**RESPONSE:**


**Interrogatory No. 7:**

Identify all Premarket Tobacco Applications Midwest has submitted to the FDA for the Accused Products.

**RESPONSE**:


**Interrogatory No. 8:**

State, on a month-by-month basis, Midwest's total sales of the Accused Products from date of first sale to the present, including units sold, monetary revenue, and profits derived from the sales.

**RESPONSE:**


**Interrogatory No. 9:**

Describe the types or classes of customer(s) or end users to whom Midwest advertises, markets, promotes, offers, or sells the Accused Products.

**RESPONSE:**


**Interrogatory No. 10:**

State, on a month-by-month basis, Midwest's total sales of the Breeze Smoke Products from date of first sale to the present, including units sold, monetary revenue, and profits derived from the sales.

**RESPONSE:**


**Interrogatory No. 11:**

Describe each and every instance of which Midwest is aware, directly or indirectly, of any actual or purported association, confusion, mistake, or deception as to the origin, sponsorship, or affiliation between the Accused Products on the one hand and the Breeze Smoke IP or the Breeze Smoke Products on the other. Your response should identify all persons or entities involved in such instances, describe the circumstances, and identify any communications and/or documents that make up the basis for Your answer.

**RESPONSE:**


**Interrogatory No. 12:**

Identify all complaints, concerns, or other negative customer feedback that Midwest has received relating to Midwest's offer and sale of the Accused Products.

**RESPONSE:**

**Interrogatory No. 13:**

To the extent Midwest contends that Breeze Smoke does not have protectable rights in the Breeze Smoke IP, describe in detail the basis for that contention and identify all documents or information You may use to support such a contention.

**RESPONSE:**


**Interrogatory No. 14:**

Identify and describe each and every instance of which Midwest compared its Accused Products to the Breeze Smoke IP or the Breeze Smoke Products in marketing material or communications with suppliers, distributors, or actual or potential retail customers.

**RESPONSE:**


**Interrogatory No. 15:**

Identify all individuals affiliated with Midwest or its counsel having knowledge related to the claims or defenses at issue in this Litigation, including all individuals—other than counsel— who supplied documents or information for, or who participated in responding to these Interrogatories or to Breeze Smoke's Requests for Production or Requests for Admission.

**RESPONSE:**


**Interrogatory No. 16:**

Describe in detail all bases supporting Midwest's contention that Midwest should be entitled to damages in this Litigation, including, but not limited to, each legal theory under which damages are sought, and all facts and/or calculations that support all damages that Midwest claims.

**RESPONSE:**


**Interrogatory No. 17:**

To the extent Midwest contends that it does not infringe the Asserted Patent, describe in detail all factual and legal bases for such contention, including facts supporting or refuting such contention.

**RESPONSE:**


**Interrogatory No. 18:**

To the extent Midwest contends that any features of the Asserted Patent are functional or not ornamental, describe in detail all factual and legal bases for such contentions, and identify any bates numbered documents relating to the foregoing.

**RESPONSE:**


**Interrogatory No. 19:**

To the extent Midwest contends that the Asserted Patent is invalid, describe in detail all factual and legal bases for such contentions, including facts supporting or refuting such contentions, and including, to the extent you contend that prior art anticipates or renders obvious the Asserted Patent, a detailed statement of how such prior art allegedly anticipates or renders obvious the Asserted Patent, and if a combination of prior art allegedly renders the Asserted Patent obvious, the identity of each such combination and the reasons to combine such prior art.

**RESPONSE:**

**Interrogatory No. 20:**

To the extent Midwest contends that the Asserted Patent is unenforceable, describe in detail all factual and legal bases for such contention, and identify any bates numbered documents relating to the foregoing.

**RESPONSE:**

Dated:  January 19, 2024

Respectfully submitted,

By:  /s/ *Mary A. Hyde*
Jeffrey K. Lamb
HONIGMAN LLP
660 Woodward Ave., Suite 2290
Detroit, MI 48226
Telephone:  (313) 465-7000
jlamb@honigman.com

Mary A. Hyde
William B. Berndt
Vikram A. Mathrani
David J. Roulo
Jenna E. Saunders
HONIGMAN LLP
155 North Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone:  (312) 701-9360
mhyde@honigman.com
wberndt@honigman.com
vmathrani@honigman.com
droulo@honigman.com
jsaunders@honigman.com
*Attorneys for the Defendant/Counterclaim Plaintiff*
*Breeze Smoke LLC*

10

## CERTIFICATE OF SERVICE

I certify that on January 19, 2024 I served the foregoing BREEZE SMOKE'S FIRST SET

OF INTERROGATORIES upon the following counsel of record via email:


Drew G.A. Peel (ARDC #6209713)
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
**CARRINGTON, COLEMAN, SLOMAN,
 & BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, Texas 75202

*Attorneys for Plaintiffs*


/s/ *Mary A. Hyde*
*One of the Attorneys for*
*Defendant/Counterclaim Plaintiff*
*Breeze Smoke LLC*



# International Product Catalog 2023

info@breezesmoke.com

**www.breezesmoke.com**

Exhibit

L

exhibitsticker.com

# BREEZE *PRO*

**Fully Charged**
OUT OF THE BOX

**6 ML**
CAPACITY E-LIQUID

**5.0%**
NICOTINE

**2000 Puffs**
PER DEVICE

**1000 MAH**
LONG-LASTING BATTERY



**WARNING:** this product contains nicotine. Nicotine is an addictive chemical.

*Breeze is back, and it's better than ever. Now with Smoother Vapor. More Hits. More Flavor.*




**BREEZE** —SMOKE—
DISPOSABLE POD DEVICE

Introducing the Breeze Pro Disposable Pod Device. Experience the rush of huge smooth clouds. The Breeze Pro is the highest quality all-in-one vaping system ever introduced. Boasting a powerful 1000mAh battery, an improved 6mL capacity with 5% nicotine, and premium mesh coils, it delivers an incredible amount of smooth vapor in a tiny package.

*NEXT GEN VAPING*

Breeze-MG000375



# BREEZE
## —SMOKE™—
### DISPOSABLE POD DEVICE



**PREMIUM MESH COILS**

Our cutting-edge mesh coil technology is ceramic woven coils with a mesh-like structure. They heat up faster than other coils on the market, with no burnt taste and no leaking. We've designed our coils to deliver some of the biggest vapor available in our devices and will produce a smooth and pure draw from your first to last hit.

 **Fast Heating**

 **Big Vapor**

 **No Burnt Taste**

 **No Leaking**



 

**NEW SECURITY TAGS FOR EASIER AUTHENTICATION. SHINE A LIGHT TO VERIFY THE AUTHENTICTY .**

We take security seriously. With our innovative security tags, you'll be able to easily verify the authenticity of our products to ensure the quality of our brand. Simply shine a light on the tag to check its authenticity and you will see a very distinct pattern that should be familiar to anyone who has purchased Breeze. Rest easy knowing that this product is genuine.

Breeze-MG000376



## GMP Work Place

Breeze Smoke is GMP certified and sincerely committed to producing healthy, clean and safe vape devices for customers. GMP regulations ensure Breeze has implemented advanced equipment, high standard production processes, and strict and full sets of quality management systems to provide safe and sanitary standards to customers and employees.

Breeze has been continually developing higher standards of excellence.





# Factory

Breeze Smoke is a company that has been established in the vaping industry for over 5 years. Since its inception, Breeze has grown to become one of the leaders in the vape industry. Breeze Smoke's 7 patents have earned acclaimed recognition in the USA, and its disposable pens are the most reliable vape system partner and the NO.1 vape device manufacturer in the industry.

Breeze operates a custom engineered, high-volume manufacturing facility in its factory in Shenzhen, China. It is proud to be one of three companies in the industry to have both ISO9001 and GMP certifications. Currently, Breeze has more than 3200 workers, 22 workshops, and 132 production lines—all of which ensure that any size order can be accepted from any customer.

# Breeze Pro Patents









# Factory Certificates







## Breeze USA

Breeze Smoke continues to disrupt industry standards, unrivaled in performance with its cutting-edge technology.

Established in 2019, Breeze are sold in over 10,000 stores and distributors across all 50 states in the United States.

Breeze Smoke is your industry partner with experience and dedication.

## Breeze International

Breeze Smoke continues to see an increase in the international market.

Breeze has now expanded sales to Canada, Trinidad, Paraguay, Jordan and Kuwait with over 10,000 international locations and continues to grow.

# International Designs

We understand the importance of adhering to vape regulations in your country. That's why we design packaging that follows all the rules and regulations set by your government. We'll make sure your product gets to market safely and efficiently.

**● Canada**



**● United States of America**



| Parameter | |
|---|---|
| Size | 27x14x104mm |
| Battery capacity | 1000mah |
| Liquid capacity | 6.0ml |
| Puffs | 2000 |
| Nicotine | 20mg/ml |
| Output voltage | 3.4v |
| Coil resistance | 1.36±0.09Ω |
| Working Power | 7-9W |

**● Jordan**

**● State of Kuwait**



Breeze-MG000379





### Blue Raspberry
### - 5% Nic 10ct Display

Awaken the senses with Breeze Pro Blue Raspberry, a delicious blue raspberry disposable vape with one of the best e-juice flavors on the market. This disposable is made for the vaping connoisseur looking for a new flavor sensation.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26849-8**




### Anejo
### - 5% Nic 10ct Display

Reminiscent of your favorite energy drink. Anejo Breeze Pro is perfect for the vaper that loves to live on the edge. It is a perfect blend of sweet and tart that will keep you coming back for more.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26708-8**




### (Limited Edition *) Pumpkin Spice
### - 5% Nic 10ct Display

The crisp air and crunchy leaves aren't the only signs of fall, pumpkin spice vape has arrived! This convenient disposable e-cigarette contains a medley of cinnamon, nutmeg, cloves, ginger and allspice with a tobacco finish.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26799-6**




### Blueberry Banana
### - 5% Nic 10ct Display

Blueberry Banana Breeze Pro is filled with a perfect balance of creamy bananas and sweet blueberries with a rich inhale, and a sweet exhale finish.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26710-1**





### Grape Soda
### - 5% Nic 10ct Display

Grape Soda Breeze Pro Device delivers a fruity and refreshing taste with a crisp effervescence finish.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26706-4**




### Blueberry Mint
### - 5% Nic 10ct Display

Blueberry Mint Breeze Pro Device have a light and fruity Breeze flavor profile that is icy and crisp as a Spring day.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**SKU #6-18149-26712-5**

* Limited Edition flavors are subject to availability and may not be in stock.

* Limited Edition flavors are subject to availability and may not be in stock.



## Cherry Lemon
## - 5% Nic 10ct Display

Refreshingly crisp like freshly sliced lemons and cherries. The Cherry Lemon Breeze Pro is perfect for someone who likes tart flavors but still wants fruity flavor.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26714-9



## Pina Colada
## - 5% Nic 10ct Display

Imagine sitting on a breezy beach, sipping your favorite beverage, with a warm tropical breeze rolling over you. This is our Pina Colada. We have crafted this flavor based on the popular flavors of a cool pina colada cocktail by combining juicy pineapple and coconut flavors to bring you a tropical treat with each vape.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26796-5



## Lemon Mint
## - 5% Nic 10ct Display

Lemon Mint Breeze Pro Disposable device boasts tart fruity flavor with a minty finish. A refreshingly cool, sweetened mint and citrus.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26716-3



## Gum Mint
## - 5% Nic 10ct Display

This is a crisp and sweet experience that will surely satisfy your taste buds. Our disposable vape is perfect for those who enjoys fresh and original flavors. It offers a long-lasting and satisfying experience that we're sure you'll love.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26797-2

## Mint
## - 5% Nic 10ct Display

Enjoy Breeze Disposable pod device with a classic sweet mint flavor and ice cooling technology that offers a cool effect providing you with the ultimate satisfaction.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26718-7



## Strawberry Cream
## - 5% Nic 10ct Display

Give me a bowl of fresh strawberries, a dollop of sweet cream, and I'm happy. Breeze Pro Strawberry Cream is a custard-inspired vape with sweet strawberry flavor. Go ahead and vape this up as soon as you get it; you'll love how creamy it tastes!

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.



### SKU #6-18149-26807-8

* Limited Edition flavors are subject to availability and may not be in stock.

* Limited Edition flavors are subject to availability and may not be in stock.




## Lush Ice
## - 5% Nic 10ct Display

From the first inhale, Lush Ice will quickly win you over with its authentic watermelon flavor. A crisp finish ensures that this vape lives up to its name, and the delicious taste will keep you coming back for more!

**SKU #6-18149-26810-8**




## Cherry Cola
## - 5% Nic 10ct Display

Breeze Pro Cherry Cola flavor is a delightful mix of cherries with a fizzy cola finish. Its bold flavor and unique spin on a classic favorite is sure to be one of your new go-to flavors. Breeze Pro technology is all about how the air hits your throat, so each puff feels like a light breeze.

**SKU #6-18149-26828-3**




## Banana Mint
## - 5% Nic 10ct Display

Banana mint like you've never had it before. Breeze Pro fills the air with your favorite flavor and mouthwatering taste of creamy bananas and a cool, refreshing mint cloud.

**SKU #6-18149-26813-9**




## Bubble Gum Freeze
## - 5% Nic 10ct Display

The perfect storm of fruity, bubble gum flavors makes Breeze Pro Bubble Gum Freeze vape one you will want to frequent often. With icy blast at the forefront, a hint of strawberry on the second note, and a soft bottom note of cotton candy, Breeze Pro Bubble Gum Freeze combines flavors that are both familiar and unique for a vape you will be falling in love with in no time.

**SKU #6-18149-26831-3**




## Pom Berry Mint
## - 5% Nic 10ct Display

Pom Berry Mint is a fresh twist for your favorite flavor. It's a classic flavor - one of the best selling flavors on the market. You'll love the combination of sweet berries with a fresh minty finish.

**SKU #6-18149-26816-0**




## Vanilla Tobacco
## - 5% Nic 10ct Display

It's finally here, our exotic Breeze Pro Vanilla Tobacco! This vape is perhaps our most well-rounded flavor, featuring a smooth vanilla inhale with a robust tobacco finish. This vape is perfect for anyone looking to get that real tobacco taste!

**SKU #6-18149-26834-4**



\* Limited Edition flavors are subject to availability and may not be in stock.

\* Limited Edition flavors are subject to availability and may not be in stock.

Breeze-MG000382




## Blueberry Watermelon
## - 5% Nic 10ct Display

Delicious, juicy, and fruity watermelon blueberry vape. This vape is the perfect combination of sweet blueberry and watermelon flavor.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26915-0




## Strawberry Peach Mint
## - 5% Nic 10ct Display

Strawberry Peach Mint Breeze Pro Disposable Device is absolutely delicious and refreshing to the last hit. Simultaneously sweet and juicy with a minty finish.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26724-8



## Orange Mango Watermelon
## - 5% Nic 10ct Display

Orange Mango Watermelon Breeze Pro is a citrusy, sweet, watermelon concoction that will tickle your taste buds and wake up your palate.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26720-0




## StrawKiwi
## - 5% Nic 10ct Display

This vape flavor is a refreshing fruity flavor that combines the tangy taste of strawberry & kiwi with the juicy flavor of watermelon.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26912-9



## Raspberry Lemon
## - 5% Nic 10ct Display

Sweet raspberry and tart lemon come together to create this flavor. This flavor is a thoughtful fusion of the two fruits that complement each other perfectly, making for an enjoyable fruit vape.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26722-4




## Tropical Summer
## - 5% Nic 10ct Display

The summer you have been waiting for. Tropical beats, warm beaches and cold drinks; what could be better? We sat down and crafted this one to give you the best experience possible. With fruity tropical flavors.

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26921-1




* Limited Edition flavors are subject to availability and may not be in stock.

* Limited Edition flavors are subject to availability and may not be in stock.



## StrawMelon
## - 5% Nic 10ct Display

Strawberries and watermelon make this scrumptious flavor. Sweet strawberries and juicy watermelon base give this vape a tasty, refreshing citrus twist.



**SKU #6-18149-26909-9**



## Strawberry Banana
## - 5% Nic 10ct Display

You'll taste the combination of sweet creamy banana and tart strawberries in this vape. It's a delicious treat, just like your favorite milkshake!



**SKU #6-18149-26917-4**



## Breeze Pro Display B
## - 5% Nic 100ct Display

An acrylic display with Strawberry Cream, Bubble Gum Freeze, Pom Berry Mint, Straw Kiwi, Lush Ice, Blue Raspberry, Banana Mint, Blueberry Watermelon and Pina Colada.



**SKU #6-18149-26847-4**



## Strawberry Lime
## - 5% Nic 10ct Display

The strawberry lime Breeze is a tangy blend of sweet strawberries and sour lime that will leave you craving this summery vape.



**SKU #7-20665-11732-4**




## Breeze Pro Display A
## - 5% Nic 100ct Display

An acrylic display with Blueberry Mint, Tropical Summer, Cherry Lemon, Grape Soda, Strawmelon, Mint, Orange Mango Watermelon, Raspberry Lemon, Strawberry Peach Mint and Anejo.



**SKU #6-18149-26788-0**



## Tobacco
## - 5% Nic 10ct Display

A classic tobacco flavor for the classic person in your life. Smooth and natural in flavor.



**SKU #6-18149-26906-8**

\* Limited Edition flavors are subject to availability and may not be in stock.

\* Limited Edition flavors are subject to availability and may not be in stock.





## Candy Cane (Limited Edition*) - 5% Nic 10ct Display

What do you get when you mix Breeze with your favorite winter holiday? Thats right, Breeze Pro Candy Cane is here! The sweet candy cane flavor has arrived for a limited time.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #7-20665-10112-5




## Mango Freeze - 5% Nic 10ct Display

Experience the bold mango flavor of Mango Freeze Breeze Pro. The sweet fruitiness of mango is combined with an icy blast for a mouthwatering taste that is bursting with flavor.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26892-4




## Candy Hearts (Limited Edition*) - 5% Nic 10ct Display

Whats better than Valentine's Day? Opening up a fresh Candy Hearts Breeze Pro. Sweetly reminiscent of those little candy hearts you get for your sweetie every February.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #7-20665-11739-3




## Peach Mango - 5% Nic 10ct Display

This peach mango Breeze vape will leave you happy and satisfied. A light breeze of southern peaches and tropical mangoes that makes your mouth water!

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #6-18149-26889-4





## Coconut Banana - 5% Nic 10ct Display

Just when you thought Breeze couldn't get any better, we threw in a banana for good measure. The creamy coconut and silky banana combine to make one of our smoothest flavors yet.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #7-20665-10124-8




## Pineapple Passion - 5% Nic 10ct Display

Tropical pineapple and passionfruit combine together in perfect harmony to make this exotic Breeze vape. It's a delicious blend of crisp fruit with a bold throat hit that leaves you wanting more.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

### SKU #7-20665-10128-6

* Limited Edition flavors are subject to availability and may not be in stock.

* Limited Edition flavors are subject to availability and may not be in stock.

# Accessories

We offer a wide range of promotional accessories to help advertise our product. Whether you are looking for clothing items, holders, hats, bags, or more - we have the perfect accessory to suit your needs.



**Lanyards**  **Drawstring Bags**  **T- Shirts**  **Bottle Openers**

**Pop Sockets**  **Credit Card Holder**  **Snapback Hats**  **Beanie Hats**

**Universal Charging Cable**  **Leather Breeze Holder**  **Handheld Mirrors**  **Ink Pens**

2000 **PUFFS**

5.0% **NIC**

6ML **DEVICE**

**BREEZE** — SMOKE — ™

DISPOSABLE POD DEVICE

**PRO** EDITION

PREMIUM **MESH COILS**

**WARNING:** This product contains nicotine. Nicotine is an addictive chemical.

Breeze-MG000386



# BREEZE
## —SMOKE™—
### DISPOSABLE POD DEVICE

# International Product Catalog 2023

**CONTACT**

info@breezesmoke.com

26056 Van Dyke Ave.
Warren, MI 48015

# www.breezesmoke.com

Breeze-MG000387

Filed by Corporations Division Administrator    Filing Number: 220271589440    Date: 05/12/2020



Form Revision Date 02/2017

## ARTICLES OF ORGANIZATION
### For use by DOMESTIC LIMITED LIABILITY COMPANY

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

### Article I

The name of the limited liability company is:

BREEZ SMOKE LLC

### Article II

Unless the articles of organization otherwise provide, all limited liability companies formed pursuant to 1993 PA 23 have the purpose of engaging in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan. You may provide a more specific purpose:

### Article III

The duration of the limited liability company if other than perpetual is:

### Article IV

The street address of the registered office of the limited liability company and the name of the resident agent at the registered office (P.O. Boxes are not acceptable):

1. Agent Name:           MARK FARAJ
2. Street Address:       4654 LILLY CT
   Apt/Suite/Other:
   City:                 WEST BLOOMFIELD
   State:                MI                              Zip Code: 48323

3. Registered Office Mailing Address:
   P.O. Box or Street
   Address:              4654 LILLY CT
   Apt/Suite/Other:
   City:                 WEST BLOOMFIELD
   State:                MI                              Zip Code: 48323

Signed this 6th Day of May, 2020 by the organizer(s):

| Signature | Title | Title if "Other" was selected |
|-----------|-------|-------------------------------|
| Mark Faraj | Organizer | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

      ○ Decline     ◉ Accept



Exhibit

M

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

*This is to Certify that the*    ARTICLES OF ORGANIZATION

*for*

BREEZ SMOKE LLC

**ID Number:**    802444884

*received by electronic transmission on*    May 06, 2020    *, is hereby endorsed.*

**Filed on**    May 12, 2020    *, by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 12th day of May, 2020.*

*Linda Clegg, Interim Director*
*Corporations, Securities & Commercial Licensing Bureau*



Form Revision Date 07/2016

# CERTIFICATE OF AMENDMENT TO THE ARTICLES OF ORGANIZATION
### For use by DOMESTIC LIMITED LIABILITY COMPANY

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Certificate of Amendment:*

The identification number assigned by the Bureau is:

> 802444884

The name of the limited liability company is:

> BREEZ SMOKE LLC

The date of filing the original Articles of Organization was:

> 5/12/2020

Complete only those articles being amended.

### Article I

The name of the limited liability company as amended, is:

BREEZE SMOKE LLC

The amendment was approved by a majority in interest if an operating agreement authorizes amendment of Articles of Organization by majority vote.

This document must be signed by a member, manager, or an authorized agent:

Signed this 1st Day of July, 2020 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Mark Faraj | Member | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

     ○ Decline     ◉ Accept

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

*This is to Certify that the*   CERTIFICATE OF AMENDMENT TO THE ARTICLES OF ORGANIZATION

*for*

BREEZE SMOKE LLC

**ID Number:**   802444884

**received by electronic transmission on**   July 01, 2020   **, is hereby endorsed.**

**Filed on**   July 10, 2020   **, by the Administrator.**

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 10th day of July, 2020.*

*Linda Clegg, Interim Director*
*Corporations, Securities & Commercial Licensing Bureau*

Filed by Corporations Division Administrator   Filing Number: 220316665650     Date: 11/13/2020



**Department of Licensing and Regulatory Affairs**

Form Revision Date 07/2016

# CERTIFICATE OF AMENDMENT TO THE ARTICLES OF ORGANIZATION
**For use by DOMESTIC LIMITED LIABILITY COMPANY**

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Certificate of Amendment:*

The identification number assigned by the Bureau is:

802444884

The name of the limited liability company is:

BREEZE SMOKE LLC

The date of filing the original Articles of Organization was:

5/12/2020

(Insert any additional provision authorized by the Act.)

ARTICLE V

THE COMPANY SHALL BE MANAGED BY ONE OR MORE MANAGERS.

ARTICLE VI

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY SHALL INDEMNIFY, DEFEND, AND HOLD THE MEMBERS AND THE MANAGERS HARMLESS FROM AND AGAINST ANY LOSSES, CLAIMS, COSTS, DAMAGES, AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, JUDGMENTS, FINES, AMOUNTS PAID IN SETTLEMENT, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES, COURT COSTS, INVESTIGATION COSTS, AND LITIGATION COSTS) INCURRED BY THE MEMBERS OR MANAGERS IN ANY CIVIL, CRIMINAL, OR INVESTIGATIVE PROCEEDING IN WHICH SHE IS INVOLVED OR THREATENED TO BE INVOLVED BY REASON OF BEING A MEMBER OR MANAGER OF THE COMPANY. HOWEVER, THE COMPANY SHALL NOT BE REQUIRED TO INDEMNIFY A MEMBER OR A MANAGER FOR LIABILITIES ASSOCIATED WITH: (A) THE RECEIPT OF A FINANCIAL BENEFIT TO WHICH THE APPLICABLE MEMBER OR MANAGER IS NOT ENTITLED; (B) LIABILITY UNDER SECTION 308 OF THE ACT; (C) A KNOWING VIOLATION OF LAW; OR (D) AN ACT OR OMISSION OCCURRING BEFORE THE EFFECTIVE DATE OF THIS FILING.

The amendment was approved by a majority in interest if an operating agreement authorizes amendment of Articles of Organization by majority vote.

This document must be signed by a member, manager, or an authorized agent:

Signed this 13th Day of November, 2020 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Nolan A. Yaldo | Authorized Agent | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

◯ Decline      ⦿ Accept

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the**    CERTIFICATE OF AMENDMENT TO THE ARTICLES OF ORGANIZATION

*for*

BREEZE SMOKE LLC

**ID Number:**    802444884

**received by electronic transmission on**    November 13, 2020 *, is hereby endorsed.*

**Filed on**    November 13, 2020*, by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



**In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 13th day of November, 2020.**

*Linda Clegg, Interim Director*
*Corporations, Securities & Commercial Licensing Bureau*

Filed by Corporations Division Administrator   Filing Number: 220320818400   Date: 11/20/2020


Form Revision Date 07/2016

## ANNUAL STATEMENT

*(Required by Section 207, Act 23, Public Act of 1993)*

Identification Number:     802444884

Annual Statement Filing Year:    2021

1. Limited Liability Company Name:

BREEZE SMOKE LLC

2. The street address of the limited liability company's registered office and name of the resident agent at that office:
1. Resident Agent Name:    MARK FARAJ
2. Street Address:    4654 LILLY CT
   Apt/Suite/Other:
   City:    WEST BLOOMFIELD
   State:    MI        Zip Code: 48323

3. Mailing address of the registered office:
   P.O. Box or Street Address:    23999 WEST 10 MILE ROAD STE 200
   Apt/Suite/Other:
   City:    SOUTHFIELD
   State:    MI        Zip Code: 48033

This annual statement must be signed by a member, manager, or an authorized agent.

Signed this 20th Day of November, 2020 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Mark Faraj | Member | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

     ⌀ Decline     ⊙ Accept

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the** 2021 ANNUAL STATEMENT

**for**

BREEZE SMOKE LLC

**ID Number:**      802444884

**received by electronic transmission on** November 20, 2020 **, is hereby endorsed.**

**Filed on** November 20, 2020**, by the Administrator.**

**The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.**



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 20th day of November, 2020.*

*Linda Clegg, Interim Director*
*Corporations, Securities & Commercial Licensing Bureau*

Filed by Corporations Division Administrator    Filing Number: 224774800130    Date: 02/06/2024



Form Revision Date 07/2016

## ANNUAL STATEMENT
**For use by DOMESTIC LIMITED LIABILITY COMPANY**

*(Required by Section 207, Act 23, Public Act of 1993)*

Identification Number: 801787511

Annual Statement Filing Year: 2024

1. Limited Liability Company Name:

KMT SERVICES LLC

2. The street address of the limited liability company's registered office and name of the resident agent at that office:
1.  Resident Agent Name: MARK FARAJ
2.  Street Address: 23250 SHERWOOD AVE
    Apt/Suite/Other:
    City: WARREN
    State: MI                                    Zip Code: 48091

3. Mailing address of the registered office:
    P.O. Box or Street Address: 23250 SHERWOOD AVE.
    Apt/Suite/Other:
    City: WARREN
    State: MI                                    Zip Code: 48091

This annual statement must be signed by a member, manager, or an authorized agent.

Signed this 5th Day of February, 2024 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| MARK FARAJ | Member | |
| | | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

○ Decline        ● Accept

**Exhibit**

**N**

exhibitsticker.com

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the** 2024  ANNUAL STATEMENT

**for**

KMT SERVICES LLC

**ID Number:**     801787511

**received by electronic transmission on**   February 05, 2024   **, is hereby endorsed.**

**Filed on**     February 06, 2024   **, by the Administrator.**

**The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.**



**In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 6th day of February, 2024.**

*Linda Clegg*

Linda Clegg, Director
Corporations, Securities & Commercial Licensing Bureau

**WARNING LETTER**

# Breeze Smoke, LLC

**MARCS-CMS 655821 — MAY 25, 2023**

**Delivery Method:**

VIA UPS and Electronic Mail

**Product:**

Tobacco

**Recipient:**

Mark Faraj and Steven Haddad

Breeze Smoke, LLC

4654 Lilly Ct.

West Bloomfield, MI 48323

United States

✉ info@breezesmoke.com (mailto:info@breezesmoke.com)

✉ (b)(6) (mailto:(b)(6))

**Issuing Office:**

Center for Tobacco Products

United States



May 25, 2023

**WARNING LETTER**

Dear Mark Faraj and Steven Haddad:

The Center for Tobacco Products of the U.S. Food and Drug Administration (FDA) recently reviewed the website https://www.breezesmoke.com, and additional information, and determined that electronic nicotine delivery system (ENDS) products listed there are received and offered for sale or distribution to customers in the United States.

Under section 201(rr) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. § 321(rr)), these products are tobacco products because they are made or derived from tobacco or contain nicotine from any source, and are intended for human consumption. Certain tobacco products, including ENDS products, are

subject to FDA jurisdiction under section 901(b) of the FD&C Act (21 U.S.C. § 387a(b)), and are required to be in compliance with the requirements in the FD&C Act.

Please be aware that, on March 15, 2022, the President signed legislation to amend the FD&C Act to extend FDA's jurisdiction to products "containing nicotine from any source," not just nicotine derived from tobacco. See Consolidated Appropriations Act, 2022, Public Law 117-103, Division P, Title I, Subtitle B. Specifically, this legislation expanded the definition of "tobacco product" under section 201(rr) of the FD&C Act (21 U.S.C. § 321(rr)) to include products containing nicotine from any source. Tobacco products, including ENDS products containing nicotine from any source, must be in compliance with the FD&C Act and its implementing regulations. For more information, please see https://www.fda.gov/tobacco-products/ctp-newsroom/requirements-products-made-non-tobacco-nicotine-take-effect-april-14.

Generally, to be legally marketed in the United States, the FD&C Act requires "new tobacco products" to have a premarket authorization order in effect. A "new tobacco product" is any tobacco product that was not commercially marketed in the United States as of February 15, 2007, or any modified tobacco product that was commercially marketed after February 15, 2007 (section 910(a) of the FD&C Act; 21 U.S.C. § 387j(a)). Generally, a marketing authorization order under section 910(c)(1)(A)(i) of the FD&C Act (21 U.S.C. § 387j(c)(1)(A)(i)) is required for a new tobacco product unless (1) the manufacturer of the product submitted a report under section 905(j) of the FD&C Act (21 U.S.C. § 387e(j)) and FDA issues an order finding the product substantially equivalent to a predicate tobacco product (section 910(a)(2)(A) of the FD&C Act) or (2) the manufacturer submitted a report under section 905(j)(1)(A)(ii) of the FD&C Act (21 U.S.C. § 387e(j)(1)(A)(ii)) and all modifications are covered by exemptions from the requirements of substantial equivalence granted by FDA under section 905(j)(3) of the FD&C Act (21 U.S.C. § 387e(j)(3)).

**New Tobacco Products Without Required Marketing Authorization are Adulterated and Misbranded**

Our review of the website https://www.breezesmoke.com, and additional information, revealed that Breeze Smoke, LLC receives and delivers ENDS products without a marketing authorization order. Specifically, Breeze Smoke, LLC receives the products listed below from a foreign manufacturer and distributes those products in the United States to some or all of the retailers listed on https://www.breezesmoke.com. Breeze Smoke, LLC owns and operates the website https://www.breezesmoke.com, which lists the products below for sale, identifies retailers in the "Authorized Stores" tab of https://www.breezesmoke.com that sell those products, and directs consumers to those retailers. The following ENDS products offered for sale or distribution within the United States on https://www.smokersworldhw.com that lack a marketing authorization are Breeze Pro Disposable Vape – Candy Cane and Breeze Pro Disposable Vape - Candy Hearts.

The ENDS products listed above are new tobacco products because they were not commercially marketed in the United States as of February 15, 2007. These products do not have an FDA marketing authorization order in effect under section 910(c)(1)(A)(i) of the FD&C Act and are not otherwise exempt from the marketing authorization requirement. Therefore, these products are adulterated under section 902(6)(A) of the FD&C Act (21 U.S.C. § 387b(6)(A)). In addition, these products are misbranded under section 903(a)(6) of the FD&C Act (21 U.S.C. § 387c(a)(6)) because a notice or other information respecting these products were not provided as required by section 905(j) of the FD&C Act.

**Conclusion and Requested Actions**

FDA has determined that your firm receives and delivers new tobacco products lacking premarket authorization in the United States. All new tobacco products on the market without the statutorily required premarket authorization are marketed unlawfully and are subject to enforcement action at FDA's discretion.

The violations discussed in this letter do not necessarily constitute an exhaustive list. You should address any violations that are referenced above, and promptly take any necessary actions to bring the tobacco products into compliance with the FD&C Act. It is your responsibility to ensure that these tobacco products and all related labeling and/or advertising on this website, on any other websites (including e-commerce, social networking, or search engine websites), in any other media in which you advertise, and in any retail establishments comply with each applicable provision of the FD&C Act and FDA's implementing regulations. Failure to address any violations of the FD&C Act, 21 U.S.C. § 301 et seq., and implementing regulations relating to tobacco products including the tobacco regulations in 21 C.F.R. Parts 1140, 1141, and 1143, may lead to regulatory or legal action, including, but not limited to, civil money penalties, seizure, and/or injunction. However, this Warning Letter does not constitute "written notice" for purposes of section 303(f)(9)(B)(i)(II) of the FD&C Act. Please note that tobacco products offered for import into the United States that appear to be adulterated or misbranded may be detained or refused admission.

Please submit a written response to this letter within 15 working days from the date of receipt describing your actions to address any violations and bring these products into compliance, including the dates on which you discontinued the violative labeling, advertising, sale, and/or distribution of these tobacco products and your plan for maintaining compliance with the FD&C Act. If you believe that these products are not in violation of the FD&C Act, include your reasoning and any supporting information for our consideration. This letter notifies you of our findings and provides you with an opportunity to address them. You can find the FD&C Act through links on FDA's homepage at http://www.fda.gov. (http://www.fda.gov.) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

Please note your reference number, RW2301912, in your response and direct your response via email at CTPCompliance@fda.hhs.gov and to the following address:

DPAL-WL Response, Office of Compliance and Enforcement
FDA Center for Tobacco Products
c/o Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

If you have any questions about the content of this letter, please contact Bryan Hills at (301) 796-9367 or via email at CTPCompliance@fda.hhs.gov.

Sincerely,
/S/

Ann Simoneau, J.D.
Director
Office of Compliance and Enforcement
Center for Tobacco Products

**VIA USPS, UPS, and Electronic Mail**

cc:

Breeze Smoke, LLC
Attn: Mark Faraj and Steven Haddad
450 W. Fourth St.
Royal Oak, MI 48067

Breeze Smoke
Attn: Mark Faraj and Steven Haddad
26056 Van Dyke Ave.
Warren, MI 48015

Breeze Smoke LLC
Attn: Mark Faraj and Steven Haddad
1471 E Nine Mile Rd., Unit 200
Hazel Park, MI 48030

Breeze Smoke LLC
23999 West 10 Mile Road Ste 200
Southfield, MI 48033

Dongguan Shikai Technology Co., Ltd.
Attn: Ningle Zhong
**(b)(6)**

Contract In-House Counsel and Consultants, LLC (d/b/a FDA Atty)
Attn: Marc C. Sanchez
1717 Pennsylvania Ave. NW, Suite 1025
Washington, DC 20006
msanchez@fdaatty.com

Contract In-House Counsel and Consultants, LLC (d/b/a FDA Atty)
Attn: Marc C. Sanchez
53516 Bickett
Chapel Hill, NC 27517

Smokers World
2125 Stirling Road
Fort Lauderdale, FL 33312
INFO@smokersworldhw.com

GoDaddy.com, LLC
abuse@godaddy.com

Wix.com Inc
abuse@wix.com

Was this helpful?   | Yes |   | No |

◉ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

 



SignalHire    ⋯   ✕

☑ Auto open    ☑ Enable notifications

**Welcome to SignalHire!**

SignalHire is a great way to find contact information in a couple of clicks

[ Sign in ]   OR   [ Create an account ]

*If you don't want the extension to automatically roll over, just uncheck the box!* ✕

# Scott Haddad

**Capital Sales Company, Breeze Smoke, Addall XR**

- Breeze Smoke
-  Oakland University

Detroit Metropolitan Area · **Contact info**

385 connections

Connect   ( **Message** )   ( More )

## Featured



Addall Unit      Breeze Device strawberry cream      Bree:

## Activity

463 followers

**Scott hasn't posted yet**
Recent posts Scott shares will be displayed here.

Show all activity →

## Experience

**Breeze Smoke**
Breeze Smoke
Sep 2020 - Present · 3 yrs 9 mos
Hazel Park, Michigan, United States

**Capital Sales Company**
Capital Sales Company
Jan 2012 - Present · 12 yrs 5 mos

## Education

 **Oakland University**
Master's degree, Accounting

2018 - 2020



**Wayne State University**
Bachelor's degree, Business Administration and Management, General
2013 - 2017

## Interests

Companie

SignalHire

*If you don't want the extension to automatically roll over, just uncheck the box!*  ✕

☑ Auto open      ☑ Enable notifications

214,585 followers

( + Follow )

**Welcome to SignalHire!**

SignalHire is a great way to find contact
information in a couple of clicks



**Oakland University**
121,770 followers

( + Follow )

OR

Show all companies →

Ad  •••

Insights on AI, machine learning, and more.



Keep up with the latest from Google
Research

( Follow )

## Other similar profiles

**Rafi K.** · 3rd+
Breeze Smoke LLC

( + Follow )

**Peter Elias** · 3rd+
Breeze Smoke-"Feel the Breeze"

( 🔒 Message )

**Alexander Anisimov** · 3rd+
Senior Business Development Manager I Africa+Middle East I UAE SOAK LLC
/...

( + Follow )

**Justin Samona** · 3rd+
VP Of Business Development at Wild Bill's Tobacco

( 🔒 Message )

**Jon VerLee** 🔗 · 3rd+
Restoring God's Kingdom through business.

( 🔒 Message )

Show all

People you may know



Kort McCulley, AIF, BFA, CPFA 🔗

Serving people on their journey to financial freedom and the pursuit of a bigger future!

( 👤+ Connect )

SignalHire

☑ Auto open    ☑ Enable notifications

**Welcome to SignalHire!**

SignalHire is a great way to find contact information in a couple of clicks

OR

If you don't want the extension to automatically roll over, just uncheck the box!

Jason Barton 🔗

Trusted Industry Partner for State of the Art Staffing and Recru

( 👤+ Connect )

Jawad Hafeez 🔗

Talent Acquisition Specialist @ Midwest Goods Inc. | Recruiting

( 👤+ Connect )

Dave Stumm

EVP at Stumm Insurance, LLC

( 👤+ Connect )

Show all



# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| | |
|---|---|
| Midwest Goods, Inc. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 1:23-cv-05406 |
| Breeze Smoke LLC | ) |
| _Defendant_ | ) |

**Exhibit**

**P**

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       Parkhill Properties LLC d/b/a Vape District
19398 Saratoga Trail, Strongsville, OH 44136

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A attached.

| Place: Honigman LLP<br>155 N. Wacker Dr., Suite 3100<br>Chicago, IL 60606 | Date and Time:<br><br>04/19/2024 10:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       03/29/2024

_CLERK OF COURT_

OR

_____        /s/ Vikram A. Mathrani
_Signature of Clerk or Deputy Clerk_                   _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_  Breeze Smoke LLC
, who issues or requests this subpoena, are:

Vikram A. Mathrani, vmathrani@honigman.com, Honigman LLP, 155 N. Wacker, Suite 3100, Chicago, IL 60606 (312)- 701-9313

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:23-cv-05406

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

Pursuant to Federal Rule of Civil Procedure 45, Parkhill Properties LLC d/b/a Vape District is ordered to produce and permit the inspection and copying of documents, information, and things that are in his possession, custody, or control, in response to the Requests listed in **Exhibit A**. Please produce such documents, information, and things to the place listed in the attached subpoena by April 19, 2024 at 10:00 a.m. CST.

Electronic documents such as Excel, Access, database records, audio files (such as voice mail), and video files shall be produced in their native formats, with an accompanying load file, including defined metadata. Responsive email should be produced in a format that retains the parent/child relationship, with an accompanying load file, including extracted text and defined metadata.

Responsive hard-copy documents shall be produced electronically in searchable .pdf or .tiff format. In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e. paper documents should be logically unitized).

**DEFINITIONS**

For the purposes of this Subpoena, the following terms shall have the meanings set forth below:

1.     "You," or "Your" means Parkhill Properties LLC d/b/a Vape District, the subject of this subpoena and these requests and its subsidiaries, divisions, predecessor and successor companies, affiliates, parents, any partnership or joint venture to which it may be a party, and/or each of the foregoing entities' employees, agents, officers, directors, representatives, consultants,

accountants, and attorneys, including any person who served in any such capacity at any time during the relevant time period specified herein.

2.  "Breeze Smoke" means Breeze Smoke LLC its subsidiaries, divisions, predecessor and successor companies, affiliates, parents, any partnership or joint venture to which it may be a party, and/or each of the foregoing entities' employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at any time during the relevant time period specified herein.

3.  The term "NORTH Vape" means any vaping products, including packaging, under the name "NORTH".

4.  The term "SOUTH Vape" means any vaping products, including packaging, under the name "SOUTH".

5.  "Concern," "concerns," or "concerning" means consisting of, referring to, relating to, reflecting, concerning, or being in any way logically or factually connected with the matter discussed.

6.  "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7.  "Date" means the exact day, month, and year if ascertainable, or, if not, the best available approximation (including relationship to other events).

8.  "Describe" means:

   a. Describe fully by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law;

   b. Where applicable, particularize as to (i) time; (ii) place; and (iii) manner; and

c. Set forth all relevant facts necessary to the complete understanding of the act, allegation, process, event, or thing in question.

9. "Document" is synonymous in meaning and equal in scope to its usage in Fed. R. Civ. P. 34(a)(1)(A). The term "document" refers to any document now or at any time in Applicant's possession, custody, or control. A person is deemed in control of a document if the person has any ownership, possession, or custody of the document, or the right to secure the document or a copy thereof from any person or public or private entity having physical possession thereof.

10. "Identify" with respect to a natural person or individual means to state that person's:

a. full name;

b. present or last known address; and

c. current or last known place of employment.

11. "Identify" with respect to an entity means to state its:

a. full name;

b. legal form;

c. date of organization;

d. state of incorporation or organization or other business or license authority;

e. present or last known address and telephone number; and

f. the identity of its chief executive officer, partners, or persons in equivalent positions.

12. "Identify" with respect to a document means to provide, to the extent known, the

a. type of document;

b. general subject matter of the document;

c. date of the document; and

d. author(s), addressee(s) and recipient(s).

In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Rule 33 of the Federal Rules of Civil Procedure.

13. "Identify" with respect to communications means to provide, to the extent known:

a. a description of the substance of the communication;

b. the form of the communication (e.g., telephone, facsimile, email, etc.);

c. the identity of each person that was a party to and/or present at the time of the communication, as well as the full name, present or last known address, and the current or last known place of employment of each person;

d. the identity of the person whom you contend initiated the communication; and

e. the time, date, and place of the communication.

14. The term "mark" means any word, name, symbol, or device (including any key word or metatag) or any combination thereof.

15. The term "person" means any natural person or any legal entity, including, but not limited to, any business or governmental entity, organization, or association.

## INSTRUCTIONS

A. **<u>Privilege.</u>** For each document requested that you seek to withhold under a claim of privilege, provide the following information:

    1. The privilege or privileges asserted;

    2. The place, approximate date, and manner of recording or otherwise preparing the document;

    3. The name and title of the sender and the name and title of the recipient of the document;

    4. The name of each person or persons (other than stenographic or clerical assistants) participating in the preparation of the document;

    5. The name and title of each person to whom the contents of the document has been communicated by copy, exhibition, reading, or substantial summarization;

    6. A statement of the basis on which the privilege is claimed, the subject matter of the document, and whether or not the subject matter or the contents of the document is limited to legal advice or information provided for the purpose of securing legal advice; and

    7. The name and title of the person or persons supplying the information requested in subparts 1 through 6 above.

B. **<u>Not Reasonably Accessible.</u>** For each document requested that you seek to withhold on the basis that it is not reasonably accessible because of undue burden or cost, identify the precise nature of the burden or cost involved in producing the document, and explain why you believe this cost or burden renders the document not reasonably accessible.

C. **<u>These Requests are Continuing.</u>** In the event any information of any kind whatsoever within the scope of these Requests comes to your attention after you serve your responses to these Requests, you must furnish such additional information to the fullest extent provided for under the Federal Rules of Civil Procedure and the rules of the Trademark Trial and Appeal Board. In the event any documents or materials within the scope of these Requests come to your attention or come into your possession, custody, or control after you serve your responses to these Requests, you must furnish such additional documents to the fullest extent provided for under the Federal Rules of Civil Procedure and the rules of the Trademark Trial and Appeal Board.

D. **<u>Incomplete Information.</u>** If you cannot answer any request in full, you should answer to the extent possible, explain why you cannot answer the remainder, and state the nature of the information or knowledge that you cannot furnish.

E. **<u>Construction.</u>** The following rules of construction apply to all discovery requests:

1. The singular and masculine form of any noun or pronoun shall be read to also include the plural, the feminine, and the neutral, except where circumstances clearly make it inappropriate.

2. The terms "all," "any," and "each" shall be construed as encompassing any and all.

3. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

F. **Please note that there is a standing Protective Order in the above-captioned proceeding, a copy of which is attached hereto as Exhibit B. Please review the Protective Order and mark any confidential documents accordingly.**

## EXHIBIT A

## DOCUMENTS AND THINGS REQUESTED

**REQUEST 1:**

All Communications concerning the NORTH Vape products.

**REQUEST 2:**

All invoices showing the sales of the NORTH Vape products.

**REQUEST 3:**

All purchase orders showing the purchases of the NORTH Vape products.

**REQUEST 4:**

All Communications concerning the SOUTH Vape products.

**REQUEST 5:**

All invoices showing the sales of the SOUTH Vape products.

**REQUEST 6:**

All purchase orders showing the purchases of the SOUTH Vape products.

**REQUEST 7:**

All Documents and Communications between You and Midwest Goods, Inc. concerning the NORTH and/or SOUTH Vape products.

**REQUEST 8:**

All Documents and Communications comparing the NORTH and/or SOUTH Vape products to Breeze Smoke's vape products, including but not limited to, the BREEZE PRO.

**REQUEST 9:**

All Documents and Communications referring to the NORTH and/or SOUTH Vape products as "Breeze Killer."

# UNITED STATES DISTRICT COURT
### for the
Northern District of Illinois

**Exhibit**

**Q**

Midwest Goods, Inc

_____
*Plaintiff*

v.

Breeze Smoke LLC

_____
*Defendant*

)
)
)
)
)
)
)

Civil Action No. 1:23-cv-05406

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Green Light Wholesale Inc. c/o Rabee Hamayel, Registered Agent
10200 Mulberry Ln, Unit D
Bridgeview, IL 60455-6017

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached.

| Place: Honigman LLP<br>155 N. Wacker Dr., Suite 3100<br>Chicago, IL 60606 | Date and Time:<br><br>05/31/2024 10:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/13/2024

*CLERK OF COURT*

OR

_____          /s/ Vikram A. Mathrani
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Breeze Smoke LLC
_____ , who issues or requests this subpoena, are:

Vikram A. Mathrani, vmathrani@honigman.com, Honigman LLP, 155 N. Wacker Dr. Suite 3100, Chicago, IL 60606 (312)-701-9313

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:23-cv-05406

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

Pursuant to Federal Rule of Civil Procedure 45, Green Light Wholesale, Inc. is ordered to produce and permit the inspection and copying of documents, information, and things that are in his possession, custody, or control, in response to the Requests listed in **Exhibit A**. Please produce such documents, information, and things to the place listed in the attached subpoena by May 31, 2024 at 10:00 a.m. CST.

Electronic documents such as Excel, Access, database records, audio files (such as voice mail), and video files shall be produced in their native formats, with an accompanying load file, including defined metadata. Responsive email should be produced in a format that retains the parent/child relationship, with an accompanying load file, including extracted text and defined metadata.

Responsive hard-copy documents shall be produced electronically in searchable .pdf or .tiff format. In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e. paper documents should be logically unitized).

## DEFINITIONS

For the purposes of this Subpoena, the following terms shall have the meanings set forth below:

1.      "You," or "Your" means Green Light Wholesale, Inc., the subject of this subpoena and these requests and its subsidiaries, divisions, predecessor and successor companies, affiliates, parents, any partnership or joint venture to which it may be a party, and/or each of the foregoing entities' employees, agents, officers, directors, representatives, consultants, accountants, and

attorneys, including any person who served in any such capacity at any time during the relevant time period specified herein.

2. "Breeze Smoke" means Breeze Smoke LLC its subsidiaries, divisions, predecessor and successor companies, affiliates, parents, any partnership or joint venture to which it may be a party, and/or each of the foregoing entities' employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at any time during the relevant time period specified herein.

3. The term "NORTH Vape" means any vaping products, including packaging, under the name "NORTH".

4. The term "SOUTH Vape" means any vaping products, including packaging, under the name "SOUTH".

5. "Concern," "concerns," or "concerning" means consisting of, referring to, relating to, reflecting, concerning, or being in any way logically or factually connected with the matter discussed.

6. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7. "Date" means the exact day, month, and year if ascertainable, or, if not, the best available approximation (including relationship to other events).

8. "Describe" means:

   a. Describe fully by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law;

   b. Where applicable, particularize as to (i) time; (ii) place; and (iii) manner; and

c. Set forth all relevant facts necessary to the complete understanding of the act, allegation, process, event, or thing in question.

9. "Document" is synonymous in meaning and equal in scope to its usage in Fed. R. Civ. P. 34(a)(1)(A). The term "document" refers to any document now or at any time in Applicant's possession, custody, or control. A person is deemed in control of a document if the person has any ownership, possession, or custody of the document, or the right to secure the document or a copy thereof from any person or public or private entity having physical possession thereof.

10. "Identify" with respect to a natural person or individual means to state that person's:

a. full name;

b. present or last known address; and

c. current or last known place of employment.

11. "Identify" with respect to an entity means to state its:

a. full name;

b. legal form;

c. date of organization;

d. state of incorporation or organization or other business or license authority;

e. present or last known address and telephone number; and

f. the identity of its chief executive officer, partners, or persons in equivalent positions.

12. "Identify" with respect to a document means to provide, to the extent known, the

a. type of document;

b. general subject matter of the document;

c. date of the document; and

d. author(s), addressee(s) and recipient(s).

In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Rule 33 of the Federal Rules of Civil Procedure.

13. "Identify" with respect to communications means to provide, to the extent known:

a. a description of the substance of the communication;

b. the form of the communication (e.g., telephone, facsimile, email, etc.);

c. the identity of each person that was a party to and/or present at the time of the communication, as well as the full name, present or last known address, and the current or last known place of employment of each person;

d. the identity of the person whom you contend initiated the communication; and

e. the time, date, and place of the communication.

14. The term "mark" means any word, name, symbol, or device (including any key word or metatag) or any combination thereof.

15. The term "person" means any natural person or any legal entity, including, but not limited to, any business or governmental entity, organization, or association.

## INSTRUCTIONS

A. **Privilege.** For each document requested that you seek to withhold under a claim of privilege, provide the following information:

1. The privilege or privileges asserted;

2. The place, approximate date, and manner of recording or otherwise preparing the document;

3. The name and title of the sender and the name and title of the recipient of the document;

4. The name of each person or persons (other than stenographic or clerical assistants) participating in the preparation of the document;

5. The name and title of each person to whom the contents of the document has been communicated by copy, exhibition, reading, or substantial summarization;

6. A statement of the basis on which the privilege is claimed, the subject matter of the document, and whether or not the subject matter or the contents of the document is limited to legal advice or information provided for the purpose of securing legal advice; and

7. The name and title of the person or persons supplying the information requested in subparts 1 through 6 above.

B. **Not Reasonably Accessible.** For each document requested that you seek to withhold on the basis that it is not reasonably accessible because of undue burden or cost, identify the precise nature of the burden or cost involved in producing the document, and explain why you believe this cost or burden renders the document not reasonably accessible.

C.    **These Requests are Continuing.** In the event any information of any kind whatsoever within the scope of these Requests comes to your attention after you serve your responses to these Requests, you must furnish such additional information to the fullest extent provided for under the Federal Rules of Civil Procedure and the rules of the Trademark Trial and Appeal Board. In the event any documents or materials within the scope of these Requests come to your attention or come into your possession, custody, or control after you serve your responses to these Requests, you must furnish such additional documents to the fullest extent provided for under the Federal Rules of Civil Procedure and the rules of the Trademark Trial and Appeal Board.

D.    **Incomplete Information.** If you cannot answer any request in full, you should answer to the extent possible, explain why you cannot answer the remainder, and state the nature of the information or knowledge that you cannot furnish.

E.    **Construction.** The following rules of construction apply to all discovery requests:

1.    The singular and masculine form of any noun or pronoun shall be read to also include the plural, the feminine, and the neutral, except where circumstances clearly make it inappropriate.

2.    The terms "all," "any," and "each" shall be construed as encompassing any and all.

3.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

F.    **Please note that there is a standing Protective Order in the above-captioned proceeding, a copy of which is attached hereto as Exhibit B. Please review the Protective Order and mark any confidential documents accordingly.**

<u>**EXHIBIT A**</u>

<u>**DOCUMENTS AND THINGS REQUESTED**</u>

1.      All Communications concerning the NORTH Vape products, including but not limited to all those communications related to the marketing or sale of such products.

2.      All invoices and purchase orders related to the North Vape products.

3.      Documents, including extracts or reports from your inventory management and accounting systems, showing your sales of the NORTH Vape products organized by date, SKU/flavor, customer, and number of units and dollars.

4.      Documents, including extracts or reports from your inventory management and accounting systems, showing your purchases of the NORTH Vape products organized by date, SKU/flavor, source distributor, and number of units and dollars.

5.      All Communications concerning the SOUTH Vape products, including but not limited to all those communications related to the marketing or sale of such products.

6.      All invoices and purchase orders related to the SOUTH Vape products.

7.      Documents, including extracts or reports from your inventory management and accounting systems, showing your sales of the SOUTH Vape products organized by date, SKU/flavor, customer, and number of units and dollars.

8.      Documents, including extracts or reports from your inventory management and accounting systems, showing your purchases of the SOUTH Vape products organized by date, SKU/flavor, source distributor, and number of units and dollars.

9.      All Documents and Communications between You and Midwest Goods, Inc. concerning the NORTH and/or SOUTH Vape products.

10.     All Documents and Communications between You and any other distributor or wholesaler concerning the NORTH and/or SOUTH Vape products.

11.     All Documents and Communications comparing the NORTH and/or SOUTH Vape products to Breeze Smoke's vape products, including but not limited to, the BREEZE PRO.

12.     Documents and Communications sufficient to show all customers to whom You sold the NORTH Vape products.

13.     Documents and Communications sufficient to show all customers to whom You sold the SOUTH Vape products.

14.     Documents and Communications sufficient to show Your suppliers of the NORTH Vape products.

15.     Documents and Communications sufficient to show Your suppliers of the SOUTH Vape products.

**EXHIBIT B**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,<br><br>      Plaintiff,<br><br>v.<br><br>BREEZE SMOKE LLC,<br><br>      Defendant. | CASE NO: 1:23-CV-05406<br><br>HONORABLE THOMAS M. DURKIN,<br>HONORABLE BETH W. JANTZ,<br>PRESIDING<br><br>JURY TRIAL DEMANDED |
| BREEZE SMOKE LLC,<br><br>      Counterclaim Plaintiff,<br>v.<br><br>MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLIONIS, WISEMEN WHOLESALE, INC., SPEED WHOLESALE, INC., WORLD WHOLESALE, INC., LIGHT VIEW LLC,<br><br>      Counterclaim Defendants. | |

**Agreed[1] Confidentiality Order**

The parties to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

---

[1] Counsel should include or delete language in brackets as necessary to the specific case. Any other changes to this model order must be shown by redlining that indicates both deletions and additions to the model text. Counsel may also modify this model order as appropriate for the circumstances of the case. This model order is for the convenience of the parties and the court and not intended to create a presumption in favor of the provisions in this model order and against alternative language proposed by the parties. The court will make the final decision on the terms of any order notwithstanding the agreement of the parties.

1.      Scope. All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order concerning Confidential Information and Highly Confidential Information as defined below. This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

2.      Confidential Information or Highly Confidential Information.

(a)      Confidential Information.  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" by the producing party that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) medical information concerning any individual; (c) personal identity information; (d) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; or (e) personnel or employment records of a person who is not a party to the case[2]. Information or documents that are available to the public may not be designated as Confidential Information.

(b)      Highly Confidential Information.  As used in this Order, "Highly Confidential Information" means information designated as "HIGHLY CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" by the producing party that falls within one or more of the following categories:  (a) information that reveals trade secrets; (b)

---

[2] If protection is sought for any other category of information, the additional category shall be described in paragraph 2 with the additional language redlined to show the change in the proposed Order.

research, technical, commercial or financial information that the party has maintained as confidential; (c) more sensitive or strategic information than Confidential information, the disclosure of which is likely to significantly harm the party's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

3.      Designation.

(a)      A party may designate a document as Confidential Information or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER", respectively, on the document and on all copies in a manner that will not interfere with the legibility of the document. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries or descriptions that contain the Confidential Information or Highly Confidential Information. The marking "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER" shall be applied prior to or at the time of the documents are produced or disclosed. Applying the marking "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall also be so marked, except that indices, electronic databases or lists of documents that do not contain substantial portions or

3

images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information or Highly Confidential Information are not required to be marked.

(b)     The designation of a document as Confidential Information or Highly Confidential Information is a certification by an attorney or a party appearing pro se that the document contains Confidential Information or Highly Confidential Information as defined in this order.[3]

4.     Depositions.[4]

Alternative B. Unless all parties agree on the record at the time the deposition testimony is taken, all deposition testimony taken in this case shall be treated as Highly Confidential Information until the expiration of the following: No later than the fourteenth day after the transcript is delivered to any party or the witness, and in no event later than 60 days after the testimony was given, Within this time period, a party may serve a Notice of Designation to all parties of record as to specific portions of the testimony that are designated Confidential Information or Highly Confidential Information, and thereafter only those portions identified in the Notice of Designation shall be protected by the terms of this Order. The failure to serve a timely Notice of Designation shall waive any designation of testimony taken in that deposition as

---

[3] An attorney who reviews the documents and designates them as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER must be admitted to the Bar of at least one state but need not be admitted to practice in the Northern District of Illinois unless the lawyer is appearing generally in the case on behalf of a party. By designating documents confidential pursuant to this Order, counsel submits to the jurisdiction and sanctions of this Court on the subject matter of the designation.

[4] The parties or movant seeking the order shall select one alternative for handling deposition testimony and delete by redlining the alternative provision that is not chosen.

4

Confidential Information or Highly Confidential Information, unless otherwise ordered by the Court.

5. Protection of Confidential Material.

(a) General Protections. Confidential Information or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) for any purpose whatsoever other than in this litigation, including any appeal thereof.

(b) Limited Third-Party Disclosures. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any third person or entity except as set forth in subparagraphs (1)-(9). The parties and counsel for the parties shall not disclose or permit the disclosure of any Highly Confidential Information to any third person or entity except as set forth in subparagraphs (1), (3)-(9). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information and Highly Confidential Information, except that for clarity, the categories of persons in subparagraph (2) shall not be permitted to review Highly Confidential Information:

(1) Counsel. Counsel for the parties and employees of counsel who have responsibility for the action;

(2) Parties. Individual parties and employees of a party but only to the extent counsel determines in good faith that the employee's assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed;

(3) The Court and its personnel;

(4) Court Reporters and Recorders. Court reporters and recorders engaged for depositions;

5

(5) Contractors. Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(6) Consultants and Experts. Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound;

(7) Witnesses at depositions. During their depositions, witnesses in this action to whom disclosure is reasonably necessary. Witnesses shall not retain a copy of documents containing Confidential Information or Highly Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information or Highly Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(8) Author or recipient. The author or recipient of the document (not including a person who received the document in the course of litigation); and

(9) Others by Consent. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c) Control of Documents. Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information or Highly Confidential Information. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

6. Inadvertent Failure to Designate. An inadvertent failure to designate a document as Confidential Information or Highly Confidential Information does not, standing alone, waive the right to so designate the document; provided, however, that

6

a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony. If a party designates a document as Confidential Information or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order. No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information or Highly Confidential Information.

7. Filing of Confidential Information or Highly Confidential Information. This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as Confidential Information or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with LR 26.2.

8. No Greater Protection of Specific Documents. Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

9. Challenges by a Party to Designation as Confidential Information or Highly Confidential Information. The designation of any material or document as

7

Confidential Information or Highly Confidential Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

(a)    Meet and Confer. A party challenging the designation of Confidential Information or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within five (5) business days.

(b)    Judicial Intervention. A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements of this procedure. The burden of persuasion in any such challenge proceeding shall be on the designating party. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or Highly Confidential Information under the terms of this Order.

10.    Action by the Court. Applications to the Court for an order relating to materials or documents designated Confidential Information or Highly Confidential Information shall be by motion. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

8

11.     Use of Confidential or Highly Confidential Documents or Information at Trial. Nothing in this Order shall be construed to affect the use of any document, material, or information at any trial or hearing. A party that intends to present or that anticipates that another party may present Confidential information or Highly Confidential Information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the Confidential Information or Highly Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

12.     Confidential Information or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation.

(a)     If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

9

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential Information or Highly Confidential Information in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential Information or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential Information or Highly Confidential Information by the other party to this case.

13.     Challenges by Members of the Public to Sealing Orders. A party or interested member of the public has a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

14.     Obligations on Conclusion of Litigation.

(a)     Order Continues in Force. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)     Obligations at Conclusion of Litigation. Within sixty-three days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information or Highly Confidential Information and documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" under this Order, including copies as defined in ¶ 3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent practicable in lieu of return;[5] or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so.

(c)     Retention of Work Product and one set of Filed Documents. Notwithstanding the above requirements to return or destroy documents, counsel may retain (1) attorney work product, including an index that refers or relates to designated Confidential Information or Highly Confidential Information so long as that work product does not duplicate verbatim substantial portions of Confidential Information or Highly Confidential Information, and (2) one complete set of all documents filed with the Court including those filed under seal. Any retained Confidential Information or Highly Confidential Information shall continue to be protected under this Order. An attorney may use his or her work product in subsequent litigation, provided that its use does not disclose or use Confidential Information or Highly Confidential Information.

---

[5] The parties may choose to agree that the receiving party shall destroy documents containing Confidential Information or Highly Confidential Information and certify the fact of destruction, and that the receiving party shall not be required to locate, isolate and return e-mails (including attachments to e-mails) that may include Confidential Information or Highly Confidential Information, or Confidential Information or Highly Confidential Information contained in deposition transcripts or drafts or final expert reports.

(d)     Deletion of Documents filed under Seal from Electronic Case Filing (ECF) System. Filings under seal shall be deleted from the ECF system only upon order of the Court.

15.     Order Subject to Modification. This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

16.     No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information by counsel or the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

17.     Persons Bound. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

So Ordered.

Dated: 2/20/2024

_____
Honorable Beth W. Jantz
U.S. Magistrate Judge

WE SO MOVE
and agree to abide by the
terms of this Order

WE SO MOVE
and agree to abide by the
terms of this Order

/s/ Drew G.A. Peel
Drew G.A. Peel
**RACHLIS DUFF & PEEL, LLC**
542 South Dearborn Street, Suite 900
Chicago, IL 60605
(312) 275-0337 (direct)
dpeel@rdaplaw.net

Stephen L. Levine (admitted *pro hac vice*)
Kelli M. Hinson (admitted *pro hac vice*)
Mark C. Howland (*pro hac vice*
application forthcoming)
**CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, TX 75202
(214) 855-3000 (gen.)
slevine@ccsb.com
khinson@ccsb.com
mhowland@ccsb.com

*Counsel for Midwest Goods Inc., dba
Midwest Distribution Illinois*

/s/ Mary A. Hyde
Mary A. Hyde
Vikram A. Mathrani
William B. Berndt
Jenna E. Saunders
David J. Roulo
**HONIGMAN LLP**
155 N Upper Wacker Dr. Ste 3100
Chicago, IL 60606-1734
mhyde@honigman.com
vmathrani@honigman.com
wberndt@honigman.com
jsaunders@honigman.com
droulo@honigman.com

Jeffrey K. Lamb
**HONIGMAN LLP**
660 Woodward Avenue, Ste 2290
Detroit, MI 48226-3506
jlamb@honigman.com

*Counsel for Breeze Smoke LLC*

/s/Anthony Scarpiniti
Mason S Cole
Anthony Scarpiniti
**COLE SADKIN, LLC**
1652 W Belmont Ave, Ste 1
Chicago, IL 60657
mcole@colesadkin.com

*Counsel for Wisemen Wholesale, Inc.
and World Wholesale, Inc.*

**ATTACHMENT A**

| | |
|---|---|
| MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLINOIS,<br><br>      Plaintiff,<br><br>v.<br><br>BREEZE SMOKE LLC,<br><br>      Defendant. | CASE NO: 1:23-CV-05406<br><br>HONORABLE THOMAS M. DURKIN,<br>HONORABLE BETH W. JANTZ,<br>PRESIDING<br><br>JURY TRIAL DEMANDED |
| BREEZE SMOKE LLC,<br><br>      Counterclaim Plaintiff,<br>v.<br><br>MIDWEST GOODS INC., dba MIDWEST DISTRIBUTION ILLIONIS, WISEMEN WHOLESALE, INC., SPEED WHOLESALE, INC., WORLD WHOLESALE, INC., LIGHT VIEW LLC,<br><br>      Counterclaim Defendants. | |

## ACKNOWLEDGMENT
## AND
## AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she has read the Confidentiality

Order dated _____ in the above-captioned action and

attached hereto, understands the terms thereof, and agrees to be bound by its terms.

The undersigned submits to the jurisdiction of the United States District Court for the

Northern District of Illinois in matters relating to the Confidentiality Order and

understands that the terms of the Confidentiality Order obligate him/her to use materials

14

designated as Confidential Information or Highly Confidential Information in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information or Highly Confidential Information to any other person, firm or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

Date: _____     _____

Signature

Adopted 06/29/12

15

| | |
|---|---|
| **From:** | Drew Work <dpeel@rdaplaw.net> |
| **Sent:** | Friday, July 5, 2024 6:27 PM |
| **To:** | David J. Roulo |
| **Cc:** | Mason Cole; Anthony Scarpiniti; Steve L. Levine; Mark C. Howland; Kelli M. Hinson; Ania Watychowicz; Jeffrey K. Lamb; Sarah E. Waidelich; Vikram A. Mathrani; Jenna E. Saunders |
| **Subject:** | Re: [EXTERNAL] Midwest Goods v. Breeze Smoke - Breeze Smoke's Positions on Discovery Issues |

> **WARNING:** This email originated from outside our email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All —

Midwest's proposal with respect to the granular customer sales information Breeze is demanding is as follows:

(a) as to Midwest customers whose identities already are known to Breeze (*i.e.*, Counterclaim Defendants & third parties subpoenaed to date), Midwest already has provided and/or will provide more granular sales information for these customers (purchase orders & invoices, and unredacted ESI identifying these customers) that is otherwise responsive (*i.e.*, is within the ESI that hits on the search terms, and is responsive to one or more of Breeze's production requests as the same have been limited by agreement of the parties), except that Midwest will redact from invoices, etc. information regarding purchases of goods and services other than the accused NORTH or SOUTH products;

(b) as to other customers, Midwest will provide email and other ESI that is otherwise responsive (*i.e.*, is within the ESI that hits on the search terms, and is responsive to one or more of Breeze's production requests as the same have been limited by agreement of the parties), but with customer identification information (i.e., email addresses, customer names, customer addresses, etc.) redacted;

(c) as to subpoenas, cease-and-desist letters, and lawsuits (or additional counterclaims) directed to third-party Midwest customers, a moratorium will be placed on the same until party discovery is completed and any summary judgment motions addressed to liability are resolved.



**Exhibit**

**R**

exhibitsticker.com

Insofar as Breeze believes, after receiving documents with redacted customer identification information, it has a bona fide need for the disclosure of the customer identification information that has been redacted from particular documents, then the parties will meet-and-confer regarding those particular documents in an effort to resolve any disputes respecting the same, and, if unsuccessful, Breeze may then move to compel disclosure of customer identification information that has been redacted. We believe such an approach, among other things, appropriately balances Midwest's competitive concerns related to the disclosure of customer identification information with Breeze's purported need for discovery of the same information, and it will assure that any disputes brought before the court are not hypothetical but pertain to particular documents whose contents the court can review *ex parte* and *in camera* insofar as is necessary.

Finally, Midwest continues to believe that discovery in this matter should be staged, with discovery addressed to liability for purported trade dress infringement and design patent infringement completed first, and dispositive motions regarding the same briefed and decided, before discovery relevant only to damages and other remedies is completed.

Best regards,

Drew Peel

***********************************

Drew G.A. Peel
RACHLIS DUFF & PEEL, LLC
542 South Dearborn, Suite 900
Chicago, IL 60605
Direct: (312) 275-0337
Fax: (312) 733-3952
Mobile: (708) 227-6653
Email: dpeel@rdaplaw.net
Website: www.rdaplaw.net

EMAIL CONFIDENTIALITY NOTICE

This transmission may be subject to: (1) the attorney-client privilege; (2) the attorney work product privilege; or (3) strictly confidential. If you are not the intended recipient, you may not disclose, print, copy or disseminate this information. If you believe that you have received this email in error, then please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail is a violation of federal criminal law.

> On Jul 5, 2024, at 5:02 PM, Roulo, David J. <DRoulo@honigman.com> wrote:
>
> All,

Below are Breeze Smoke's positions on the various discovery issues that it believes are ripe for resolution at this time.

**Sales and Purchase Data for NORTH and SOUTH**

Breeze Smoke's proposal to Midwest regarding sales and purchase data for the NORTH and SOUTH products is as follows. Midwest should produce detailed sales information, including invoices, purchase orders, and summary purchase and sales data exported from Midwest's inventory or accounting system that shows (1) Midwest's supplier (for purchasers) and Midwest's customers (for sales), (2) SKU, (3) flavor, (4) quantity, (5) date, (6) number of units purchased/sold, (7) price. Midwest should also produce all its communications with its customers. Provided Breeze Smoke receives these documents and communications, it will refrain from sending cease and desist letters to Midwest's customers. It will also only subpoena a subset of Midwest's customers only for their sales information and communications with their further downstream customers.

Given the protective order in this case, Breeze Smoke does not agree that any information should be redacted. Rather information deemed sensitive by any party should be marked "Highly Confidential" pursuant to the protective order.

**Staging Discovery**

Breeze Smoke does not agree to stage, phase, or bifurcate discovery. There is no distinction between a "liability" and "damages" phase in this case. The information Midwest seeks to delay producing until the "damages" phase is directly relevant to its liability as it relates to at least intent to copy and secondary meaning.

**Breeze Smoke Custodians**

Breeze Smoke has identified the following custodians: Steven Haddad, Scott Haddad, Mark Faraj (Mark Kareem), Rafi Kashat, and Melissa Brady. In addition, Breeze Smoke will be collecting emails from the Breeze Smoke Customer Service email—info@breezesmoke.com. Furthermore, Breeze Smoke does not own any factories in China and therefore there are no relevant custodians in China or at Breeze Smoke's supplier.

**Wisemen/World/Light View**

Breeze Smoke requests communications between (1) Wisemen World, and Light View and Midwest and (2) Wisemen World, and Light View and their customers concerning the NORTH, SOUTH, and/or BREEZE products. Additionally, Wisemen and World should supplement their sales and purchase summaries on a routine basis as the case progresses. Finally, Light View should produce evidence that it has ceased all operations.

Thank you,

David Roulo

David J. Roulo

_____

**HONIGMAN LLP**

O   312.429.6049
M   708.466.0687
droulo@honigman.com

This e-mail may contain confidential or privileged information.  If you are not the intended recipient, please delete it and notify the sender of the error.